UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| AIDA ELZAGALLY, as the wife of MSADDEK TUNALLI, deceased | ) ) ) |
| AYAH TUNALLI, as the daughter of MSADDEK TUNALLI, deceased et.al | ) ) ) |
| | ) Case No. 1:19-cv-00853-LMB-MSN |
| Plaintiffs | ) ) ) ) ) |
| KHALIFA HAFTAR, individually last known address in Libya | ) ) ) ) |
| Defendant | ) |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR DEFAULT JUDGMENT PRUSUANT TO FED. R. CIV. P 55(B)**

COMES NOW Plaintiffs Aida Elzagally et. al and respectfully request this Court enter a Default Judgment against Defendant in this matter.

FACTUAL BACKGROUND

In 1969, Haftar was a cadet and was a participant in the coup led by Colonel Muammar Ghaddafi to overthrow the government of the King of Libya. From then, Haftar was a close ally of Ghaddafi. At times Haftar referred to Ghadaffi as his father. Eventually, Haftar was a senior military leader in the Libyan Army under Ghadaffi. Pl. Compl. ¶¶ 19-21.

In or around 2015, Defendant Haftar left the United States and went to Libya. In Libya, Haftar raised a militia of various soldiers, some from outside Libya, whose only interest was either money or destructions. Upon information and belief, a lot of forces of Haftar were former fighters of ISIS, Taliban or fought in the Syrian civil war. Pl. Compl. ¶¶ 22-24.

Haftar formed the Libyan National Army ("LNA") and declared himself Field Marshall and head of the Army. Through the LNA, Haftar, through force, captured most of Eastern Libya. Then the Government of Libya officially appointed Haftar head of all its armed forces. Pl. Compl. ¶¶ 25-27.

Haftar, since 2015, has been marching to Tripoli and has been killing and bombing civilians. Haftar's forces have been killing innocent women and children without any regard for human life. Haftar's forces specifically target civilian neighborhoods and hospitals. Haftar's forces show extreme brutality and then celebrate killing civilians. Upon information and belief, Haftar's forces, on his orders, have killed over one thousand (1000) people. Pl. Compl. ¶¶ 28-32.

On April 4, 2019, Msaddek Tunalli was evacuating women and children from an area being indiscriminately bombed by Haftar's forces in the in the Ayan Zarah District. Haftar's forces were randomly shelling the entire area. At approximately 4:45pm, one of the mortars fell on Msaddek Tunalli, killing him. The medical examiner stated that Msaddek Tunalli's death is a result of multiple infliction wounds to the head, shoulders, stomach, and arms, which resulted in severe skull damage and sever damage to the brain and internal bleeding in the brain. The weapons used were multiple artillery rounds and mortar shells. The heart, lungs and stomach were severely punctured with internal bleeding as well, which resulted in loss of oxygen to the brain and suffocation. The right elbow was fractured. The angle of penetration was from the back, from the right side of the brain and from the back side of the arms, while the angle of exit was from the stomach area. The medical examiner stated that Msaddek Tunalli's body was free of alcohol or any other poisonous substances. The medical examiner found two shrapnel fragments in the front side of Msaddek Tunalli's lungs and has preserved them. The

indiscriminate shelling was not necessary on behalf of Haftar. The indiscriminate shelling was the direct cause of Msaddek Tunalli's death. Pl. Compl. ¶¶ 33-40.

Msaddek Tunalli was a husband to Plaintiff Aida Elzagally and a father to six children: Plaintiffs Ayah Tunalli, Alaa Tunalli, Abdulhameed Tunalli, Adbulrrauf Tunalli, Muhammad Tunalli, and Adbuladeem Tunalli. The Plaintiffs named above are not left without a husband and father and the only financial support. Plaintiffs Ayah Tunalli, Alaa Tunalli, Abdulhameed Tunalli, Adbulrrauf Tunalli, Muhammad Tunalli, and Adbuladeem Tunalli are severely traumatized by the loss of their father. Due to the loss of her father, Ayah Tunalli is psychologically unstable and having nightmares. Pl. Compl. ¶¶ 41-44.

