1

1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF VIRGINIA
2                   ALEXANDRIA DIVISION

3    ------------------------------x
                                    :
4    AIDA ELZAGALLY, et al.,        : Criminal Action No.
                                    :
5                       Plaintiffs,:
                                    :
6            versus                 : 1:19-cv-853 and 1:20-cv-170
                                    :
7    KHALIFA HAFTAR, et al.,        : September 29, 2020
                                    :
8                    Defendants.:
     ------------------------------x
9

        The above-entitled Motions hearing was heard, via
10   teleconference, before the Honorable Leonie M. Brinkema,
     United States District Judge.

11
                       A P P E A R A N C E S
12

13    FOR THE PLAINTIFFS:      FAISAL M. GILL, ESQ.
                               Gill Law Firm
14                             1155 F Street
                               Suite 1050
15                             Washington, DC 20004

16                             KEVIN T. CARROLL, ESQ.
                               Wiggin Dana LLP
17                             800 17th Street NW
                               Suite 520
18                             Washington, DC 200006

19

20    FOR THE DEFENDANTS:      EDWARD J. UNGVARSKY, ESQ.
                               Ungvarsky Law PLLC
21                             114 North Alfred Street
                               Alexandria, VA 22314

22                             DUNCAN P. LEVIN, ESQ.
                               Tucker Levin, PLLC
23                             230 Park Avenue, Suite 440
                               New York, New York 10169

24

25

2

1    OFFICIAL U.S. COURT REPORTER:       MS. TONIA M. HARRIS, RPR
                                         United States District Court
2                                        401 Courthouse Square
                                         Fifth Floor
3                                        Alexandria, VA 22314

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

─────Elzagally v. Haftar─────

3

1                    **P R O C E E D I N G S**

2    (Court proceedings commenced at 11:56 a.m.)

3              THE COURT:  All right.  I'm going to call first the

4    case of Aida Elzagally, et al., versus Khalifa Haftar.  Civil

5    action 19-853.

6              All right.  And we have counsel for that case?

7              MR. GILL:  Yes, Your Honor.  Faisal Gill for the

8    plaintiffs.

9              MR. LEVIN:  Good afternoon, Your Honor.  Duncan

10   Levin for defendant, Khalifa Haftar.

11             THE COURT:  All right.  Now, this is a case

12   involving seven counts.  We have the Alien Tort Claim Act.  We

13   have the Torture Victim Protection Act.  And then we have five

14   Virginia state law claims.

15             And we have before us today the defendant's motion

16   to dismiss, which raises multiple grounds, some of which

17   dovetail with the other case, which is 20-cv-170.  Which there

18   is an overlap of some of these issues about whether we have a

19   political question involved here, whether the claims are

20   justiciable.  We have -- so there is an overlap.  I'm

21   assuming, however, that we should -- I'm not assuming, I'm

22   going to assume that we should take the two cases, to some

23   degree, separately.

24             Has there -- I want to ask defense counsel -- and

25   who is going to be the main spokesperson for the defense?

Elzagally v. Haftar

4

1          MR. LEVIN:  I'm sorry, Your Honor?

2          THE COURT:  Who is the main spokesperson?

3          MR. LEVIN:  This is Duncan Levin.

4          THE COURT:  All right.  Mr. Levin, you're going to

5    be in both cases?

6          MR. LEVIN:  Yes, Your Honor.  In this case, the --

7    if I may refer to them just as a shorthand.  One starts with

8    2019, and one starts with 2020.  So if it pleases the Court, I

9    could refer to one as the '19 case and one as the '20 case.

10          THE COURT:  We're on -- we're on '19 right now.

11          MR. LEVIN:  Correct.  And so, for this case, I

12    represent defendant, Khalifa Haftar.  And on the '20 case, I

13    represent three defendants:  Khalifa Haftar and his two sons,

14    Khalid and Saddam Haftar.

15          THE COURT:  Right.  I recognize that.

16          All right.  And we have a different group of

17    plaintiffs and we have different plaintiff's counsel, correct?

18          MR. GILL:  Yes, Your Honor.

19          THE COURT:  All right.  But I want to look at 853,

20    the '19 case first.

21          MR. LEVIN:  Yes, Your Honor.

22          MR. GILL:  Yes, Your Honor.

23          THE COURT:  All right.  Mr. Gill.

24          MR. GILL:  Yes, Your Honor.

25          THE COURT:  All right.  What actual evidence do you

─────Elzagally v. Haftar─────

5

1  have in this case that supports your theory that your clients'

2  families were somehow targeted by the defendant?

3          Wait a minute.

4          (Telephone interruption.)

5          MR. GILL:  I'm sorry, Your Honor.  I can't hear you.

6          THE COURT:  I know.  We can't work if we have this

7  much calling in.  This is becoming difficult to hear you all.

8          (Telephone interruption.)

9          THE COURT:  Counsel, we're not going to work if we

10 have this many people calling in.  I can't control it right

11 now.

12         (Telephone interruption.)

13         THE COURT:  I'm going to continue this matter until

14 3 o'clock this afternoon, gentlemen.  There's too many people

15 calling in.  I'm going to arrange it so that only the

16 attorneys can call in on this call.  There's too much

17 interference with these beeps.

18         MR. GILL:  Your Honor, if I may, I think that's

19 fine, but it may just be because it's noon right now and it

20 will quiet down in one minute as it turns into noon.  And if

21 everyone can mute their line, I think people will probably

22 stop calling in in about a minute.

23         (A pause in the proceedings.)

24         THE COURT:  We'll try one more time and if it gets

25 bad again, we're just going to continue the case.