On April 16, 2019, Haftar and his forces launched missiles into the civilian neighborhood of Hay Alintassar in Trippoli in which Mufida Sasi Abu Gasiah, her mother, sister, and young daughter lived. Defendant knew that there were numerous civilians living in this neighborhood. He knew that there were women and children present. Yet without any regard for human life, Defendant Haftar still launched missiles into the Hay Alintassar, Trippoli. Mufida Sasi Abu Gasiah, along with her mother, sister, and young daughter, lived on Tariq Al Matar road in the neighborhood of Hay Alintassar, Trippoli. Mufida Sasi Abu Gasiah, her mother and sister were all killed by the missile strike on April 16, 2019. Pl. Compl. ¶¶ 45-49.

Plaintiff Mais Ahmed Mayouf was the only survivor of the brutal attack. She was taken to the hospital for observations but was then released. Plaintiff Mais Ahmed Mayouf suffers from severe emotional trauma. She suffers from severe depression and refuses to eat or engage in any social activities. Plaintiff Mais Ahmed Mayouf father took her on vacation in hopes of helping her recover, but she would hardly leave the hotel room and would not go to any

restaurant to eat. Her father had to bring the food to her room. It is clear that Plaintiff Mais Ahmed Mayouf will suffer long term effects from the bombing. Pl. Compl. ¶¶ 50-53.

Plaintiff Abdulhameed Al-Harramah's son, Dr. Ayman Al-Harramah, was always dedicated and committed to humanitarian work. He worked alongside the Children's Hospital as a member of many civil society organizations related to humanitarian activities. He and his colleagues founded the "All Doctors Foundation" before the revolution of 2011. It provided a variety of services, including the distribution of recordings of additional lectures that medical students and other students were unable to attend or have no material resources. Pl. Compl. ¶¶ 54-55.

On April 6, 2019, in the Spring Valley area, also known in Arabic as "Wady Al- Rabii", Dr. Ayman al-Harramah was doing his work providing medical care and saving lives in a civilian field hospital when Defendant Haftar indiscriminately bombed the hospital, killing Dr. Ayman al-Harramah. Plaintiff Abdulhameed Al-Harramah is grief stricken about the loss of his son. Pl. Compl. ¶¶ 56-57.

At all times, Haftar was acting under color of authority as the military head of the Libyan forces. Haftar was officially appointed head of the forces by the Assembly of Libya. Haftar's actions are against the Laws of Nation and United Nations regulations, Geneva Convetion and the Article 7, Crimes Against Humanity, of the Rome Statute of the International Criminal Court of Justice. Pl. Compl. ¶¶ 61-63.

PROCEDURAL HISTORY

Under the Federal Rules of Civil Procedure, obtaining default judgment against a party is a two-step process. Pursuant to Fed. R. Civ. P. 55(a), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by

affidavit or otherwise, the clerk must enter the party's default." Once the clerk has entered the party's default, the party seeking default judgment must apply, under Fed. R. Civ. P. 55(b)(2), to the court for a default judgment. The Clerk has already entered default against the Defendant Khalifa Haftar. Entry of a default judgment against Khalifa Haftar is now appropriate.

## LEGAL STANDARD

Rule 55 of the Federal Rules of Civil Procedure provides for the entry of default judgment when "a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend." A defendant in default admits the factual allegations in the complaint. Fed R. Civ. P. 8(b)(6) ("An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is required and the allegation is not denied."); *see also GlobalSantaFe Corp. v. Globalsantafe.com*, 250 F. Supp. 2d 610, 612 n.3 (E.D. Va. 2003) ("Upon default, facts alleged in the complaint are deemed admitted and the appropriate inquiry is whether the facts alleged state a claim.")