─────────────── Elzagally v. Haftar ───────────────

6

1                    (Continued telephone interruption.)

2              THE COURT:  It's too many calls.  All right.  We're

3    going to stop this.  We'll reconvene at 3 o'clock.  We'll make

4    the phone call.  We'll set it up this way, but I'm not going

5    to have anybody calling in except for counsel.  All right.

6              MR. GILL:  Yes, Your Honor.

7              MR. LEVIN:  Yes, Your Honor.

8              THE COURT:  Thank you.  Bye-bye.

9              **(Proceedings recessed at 12:01 p.m.)**

10   (Court proceedings recommenced at 3:06 p.m.)

11             THE COURT:  Counsel, I hope that we are now quietly

12   on the phone.  So these are the two related cases of Aida

13   Elzagally, et al., versus Khalifa Haftar, et al.  Civil action

14   19-cv-853.

15             And Muna al-Suyid, et al., versus Khalifa Haftar, et

16   al.  Civil action 20-cv-170.

17             So let's start off again with counsel.

18             Mr. Faisal Gill, are you there for the plaintiff,

19   Elzagally?

20             MR. GILL:  Yes, Your Honor, I am.

21             THE COURT:  All right.  And then for our other

22   plaintiff, is it Mr. Carroll?

23             MR. CARROLL:  Yes, Your Honor.

24             THE COURT:  All right.  And you're the only two

25   attorneys representing the plaintiffs; is that correct, for

Elzagally v. Haftar

7

1   today's hearing?

2           MR. GILL:  We're the only two that will be speaking.

3           THE COURT:  All right.  It's going to be important

4   when you speak to say your name first so my court reporter can

5   get you.

6           And now, for the defense, Mr. Levin, it's still you

7   for the defendants in both cases, correct?

8           (No response.)

9           THE COURT:  Mr. Levin, are you there?  Hold on.

10  We're trying to get you, Mr. Levin.

11          (A pause in the proceedings.)

12          THE COURT:  Mr. Levin, are you there?  Is there

13  anybody on the phone for the defendants?  Hello?

14          MR. UNGVARSKY:  Judge, this is attorney Edward

15  Ungvarsky.  I am on the phone.  I can hear you.  Mr. Levin can

16  hear you.  He's present on the call.

17          (Telephone interruption.)

18          THE COURT:  I don't know what that grinding sound

19  is.  We're getting a real problem.

20          Mr. Levin -- why are we not able to get him,

21  Counsel, do you know?

22          MR. UNGVARSKY:  No.  He was on.  He spoke to your

23  law clerk and then I know she took his number and she said

24  that we would be unmuted.  Mr. Levin is suggesting that he

25  redials in now.

Elzagally v. Haftar

8

1          THE COURT:  All right.  Go ahead and have him

2    redial.

3          MR. UNGVARSKY:  All right.  He can hear you, Judge.

4    He heard you say that, Judge, so he's going to hang up.

5          While he does that, Judge, I'm going to put mute on

6    myself so there's no background noise from my room.

7          THE COURT:  Thank you.

8          (A pause in the proceedings.)

9          MR. UNGVARSKY:  Judge, Mr. Levin is back on -- this

10   is Edward Ungvarsky.  I apologize.  Mr. Levin is back on the

11   call.  He says that, again, the automatic message says he's in

12   "listen-only mode."  He thinks he needs to be unmuted.

13         THE COURT:  I don't know why we're having these

14   problems.  Let's try for a couple more minutes.

15         (A pause in the proceedings.)

16         MR. LEVIN:  I think I was unmuted now.  This is

17   Duncan Levin.

18         THE COURT:  All right.

19         MR. LEVIN:  Sorry about that.

20         THE COURT:  That's fine.  Again, when you all are

21   speaking, if you'll just, again, state your name so that we

22   get the right words attributed to the right attorney, all

23   right, because we are on the record.

24         As we started out earlier, we have the defendant's

25   motions to dismiss.  And I think we had started with the

Elzagally v. Haftar

9

1   853 -- sorry, the -- the case filed in 2019, which is cv-853.

2   And that's the Elzagally versus Khalifa Haftar.  Just one

3   defendant in that case.

4        So it's your motion, Mr. Levin.  You may start.

5        MR. LEVIN:  Well, thank you, Your Honor.  I would

6   say that there are so many different reasons that this case

7   should not go forward and should be dismissed, respectfully.

8        The first is that the plaintiff could not properly

9   serve the defendant in this case.  And beyond the problem of

10  service, there are two other sort of major problems hanging

11  out before even getting into the fact that they did not make

12  out a cause of action under the TVPA.

13       One is that this is a nonjusticiable political

14  question.  The Court is basically being asked to adjudicate

15  the conduct of the armed forces of a foreign government that

16  is actively working with the United States to try to bring

17  peace to the region.  And General Haftar is entitled to

18  immunity under this suit, under law, because he is the head of

19  the state.

20       And then, if the Court could even get past all of

21  those problems, which we submit are fatal problems, there

22  are just fundamental problems with the plaintiff's allegations

23  because they don't show any cause of action under the TVPA.

24  The magistrate judge's support and recommendation picked up on

25  the fact that there really is, other than very general

Elzagally v. Haftar

10

1   allegations about random shelling, there's just not any

2   evidence alleged by the plaintiff that these -- that the

3   acts meet the definition of extrajudicial killing.  That they

4   were -- that, you know, any of these killings were deliberated

5   in any way.