The party seeking default judgment has the burden of establishing both subject-matter jurisdiction over the claims and personal jurisdiction over the defendants. *See, e.g., FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1091, 381 U.S. App. D.C. 383 (D.C. Cir. 2008) ("The plaintiffs have the burden of establishing the court's personal jurisdiction over [the defendants]."); *Khadr v. United States*, 529 F.3d 1112, 1115, 381 U.S. App. D.C. 408 (D.C. Cir. 2008)("[T]he party claiming subject matter jurisdiction . . . has the burden to demonstrate that it exists."). Establishing personal jurisdiction over the Defendant includes the burden to provide evidence of proper service upon him. *See Federal Deposit Ins. Corp. v. Schaffer*, 731 F.2d 1134, 1135 (4th Cir. 1984) ("[A]bsent effective service of process, a court is without jurisdiction to render a personal judgment against a defendant…").

Further, in assessing damages, "a district court entering a default judgment may award damages ascertainable from the pleadings." *Anderson v. Found, for Advancement. Educ. & Emp't of Am. Indians*, 155 F.3d 500, 507 (4th Cir. 1998).

ARGUMENT

**1. This Court has jurisdiction over Defendant Haftar.**

In this matter, the Court is the appropriate authority that has both subject matter jurisdiction and personal jurisdiction over the Defendant.

    **a. This Court has subject matter jurisdiction over Defendant.**

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the Plaintiff's claims arise under the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C.S. § 1350 note. Further, this Court has subject matter jurisdiction for all other claims of Plaintiffs falling under state law tort claims under 28 U.S.C. § 1367 because they form part of the same case or controversy and share a common nucleus of operative fact with her federal law claims.

    **b. This Court has personal jurisdiction over Defendant.**

This Court is able to hear the complaints against Defendant Haftar in this matter because it has personal jurisdiction over Defendant Haftar, a United States Citizen with substantial ties to the forum. Further, Defendant Haftar was properly served under the Federal Rules of Civil Procedure.

        **i. Defendant Haftar is a United States citizen who owns property within the State of Virginia.**

Defendant Haftar obtained his United States citizenship in the 1990s, living in northern Virginia while in exile. He purchased property in Falls Church, Virginia in 1995 located at 5505 Seminary Road, Apt 2310, Falls Church, VA 22041. (Please see Exh. 1). Defendant lived at this property for around two decades. During that time, Defendant Haftar voluntarily became a United

States citizen. It was from this property in Virginia that he was able to continue to cultivate support in Libya and begin the formation of the Libyan National Army ("LNA"). Defendant Haftar received the rights and liberties of a United States citizen from the safety of his home in Northern Virginia while preparing his plan to become the head of the head of the Libyan Armed Forces. Defendant Haftar continues to own this property in Virginia which is also tied to his son, Okba Haftar, who, along with Haftar's children, are believed to reside in the state of Virginia. (Please see Exhs. 2, 3).

Given Defendant's substantial connections to the forum, Haftar should expect being called into court in the Eastern District of Virginia. Given Defendant Haftar's receipt of rights and liberties as a United States citizen after being exiled and use the safety of this forum to build his power in the Libyan government, the Eastern District of Virginia has the right to subject Defendant Haftar to penalty for his wrongful acts that killed thousands of people including the family members of the Plaintiffs in this matter.

### ii. Defendant Haftar was served properly in accordance with Fed. Rule Civ. Pro. R. 4(f)(2)(A).

Federal Rule of Civil Procedure 4(f)(2)(A) provides that

> (f) Service . . . may be effected in a place not within any judicial district of
> the United States:
> * * *
> (2) if there is no internationally agreed means of service or the applicable
> international agreement allows other means of service, provided that service
> is reasonably calculated to give notice:
> (A) in the manner prescribed by the law of the foreign country for service
> in that country in an action in any of its courts of general jurisdiction[.]