6           And they also go -- show that they've exhausted

7   their remedies in Libya, which is a requirement, as well.  The

8   Virginia tort actions should be dismissed, as well, because

9   they hinge on -- a reading of the Alien Tort Claims Act just

10  cannot be sustained because none of the conduct that's alleged

11  touches and concerns the United States.

12          So I don't know if there's a particular order you

13  would like me to address any of those in.  But I would just

14  say we have so many different bases by which we submit that

15  this case should be dismissed.  That in order for it to go

16  forward, the Court would have to find:  One, that this was

17  properly served on General Haftar.  Two, that he is not the

18  head of the state.  Three, that this is a justiciable

19  political question.

20          And then after getting through all of that, that

21  they're actually the cause of action under the TVPA that these

22  plaintiffs have alleged.  There are just so many problems on

23  the way to get there that -- and we submit that the Court need

24  not find on all of them.  But any number of them, any one of

25  them would be enough to get this case dismissed.

Elzagally v. Haftar

11

1          THE COURT:  All right.  Well, Mr. Levin, let me ask

2     you this question.

3          MR. LEVIN:  Yes, Your Honor.

4          THE COURT:  In the *Samantar* case, which both sides,

5     I think, have cited to, that I had several years ago, it was

6     the defense attorney who had aggressively, initially reached

7     to the State Department to try to get their position on some

8     of the same issues you're raising, both political question and

9     head of state immunity.

10         Have you -- and the first of these two cases was

11    filed back in June of 2019.

12         Have you done anything along those lines on behalf

13    of your clients?

14         MR. LEVIN:  Well, Your Honor, the answer is no.  But

15    I respectfully submit that we do not even need to get to that

16    issue before.  There are easier ways to have this case

17    dismissed on service grounds.  The nonjusticiable political

18    question does not require the executive branch to weigh in.

19    But on the head of state immunity question, solely looking at

20    that one doctrine, frankly, I think that this situation is

21    different because, number one, plaintiffs have not -- if they

22    don't believe that General Haftar is the head of state,

23    they've offered no reason to believe that anybody else is the

24    head of the state.  So they have not actually identified any

25    alternative person who is the head of the state.

Elzagally v. Haftar

12

1          Libya is at civil war right now.  In fact, there's

2   been a development since we filed our motion to dismiss on

3   this point.  As recently as September 12th, the Associated

4   Press is reporting that the United States Embassy in Libya is

5   specifically in direct negotiations with General Haftar to

6   reopen oil field terminals that have been under an eight-month

7   blockade.

8          So this is something that even since we filed the

9   motion to dismiss, there's evidence of direct negotiations

10  between the United States and General Haftar over these oil

11  fields.

12         But even before that, as cited in our moving papers,

13  President Trump has had discussions directly with General

14  Haftar about how to fight terrorism and deter Libya's oil

15  resources.  They've discussed a shared vision for Libya's

16  transition to a stable democratic political system.

17         So I think the answer is, no, there is not a formal

18  decision yet from the State Department, but we feel that there

19  is ample evidence that we --

20         (Telephone interruption.)

21         THE COURT:  Wait.  Why is there -- we shouldn't be

22  hearing any noise while one lawyer is speaking.  I'm sorry.

23         Mr. Levin, can you repeat your last statement,

24  because it became garbled.

25         MR. LEVIN:  Yes, Your Honor.

Elzagally v. Haftar

13

1        I was saying that there really -- there's ample

2   evidence that General Haftar is the head of the state, and

3   both from all the public reporting, and most recently this --

4   the negotiations between the United States Embassy and Libya

5   and General Haftar directly.  We know he's been in touch with

6   the President of the United States.  I don't believe there is

7   a formal ruling from the State Department like in the *Samantar*

8   case.

9        But in this particular case, we feel that there is

10  ample evidence that he is the head of the state.  The

11  plaintiff has not identified anyone else who is the head of

12  the state.  And frankly, it's a question that I don't think

13  the Court need even reach to dismiss the case because there

14  are other -- there are other ways that the case can be

15  dismissed without having the executive branch weigh in.

16       And, in fact, it dovetails -- if I may, Your Honor,

17  it dovetails into this issue of a nonjusticiable political

18  question.  They're interrelated doctrines.  But what the Court

19  is being asked to do is adjudicate Haftar's armed forces in a

20  way that directly implicates the doctrine of the

21  nonjusticiable political question.  And I don't believe that

22  there's any law that requires the executive branch to weigh in

23  on whether it's a nonjusticiable political question.

24       The Supreme Court in *Baker v. Carr* laid out this

25  doctrine and it was adopted by the *Schneider v. Kissinger,*

─────────────── Elzagally v. Haftar ───────────────

14

1    which we outlined in our moving papers.  But one such -- one

2    such -- the presence of a number of different facts would make

3    it such that it's a nonjusticiable political question.  And

4    one of them is the possibility of a Court's undertaking

5    independent resolution without expressing a lack of respect to

6    coordinate branches of government.

7            And here, this is basically exactly asking the Court

8    to adjudicate just that.  So I don't believe that there's any

9    reason to go to the State Department to get them to render a

10   formal decision when there are other ways that -- there are

11   other reasons that the case should be dismissed.

12           THE COURT:  All right.  You know that though --

13           MR. LEVIN:  And it should be dismissed.

14           THE COURT:  -- this Court has taken the position

15   that even the United States government does not have sovereign

16   immunity against claims that's been involved in jus cogens

17   violations.  And so, I think regardless of some of the

18   arguments you've made, if there is sufficient allegation in a

19   complaint of those types of human rights violations, at least

20   at a pleading stage, that's sufficient to let it survive.