Defendant Haftar was served on November 25, 2019 through alternative international service and by publication as shown in the Affidavit of Service [ECF Doc. No. 8]. These methods of service are allowed under Libyan law to notify a defendant of a lawsuit against them. Further,

service by publication is a method allowed under the Federal Rules of Civil Procedure and is reasonably calculated to give notice.

2. **The Complaint alleges facts establishing all the necessary elements of one or more claims upon which relief can be granted.**

In their Complaint, Plaintiffs have sufficiently alleged at least one claim for entitlement of damages. Specifically, Plaintiffs have alleged facts which establish the necessary elements for the Torture Victim Protection Act and for Wrongful Death.

    a. The Complaint sufficiently alleges a claim for relief under the Torture Victim Protection Act.

As explained by the United States Supreme Court, the TVPA makes available to all individuals, not just foreign citizens, a civil cause of action for torture and extrajudicial killing that may be brought against natural persons. *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1432 (2018). *See also Mohamad v. Palestinian Authority*, 566 U. S. 449, 451-452, 454 (2012). Specifically, the Act states that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation—

"(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

"(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.For the purposes of the TVPA, "the term 'extrajudicial killing' means a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international

law, is lawfully carried out under the authority of a foreign nation." 28 U.S.C.S. § 1350 note. Further,

> the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind…

*Id*.

As set forth in the Complaint, Haftar was officially appointed by the Government of Libya as head of all its armed forces. Pl. Compl. ¶ 27. Further, Plaintiffs are foreign citizens who are family members of individuals who were extrajudicially killed by Haftar's orders to bomb locations in Libya while he was head of the armed forces of Libya. Specifically, Msaddek Tunalli was killed by Haftar's deliberate and indiscriminate bombing in the Ayan Zarah District on April 4, 2019. Pl. Compl. ¶ 33-40. On April 16, 2019, Haftar and his forces launched missiles into the civilian neighborhood of Hay Alintassar in Trippoli in which Mufida Sasi Abu Gasiah, her mother, sister, and young daughter lived, killing them all. Pl. Compl. ¶ 45-49. Further, On April 6, 2019, in the Spring Valley area, also known in Arabic as "Wady Al-Rabii", Dr. Ayman al-Harramah was doing his work providing medical care and saving lives in a civilian field hospital when Defendant Haftar indiscriminately bombed the hospital, killing Dr. Ayman al-Harramah. Pl. Compl. ¶ 56. Thus, Plaintiffs have alleged sufficient facts for a valid claim of the Torture Victim Protection Act of 1991.

  b. The Complaint sufficiently alleges claim for Wrongful Death.

In their Complaint, Plaintiffs also bring tort claims of Wrongful Death against Defendant Haftar. Va. Code Ann. § 8.01-50 states

> Whenever the death of a person shall be caused by the wrongful act, neglect, or default of any person or corporation, or of any ship or vessel, and the act, neglect, or default is such as would, if death had not ensued, have entitled the party injured to maintain an action, or to proceed in rem against such ship or vessel or in personam against the owners thereof or those having control of her, and to recover damages in respect thereof, then, and in every such case, the person who, or corporation or ship or vessel which, would have been liable, if death had not ensued, shall be liable to an action for damages, or, if a ship or vessel, to a libel in rem, and her owners or those responsible for her acts or defaults or negligence to a libel in personam, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances, as amount in law to a felony.

Here, Plaintiffs sufficiently allege that Defendant Haftar caused the indiscriminate bombing the Ayan Zarah District, the neighborhood of Hay Alintassar in Trippoli, and the area of Wady Al-Rabii which resulted in the deaths of Plaintiffs' close relatives. Specifically, Msaddek Tunalli was killed by Haftar's deliberate and indiscriminate bombing in the Ayan Zarah District on April 4, 2019. Pl. Compl. ¶ 33-40. On April 16, 2019, Haftar and his forces launched missiles into the civilian neighborhood of Hay Alintassar in Trippoli in which Mufida Sasi Abu Gasiah, her mother, sister, and young daughter lived, killing them all. Pl. Compl. ¶ 45-49. Further, On April 6, 2019, in the Spring Valley area, also known in Arabic as "Wady Al-Rabii", Dr. Ayman al-Harramah was doing his work providing medical care and saving lives in a civilian field hospital when Defendant Haftar indiscriminately bombed the hospital, killing Dr. Ayman al-Harramah. Pl. Compl. ¶ 56. Thus, Plaintiffs have sufficiently alleged that the deaths of their family members were caused by the wrongful acts of Defendant Haftar and are entitled to damages.