21           I mean, again, we're not -- even though I think your

22   motions are -- these are motions to dismiss, they're not

23   motions for summary judgment, and they couldn't be at this

24   point because there's not been any discovery conducted.  I

25   mean, there are other problems with these cases just given the

Elzagally v. Haftar

1  nature of what's alleged and the types of discovery one might

2  need to have before they could be ready for summary judgment.

3  But in terms of -- I want to try to at least pare these cases

4  down somewhat.

5        So let me ask defense counsel -- I'm sorry

6  plaintiff's counsel, starting with you, Mr. Gill, if, in fact,

7  you feel you can save any of your state law claims.

8        MR. GILL:  Yes, Your Honor, I believe I can.  I

9  mean, at the end of the day, Your Honor, Mr. or General Haftar

10  is a U.S. citizen.  He is a Virginia resident, and he is

11  committing what we believe to be these atrocities.  He's

12  committing murder.  He's committing -- he is bombing.  He is

13  killing.  Therefore, we believe that under state law, he

14  should be liable for those claims.

15        A U.S. citizen, a Virginia resident, if he does that

16  anywhere else, they would be liable.  For that reason, I do

17  believe the state law claims would survive at least at this

18  stage.

19        Now, I would have to make out the case for it all,

20  which we believe, when we get to the discovery phase, that we

21  believe that we can make the case for it.

22        THE COURT:  Well, if a Virginia resident went into

23  Maryland and committed the torts in Maryland, where would the

24  tort litigation occur?

25        MR. GILL:  Your Honor, if a Virginia resident

─────────Elzagally v. Haftar─────────

16

1   committed the tort in Maryland, I would argue that it could --

2   more than likely would occur in Maryland since that is where

3   the actions took place.  But I do also feel that Virginia

4   courts could also have jurisdiction over its own resident.

5   Certainly, a Virginia prosecutor could charge the person for

6   committing some of these things.  And again, we're charging

7   him with wrongful death.

8           THE COURT:  Whoa, whoa, whoa.  I don't think you're

9   right on criminal law.  If a Virginia resident went over to

10  California and committed a crime in California, the Virginia

11  courts couldn't handle that.  That's a California court.

12          MR. GILL:  Well, that's what normally happens, Your

13  Honor.  But I think in our case -- I'm handling a criminal

14  case right now in Southern District of Indiana, where the

15  majority of the actions occurred in Michigan.  But if there's

16  a slight connection in the State of Indiana, the federal court

17  claimed that jurisdiction there.  It all depends on --

18          THE COURT:  Right, but it has to be an act.  It

19  can't just be the status of the person is a citizen of that

20  state.  I've never seen that in a criminal case.

21          You're right, it only takes -- it only takes an

22  e-mail message into the jurisdiction or you're flying through

23  Dulles Airport and everything else occurs outside of some

24  other location.  That one minimal contact with the forum can

25  do it.

Elzagally v. Haftar

17

1     But you don't allege -- neither plaintiff has

2  alleged, in either of their complaints, that any of the

3  actions that are described in these two complaints had any --

4  any connection whatsoever to this district other than the fact

5  that the defendants are U.S. citizens who own property in

6  Virginia.

7     Is that not correct, Mr. Carroll?  Do you agree?

8     There's nothing that I see in the complaints that

9  would suggest that any of the Virginia causes of action can go

10 forward.

11     MR. CARROLL:  Your Honor, this is Kevin Carroll.

12 Both defendant's arguments about the state law claims were

13 well put, and we're prepared to waive those.  This is at heart

14 a Torture Victim Protection Act case and we strongly disagree

15 with the arguments on the TVPA.

16     THE COURT:  Okay.  All right.  I think, Mr. Gill,

17 those portions of the complaints that are alleged Virginia

18 causes of actions.  In the one case, there's a time bar

19 problem, too, because those events are alleged to have

20 occurred in 2014, and there's a two-year statute of

21 limitations for these types of torts in Virginia.

22     Also, I just don't see how there's any connection

23 between those activities and the forum other than the fact

24 that the defendants owned property.  There's no allegation the

25 property was used somehow to support these activities.

—Elzagally v. Haftar—

18

1   It's just -- there's just nothing.  So the state law claims in

2   both complaints will be dismissed.

3         Then in terms of the Alien Tort Claims Act, I'll

4   have the plaintiffs respond on those first.

5         MR. GILL:  I'm sorry, Your Honor, was that directed

6   towards me?

7         THE COURT:  Yes, Mr. Gill.

8         MR. GILL:  Faisal Gill.  Okay.

9         Yes, Your Honor.  We believe the Alien Tort Claims

10  Act does survive because, unlike in other cases, the biggest

11  one being the *Warfaa v. Ali* case, this case here, there is a

12  U.S. citizen involved.  So for that reason we believe that it

13  does touch and concern the United States, which is what the

14  Supreme Court has stated.

15        So because Mr. -- General Haftar is a U.S. citizen,

16  we believe that the Alien Tort Claims Act does survive.  And

17  that was the main distinction between what we have in our

18  facts and what was in the *Warfaa v. Ali* case.

19        THE COURT:  All right.  Mr. Levin, do you want to

20  respond to that?

21        MR. LEVIN:  Your Honor, I do.  I disagree with that.

22  I mean, the Alien Tort Claim Act really -- it is a

23  jurisdictional statute and it basically -- to go forward, a

24  claim has to touch and concern the U.S. with sufficient force

25  to displace the presumption against exterritoriality where

Elzagally v. Haftar

19

1   there is a presumption here.  And at least the Ninth Circuit

2   has weighed in on this in the *Mujica* case, that U.S. citizen

3   alone does not satisfy this test.