3. **Plaintiffs are individuals entitled to receive damages on behalf of those killed by Defendant Haftar.**

Under the TVPA, individuals who may be claimants under the action are those "who may be [] claimant[s] in an action for wrongful death." 28 U.S.C. § 1350, note § 2(a)(2) (2006). The TVPA "suggests looking to state law for 'guidance' regarding which parties would be proper wrongful death claimants and permits suit 'by the victim or the victim's legal representative or a beneficiary in a wrongful death action.'" *Sikhs for Justice Inc. v. Indian Nat'l Cong. Party*, 17 F. Supp. 3d 334, 346 (S.D.N.Y. 2014)(emphasis added)(quoting S. Rep. No. 102-249 at *7 (1991)), aff'd sub nom. *Sikhs for Justice, Inc. v. Nath*, 596 F. App'x 7 (2d Cir. 2014); see also *Baloco ex rel. Tapia v. Drummond Co.*, 640 F.3d 1338, 1349 (11th Cir. 2011) ("[S]tate law should govern the determination of whether a plaintiff is a claimant in an action for wrongful death and, where state law would provide no remedy, a court may apply the foreign law that would recognize the plaintiff's claim."). Pursuant to Va. Code § 8.01-52, damages for wrongful death

> shall be distributed as specified under § 8.01-54 to (i) the surviving spouse, children of the deceased and children of any deceased child of the deceased, and the parents of the decedent if any of such parents, within 12 months prior to the decedent's death, regularly received support or regularly received services from the decedent for necessaries, including living expenses, food, shelter, health care expenses, or in-home assistance or care, or (ii) if there be none such, then to the parents, brothers and sisters of the deceased, and to any other relative who is primarily dependent on the decedent for support or services and is also a member of the same household as the decedent or (iii) if the decedent has left both surviving spouse and parent or parents, but no child or grandchild, the award shall be distributed to the surviving spouse and such parent or parents or (iv) if there are survivors under clause (i) or clause (iii), the award shall be distributed to those beneficiaries and to any other relative who is primarily dependent on the decedent for support or services and is also a member of the same household as the decedent or (v) if no survivors exist under clause (i), (ii), (iii), or (iv), the award shall be distributed in the course of descents as provided for in § 64.2-200.

The Plaintiffs in this case are all close family members of decedents that are entitled to recover under the wrongful death statute. Aida Elzagally, is the surviving spouse of Msaddek Tunalli, and their children, Ayah Tunalli, Alaa Tunalli, Abdulhammed Tunalli, Abdulrauff Tunalli,

Muhammad Tunalli, and Abduladeem Tunalli, are all entitled to damages under the statute. (Please see Exh. 4). Further, Mais Ahmed Mayouf is the birth daughter of Mufida Sasi Abu Gasiah and is entitled to damages under the wrongful death statute. (Please see Exh. 5). Last, Abdulhameed Al-Harramah is the father of the decedent, Dr. Ayman Al-Harramah, who left no spouse or children. (Please see Exh. 6). Thus, all plaintiffs in this matter are entitled to damages under the TVPA and wrongful death statutes.

Dated: January 31, 2020                                          Respectfully Submitted,

/s/ Faisal Gill
Faisal Gill (#VSB 93255)
Gill Law Firm
1155 F Street NW
Suite 1050
Washington DC 20005
202-570-8223
202-318-5331 (fax)
fgill@glawoffice.com
*Counsel for Plaintiffs*