4              Once again, nothing happened here in the United

5   States.  They're trying to ram a lot of behavior, alleged

6   behavior through this that all took place outside of the

7   United States through the notion that because he is a U.S.

8   citizen, he can be held responsible.  But the behavior -- just

9   like the Virginia tort case, the Virginia tort claim, the

10  Alien Tort Claims Act simply does not apply unless the conduct

11  of the claims themselves touch and concern the United States

12  to -- this was not forced to displace this presumption.  We

13  just have a disagreement that the U.S. citizenship alone would

14  satisfy this test.  And there is precedent.  There aren't a

15  lot of cases on this point, but to the extent that there are

16  any cases -- there's this Ninth Circuit case, *Mujica,* that

17  takes the exact position that I'm espousing here.

18             THE COURT:  All right.  And, of course, again, I

19  have the *CACI* case, which you've also mentioned in your

20  papers, and there it's a very different situation because the

21  defendant corporation is a U.S. corporation.  Although all the

22  events occurred in Iraq, they occurred because -- the

23  connection to the United States is that the corporate

24  defendant was functioning in Iraq under a contract that had

25  the U.S. government.  It was taking -- it's allegedly taking

—————Elzagally v. Haftar—————

20

1   directions from U.S. military.

2           In other words, there was definitely clear

3   connections with the United States that would give us a basis

4   to find that, you know, there was the kind of contact with

5   this country that would give us the extraterritorial reach for

6   that conduct.

7           That's totally different, again, because there's

8   nothing in these complaints that have that kind of linkage.

9   And even the timeframe is problematic.  Although, one of the

10  complaints, I think in *Elzagally*, it alleges that Haftar left

11  the United States or the Northern Virginia in 2015.  I note

12  that the *al-Suyid* case alleges that he left in 2011.  And it

13  appears as though that that 2011 date is the more accurate

14  date.

15          So today is now 2020, and at least, you know, within

16  the four corners of these complaints, it would appear as

17  though Haftar has not even been in the district for quite some

18  time.  Even if he's coming back and forth and making an

19  occasional visit, again, there's been no description of any

20  activity in the forum, in the United States, that is connected

21  to the events in Libya other than this man's citizenship.

22          So at least as the complaints are currently

23  structured, I don't see how one can argue that there's enough

24  in the complaint to support an alien tort claim.

25          Does either plaintiff's counsel want to add anything

Elzagally v. Haftar

21

1   to this?

2          MR. CARROLL:  Your Honor, Kevin Carroll.  Just

3   stating for the record that our complaint does not include an

4   alien tort statute.

5          THE COURT:  Right.  Yours is the TVPA.  I understand

6   that.

7          But, Mr. Gill, is there anything further you want to

8   add?

9          MR. GILL:  Your Honor, I would only add that in the

10  *Kiobel* case, the Supreme Court did state, although broadly

11  stated, it's the claims rather than the alleged tortious

12  conduct that must concern the United States territory with

13  sufficient force.

14         And we believe the fact that he is a U.S. citizen

15  satisfies what, you know, *Kiobel* is saying, if you broadly

16  construe it.  But all the actions (audio interruption), but as

17  long as there is some testing and concern, and certainly the

18  fact that he is a U.S. citizen absolutely touches and concerns

19  the United States that satisfies what we believe in *Kiobel*.

20  And as you cited in *CACI*, it was U.S. contractors.  It was a

21  U.S. company.  Yes, they were operating and/or operating in

22  Iraq.  So in that sense, we do believe that there -- it is

23  fairly similar.

24         THE COURT:  I think there is significant factual

25  differences between -- it's not even close.  As I said

Elzagally v. Haftar

22

1   earlier, there is far more direct connection between the

2   United States and that.  It's not just a corporation that

3   happens to be doing something in a foreign country.  So I'm

4   going to grant that portion of the motion to dismiss.

5          So that leaves in both cases then the TVPA claim,

6   which is the core complaint of the claim here.

7          And on that one, I recognize that there are a lot of

8   these technical arguments that are made by the defendant, but

9   I certainly think that the allegations are very problematic.

10  I mean, there are allegations of some very, very serious

11  conduct.  Especially in the -- in the *Elzagally* case.  These

12  two cases are hard to do separately because there is such a

13  great deal of overlap.

14         But *Elzagally* only lists Mr. Haftar as the

15  defendant, correct?  And the *al-Suyid* case also includes the

16  sons.

17         I wanted to address that one next.  That's right.

18         Mr. Carroll, that's your case.  What evidence do you

19  have at this point that would, other than sort of information

20  and belief or suspicion, that the two sons are at all involved

21  in the specific allegations that the plaintiffs are raising?

22         MR. CARROLL:  Thank you for asking, Your Honor.

23  Again, this is Kevin Carroll.  Both of the sons were battalion

24  commanders in the Libyan National Army in Benghazi in

25  October/November 2014.  And that is where the --

Elzagally v. Haftar

23

1          THE COURT:  Wait, I'm sorry.  Mr. Carroll, I don't

2   know what you're talking on, but you're breaking up.

3          Are you on a speakerphone or on a computer?  Hello?

4          MR. CARROLL:  Hold on, Your Honor.  Sorry, Your

5   Honor.  I took it off speaker.  Is that better?

6          THE COURT:  Much better.  Go ahead.

7          MR. CARROLL:  Okay.  Thank you, Your Honor.  I'm

8   glad you asked the question.  Khalid and Saddam Haftar were

9   both battalion commanders in the Libyan National Army --

10          THE COURT:  Wait, wait.  I'm sorry.  Wait.  Slow

11   down, please.

12          (Court reporter clarification.)

13          THE COURT:  Start over again, please, Mr. Carroll.

14          MR. CARROLL:  Yes, Your Honor.  Khalid and Saddam

15   Haftar were both battalion commanders in the Libyan National

16   Army in Benghazi in October/November of 2014, when the crimes

17   in question took place.  Our understanding is that the officer

18   corps of the Libyan National Army that was present in

19   Benghazi, when the war crimes took place, only amounted to 27

20   officers.

21          They served as close adjutants to their father.

22   Saddam Haftar is additionally involved in fundraising for the

23   Libyan National Army.

24          So I think that under the doctrine of command

25   responsibility, which even impacts decisions, field grade

Elzagally v. Haftar

24

1  officers at the battalion commander level, ten colonels

2  present while war crimes are taking place, would be liable as

3  well.

4          THE COURT:  All right.  Mr. Levin.

5          MR. LEVIN:  Thank you, Your Honor.  This is Duncan

6  Levin.  I have to say I have been scratching my head at this

7  one because we've been looking through the complaint for any

8  specific evidence that the sons, in fact, are alleged to have

9  been tied to any specific incidents at all, which they are

10  not.  The theory is under this command responsibility

11  doctrine, which we, of course, adopt just like the Court has.

12  But if you look -- if Your Honor looks at the elements of it,

13  that's been laid out in the *Drummond's* case.

14          If I may:  "The existence of a superior subordinate

15  relationship between the commander and the perpetrator of the

16  crime..." which has not been laid out, "that the commander

17  knew or should have known, owing to the circumstances at the

18  time, that his subordinates had committed, were committing, or

19  plan to commit acts violative of the law of the war," which

20  has not been laid out, "and that the commander failed to

21  prevent the commission of the crimes or failed to punish the

22  subordinate after the commission of the crimes."  Which has

23  not been laid out.

24          If I may offer my observation, I believe that the

25  plaintiffs have included the sons because they owned property

Elzagally v. Haftar

25

1    in the United States and they are trying to pierce the veil

2    and somehow try to get at the sons' property in the United

3    States.  But frankly, there are just no facts whatsoever in

4    its complaint that specifically ties the sons to any of the

5    activities whatsoever.

6            There were, assuming that there were 27 officers, as

7    the plaintiffs just laid out, the plaintiffs' theory could be

8    viewed that all 27 officers are liable.  But not all of the 27

9    would be in the chain of command as to the acts.  And there's

10   just no showing that the sons are, in fact, in the chain of

11   command as to the allegations.

12           The complaint is just devoid of anything regarding

13   the sons.  And we submit that for these reasons, the claims

14   against the sons should be dismissed.

15           THE COURT:  All right.  Mr. Carroll, do you want to

16   have the last word on that?

17           MR. CARROLL:  Yes, Your Honor.  As the complaint

18   lays out, we know the three-star who is responsible, Khalifa

19   Haftar.  We know the two-star major generals who were

20   responsible for the atrocity by name.

21           We know the full-bird colonels who were responsible

22   for the atrocities, and we know that the sons were battalion

23   commanders.  So we know exactly who committed the crimes at

24   the three-star corps level, the two-star division level, the

25   full colonel brigade level, and we know that the sons were

Elzagally v. Haftar

26

1    lieutenant colonels present in the city while this was going

2    on.

3           And this would seem to me to be a good subject for

4    discovery, to see exactly what full colonel -- Lieutenant

5    Colonel Saddam Haftar, Lieutenant Colonel Khalifa Haftar

6    reported to while they were in Benghazi, while the war crimes

7    were taking place in the fall of 2014.

8           THE COURT:  Well, you know, that's not really the

9    way in which civil litigation is supposed to be conducted in

10   federal court.  I mean, the lawyers are supposed to have a

11   decent understanding of the facts and not just file the

12   complaint and then hope that the discovery will support their

13   position.

14          I am going to grant the motion to dismiss the sons.

15   The complaint as written right now before me simply does not

16   have enough in it.

17          However, as to Mr. Haftar himself, those -- there

18   are certain paragraphs in this complaint that have the kind of

19   specificity that would clearly be sufficient at this pleading

20   stage to allow the case to go forward against him under the

21   command control doctrine.  In particular, I suppose it's

22   paragraph 46 is the most compelling, where it's alleged that

23   Khalifa released a video announcing that LNA's opponents would

24   be shown "no mercy."  But there is no prisoner -- that

25   prisoners are -- no prisoner -- no prison for them, that the

Elzagally v. Haftar

27

1    field is the prison, end of story.

2              And then there's also reference in paragraphs 27 and

3    35 to other statements made by LNA's.  There's a video

4    announcement that the opponents will all be liquidated.  And

5    another one indicating the expulsion of certain groups from

6    Benghazi, and that the plaintiffs in this case were among

7    those types of folks.

8              So I think there's enough in that complaint to allow

9    the allegations against Haftar himself to go forward, but not

10   the sons.  So I will be granting that portion of the motion to

11   dismiss as well.

12             So essentially, what that's leaving in both cases is

13   the TVPA claim.  And I recognize the defendant has made a

14   bunch of other arguments about that.

15             In terms of the service argument, although it is

16   true that it does appear to be a technical problem with

17   service, the whole point behind the service rules, in my view,

18   is to make sure that due process is protected.  And what due

19   process provides is that there be notice and an opportunity to

20   be heard.  And whether that notice came through the media or

21   some other kind of means, certainly the defendants were aware

22   of the lawsuit.

23             They were able to retain you, Mr. Levin, and you've

24   articulated very strong arguments on their behalf.  You came

25   in after the defaults had been entered, and we set aside the

Elzagally v. Haftar

1   defaults so that your clients now have their opportunity in

2   court to respond to the allegations.  And I don't know why

3   that's not sufficient to get around the service issue.

4           MR. LEVIN:  May I address that, Your Honor.

5           THE COURT:  Yeah.

6           MR. LEVIN:  Thank you.  Your Honor, I think, if I

7   may.  If that is true, then what the Court is saying, in

8   essence, is that there's no way for a defendant to come into

9   federal court and argue service failure, because the service

10  rules are meant to ensure that the -- that a defendant is

11  apprised of a case against him or her.

12          In this particular case, the service was not

13  effectuated properly.  We've timely raised the problems with

14  it.  And these are more than technical violations, because

15  what we've done is, we've come in to argue service.  But what

16  the Court is saying is, by the mere fact that he is now aware

17  of the case, has hired counsel, and come in to argue it, that

18  no one can bring a lawyer into court and argue service because

19  they are, by definition, aware of the fact that there is a

20  lawsuit.

21          And so, I do think that the issues are more than

22  just technical.  Both of the cases certainly were served

23  improperly in different ways.  But I -- I fully hear what the

24  Court is saying.  But I do think that the Court's position

25  would not allow defendants to come in and argue service

─────────── Elzagally v. Haftar ───────────

29

1  because they would, by definition, have a lawyer be arguing

2  about something that they knew about.

3          THE COURT:  Well, I mean, again, as I said, if the

4  whole purpose, and it's a good purpose, behind the service

5  rules is to ensure that a party is on notice as to the case

6  that's been brought against them and has a chance to respond

7  to it.

8          In my view, it's meant to prevent, you know,

9  improper defaults, and that's exactly what's happened here.

10 You've got notice of it.  Had the default judgments been

11 entered down the road and you've come in and try to have them

12 set aside, this would possibly be a different situation.  But

13 at this point, I don't think that due process has been

14 violated.

15         I mean, your clients know about this case.  Two of

16 them have been dismissed, and we only have one claim per each

17 case against Khalifa Haftar.  And as to that, then you've got

18 these other sort of meatier issues about whether this is an

19 improper political question that the Court does not have the

20 authority to address.  The head of state immunity argument, I

21 don't think, at this point, has -- I'm not at all concerned

22 about that.

23         As I've said, these are allegations of jus cogens

24 violations.  And even if he had some sort of immunity, it

25 doesn't protect, in that respect, in my view, not in these

———Elzagally v. Haftar———

30

1   types of cases.

2          So I'm going to go ahead and at this point allow the

3   TVPA claims to go forward in each of these complaints.  I

4   don't have any idea how in the world the plaintiffs will get

5   discovery.  My experience with the Somali cases that I had was

6   it took years to get that discovery.  And I think that the

7   kind of activity that's going on right now in Libya is much,

8   much stronger.  I am, to make sure that we are not going to

9   bump into a political question problem, however, going to

10  follow the same route that I took in the *Samantar* case.  And

11  that is, I am going to address a letter to the State

12  Department advising them essentially of what's before the

13  Court in both these cases and give them an opportunity -- give

14  the Department an opportunity to express its position.  That's

15  the safest way of handling these two cases.

16         And that being the situation, what I'm going to do

17  is, I'm not going to issue a scheduling order at this point.

18  I'm going to stay both cases.  I'm going to give the State

19  Department 60 days to voice any position, if it has one.  If

20  it doesn't do anything, then I'm going to assume the U.S.

21  government doesn't have a concern about it.  If they do, then

22  we will, at that point, address what, if any, impact that

23  position has on going forward with the remaining claim.

24         MR. LEVIN:  Judge, this is Duncan Levin.  If I may

25  just address that.  One issue for the Court is whether, if

Elzagally v. Haftar

31

1   there is a change in administration, allowing -- part of the

2   issue is presenting a nonjusticiable political question is

3   that the Court, respectfully, should not be stepping on the

4   toes of the executive branch on something that has significant

5   political overtones that obviously is at the core of diplomacy

6   between the countries and the United States with regard to

7   peace in the whole region.

8            As the election is coming up, if there is a change

9   in administration, we would agree that -- depending on how the

10  election holds, we may come back to the Court on the issue of

11  a stay for 60 days, and whether that would hamstring the next

12  administration, if there is a change of administration.

13           THE COURT:  Mr. Levin, that's a reasonable request.

14  And so, as I said, I'm going to stay the cases right now.  And

15  60 days from now would clear the election, so we would know,

16  assuming we would know by that point what the outcome is, and

17  depending upon that you can renew the -- ask for an extension,

18  if it goes the other way.  All right.

19           MR. LEVIN:  Your Honor, if I also may just address

20  one other issue that the Court raised earlier that I didn't

21  have an opportunity to address.

22           The Court addressed some of the comments allegedly

23  made by General Haftar showing that -- announcing that LNA

24  opponents allegedly would be shown no mercy.  I just wanted to

25  address, in the broadest terms, those comments.

32

1      One is that, I just want to be clear that we are not

2  asking the Court to say things are right or wrong.  I'm a

3  lawyer based in the United States, looking at whether this

4  fits the criteria of the statute.  So I know the Court said

5  that the allegations are very problematic, and I'm not -- it's

6  not our position to ask the Court to weigh in on whether the

7  allegations are right or wrong, but whether the statute is

8  met.

9      And those comments just -- just so the record is

10  clear on it, those comments were made allegedly after the date

11  that the conduct alleged to commit -- to have been committed

12  by General Haftar took place.

13      So the allegations are that the conduct took place

14  and that those comments took place after the allegations, not

15  before the allegations.  So I don't -- I don't particularly

16  think they're relevant or, in fact, weigh at all as to General

17  Haftar's involvement in these alleged activities.

18      And then the other thing is just -- I did -- I do

19  want to address this notion of exhaustion of remedy is because

20  it's something that we have not had an opportunity to address

21  yet in this -- in this argument.  But I do think that there is

22  an element that is not -- it is not a technical requirement

23  under the TVPA that a plaintiff has to exhaust local remedy.

24      And I think it's interesting that the Muna al-Suyid

25  plaintiff has basically thrown their hands up at this whole

Elzagally v. Haftar

33

1    notion and they're citing to the *Mugabe* case, that the

2    then-president of Zimbabwe, who disregarded a number of

3    Zimbabwean court rulings, and that the *Elzagally* plaintiffs

4    have basically said that they can't pursue anything that would

5    be in court.

6           I don't think there's -- first off, there's no

7    evidence in the record that the Libyan courts are not a proper

8    place to pursue these claims, and they haven't even tried.

9           So I -- and to the extent that the *Elzagally*

10   plaintiff have even tried, other than serve -- submitting one

11   affidavit saying that they served General Haftar in a Libyan

12   court -- which by the way, I will just mention, was

13   in Tripoli, when they knew full well that General Haftar

14   controls Benghazi, but not Tripoli.  There's a civil war going

15   on.

16          I just think that their lack of even trying to

17   pursue these claims in the course of Libya is like skipping

18   over a prerequisite that is codified in the -- in the Torture

19   Victim Protection Act.

20          Again, I'm not trying to ask the Court to say that

21   what is alleged is not horrendous.  I'm not trying to ask the

22   Court to make a value judgment.  I'm just trying to look at

23   what the statute itself says and whether the plaintiffs have

24   met their burden.  Exhaustion of remedy is just clearly part

25   of it, but they haven't even tried.  They haven't said they've

Elzagally v. Haftar

34

1   tried it.  They've just sort of thrown up their hands with

2   that.  And I know you've heard my arguments on the other piece

3   of this, which is that the killings weren't extrajudicial or

4   deliberate.

5         But I do want to mention that in the TVPA, the

6   Senate Report itself specifically carved out liability for

7   collateral civilian casualties resulting from legitimate

8   military operations undertaken in the civil war.  I think

9   Congress looks at these issues specifically in the TVPA and

10  they said, number one, exhaust your remedies in a foreign

11  country.

12        The plaintiffs in both of the cases haven't done it.

13  They haven't said they've done it.  They've basically argued

14  that they don't need to do it, and they haven't reported

15  back -- they're in different situations with regard to

16  exhaustive remedies.  But neither of them have -- I don't

17  think that that is a technical requirement at all.

18        And secondly, I just don't think they've -- they're

19  trying to create liability under the TVPA for something that

20  the United States Congress had specifically carved out.  The

21  Senate Report itself specifically addresses civil war.  It

22  specifically addresses this in the Senate Report on the TVPA.

23        And so, I fully understand when the Court reads

24  these allegations, understanding that they are "problematic,"

25  as Your Honor has said.  I don't ask the Court to weigh in on

Elzagally v. Haftar

35

1    that.

2           I just ask the Court to look at the actual -- the

3    intent of Congress in making this law and then the specific

4    requirement that they exhaust local remedy.

5           THE COURT:  Well, as you know, that they've

6    referenced to this Amnesty International report and other

7    reports that even from their our own State Department

8    commenting upon the situation of the court system in Libya

9    right now.  And some of the cases that you cite to do involve

10   situations where the civil war conflict has ended and then the

11   parties are able to use the court system that exists.

12          But at this point, again, I think given what I've

13   got before me at this point, I'm satisfied that there's enough

14   evidence that the functioning of the Libyan courts will not be

15   sufficient to give them an -- a fair opportunity to raise

16   these issues there.  So I'm not going to change my view at

17   this point.

18          So, as I've said, I'm allowing those two claims to

19   go forward.  One claim per complaint.  I'm staying the case

20   for 60 days to see if the State Department is going to make

21   any statement.  I will send you, obviously, copies of the

22   letter that we send to State.  It will probably get out

23   tomorrow.

24          If it would assist the process, if either of you

25   might know what desk or office at the State Department is

Elzagally v. Haftar

36

1   responsible for what's going on in Libya.  I have trouble

2   believing that some of you might not know that.

3           MR. CARROLL:  Your Honor, this is Kevin Carroll.  It

4   would be at least the Near East desk.

5           THE COURT:  Just the Near East desk.

6           MR. CARROLL:  At the Department of State.

7           THE COURT: All right.  That's what we'll do.  All

8   right.  Thank you gentlemen for calling in.  We got through it

9   with the technology being what it is.  We'll get an order out

10  to you today.  We're signing off.

11          MR. LEVIN:  Thank you, Your Honor.

12          MR. CARROLL:  Thank you, Your Honor.

13

14          **(Proceedings adjourned at 3:55 p.m.)**

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF REPORTER

2

3            I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motions

7    hearing in the case of the **AIDA ELZAGALLY, et al., versus**

8    **KHALIFA HAFTAR, et al.**, Civil Action No. 1:19-cv-853 and

9    1:20-cv-170, in said court on the 29th day of September,

10   2020.

11           I further certify that the foregoing 37 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16           In witness whereof, I have hereto subscribed my

17   name, this October 9, 2020.

18

19

20

21   _____

22   Tonia M. Harris, RPR
     Official Court Reporter

23

24

25