United Nations



**Security Council**

S/2019/914

Distr.: General
9 December 2019

Original: English

---

**Letter dated 29 November 2019 from the Panel of Experts on Libya established pursuant to resolution 1973 (2011) addressed to the President of the Security Council**

The Panel of Experts on Libya established pursuant to Security Council resolution 1973 (2011) has the honour to transmit herewith, in accordance with paragraph 15 of resolution 2441 (2018), the final report on its work.

The report was provided to the Security Council Committee established pursuant to resolution 1970 (2011) concerning Libya on 28 October 2019 and was considered by the Committee on 25 November 2019.

The Panel would appreciate it if the present letter and the report were brought to the attention of the members of the Security Council and issued as a document of the Council.

(*Signed*) Lipika **Majumdar Roy Choudhury**
Coordinator
Panel of Experts on Libya established pursuant to
resolution 1973 (2011)

(*Signed*) Luis Antonio **de Alburquerque Bacardit**
Expert

(*Signed*) Amanda **Kadlec**
Expert

(*Signed*) Moncef **Kartas**
Expert

(*Signed*) Yassine **Marjane**
Expert

(*Signed*) Adrian **Wilkinson**
Expert

19-18816 (E)   061219

Please recycle 



S/2019/914

# Final report of the Panel of Experts on Libya established pursuant to Security Council resolution 1973 (2011)

*Summary*

The military offensive on Tripoli by Khalifa Haftar's Libyan National Army (LNA) and subsequent conflict inhibited the nationwide Libyan political process, stalled reform and contributed to overall instability throughout the country. Disparate armed groups, some previously in conflict with one another, coalesced to affiliate with either the Government of National Accord (GNA) or Haftar's LNA. This new phase of instability, combined with the interest of several State and non-State actors in the outcome, amplified the existing proxy conflict that took shape after 2011. The Panel of Experts on Libya identified multiple acts that posed a threat to the security, peace and stability of Libya.

Both parties to the conflict received weapons and military equipment, technical support and non-Libyan fighters in non-compliance with the sanctions measures related to arms. Jordan, Turkey and the United Arab Emirates routinely and sometimes blatantly supplied weapons, employing little effort to disguise the source. The Panel also identified the presence of Chadian and Sudanese armed groups in support of forces affiliated with GNA and LNA alike. Although the military capability of both parties was apparently enhanced, in reality the impact of the foreign armed groups to outcomes in the conflict was limited. Military operations have been dominated by the use of precision-guided munitions from unmanned combat aerial vehicles, which has, to a degree, limited the collateral damage normally expected from such a conflict.

The front line of the fighting has remained fluid but constrained within narrow bounds since April 2019. Neither side has the military capability to effectively decide the outcome to their advantage. Consequently, fatalities among armed groups and civilians remain low. The conflict continues to pose localized threats to Libyan civilians, through displacement from fighting or the weaponization or financial exploitation of the country's vital institutions, such as water, electricity and fuel supplies.

Migrants and asylum seekers in Libya remain vulnerable not only to the effects of the conflict, but to abuse. Those who are held in official government detention centres risk exposure to a range of human rights abuses, including but not limited to degrading living conditions, repeated extortion, sexual and other exploitation, and torture. Human trafficking and the smuggling of migrants, although reduced considerably compared with previous reporting periods, continues to finance networks that contribute to instability.

The armed conflict and collapse of the political process were accompanied by increased attacks to the unity of Libyan institutions. The Panel has identified four attempts by the eastern National Oil Corporation to illicitly export crude oil. In addition, that entity is attempting to assert its claims to legitimacy and establish control over fuel distribution and installations in the east. The stability of the fuel distribution system in Libya is at risk because of a monopoly by the fuel distribution companies over supply. Refined petroleum products continue to be diverted by sea and overland, albeit at a lower level than in previous years. The Panel continues to identify networks involved in such activities operating inside and outside the country.

19-18816

Assets of designated entities continue to engage the Panel's attention, although detailed investigations are complicated by a lack of access to financial data within certain Member States. The continuing dispute over who has authority over the Libyan Investment Authority is a matter of concern. The Panel noted that the payment of management and custodian fees from frozen assets to financial institutions has not always followed procedure. In addition, there are two individuals who were found to have been in non-compliance with the travel ban.

S/2019/914

# Contents

*Page*

| | | |
|---|---|---|
| I. | Background | 6 |
| | A. Introduction | 6 |
| | B. Cooperation with stakeholders and institutions | 7 |
| II. | Acts that threaten the peace, security and stability of Libya or acts that obstruct or undermine the successful completion of its political transition | 8 |
| | A. Conflict dynamics | 8 |
| | B. Acts that threaten peace, stability and security | 8 |
| | C. Engaging in any action that may lead to or result in the misappropriation of Libyan State funds | 12 |
| | D. Attacks against any air, land or sea port in Libya, or against a State institution or installation, or against any foreign mission in Libya | 13 |
| | E. Acts that violate applicable international human rights law or international humanitarian law or acts that constitute human rights abuses | 14 |
| III. | Implementation of the arms embargo | 19 |
| | A. Maritime supply and non-compliance | 20 |
| | B. Maritime non-compliance and exceptions | 23 |
| | C. Maritime capability | 25 |
| | D. Land service military equipment | 26 |
| | E. Land service support and training | 30 |
| | F. Aviation: fixed- and rotary-wing aviation assets | 30 |
| | G. Aviation: unmanned combat aerial vehicles | 31 |
| | H. Aviation: small unmanned aerial vehicles | 38 |
| | I. Aviation: commercial drones | 39 |
| | J. Air transfers and supply | 40 |
| IV. | Unity of State institutions | 42 |
| | A. Central Bank of Libya | 42 |
| | B. Challenges to the integrity of the National Oil Corporation | 43 |
| | C. Libyan Investment Authority | 45 |
| V. | Prevention of illicit exports of petroleum, including crude oil and refined petroleum products, under resolutions 2146 (2014) and 2362 (2017) | 45 |
| | A. Focal point pursuant to resolution 2146 (2014) | 45 |
| | B. Prevention of illicit exports of crude oil | 45 |
| | C. Prevention of illicit exports of refined petroleum products | 46 |

---

\* The annexes are being circulated in the language of submission only and without formal editing. Owing to the word limits on reports of monitoring mechanisms, the Panel has provided further details relating to a number of investigations in the annexes. A table of abbreviations and acronyms can be found in annex 2.

| | | |
|---|---|---|
| VI. | Implementation of the assets freeze on designated entities | 53 |
| | A. Overview | 53 |
| | B. Palladyne/Upper Brook case | 53 |
| | C. Management and custodian fees | 56 |
| | D. Subsidiaries | 56 |
| | E. Additional factors | 57 |
| VII. | Implementation of the assets freeze and travel ban on designated individuals | 58 |
| | A. Update on designated individuals of the former regime | 58 |
| | B. Update on individuals designated after the adoption of resolution 2174 (2014) | 58 |
| | C. Non-compliance with the travel ban | 60 |
| VIII. | Actions taken for the effective implementation of the assets freeze and travel ban measures | 60 |
| IX. | Recommendations | 61 |
| X. | Annexes* | 64 |

S/2019/914

# Final report of the Panel of Experts on Libya established pursuant to Security Council resolution 1973 (2011)

## I. Background

### A. Introduction

1.    The present report, provided to the Security Council pursuant to paragraph 15 of resolution 2441 (2018), covers the period from the publication of the Panel of Experts' previous report (S/2018/812) on 5 September 2018, to 20 October 2019, and includes updates on ongoing investigations detailed therein. An overview of the evolution of the sanctions regime concerning Libya may be found in annex 1.

2.    In the conduct of its investigations, the Panel complied with the best practices and methods recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997). The Panel has maintained the highest achievable standard of proof, even though travel within Libya is restricted due to the security environment. The Panel placed emphasis on adherence to standards regarding transparency and sources, documentary evidence, corroboration of independent verifiable sources and the provision of the opportunity to reply.[1] The Panel has maintained transparency, objectivity, impartiality and independence in its investigations and based its findings on verifiable evidence.

3.    The attack on Tripoli launched by armed groups affiliated with Khalifa Haftar (Haftar Armed Forces, or HAF)[2] on 4 April 2019 and the ongoing armed conflict defined the present reporting period. Since then, instances of non-compliance with the sanctions measures for Libya have rapidly increased. Incidents violating international humanitarian law have become more salient.

4.    Travel to Libya was constrained due to the deteriorating security situation, and further complicated by the illegal detention of a member of the Panel of Experts, Moncef Kartas (Tunisia), by the Tunisian authorities on 26 March 2019. His arrest and detention, and the initiation of legal processes against him, were in violation of the provisions of article VI, section 22, of the Convention on the Privileges and Immunities of the United Nations. The United Nations spokesperson stated on 15 May 2019 that the documents submitted by the Government of Tunisia had been reviewed and that the Organization had requested the immediate release of Mr. Kartas and that charges against him be dropped.[3] Mr. Kartas was released on 21 May 2019, although charges are still pending against him. On the basis of advice from the Secretariat, the Panel was unable to travel to Tunisia, which serves as the United Nations departure point for Libya, and as a consequence was unable to travel to Libya from 25 March to 27 July 2019 (see recommendation 1).

5.    The work of the Panel was affected by two administrative issues. The first was stricter enforcement by the Secretariat of the revised administrative procedures regarding travel, initiated pursuant to section VI, paragraph 8, of General Assembly resolution 67/254 A. The Panel must now provide notice of a visit 25 days before

---

[1] Further information on methodology and the opportunity to reply can be found in annex 3.

[2] These include the armed group previously referred to as Khalifa Haftar's Libyan National Army (which is now being restyled as the Libyan Arab Armed Forces) and domestic and foreign armed groups. The Panel has developed the abbreviation Haftar Armed Forces (HAF) to cover all armed groups affiliated with Haftar. The Panel also uses the lower case to refer to armed groups who refer to themselves as "Brigade" or "Battalion", etc., in order to identify the group without providing them with the legitimacy of being a formed military unit of a government. Similarly, the lower case is used if appropriate when referring to the authorities in the east of Libya.

[3] See www.un.org/press/en/2019/db190515.doc.htm.

departure, with waivers of that rule granted only under exceptional circumstances. Second, owing to auditing considerations, travel is only approved if the Panel provides proof that meetings are scheduled for the entire duration of a mission. Individuals or organizations are often unable to confirm a meeting that far in advance. This new requirement removes the ability of the Panel to spend time on the ground identifying and developing sources or initiating investigations based on new information or evidence. Follow-up investigations therefore require additional travel and visits, which duplicate travel time, reduce the available work time of the Panel and risk the loss of potential sources. Source identification and recruitment is all but impossible for certain experts unless they can spend time among the Libyan diaspora in other countries.

6.      The impact of the restrictions placed on the Panel to travel to Libya and Tunisia for nearly four months, and to spend the time there necessary to identify and cultivate local sources, was particularly hard on the armed group experts (see para. 46 below). The evidential levels required for the Panel to include case studies in reports to the Security Council are high, and are often not met by remote access alone. Individuals are reluctant to use electronic communications. The need to obtain corroborating evidence through triangulation interviews with, for example, health officials or family members, means that only face-to-face interviews can provide the high evidential levels required to make a case.

## B.   Cooperation with stakeholders and institutions

7.      A complete list of Member States, organizations and individuals consulted can be found in annex 4. The Panel has sent 330 official letters to 61 Member States and 87 letters to entities and companies, and has received 213 replies as at 24 October 2019, the details of which can be found in annex 5.

### 1.   United Nations and other entities

8.      The Panel interacts frequently with the United Nations Support Mission in Libya (UNSMIL) and regularly meets with the Special Representative of the Secretary-General for Libya. The Panel benefited from regular exchanges with the different divisions of UNSMIL. The regular flights by UNSMIL into Libya and its strong support and flexibility facilitated the Panel's access and logistical requirements.

9.      The Panel met and exchanged information with the Panel of Experts on the Sudan and the Analytical Support and Sanctions Monitoring Team pursuant to resolutions 1526 (2004) and 2253 (2015) concerning Islamic State in Iraq and the Levant (ISIL) (Da'esh), Al-Qaida and the Taliban and associated individuals and entities.

### 2.   The authorities in the east and the Libyan National Army

10.    During the reporting period, the Panel sent 12 formal communications to three separate email addresses obtained from a range of sources, and had a number of informal communications with individuals within the authorities in the east and the Libyan National Army (LNA). No formal responses were received. It was not until 9 October 2019 that the Panel received a communication from a military official stating that his office was now the official focal point for the Panel. The Panel then re-submitted copies of all 12 official letters and is awaiting a response. The Panel made clear to the new focal point the necessary timelines for the inclusion of any statements from the authorities in the east for consideration by the Panel for inclusion in the present report. On 19 October 2019, the Panel received a communication from the new focal point to say that Khalifa Haftar had appointed a committee of three general officers to develop responses to the Panel's communications.

S/2019/914

## II.   Acts that threaten the peace, security and stability of Libya or acts that obstruct or undermine the successful completion of its political transition

### A.   Conflict dynamics

11.   The onset of nationwide conflict that began on 4 April 2019[4] has driven the country's disparate groups to more clearly align with either HAF or forces affiliated with the Government of National Accord (GNA-AF) (see annex 6 for conflict maps).

12.   Haftar's strategy to take Tripoli began with a sweep through cities and towns in the south in January 2019, where support for his offensive from his allies was favourable. HAF handed over control to proxies, continuing westward and then northward to seize strategic assets and establish positions for the assault on Tripoli. By the end of March 2019, HAF had gained control of the Sharara oil installation[5] (see para. 137 below) and established forward bases with allies in Gharyan,[6] Tarhuna[7] and Sabratha,[8] and Surman,[9] just to the south, east and west of the capital.

13.   Khalifa Haftar's aim to easily wrest Tripoli from the array of localized armed groups failed for several reasons. Previous HAF agreements with certain armed groups did not hold. In anticipation of the offensive, disparate Tripoli-based armed groups actively cooperated with large and influential Misrata-based groups. In terms of territory, the conflict has stabilized in the front-line battle area as HAF remains on the outskirts of Tripoli. When GNA-AF counter-attacked and seized the strategic town of Gharyan in late June 2019, perceptions of HAF operational capabilities were damaged.

14.   The involvement of international and regional actors, both State and non-State, is persistent and increasing. The supply of military equipment from foreign Governments and the inclusion of foreign armed groups directly involved in the fighting are destabilizing factors.

### B.   Acts that threaten peace, stability and security

#### 1.   Activities of international terrorist groups and individuals

15.   Elements of ISIL (QDe.115) remain dormant in cells in Tripoli and Misrata, and as autonomous groups in Sebha, Murzuq and Al Qatrun, and surrounding Mount Al Haruj. ISIL leadership is still centred in Bani Walid.

16.   In late April 2019, video imagery showed Abu Bakr al-Baghdadi (QDi.299), leader of ISIL,[10] praising attacks in the town of Fuqaha and calling on his militants to wage a war of attrition in Libya. On 6 July 2019, an ISIL media branch (A'maq) released video of an ISIL in Libya leader, Mahmud Massud al-Baraassi (also known as Abu Musab Allibi), in which he highlighted that Libya was now one of the main axes of future ISIL operations, which are designed to compensate for the loss of

---

[4] The HAF operation is known as "Deluge of Dignity"; the GNA responded with "Operation Volcano of Rage".

[5] 26°34'36"N, 12°13'05"E.

[6] 32°10'20"N, 13°1'13"E.

[7] 32°26'02"N, 13°38'04"E.

[8] 32°46'51.96"N, 12°26'58.20"E.

[9] 32°44'50.28"N, 12°33'51.12"E.

[10] Abdulkader Assad, "Al-Baghdadi admits ISIS was defeated in Libya's Sirte", Libya Observer, 30 April 2019. Available at www.libyaobserver.ly/news/al-baghdadi-admits-isis-was-defeated-libyas-sirte.

ground and influence in the Syrian Arab Republic. Mahmud Massud al-Baraassi is reportedly located south of Bani Walid.

17.   GNA-AF,[11] HAF[12] and increased United States Africa Command (AFRICOM)[13] counter-terrorist operations against Al-Qaida (QDe.004) or ISIL continue to disrupt the organizational structures of these groups and temporarily reduce their operational capacities in Libya.[14]

18.   ISIL in Libya finances its activities through robbery, kidnap for ransom, extortion of Libyan citizens and the cross-border smuggling of artefacts and other commodities. Taxation of human trafficking networks (S/2019/570, para. 25), continues to be a source of funding for ISIL in Libya.

**2.   Foreign armed groups in Libya**

19.   The interference of Chadian and Sudanese fighters in Libya is a direct threat to the security and stability of Libya. On 2 January 2019, the Office of the Attorney General issued an arrest warrant for 37 people (22 Chadians, 6 Libyans and 9 Sudanese) (see annex 7) for their roles in robberies, kidnappings and killings that took place in 2018 against the Libyan population in the south. Their presence, set out in previous reports of the Panel (S/2017/466, para. 83, and S/2018/812, para. 24), has become more marked during 2019, due to the intensification of the armed conflict. The continued presence of these foreign individuals, as organized groups or as mercenaries, may lead to further instability.

**3.   Sudanese armed groups**

*Sudan Liberation Army-Abdul Wahid*

20.   In mid-January 2019, the Sudan Liberation Army-Abdul Wahid (SLA-AW) operated in support of HAF brigades during the group's incursion into the south. SLA-AW, composed of approximately 200 fighters commanded by Yusif Ahmed Yusif (also known as Karjakola) (S/2019/34, para. 83), is located in Waw an-Namus, in the Fezzan region. Abdul Wahid's wider leadership is threatened by the SLA-AW elements in Libya due to a disagreement over the disbursement of the funding he receives from HAF to those elements.

*Sudan Liberation Army-Minni Minawi*

21.   The Sudan Liberation Army-Minni Minawi (SLA-MM) is led by Jaber Is'hak in Libya, and is composed of approximately 300 fighters based in Jufra. The group initially supported Haftar's incursion in the south in mid-January 2019, and is now tasked with defending the HAF rear area and the line of communication between Tripoli and Jufra.

*Gathering of the Sudan Liberation Forces*

22.   The Gathering of the Sudan Liberation Forces (S/2019/34, para. 79) is led by Taher Abu Baker Hajar in Libya and is composed of approximately 500 to 700 reportedly experienced fighters. The group supports HAF and is based in small units

---

[11] Xinhua, "Libyan authorities arrest 2 members of al-Qaida, IS", 30 May 2019. Available at www.xinhuanet.com/english/2019-05/31/c_138103881.htm.

[12] Libyan Address, "Details of the killing of senior al-Qaeda leader by LNA in Sabha", 28 January 2019. Available at www.addresslibya.com/en/archives/40581.

[13] Four air strikes carried out by United States Africa Command in September 2019 killed at least 43 members of ISIL in Libya. See www.Africom.mil.

[14] Meeting with counter-terrorism officials in Tripoli, 11 September 2019.

around Sebha, Murzuq and Umm Al Aranib. The group cooperates closely with SLA-MM forces in Libya.

### Justice and Equality Movement

23.   The Justice and Equality Movement is led by Abdelkarim Cholloy Konti in Libya, and is composed of approximately 160 fighters with 22 4x4 trucks. The group is highly mobile and has been reported as operating in Tripoli with GNA-AF and in the area between Zillah and Sebha.

### Rapid Support Forces

24.   The Panel estimates that 1,000 Sudanese troops from the Rapid Support Forces (RSF) were deployed to Libya on 25 July 2019 by General Mohamed Hamdan Dagalo (also known as Hemeti).[15] The initial plan was that the Sudanese troops would guard critical national infrastructure, thereby freeing up HAF troops for offensive operations. On 17 June 2019, open sources[16] reported that the Sudanese troops were stationed in Jufra.

25.   The Panel noted a contract signed in Khartoum on 7 May 2019 between General Mohamed Hamdan Dagalo, on behalf of the Transitional Council of Sudan, and the Canadian company Dickens & Madson (Canada) Inc.,[17] in which the company would "strive to obtain funding for your Council from the Eastern Libyan Military Council in exchange for your military help to the LNA (Libyan National Army)" (see annex 8). The Panel has yet to establish if the RSF deployment was the result of HAF funds sent to Transitional Council of Sudan or directly to General Mohamed Hamdan Dagalo, as a result of the activities of Dickens & Madson, and continues to investigate the latter's direct role, if any, in the initial RSF deployment.

26.   The Panel finds that the Sudan, and General Mohamed Hamdan Dagalo, as he has command responsibility, are both in non-compliance with paragraph 9 of resolution 1973 (2011).

### 4.   Chadian armed groups

### Front pour l'alternance et la concorde au Tchad

27.   The Front pour l'alternance et la concorde au Tchad in Libya is led by Mahdi Ali Mahamat and is composed of approximately 700 men based in Jufra camp. It is tasked by HAF to defend the area against potential attacks, namely from terrorists.

### Conseil de commandement militaire pour le salut de la république

28.   The Conseil de commandement militaire pour le salut de la république, reportedly commanded by Mahamat Haki Abdermane,[18] is composed of approximately 300 men, fights alongside GNA-AF and is reportedly based in the areas of Al Qatrun, Murzuq and Sebha. The group is likely highly involved in criminal

---

[15] The New Arab, "Hundreds of Sudan militia fighters deployed to Haftar's Libya offensive", 26 July 2019, available at www.alaraby.co.uk/english/News/2019/7/26/Hundreds-Sudan-militia-fighters-deployed-to-Haftars-Libyas-offensive; and confidential source.

[16] Jean-Philippe Rémy, "Au Soudan, 'Hemetti', le général sanglant qui voulait être roi", Le Monde, 17 June 2019. Available at www.lemonde.fr/afrique/article/2019/06/15/au-soudan-hemetti-le-general-sanglant-qui-voulait-etre-roi_5476564_3212.html?xtor=RSS-3208. See also www.alaraby.co.uk/politics/2019/7/22/معسكر-حفتر-يعلن-بدء-معركة-طرابلس-ودور-إماراتي-جديد.

[17] http://www.dickensandmadson.com (URL no longer active).

[18] The group's former leader, Hassan Boulmaye, was arrested in 2017 in the Niger, was extradited to Chad, and is now serving a life sentence.

and trafficking activities of all kinds, linking southern Libya to the Chadian region of Tibesti.

*Union of Forces for Democracy and Development*

29.   The Union of Forces for Democracy and Development (UFDD) is currently composed of approximately 100 fighters, in factions that support either GNA-AF or HAF, and is based in the area of Waw al Kabir. In early March 2019, 400 UFDD members left Libya and surrendered to the Chadian authorities, although its leader, Mahmat Nouri, claims the defections were significantly fewer.[19] Since 2017, Mahmat Nouri has been under judicial investigation in France.[20]

*Union des forces de la résistance*

30.   The Union des forces de la résistance (UFR) is a pro-GNA-AF group that maintained a considerable presence in the southern cities of Tmassah and Waw al Kabir until February 2019. Their leader, Timan Erdimi, is based in Qatar. At the request of the Government of Chad, the French Air Force interdicted a large group of UFR members in Chad, between 6 and 8 February 2019.[21] Some members of UFR who remained in Libya joined the command of Jaber Is'hak (see para. 21 above), while others sought alliances with other Chadian factions present in Libya.

**5.   Implication of Libyan nationals in the recruitment of foreign fighters**

31.   The commanders of the HAF 116th and 128th brigades, Masoud Jeddi[22] and Hasan Maatug Zadma[23] respectively, are constantly recruiting Chadian and Sudanese fighters in the south of Libya.

32.   Panel sources confirm that Nasser Bin Jreid (S/2019/34, para. 92, and S/2018/812, para. 22), continues to recruit individual Sudanese and Chadian fighters for both parties to the conflict. He is also involved in trafficking activities. Hassan Mussa, a Tebu leader who leads the Southern Protection Force connected to GNA-AF, is another prominent facilitator for the recruitment of Chadian mercenaries (S/2018/812, para. 22).

**6.   Regional impact of Chadian and Sudanese armed groups**

33.   On 3 March 2019, for the second time in two years, the Government of Chad announced the closure of its borders[24] in an attempt to limit the trafficking activities between the two countries and halt the flow of rebels to Chad. On 26 September 2019, the Sovereign Council of the Sudan ordered the closure of the country's borders with Libya and the Central African Republic, citing unspecified security and economic dangers.[25]

---

[19] Jeune Afrique and AFP, "Tchad: 400 rebelles déposent les armes, selon le gouvernement", 11 March 2019. Available at www.jeuneafrique.com/747422/politique/tchad-400-rebelles-deposent-les-armes-selon-le-gouvernement/.

[20] RFI, "Chad rebel leader arrested in Paris", 17 June 2019. Available at http://en.rfi.fr/africa/20190617-chad-rebel-leader-arrested-home-paris-french-prosecutor.

[21] Letter from Member State to the Panel dated 11 March 2019.

[22] Massoud Jeddi belongs to the Awlad Suleimane tribe. He is the commander of the brigade formerly known as "Rada brigade", based in Sebha.

[23] Hasan Maatug Zadma belongs to the Awlad Suleiman tribe, originally from the town of Harawah. The brigade is based in Jafra.

[24] Sami Zaptia, "Chad closes its border with Libya", Libya Herald, 5 March 2019. Available at www.libyaherald.com/2019/03/05/chad-closes-its-border-with-libya/.

[25] BBC World Service, "Sudan to close borders with CAR and Libya", 26 September 2019.

## C.  Engaging in any action that may lead to or result in the misappropriation of Libyan State funds

### 1.  Eastern Central Bank of Libya

34.    The Panel has established that when the European Central Bank and European commercial banks transferred Euro notes to Libya, no records of serial numbers were maintained by the European Central Bank, the commercial banks or the Central Bank of Libya. The movement of large amounts of currency between branches of the Central Bank of Libya took place without the recording of serial numbers. This makes the attribution of any Euro currency to a particular branch all but impossible.

35.    Although the Office of the Attorney General in Tripoli is still investigating the conditions of the transfer of money by the Central Bank of Libya from its old headquarters in Benghazi to its new location (also in Benghazi), there is no dispute as to the total currency loss (€28,510,000 partially damaged and €16,490,000 ruined and unusable).

36.    The Governor of the eastern Central Bank of Libya took personal initiative in order to reduce losses to the Central Bank by transferring the financial risk to third parties. He sold €28,510,000 in damaged notes at the Central Bank official rate to 2 corporate and 15 individual buyers. This happened without the concurrence of the Central Bank in Tripoli, as the two branches do not cooperate on financial issues.

37.    The Office of the Attorney General is still investigating the conditions of that transfer as well. On 18 September 2018, the Office was requested by the Central Bank to investigate the circumstances surrounding the physical transfer of money. No formal request has been made to investigate whether the circumstances of the sale of the damaged banknotes by the eastern Central Bank was in contravention of article 6 of the Banks Act (Law No. 1 of 2005 as amended by Law No. 46 of 2012).

### 2.  Administrative Control Authority East

38.    On 26 August 2019, the Administrative Control Authority East[26] published its 2018 report,[27] which provided evidence of corruption, major financial irregularities and the misappropriation of State funds by different institutions of the interim government.[28] Coincidentally, on 1 September 2019, Abdelsalam Al-Hassi, Head of the Administrative Control Authority East, was arrested by alleged HAF-affiliated individuals[29] and released the following day.

---

[26] The Libyan Administrative Control Authority is an independent body composed of two branches, East and West. The head of the Administrative Control Authority West is nominated by the Presidential Council, and the head of the Administrative Control Authority East by the House of Representatives. The Administrative Control Authority monitors the work of the executive bodies, supervises their operations and assesses their performance.

[27] See http://raqaba-ly.com/wp-content/uploads/2019/08/مرقم-2018-الهيئة-تقرير.pdf.

[28] The interim government was endorsed by the House of Representatives in 2014 and is based in Bayda, in eastern Libya. Following the establishment of the Government of National Accord in Tripoli in 2016, the interim government lost international recognition, but continues to claim legitimacy, operating mostly in eastern Libya.

[29] Safa Alharathy, "Head of the administrative control authority of the eastern authorities released after brief detention", Libya Observer, 3 September 2019. Available at www.libyaobserver.ly/inbrief/head-administrative-control-authority-eastern-authorities-released-after-brief-detention.

### D.  Attacks against any air, land or sea port in Libya, or against a State institution or installation, or against any foreign mission in Libya

39.   The Panel identified multiple attacks against the civilian national infrastructure and State institutions during the reporting period. In particular, attacks against joint civilian-military airports were prevalent. All the attacks are still under investigation by the national authorities, and the Panel has either not had access to their evidence, or is unconvinced by the veracity of some claims. Major cases are highlighted below.

Table 1
**Summary of attacks against State institutions or installations**

| Date | Activity | Remarks | Annex |
|---|---|---|---|
| 10 September 2018 | National Oil Corporation headquarters in Tripoli. An unidentified group of armed men entered the building by force, killed 2 and injured 37 staff. Three improvised explosive devices (IEDs) were detonated | ISIL claimed responsibility | 9 |
| 25 December 2018 | Two person-borne improvised explosive devices (PBIEDs) were detonated in the Ministry of Foreign Affairs. A third attacker was killed in a gunfight with guards | ISIL claimed responsibility | 10 |
| 8 April 2019 | HAF usurped Tripoli International Airport and battled with GNA-AF for control throughout the conflict | | 11 |
| 24 September 2019 | Physical assault and intimidation of the Minister for Finance by members of a Tripoli-based armed group in his office | | 12 |

#### Attacks on Tripoli Mitiga airport

40.   On 7 April 2019, Tripoli Mitiga airport was first attacked by HAF within the context of the current conflict. This was the first of multiple attacks on the airport throughout the reporting period.[30] Subsequent attacks damaged civilian aircraft (see annex 13).

41.   As the only operating international airport in Tripoli serving both commercial and military flights, Mitiga is a strategic asset. Frequent disruptions to flight schedules, including United Nations flights, and reduced traffic constrain the free flow of goods and people to the capital, which is essential for economic viability. It also has a negative impact on the airport's ability to carry out urgent medical evacuations.

42.   The Special Deterrence Force (SDF)[31] effectively controls the airport and its operations. Adjacent to the airport is the nearby SDF-controlled detention facility, which is used to detain, inter alia, fighters from local armed groups. This serves as a rationale for attacks by armed groups from both parties to the conflict, as they aim to release their own fighters from detention.

---

[30] UNSMIL, "Latest attacks on Mitiga airport, a direct threat to the lives of civilian passengers; perpetrators will face accountability", 1 September 2019. Available at https://reliefweb.int/report/libya/unsmil-latest-attacks-mitiga-airport-direct-threat-lives-civilian-passengers.

[31] Retitled the Deterrent Agency for Combating Organized Crime and Terrorism, according to a 7 May 2018 decree by the GNA. The Panel continues to use the older version of the name.

## E.  Acts that violate applicable international human rights law or international humanitarian law or acts that constitute human rights abuses

43.   The Panel has identified a range of international humanitarian law violations and human rights abuses committed during the reporting period on the basis of evidence from confidential sources (including eyewitness interviews and testimonials), social media and the analysis of imagery.

44.   The Panel noted the requirement under paragraph 11 of resolution 2441 (2018) that the travel ban and asset freeze measures also apply to acts that may also include but are not limited to planning, directing or committing acts involving sexual and gender-based violence. Although the Panel identified individuals that had more than likely been subjected to abuse and sexual and gender-based violence, the necessary evidential levels for reporting to the Committee could not be met. The Panel did not have access to confidential locations in which to interview victims, nor were they able to solicit the opinions of independent psychological and trauma counsellors. In addition, the Panel could not be assured of the safety and security of both victims and witnesses. Some or all of those conditions are necessary to meet the evidential levels required by the best practices and methods recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (see S/2006/997).

### 1.   Indiscriminate use of explosive ordnance

45.   The indiscriminate use of explosive ordnance has been routine, widespread and attributable to both GNA-AF and HAF. As an illustration of the types of ongoing violations, Panel investigations have set out the following violations of customary international humanitarian law (CIHL) involving the indiscriminate use of explosive ordnance in table 2 below (see also annexes 13 to 18).

Table 2
**Summary of international humanitarian law violations (indiscriminate use of explosive ordnance), 2019**

| Entity | Date | Activity | Remarks/CIHL rule[a] | Annex |
|--------|------|----------|---------------------|-------|
| GNA | 13 June | Firing of S-125 Neva Pechora medium-range surface-to-air missile from an improvised launcher in an indirect fire role against civilian neighbourhood in Tripoli | Rules 7, 11, 14 and 15[b] | 14 |
| HAF | 2 July | Delivery of explosive ordnance, from what was reportedly a Mirage 2000-9 fighter ground-attack aircraft under the group's direction and operational control, during an air strike against the Dhaman military compound in Tajura, which impacted on a detention centre of the Department for Combating Illegal Migration | Multiple fatalities and casualties<br><br>Rules 14 and 15 | 15 |
| HAF | 5 August | Delivery of explosive ordnance, from a Wing Loong II unmanned combat aerial vehicle under the group's direction and operational control, during four air strikes against Tebu civilian neighbourhoods in Murzuq | 42 fatalities confirmed by the Panel<br><br>Rules 7, 14 and 15 | 16 |

| Entity | Date | Activity | Remarks/CIHL rule[a] | Annex |
|--------|------|----------|---------------------|-------|
| HAF | 15 and 16 August | Delivery of explosive ordnance (cluster munitions), from an unmanned combat aerial vehicle under the group's direction and operational control, against Zuwarah international airport | Failure to take precautions to avoid damage to civilian objects<br><br>UNSMIL investigation found no military use of the airport<br><br>Rule 15 | 17 |
| GNA-AF | 1 September | Mortar attack against Mitiga international airport during civilian air operations | Highly probably executed by a single group to support its own criminal activities | 13 |
| HAF | 6 September | Free flight rocket attack against Mitiga international airport | Rules 7, 11, 14 and 15 | 18 |

[a] There may be other violations of international humanitarian law identified after further investigation of the circumstances.
[b] Rule 7: The principle of distinction between civilian objects and military objectives. Rule 11: Indiscriminate attacks. Rule 14: Proportionality in attack. Rule 15: Principles of precautions in attack.

### 2. Human trafficking and migrant smuggling

46.   Human trafficking and migrant smuggling[32] to and through Libya onward to Europe remains profitable, but the trade has all but collapsed compared with the pre-2018 period.[33] Changing regulations in neighbouring countries and localized clashes along trafficking routes have forced changes to established routes in order to avoid these barriers. This makes migration to Libya longer, costlier and more dangerous. The volume of cross-border traffic into Libya through Chad and the Niger has dropped significantly over the past two years.[34] Limitations to the Panel's ability to conduct field interviews (see para. 6 above) required that the Panel focus on internal routes to the country's western coastal departure points.

47.   Once migrants are in Libya, local conflict dynamics and the battle for Tripoli determine paths taken to reach the coast, either with the intention to work or to transit to Europe. Departures to Europe in summer months experienced a 19 per cent decline from the previous year. Since peak rates in 2016, departures have been reduced to historic lows (see table 3).[35]

---

[32] Libya is not a signatory to the Convention Relating to the Status of Refugees and has no asylum system to recognize refugees. See also S/2018/812, recommendation 13.
[33] Global Initiative against Transnational Organized Crime, "The human conveyor belt broken – assessing the collapse of the human-smuggling industry in Libya and the central Sahel", March 2019.
[34] Ibid.
[35] Historical routes are still used as main arteries for migrants, although less-trafficked, non-standard routes are proliferating. No significant departures from eastern coastal cities were identified during the current reporting period. See International Organization for Migration (IOM), "Libya's migrant report, round 18", March 2018. Available at http://migration.iom.int/docs/DTM%20Libya%20Round%2018%20Migrant%20Report%20(March%202018).pdf.

Table 3

**Migrant-refugee departures from Libya from May through September, 2016–2019**

| Year | Estimated number of departures | Reduction from 2016 peak (percentage) | Number of interdictions by the Libyan Coast Guard[a] | Interdictions by the Libyan Coast Guard (percentage) |
|------|------|------|------|------|
| 2016 | 103 100 | – | – | – |
| 2017 | 73 000 | 29 | – | – |
| 2018 | 17 000 | 83 | 8 529 | 50 |
| 2019 | 13 800 | 86 | 6 365 | 46 |

*Source*: Data from the International Organization for Migration and the Global Initiative against Transnational Organized Crime.

[a] Confidential source.

48.   As income from wide-scale trafficking decreased, the business model adjusted. Human trafficking in Libya is now a far more fragmented process whereby individuals, armed groups and criminal networks alike are able to exploit vulnerable individuals for low-cost labour or other personal or financial gain.[36] Although individuals may enter Libya through a smuggling system, most of them inevitably become part of the human trafficking networks within Libya.

49.   The rotation of existing migrant populations through multiple detention centres within Libya for months or years has become a far more prominent characteristic of migration than previously. Although individuals pay for multiple segments of a journey through Libya, they are still highly vulnerable to extortion, ransoming and forced labour. Migrants who work in Libya often reside in ghettos, and run the risk of arrest by police or local armed groups and are immediately detained.

50.   Bani Walid remains a major transit point for migrants from East and sub-Saharan Africa either from or travelling through the Sudan, Chad and the Niger to western coastal cities.[37] The area between Bani Walid and Khoms, Garabulli and Zliten is open to traffic as eastern routes have shifted just east of Tripoli to avoid areas of direct conflict. The detention and abuse of migrants and refugees in informal facilities in Bani Walid remains systematic.

---

[36] Libyan law prohibits illegal entry into its territory and imposes imprisonment for offenders, which may include penalties of labour, and does not distinguish vulnerable persons, refugees or asylum seekers from other migrants. See Law No. 6 of 1987, Regulating the Entry, Residence and Exit of Foreign Nationals, as amended by Law No. 2 of 2004, and Law No. 19 of 2010, Combating Irregular Migration.

[37] Panel source, 30 September 2019; and UNSMIL and Office of the United Nations High Commissioner for Human Rights (OHCHR), "Desperate and dangerous: report of the human rights situation of migrants and refugees in Libya", 20 December 2018. Available at www.ohchr.org/Documents/Countries/LY/LibyaMigrationReport.pdf.

Map 1
**Western smuggling routes**



*Source*: Based on a map created by the Global Initiative against Transnational Organized Crime, as amended by the Panel of Experts on Libya.

51.   The primary departure points are now Khoms,[38] Garabulli[39] and Zuwarah.[40] Khoms, Tripoli and Zawiyah are the main disembarkation points following interdiction by the Libyan Coast Guard.[41] The International Organization for Migration (IOM) and the International Medical Corps[42] provide immediate shelter, relief and medical care on arrival at these locations.[43] The Panel notes that disembarkation, registration and transportation procedures remain unclear and put migrants at further risk of exploitation.

---

[38]  32°38'55"N, 14°15'43"E.

[39]  32°45'N, 13°43'E.

[40]  32°56'N, 12°05'E.

[41]  IOM provides support facilities at 10 disembarkation points (Tripoli-Naval Base, Tripoli-Harbour, Tripoli-Tajura, Zuwarah, Marsa Dila, Zawiya, Khoms, Garabulli, Misrata, Zawiyah), Panel interview with Libyan Coast Guard.

[42]  Independent partner of the Office of the United Nations High Commissioner for Refugees (UNHCR).

[43]  UNHCR, "Libya: activities at disembarkation, monthly update", August 2019. Available at https://data2.unhcr.org/en/documents/download/71355.

### 3. Government detention centres and other informal holding facilities

52. As reported in paragraph 32 of the Panel's previous report on Libya (S/2018/812), detention centres and other informal holding facilities are operated by armed groups and individuals throughout Libya. They act as nodes along the human trafficking routes where migrants are further financially, physically and psychologically abused.

53. The Tripoli-based Office for Migration Affairs and the Department for Combating Illegal Migration, under the auspices of the Ministry of the Interior, officially manages 20 facilities, 15 of which are in the Tripolitania region. Of those 15 facilities, 12 are operational (see annex 19),[44] and contain approximately 8,000[45] (1 per cent) of the 700,000 migrants currently in Libya. Libyan authorities are attempting to curtail the practices of armed groups that are in de facto control of detention centres through the implementation of a formalized migration system. Informal holding facilities operated by groups unaffiliated with the Department for Combating Illegal Migration are beyond the authorities' purview.

54. Serious human rights violations continue in detention centres and informal holding facilities. Violations included unlawful deprivation of liberty, forced labour, rape or sexual exploitation, disappearances, lack of access to basic medical care, and torture that in many instances led to fatalities.[46]

55. Migrants at detention centres in Qasr bin Ghashir,[47] Tajura (see annex 19), Tariq Al Matar[48] and Ain Zara[49] were transferred due to the conflict to detention centres in other locations but remained in vulnerable positions owing to poor conditions and treatment in the new centres. Most of the migrants in the centres are there as a result of interdiction at sea by the Libyan Coast Guard.

56. There are approximately 3,800 migrants in detention centres located near conflict areas.[50] On 1 August 2019, in recognition of the risks posed to migrants at those facilities (primarily trafficking and the living conditions), the Head of the Department for Combating Illegal Migration, Colonel Abdelhafiz Mabrouk, announced the closure of three centres: Tajura, Misrata (also known as Karareem) and Khoms (see annex 20). At the same time, he urged the managers of the centres not to cooperate directly with migration organizations.[51] On 11 September 2019, the Director of the Office for Migration Affairs, Mohamed Shibani, informed the Panel that the above three detention centres were being closed. The Panel has ascertained that, as at 20 October 2019, the Tajura facility continued to house detainees.

---

[44] IOM.

[45] Libyan Ministry of the Interior, Office of Migration Affairs.

[46] Panel source, 30 September 2019; and UNSMIL and OHCHR, "Desperate and dangerous".

[47] 32°42'8.67"N, 13°11'42.69"E. Médecins sans frontiers, "Time running out for evacuations of trapped refuges in Tripoli amid shooting", 26 April 2019. Available at www.msf.org/time-running-out-evacuations-refugees-tripoli-amid-shooting-libya?component=video-262778.

[48] 31°59'29.60"N, 12°30'54.10"E.

[49] 32°46'59.77"N, 13°17'3.69"E.

[50] IOM, Libyan Rapid Migrant Assessment, 4 July 2019. Available at https://reliefweb.int/sites/reliefweb.int/files/resources/DTM_Tripoli_MigrantAssessment_2019-07-03_FINAL.pdf.

[51] Official Facebook page of the Ministry of the Interior. See also James Reinl, "Libya's hellish refugee centers remain open despite calls for closure", GlobalPost, 6 August 2019. Available at www.pri.org/stories/2019-08-06/libyas-hellish-refugee-centers-remain-open-despite-calls-closure.

*Al-Nasr detention centre*

57.    The Al-Nasr detention centre[52] is adjacent to the Zawiyah oil complex. Both are controlled by the Al-Nasr brigade, commanded by Mohammed Kashlaf (LYi.025). Migrants interviewed by the Panel identified the Al-Nasr detention centre as a primary hub for trafficking in western Libya. The Panel identified that the de facto manager, "Osama" or "Osama Zawiyah", was responsible for systematic exploitation within the detention centre (see para. 164 below and annex 21).

### 4.    Other violations

58.    Panel investigations have identified a range of violations of CIHL or human rights abuses (see table 4, annex 15 (as seen in table 2 above), and annexes 22 to 26).

Table 4
**Summary of other international humanitarian law violations and human rights abuses, 2019**

| Entity | Date | Activity | Remarks/CIHL rule[a] | Annex |
|---|---|---|---|---|
| ISIL in Libya | 8 April | The President of the Municipal Council, Ahmed Sassi, and the Head of Municipal Security, Abdelkafi Ahmed Abdelkafi, were assassinated in Fuqaha | Rule 2[b] | 22 |
| | 22 April | The Deputy Minister for Defence, Ouheida Abdulah Naijm, was arbitrarily detained by a Tripoli-based armed group | Violation of human rights | 23 |
| | 21 May | Denial of water supply to the population of Tripoli by disrupting supply through the Great Man-Made River | Rule 54[c] | 24 |
| GNA | 10 July | Failure to implement a release order in favour of former Prime Minister Baghdadi al Mahmoudi | Violation of human rights | 25 |
| | 17 July | A female member of the House of Representatives in Tobruk, Siham Sergewa, was kidnapped and was still missing as at 8 October 2019 | Violation of human rights | 26 |

[a] There may be other violations of international humanitarian law identified after further investigation of the circumstances.
[b] Rule 2: Violence aimed at spreading terror among the civilian population.
[c] Rule 54: Attacks against objects indispensable to the survival of the civilian population.

# III.    Implementation of the arms embargo

59.    Pursuant to paragraphs 9 to 13 of resolution 1970 (2011), as modified by subsequent resolutions, the Panel continued to monitor, investigate and identify instances of non-compliance with the arms embargo.

60.    The conflict that started on 4 April 2019 was a trigger for the supply of new military equipment to the participants to the conflict, and possibly for the emergence from storage of military equipment previously supplied but was not detected by the Panel. The transfers to Libya were repeated and sometimes blatant, with scant regard

---

[52] 32°46'19.32"N, 12°41'47.97"E.

paid to compliance with the sanctions measures. The Panel identified multiple cases of non-compliance with the arms embargo in support of both parties to the conflict, which it has summarized and tabulated in annexes 27 and 28 for ease of reference and to avoid repetition. Detailed evidence for each Panel finding of non-compliance with paragraph 9 of resolution 1970 (2011) below is contained within supporting annexes. In many cases Member States and commercial organizations, particularly those involved in illicit transfers, failed to respond to requests for information by the Panel. During the reporting period, the arms embargo was ineffective, and resulted in regular maritime and air transfers to Libya of military materiel.

61.    The majority of transfers to HAF were from either Jordan or the United Arab Emirates. The Panel finds that Jordan, the United Arab Emirates and HAF were in repeated non-compliance with paragraph 9 of resolution 1970 (2011).

62.    In response to the illicit transfers by Jordan and the United Arab Emirates, GNA approached Turkey, who soon supplied GNA-AF with military materiel. On 31 July 2019, the President of GNA, Fayez al-Sarraj, admitted that GNA was receiving weapons from Turkey.[53] On 31 July 2019, the Minister for the Interior and Defence, Fathi Bashagha, openly acknowledged the transfer of armoured vehicles for the use of the Ministry through the port of Khoms on 6 February 2019 (see para. 71 below) and Tripoli on 18 May 2019 (see para. 67 below).[54] The Panel finds that Turkey and GNA were regularly in non-compliance with paragraph 9 of resolution 1970 (2011).

## A.    Maritime supply and non-compliance

63.    The Panel identified three transfers of weapons, ammunition or armoured vehicles using the maritime supply route. Two of the transfers were in shipping containers and involved false declarations of the contents on the shipping documentation. This makes interdiction at sea, even if a vessel were to be inspected, more difficult unless: (a) a physical inspection of the full cargo occurs; (b) dogs trained to search out arms and explosives are used to locate the containers among many others; or (c) actionable intelligence is available. Documentary inspection alone will often be insufficient to identify containers that hold weapons.

64.    Resolution 2473 (2019) extended the authority for the inspection of vessels on the high seas off Libya,[55] but no such inspections took place during the reporting period. Although the mandate of the European Union military operation in the Southern Central Mediterranean (EUNAVFOR MED) operation SOPHIA was extended until 31 March 2020,[56] the operation does not have sufficient naval assets available to conduct physical inspections at sea, and fulfils mainly training and surveillance roles. Member States should initiate an effective inspections regime to interdict or deter arms transfers by sea as initially authorized by paragraph 4 of resolution 2292 (2016) and most recently extended by resolution 2473 (2019) (see recommendation 2).

---

[53] Asharq Al-Awsat, "Libya's Sarraj admits to receiving arms from Turkey", 31 July 2019, available at https://aawsat.com/english/home/article/1837556/libya's-sarraj-admits-receiving-arms-turkey; and multiple sources.
[54] Meeting with the Panel, 31 July 2019. The Panel finds that, during a period of conflict, the ease with which these vehicles can be modified with weapons makes such vehicles a "force multiplier", and removes them from "non-lethal" status.
[55] Authority first granted in paragraphs 3 and 4 of resolution 2292 (2016).
[56] European Council Decision (CFSP) 2019/1595 of 26 September 2019.

### 1. MV *Esperanza*

65.   The MV *Esperanza* (IMO 9252785) delivered three containers to Khoms between 13 and 17 December 2018. A subsequent customs inspection of containers from the vessel resulted in the interdiction of 3,000 Atak Zoraki 2918 blank firing pistols. On its next voyage, to Misrata, on 30 December 2018, the MV *Esperanza* delivered a container holding 20,000 Ekol P29 blank firing pistols. The customs authorities seized them on 7 January 2019.[57] Full details of these cases can be found in annexes 29 and 30.

66.   Although both Libya and Turkey informed the Panel that they were jointly investigating the shipments, as of the time of writing they have provided the Panel with only limited substantive information on these instances of non-compliance with paragraph 9 of resolution 1970 (2011).

### 2. MV *Amazon*

67.   On 18 May 2019 a large consignment of Kirpi 4x4 Mine Resistant Ambush Protected (MRAP) vehicles,[58] manufactured by BMC Otomotiv Sanayi ve Ticaret AS,[59] was offloaded in Tripoli port from the Moldovan-flagged MV *Amazon* (IMO 7702657). The media covered this event extensively, and no effort was made to disguise the delivery. The vehicles were collected by Ashraf Mami, on behalf of designated individual Salah Badi (LYi.028) of the Al Somoud brigade and Mohamed Bin Ghuzzi of the Al Marsa brigade.[60] Vehicles were also supplied to the 33rd Infantry Regiment led by Bashir Khalafallah.

68.   The Panel notes that the MV *Amazon* left Samsun, Turkey, on 9 May 2019, transited the Bosphorus on 11 May 2019 and then went "dark" for the night of 14/15 May 2019 while in the vicinity of Izmir port. Izmir is coincidentally the location of the BMC Pinarbaşi production plant of the Kirpi 4x4 MRAP vehicles. The Panel finds that the vessel's operator, Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Limited Sti.[61] is in non-compliance with paragraph 9 of resolution 1970 (2011) for the transportation of this military equipment to Libya. Full details can be found in annex 31 and a summary of the supply chain is illustrated in figure I.

---

[57] In 2013, the Committee confirmed that "this type of materiel is subject to the embargo" owing to the ease of its conversion to live firing weapons (S/2016/209, annex 35, para. 10).

[58] The Panel identified at least 27 vehicles from open-source imagery of the vessel's deck, but confidential sources have suggested the true number is closer to 50 to 80.

[59] See www.bmc.com.tr/en/defense-industry/kirpi.

[60] Confidential source and wide media coverage.

[61] http://www.akdenizroro.com/filo.html (URL no longer active). Operator's address: Akdeniz Roro Deniz Tasimac, Dagilgan Kume Evleri 30/A, Evci Mah, Akdeniz, 33100 Mersin, Turkey. Note that it is the same address as the vessel's owner, Maya Roro SA.

S/2019/914

Figure I
**Supply chain for Kirpi 4x4 Mine Resistant Ambush Protected vehicles**



*Source*: Panel of Experts on Libya.
*Abbreviation*: GNA, Government of National Accord.

69.   The Moldovan authorities responded quickly to this incident, and on 21 May 2019 the Naval Agency of Moldova suspended the flag certificate. On 25 May 2019, that vessel's flag certificate and all other statutory certificates for all vessels owned by Maya Roro SA, and those operated by Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Limited Sti., were deleted from the Moldovan shipping register. The MV *Amazon* was provisionally reregistered with the Togo Maritime Administration on 14 June 2019, until the Togo Maritime Administration cancelled the provisional registration on 20 August 2019. The MV *Amazon* again became a stateless vessel under article 92 of the United Nations Convention on the Law of the Sea.

70.   BMC confirmed to the Panel that it had only directly exported the Kirpi 4x4 vehicles to Qatar, Tunisia and Turkmenistan, and all others had been sold to the Presidency of Defence Industries of Turkey.[62] On 31 July 2019, the Minister for the Interior and Defence of Libya confirmed the procurement of the vehicles from Turkey.[63]

**3.   Unknown vessel**

71.   On 5 February 2019, customs authorities in Khoms port found a quantity of 4x4 Toyota vehicles with armoured rear cabs in shipping containers.[64] A confidential source indicated to the Panel that the internal destination for the vehicles in the

---

[62] Letter to the Panel from BMC dated 1 July 2019.
[63] Meeting with the Panel. See recommendation at para. 80.
[64] The same vehicles were seen by the Panel at the Ministry of the Interior headquarters location on 30 July 2019. No exemption request was made or notified for these vehicles.

19-18816

shipment was disputed within GNA administration.[65] The procurement was confirmed to the Panel during a meeting with the Minister for the Interior and Defence on 31 July 2019.

## B.   Maritime non-compliance and exceptions

### 1.   *Alkarama* offshore patrol vessel

72.   The Panel first reported in paragraphs 75 and 76 of its previous report (S/2018/812) on the transfer of the offshore patrol vessel (OPV) *Alkarama* (IMO 7820693) to HAF control in Benghazi. The Panel finds that the OPV *Alkarama* is classified as a naval vessel, and thus falls under the auspices of military equipment in paragraph 9 of resolution 1970 (2011). The rationale for this finding and the documentary evidence for this case can be found in annex 32.

73.   The supply chain for the vessel was kept deliberately opaque using the following measures: (a) the sale was previously agreed with Libya before purchase by the supplier; (b) the shipping register was changed at each stage of the supply chain; (c) a change of use declaration was made to deliberately disguise the vessel's true purpose; (d) a false declaration of demolition was made to Panama, the final flag registry of the vessel; and (e) a diversion en route was made from its declared port of destination of Alexandria, Egypt, to Benghazi. The Panel has now established the full supply chain for OPV *Alkarama* (see figure II).

---

[65] The Panel has a transcript of various conversations between high ranking government officials. Supported by Abdulkader Assad, "Tripoli Protection Force calls for probing armored vehicles shipment seized in Al-Khums port", Libya Observer, 6 February 2019. Available at www.libyaobserver.ly/news/tripoli-protection-force-calls-probing-armored-vehicles-shipment-seized-al-khums-port.

Figure II
**Supply chain for OPV *Alkarama***



*Source*: Panel of Experts on Libya.
*Abbreviations*: ETA, estimated time of arrival; LNA, Libyan National Army; UAE, United Arab Emirates.
  [a] Trading as van der Kamp Shipsales BV, Netherlands. See https://vanderkamp.com.
  [b] 1410 One Lake Plaza, JLT, Dubai, United Arab Emirates. See www.universalsatcom.com.

74.   The Panel notes that the sale of the vessel by Universal Satcom Services FZE of the United Arab Emirates to the Ahl al-Thiqa Security and Safety Equipment Imports Company of Benghazi was agreed on 1 February 2019, prior to the purchase of the vessel by Universal Satcom Services FZE from the Dutch owners.

75.   Since its transfer to Libya, OPV *Alkarama* has been refitted with the weapons systems it was originally designed to carry (i.e., one 40 mm cannon and two 20 mm cannons) (see figure III).

Figure III
**Image showing retrofitting of weapons to OPV *Alkarama* (Ras Lanuf – 26 April 2019)**



*Source*: Confidential.

76.     Universal Satcom Services FZE were thrice offered the opportunity by the Panel to provide a rationale for this transfer, and the Panel received a response on 9 September 2019.[66] The Managing Director's rationale for the sale of the vessel was contrary to some known facts, and her reply lacked the depth of detail requested by the Panel.

77.     The Panel finds that Universal Satcom Services FZE and its owner, Reema Sami Abdullah Al Omari, are both in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military materiel to Libya.

**2.    Non-lethal maritime exceptions**

78.     The Panel has identified that it is common practice that naval-type patrol vessels supplied to GNA by Member States, under the auspices of the non-lethal exception provided for under the authority of paragraph 10 of resolution 2095 (2013), are subsequently armed post-delivery (see annex 33). This is not a difficult engineering task and provides such vessels with an offensive military capability.

79.     One Member State's rationale for the supply of such vessels to the Libyan Coast Guard was: (a) that the list of embargoed goods in resolution 1970 (2011) and subsequent resolutions "leaves the burden on the Member State to define the exact boundaries of the measure's application";[67] and (b) the statement of 30 May 2017 by the Permanent Mission of Libya to the United Nations[68] that the Libyan Coast Guard is a force under the direct control of GNA. The Panel has identified evidence subsequent to that statement, which demonstrates that elements of the Libyan Coast Guard and Navy in the east are now under the effective control of HAF (see annex 33).[69]

80.     The Panel considers that paragraph 8 of resolution 2174 (2014) should now apply to the transfer of such vessels and that implementation assistance notices be issued to clarify whether particular technologies (for example patrol boats or wheeled armoured vehicles) now have military utility in Libya and should thus fall under the auspices of paragraph 9 of resolution 1970 (2011) (see recommendation 4).

## C.    Maritime capability

**1.    Naval assets**

81.     The Panel has developed a summary of Libyan Navy and Libyan Coast Guard assets available to the parties to the conflict (see annex 34). No naval asset transfers have been identified as taking place in 2019.

---

[66] See Panel methodology in annex 3.
[67] Letter from Member State to the Panel.
[68] Confidential source.
[69] Evidence includes the designation of a Libyan Coast Guard Commander, Abd Al-Rahman al-Milad (LYi.026); HAF/Libyan Coast Guard military exercises on 29 March 2019; and the announcement by HAF on 20 May 2019 of a blockade against ports in western Libya (see Jeremy Binnie, "LNA announces naval blockade of western Libya", Jane's Defence Weekly, 23 May 2019, available at www.janes.com/article/88731/lna-announces-naval-blockade-of-western-libya). The blockade has proved to be ineffective.

2. *Al Hani* **frigate (PF212)**[70]

82.   The Panel visited the Cassar Ship Repair Limited facility in Malta on 8 and 9 April 2019 to inspect the weapons systems on the *Al Hani* frigate (PF212) and determine their potential effectiveness. Recommendations for demilitarization prior to the vessel's return to Libya can be found in annex 35.

## D.   Land service military equipment

83.   The recent conflict has seen a transition from the use of converted and armed 4x4 trucks ("Technicals")[71] as a weapons platform to the preferred use of wheeled armoured vehicles. These afford their crews much-enhanced protection from small arms fire and fragmentation and improved tactical mobility, while providing a more stable weapons platform. During the reporting period, the Panel identified five new types not previously seen. A summary of the 14 different types of wheeled armoured vehicles now currently in use can be found in annex 36.

### 1.   Infantry armoured fighting vehicles

84.   The Panel notes that the Al Mared 8x8 infantry armoured fighting vehicle (IAFV),[72] manufactured by the King Abdullah II Design and Development Bureau (KADDB) in Jordan, was deployed during the reporting period for the first time by the HAF 9th Tarhuna brigade.[73] The Panel requested further clarification from Jordan as to the presence of these vehicles in Libya but no response was received. The Al Mared 8x8 IAFV is a new design and has not been reported to be in service anywhere other than Jordan.[74]

85.   The Panel notes that the Mbombe 6x6 IAFV,[75] designed by the Paramount Group, South Africa, and manufactured under licence by KADDB, was deployed by HAF[76] during the reporting period. The Panel has confirmed that these vehicles are not of South African origin,[77] and that only KADDB-manufactured vehicles are fitted with the distinctive "snakehead" turret. The Panel requested further clarification from Jordan as to the presence of these vehicles in Libya but received no response.

### 2.   Infantry fighting vehicles

86.   The Ratel-60 infantry fighting vehicle was identified as being used by the HAF 101st infantry battalion on 18 April 2018,[78] and was also seen with the HAF Al Saiqa 302nd special forces battalion on 18 April 2019.[79] This is the first time its presence

---

[70] Koni II-class frigate design. Construction started in the then Union of Soviet Socialist Republics as SKR-201 on 22 September 1982; the frigate was commissioned in the Libyan Navy on 25 December 1985.

[71] A "Technical" is an improvised civilian or non-combat military vehicle, modified to provide an offensive capability. In Libya, they are usually a 4x4 civilian-pattern light truck with a medium or heavy machine gun (predominantly DShK type) mounted in the rear of the vehicle. The term originated in Somalia in the early 1990s.

[72] See www.kaddb.com/kaddbs-portfolio/land-systems.

[73] See www.facebook.com/1316206651852074/posts/1353048164834589/, 18 May 2019.

[74] Authoritative source: https://janes.ihs.com.

[75] See www.paramountgroup.com/capabilities/land/mbombe-6/.

[76] See https://twitter.com/LiBya_73/status/1130556593035255808?s=19, 20 May 2019; and www.facebook.com/Burkan.alghedab/videos/vb.2120292251386114/353692145504122/?type=2&theater, 25 May 2019.

[77] Letter from Member State to the Panel dated 29 August 2019.

[78] See https://twitter.com/Oded121351/status/990612159896936448, 29 April 2018.

[79] See https://twitter.com/Oded121351/status/1118808298491396096, 18 April 2019; and https://twitter.com/Oded121351/status/1148278539659153409, 8 July 2019.

in Libya has been reported by the Panel. Panel investigations continue into the supply chain for this military vehicle.

### 3. Mine resistant ambush protected vehicles

87.   In its previous report (S/2018/812, para. 110, and annex 29) the Panel noted that the Caiman 6x6 MRAP, manufactured by BAE Systems Incorporated of the United States, was present in Libya at the siege of Derna in August 2017. Seven well-maintained Caiman 6x6 MRAP vehicles were identified during the reporting period as being stored by HAF in Benghazi.[80] The Panel has written to the country of manufacture to try to identify the supply chain.

88.   The transfer of BMC Kirpi 4x4 MRAP vehicles to GNA is covered in paragraphs 67 to 70 above.

### 4. Protected patrol vehicles

89.   In the same paragraph and annex of its previous report (S/2018/812, para. 110, and annex 29), the Panel first identified the presence of the al-Wahsh 4x4 protected patrol vehicle (PPV),[81] which is manufactured by KADDB in Jordan. The Panel has observed images of these vehicles in operational use by the Tariq bin Ziyad battalion of HAF[82] during 2019. The Panel requested further clarification from Jordan as to the presence of these vehicles in Libya but, as in 2018, no response to Panel enquiries was received. The al-Wahsh 4x4 PPV is not reported to be in service anywhere other than Jordan.[83]

### 5. Armoured personnel carriers

90.   Also in the same paragraph and annex of its previous report, the Panel first identified the presence of the Panthera F9 4x4 armoured personnel carrier (APC),[84] manufactured by Minerva Special Purpose Vehicles of the United Arab Emirates. The Panel has identified these vehicles as having been used by the HAF Tariq bin Ziyad battalion[85] during 2019, and it is notable that the vehicles have been locally modified by the addition of additional protective armour. The Panel is now investigating a sighting of a number of either new or refurbished Panthera T6 4x4 APC vehicles near Benghazi.[86]

91.   The Panel has identified the use of the Irigiri 4x4 APC,[87] manufactured by the Nigerian Army, by HAF.[88] The Panel has requested further clarification from Nigeria as to the presence of these vehicles in Libya.

### 6. Nashshab RPG-32 anti-tank rocket system

92.   The Panel has identified from open-source information[89] (see annex 37) the possession of the RPG-32 Nashshab shoulder-launched anti-tank rocket system by HAF. This weapons system is produced in Jordan by a cooperative venture between

---

[80] See https://www.facebook.com/100009157008088/posts/2258828957765649/, 20 May 2019.
[81] See http://www.kaddb.com/kaddbs-portfolio/land-systems.
[82] See https://twitter.com/Oded121351/status/1084717353361911808, 13 January 2019.
[83] Authoritative source: https://janes.ihs.com.
[84] See www.mspv.com/panthera-f9-2/.
[85] See https://twitter.com/Oded121351/status/1097586142097166343, 18 February 2019.
[86] See https://twitter.com/Oded121351/status/1168131362009886720, 1 September 2019.
[87] Defence Blog, "Made in Nigeria 'Igirigi' armoured personnel carriers", 26 August 2015. Available at https://defence-blog.com/army/made-in-nigeria-igirigi-armoured-personnel-carriers.html.
[88] See https://twitter.com/Gorgon11/status/1133280679914090501, 28 May 2019.
[89] See https://twitter.com/Mansourtalk/status/1133996109448253440?s=08, 30 May 2019.

the Joint Stock Company Scientific Production Association Bazalt (JSC SPA Bazalt)[90] of the Russian Federation and KADDB, Jordan, called Jadara Equipment & Defence Systems[91] (formerly the Jordan Russian Electronics Systems Company). The RPG-32 Nashshab only began production in Jordan in 2013, and is not in service anywhere other than Jordan.[92] The Panel requested further clarification from Jordan as to the presence of this weapon system in Libya but no response was received.

### 7. FGM-148 Javelin anti-tank guided missile

93.   On 27 June 2019, forces affiliated with GNA captured a range of ammunition and military equipment from HAF. Among this ammunition were at least four L239A185 ammunition container assemblies for the FGM-148 Javelin anti-tank guided missile (ATGM) system. The Panel identified four ATGM serial numbers (370719, 370720, 370722 and 370847) and two lot/batch numbers (IAI GO002 MGP07 and MGP07E035-002), which when traced led to France. France explained to the Panel that the missiles were present in Libya in accordance with paragraph 3 of resolution 2214 (2015), and that they were damaged beyond safe use and thus inoperable (see recommendation 6).

### 8. 9K115-2 Metis-M anti-tank guided weapon

94.   The Panel has identified from open-source information[93] that the 9K115-2 Metis-M anti-tank guided weapon was possibly present in Libya in the third quarter of 2016, but was certainly present in the country by 27 December 2018. The system was more recently seen in the possession of GNA-AF on 14 July 2019.[94] The Panel has requested information from a number of Member States in order to identify the supply chain for this common weapons system (see also annex 38).

### 9. 155 mm high explosive laser-homing projectile GP6 rounds

95.   On 27 June 2019 in Gharyan, GNA-AF captured at least two 155 mm high-explosive laser-homing projectile GP6 rounds, which were manufactured after 2011 by the China North Industries Group Corporation Limited. The detailed markings on the packaging and the projectile identify these precision guided artillery projectiles as part of a consignment supplied to the United Arab Emirates under contract No. DP3/2/6/1/2006/23/A (see annex 39). The Panel has submitted a tracing request to the country of manufacture but has not yet received a response. Regardless, the Panel finds that the United Arab Emirates is in non-compliance with paragraph 9 of resolution 1970 (2011) for the post-delivery transfer of this ammunition to Libya.

### 10. Pantsir S-1 and MIM-23 Hawk air defence systems[95]

96.   The Panel has established that the Pantsir S-1 surface-to-air missile system was deployed to provide air defence for Jufra airbase between 5 March[96] and 19 April 2019[97] (see annex 40). The weapons system was sighted again near Gharyan on 19 June 2019.[98] The Panel notes that this particular Pantsir S-1 system is mounted on

---

[90] See http://bazalt.ru/en/.

[91] See https://www.jadara.jo.

[92] Authoritative source: https://janes.ihs.com.

[93] See https://twitter.com/Oded121351/status/745852183934033920, 23 June 2016.

[94] See https://twitter.com/rahbatajoura/status/1150532386419089412; and https://twitter.com/rahbatajoura/status/1150532386419089412/photo/4.

[95] Other nomenclature: SA-22 Greyhound.

[96] Not shown on Google Earth image of 5 March 2019.

[97] Identified at 29°13'10.0"N, 15°59'44.2"E from confidential satellite imagery of 19 April 2019.

[98] Seen during a road movement by low loader south of Gharyan at approximately 32°05'50.40"N, 12°59'10.05"E.

a MAN SX45 heavy mobility truck ground mobility platform. Only the United Arab Emirates uses this configuration for its Pantsir S-1 systems, which was supplied to them after 2011. The complexity and costs of the system make it very unlikely that the United Arab Emirates has supplied it to any other entity who could have subsequently transferred it to Libya. The Panel thus finds that the United Arab Emirates is in non-compliance with paragraph 9 of resolution 1970 (2011) for the post-delivery transfer of this military equipment to Libya.

97.   Confidential satellite imagery taken on 21 July 2019 shows the MIM-23 Hawk surface-to-air missile system at Jufra airbase with three launchers, a command post, a high-powered illuminating radar and an unidentified radar. [99] The system was deployed tactically to defend the north end of the runway. The United Arab Emirates received 343 MIM-23 Hawk systems between 1996 and 2000. [100] Based on the location, and other confirmed United Arab Emirate military assets deployed at Jufra airbase, the Panel finds it most likely that the MIM-23 Hawk system was also transferred to Libya by the United Arab Emirates.

## 11.   Electronic countermeasures equipment

98.   The Panel has further investigated the use of electronic countermeasure systems mentioned in its previous report (S/2018/812, annex 33). The Panel concluded that the system was a Bulgarian-manufactured Samel-90 mobile IED jammer radio frequency inhibition system (see annex 41), [101] and continues to investigate the supply chain.

99.   The Panel observed an unusual antenna array on the roof of the Tripoli Security Directorate. GNA stated that it was for "enhancing communications with the transmitters of the traffic and licensing unit" in Tripoli. [102] However, the antenna array is not the type normally used for VHF or HF communications with law enforcement agencies. The Panel finds that the antenna array shares many characteristics with those used for the inhibition and jamming of unmanned aerial vehicles (see annex 42). The Council should determine whether such active jamming systems fall within the category of "military equipment" and thus whether an end user certificate should be required for any future transfers of such systems (see recommendation 5).

100.  Reports are also emerging of Global Positioning System (GPS) interference over western Libya. [103] Confidential sources informed the Panel that, between 14 and 24 July 2019, their air assets had identified GPS jamming out to 50 nautical miles from the coast of Libya, from Mitiga to Misrata. As the jamming was omnidirectional, the coastal hinterland of Libya was also subjected to GPS jamming to an inland distance of at least 50 nautical miles. The Panel continues to investigate this issue.

---

[99]  Identified in the area of 29°13'04"N, 15°59'07"E.

[100]  Authoritative source: https://janes.ihs.com.

[101]  See https://www.samel90.com/en/products/category/jammer-solutions-military-equipment-surveillance-systems/jammer-solutions/mobile-jammer.

[102]  Safa Alharathy, "Tripoli Security Directorate denies installation of drone antenna over its building", Libya Observer, 3 August 2019. Available at www.libyaobserver.ly/inbrief/tripoli-security-directorate-denies-installation-drone-antenna-over-its-building.

[103]  See https://twitter.com/MohsenDerregia/status/1171460418969071618, 10 September 2019; and United States Maritime Advisory 2019-013.

### E.   Land service support and training

**Haftar Armed Forces in Jordan**

101.  The Panel noted that, during April 2019, individuals from the Tariq Bin Ziyad battalion of HAF graduated from a training course(s) at the Prince Hashem bin al Hussein School for Special Operations [104] in Jordan (see figure IV and annex 43). The Panel finds that by providing training within its territory, Jordan is in non-compliance with paragraph 9 of resolution 1970 (2011).

Figure IV

**General Khayri al Tamimi, Head of the Libyan National Army General Commander's Office, during a visit to the training school in Jordan**



*Source*: https://m.facebook.com/story.php?story_fbid=847197048962469&id=253215761693937.

### F.   Aviation: fixed- and rotary-wing aviation assets

102. No asset transfers were identified as having taken place in 2019. Previously unserviceable aircraft were brought back to operational status [105] through the cannibalization of other aircraft, but some were subsequently lost due to enemy action

---

[104] 32°0'55"N, 36°07'49"E.
[105] For example, the GNA-AF Mirage F1 and the HAF MiG-23U.

or systems failures.[106] For a list of aviation assets available to the parties to the conflict, see annex 44.

## G.   Aviation: unmanned combat aerial vehicles[107]

103. During 2019, GNA-AF and HAF used medium-altitude long-endurance unmanned combat aerial vehicles (UCAVs)[108] to conduct air strikes. Since May 2019, the "drone war" has escalated, and for both parties to the conflict UCAVs are now the main means to conduct air strikes and drop precision-guided munitions. Irregular fixed-wing air strikes by the HAF Sukhoi SU-22 were, however, noted on 15 August 2019 against Zuwarah,[109] and on 27 September 2019 against GNA-AF in Tripoli.[110]

104. The operation[111] and maintenance of UCAVs are complex issues, requiring months of technical and simulator training. This is beyond the current known capability of the military units affiliated with GNA-AF or HAF.[112] "On the job" training of local personnel in parallel with operations is probable; but it is very unlikely they will reach full operational capability in the near future.

105. For a summary of all identified UCAV and unmanned aerial vehicle (UAV) assets in Libya, see annex 45. The main features of UCAVs currently in use are summarized in table 5.

---

[106] For example, a GNA-AF Mirage F1 (402) was lost due to engine failure near Al Watyah on 24 April 2019, and a GNA-AF Mirage F1 (5021) was shot down in May 2019. A MiG-23U operated by HAF was shot down on 14 April 2019.

[107] A summary of all unmanned aerial vehicles (also known as drones) can be found in annex 45.

[108] An unmanned aerial vehicle with the capability to deliver ordnance against ground targets.

[109] See annex 17.

[110] See https://libya.liveuamap.com/en/2019/27-september-earlier-this-morning-an-lna-airstrike-targeted, 27 September 2019.

[111] In an interview on 30 September 2019, after his capture in Gharyan on or around 25 August 2019, LNA Colonel Faouzi bou H'rara admitted to an Emirati presence in the Rajma-based HAF operations room (in the area of 32°05'06.82"N, 20°20'25.34"E). Available at www.facebook.com/watch/?v=2580407078645259.

[112] Six Emirati military personnel were killed at Jufra airbase on 13 September 2019. See Khaleej Times, "6 UAE soldiers martyred in military operations", 13 September 2019, available at www.khaleejtimes.com/news/government/6-uae-soldiers-martyred-in-military-operations; and Khaleej Times, "Bodies of six martyred servicemen arrive in UAE", 15 September 2019, available at www.khaleejtimes.com/uae/abu-dhabi/bodies-of-six-martyred-servicemen-arrive-in-uae. The rank profiles of a Captain, four Warrant Officers and a Sergeant would not be atypical for a UCAV operations team.

S/2019/914

Table 5
**Comparison of unmanned combat aerial vehicles used in Libya**

| Type | Manufacturer | Entity | Range | Altitude | Endurance | Payload |
|------|-------------|--------|-------|----------|-----------|---------|
| Bayraktar TB2 | Baykar Makina,[a] Turkey | GNA-AF | Less than 200 km[b] | 6,860 m | Less than 24 hours | 55 kg<br><br>2 x Roketsan Smart Micro Guided Munitions (MAM-L),[c] or 8 x MAM-C[d] |
| Wing Loong II | Aviation Industry Corporation of China[e] | HAF | 200 km using line of sight or greater than 2,000 km using satellite data link[f] | Greater than 9,000 m | Greater than 20 hours | 480 kg Blue Arrow (BA-7) air-to-surface missiles |

[a] See https://baykardefence.com.
[b] Extended by the deployment of relay units in late third quarter 2019, allowing for a range of 150 to 200 km from each relay unit.
[c] See http://www.roketsan.com.tr/en/product/mam-l-smart-micro-munition/.
[d] See http://www.roketsan.com.tr/en/product/mam-c-smart-micro-munition/.
[e] See http://enm.avic.com/index.shtml.
[f] Allows coverage over entirety of Libya.

106.  Analysis of the capabilities of each UCAV system shows that HAF currently has a significant tactical advantage, in that the Wing Loong II UCAV can deliver over eight times the weight of explosive ordnance against ground targets than the GNA-AF Bayraktar TB2 can. More importantly, the Panel has confirmed that the Wing Loong II UCAV is being operated using a satellite data link, which means it has the capability to cover all of Libya. This provides HAF with a full offensive capability and allows it to achieve local air superiority.[113]

107.  The GNA-AF-operated Bayraktar TB2 UCAV could initially only be used in a defensive strike capability against targets in the area, as shown in map 2. The operational range of the Bayraktar TB2 UCAV was extended to approximately 150 km outside GNA-AF-controlled territory by the deployment of ground relay stations in late third quarter 2019.[114] This then brought the HAF airbase at Jufra within Bayraktar TB2 UCAV range. GNA-AF are also trying to reduce the high attrition rate of the Bayraktar TB2 UCAV by deploying it from roads rather than from fixed airbases, which have proven vulnerable to HAF interdiction strikes.

---

[113] Defined as *the degree of dominance in [an] air battle … that permits the conduct of operations by one side and its related land, sea and air forces at a given time and place without prohibitive interference by opposing air forces*.
[114] Confidential source; and Paul Iddon, "Turkey is fighting a formidable drone war in Libya", Ahval News, 14 September 2019, available at www.ahvalnews.com/libya/turkey-fighting-formidable-drone-war-libya.

Map 2
**Range comparison of unmanned combat aerial vehicles used in Libya**



*Source*: Geospatial Information Section, according to specifications by the Panel of Experts on Libya.

### 1.  Wing Loong II unmanned combat aerial vehicles

108.  In paragraph 124 of its 2017 report (S/2017/466) the Panel noted at least one United Arab Emirates Wing Loong I UCAV based at Al-Khadim airbase since at least 24 June 2016.[115] The Wing Loong series of UCAVs were all supplied to the United Arab Emirates after 2011. On 20 April 2019, an air strike took place on the south-west approaches to Al Aziziya.[116] The Panel learned from the images of the recovered remnants that the ordnance used for the strike was a Blue Arrow BA-7 (LJ-7) air-to-surface missile (see annex 46). The type of weapons system was then confirmed from analysis of imagery obtained by UNSMIL from subsequent attacks at Camp Moz (20 April 2019), Ain Zara (21 April 2019) and Wadi Rabia (25 April 2019).

109.  The BA-7 air-to-surface missile is ballistically paired[117] to be delivered by the Wing Loong II UCAV, and by no other aviation asset identified in Libya to date (see

---

[115] Confirmed by Jeremy Binnie, "UAE's forward operating base in Libya revealed", Jane's Defence Weekly, 27 October 2016.

[116] 32°31′50″N, 13°01′17″E.

[117] Ballistic pairing is a process that integrates a weapons system into an airframe and then qualifies it for operational use. It requires software upgrades to the delivery system avionics, sighting and release systems to ensure that when the missile is aimed and delivered to a target that it actually follows the correct ballistic trajectory to accurately strike that target. The use of instrumented range facilities is needed for live firing trials to ensure accuracy and confidence in the integrated systems.

S/2019/914

annex 44). Final confirmation of the Wing Loong II/BA-7 pairing operating in support of HAF occurred on 3 August 2019, when a crashed Wing Loong II UCAV, with five BA-7 missiles in its immediate vicinity, was identified at Abu Ghrayn[118] (see annex 47).[119] Three serial numbers were identified from imagery of the BA-7 missiles, and a tracing request was sent to the country of manufacture. Subsequent satellite imagery clearly shows Wing Loong UCAVs operating at Jufra airbase (figures V and VI), and on 23 September 2019 imagery was posted of a missile launch from a Wing Loong UCAV operating over western Libya (figure VII).

| Figure V | Figure VI | Figure VII |
|---|---|---|
| **Wing Loong II at Jufra (28 August 2019)**[a] | **Wing Loong II at Jufra (19 September 2019)**[b] | **Wing Loong II over Tripoli (23 September 2019)**[c] |







*Source*: Extract from confidential imagery.

*Source*: https://libya.liveuamap.com/en/2019/19-september-satellite-image-of-uae-wing-loong-ii-taxiing, 19 September 2019.

*Source*: https://libya.liveuamap.com/en/2019/23-september-uav-wing-loong-ii-firing-a-rocket-over-tripoli, 23 September 2019.

  [a]  29°12'35.79"N, 16° 0'1.25"E
  [b]  29°12'20.56"N, 15°59'52.60"E.
  [c]  Reportedly overhead 29°12'20.56"N, 15°59'52.60"E.

110.  Panel investigations have confirmed that the Wing Loong II UCAV was not directly supplied from the manufacturer or by the country of manufacture.[120] The Panel thus finds that the United Arab Emirates is in non-compliance with paragraph 9 of resolution 1970 (2011) for the post-delivery transfer of Wing Loong II UCAV and Blue Arrow (BA-7) systems to Libya.

### 2.  Bayraktar TB2 unmanned combat aerial vehicles

111.  On 14 May 2019, HAF fighters shot down a UAV in the vicinity of Jufra but the type could not be identified from the remnants.[121] On 29 May 2019, GNA-AF released video imagery of a precision UCAV air strike against HAF in Qasr bin Ghashir.[122]

---

[118] Multiple media sources, including Khalid Mahmoud, "Libya: LNA downs several drones", *Asharq Al-Awsat*, 4 August 2019, available at https://aawsat.com/english/home/article/1843036/libya-lna-downs-several-drones. Location in area of 31°26'32"N, 15°14'12"E.

[119] The Panel has yet to identify when the 2016 Wing Loong I was upgraded to the Wing Loong II model in Libya.

[120] Jane's IHS reports that the BA-7 is only in operational use in three countries: China, Kazakhstan and United Arab Emirates.

[121] Libya Address, "LNA shoots down a drone of GNA's militias", 14 May 2019. Available at www.addresslibya.com/en/archives/45885.

[122] See https://twitter.com/Oded121351/status/1133985226290597888.

Open-source information subsequently reported that the first batch of four Bayraktar TB2 UCAVs was initially supplied to GNA-AF, possibly using the MV *Amazon*.[123]

112.  On 4 June 2019, confidential sources first informed the Panel that UCAVs were being assembled at Misrata. On 9 June 2019, the type was identified as the Bayraktar TB2 UCAV, manufactured by Baykar Makina[124] of Turkey, based on video imagery uploaded onto social media.[125] Since then there have been regular and routine postings on social media of Bayraktar TB2 UCAVs operating out of Mitiga and Misrata.[126] The Panel is aware that two Bayraktar TB2 UCAVs were destroyed by HAF air strikes against the Misrata air academy on 6 and 7 June 2019,[127] with a third shot down by HAF on 30 June 2019,[128] but combat losses have reportedly been much higher (see annex 48).

113.  A second batch of probably eight Bayraktar TB2 UCAVs was transferred in late May and early June 2019 to replace combat losses and enhance operational capability.[129] HAF responded to this on 15 August 2019 by planning and directing a precision strike against the hangers at Misrata air academy (see figure VIII) that had recently been built to support the Bayraktar TB2 UCAV. Further HAF attacks took place across the wider airport environs on 18 August 2019 in an attempt to destroy more of the new UCAV infrastructure and support facilities.[130]

---

[123] Africa Intelligence, "Recep Tayyip Erdogan's drones fly to Fayez Sarraj's rescue", 13 June 2019. Available at www.africaintelligence.com/mce/corridors-of-power/2019/06/13/recep-tayyip-erdogan-s-drones-fly-to-fayez-sarraj-s-rescue,108361236-art. The article also claims four UCAV were initially supplied, while secondary source claims six were initially supplied.

[124] www.ssb.gov.tr/Website/contentList.aspx?PageID=365&LangID=2.

[125] See https://twitter.com/Mansourtalk/status/1137718306306215936; and https://twitter.com/ly_box/status/1137857595862130688.

[126] See, for example, Libyan Address, "The Address Journal reveals the reality of using Mitaga Airport in Tripoli for military purposes", 28 August 2019, available at www.addresslibya.com/en/archives/49934, which contains a video of a Bayraktar TB2 on the runway.

[127] Africa Intelligence, "Recep Tayyip Erdogan's drones fly to Fayez Sarraj's rescue".

[128] Almarsad, "More Turkish-made drones delivered to Misrata for the GNA", 9 July 2019. Available at https://almarsad.co/en/2019/07/09/more-turkish-made-drones-delivered-to-misrata-for-the-gna/.

[129] Ibid; and Africa Intelligence, "Fayez Sarraj to get eight more Turkish drones", 4 July 2019, available at www.africaintelligence.com/mce/corridors-of-power/2019/07/04/fayez-sarraj-to-get-eight-more-turkish-drones,108364176-art.

[130] Ahval, "Libya's LNA targets Turkish base under construction in Misrata", 19 August 2019, available at https://ahvalnews.com/libya-turkey/libyas-lna-targets-turkish-base-under-construction-misrata; Almarsad, "New photos reveal the reasons for the LNA air strikes at Misrata air college", 18 August 2019, available at https://almarsad.co/en/2019/08/18/new-photos-reveal-the-reasons-for-the-lna-air-strikes-at-misrata-air-college/; and https://twitter.com/il_kanguru/status/1167498601511174150.

S/2019/914

Figure VIII
**Misrata air academy (14 May–6 July 2019)**



114.   The Panel has identified a series of 10 flights by two Antonov An-12BK aircraft (registrations UR-CAH and UR-CNT), and one Antonov An-12BP aircraft (registration UR-CGW) that delivered 53.6 tons[131] of "drone parts" and other UAV components from Istanbul, Turkey, to Misrata between 27 May and 16 June 2019. For these flights, the aircraft were all chartered by the Turkish office of ProAir-Charter-Transport GmbH[132] and operated by Ukraine Air Alliance PJSC[133] of Ukraine.

115.   The cargo manifests and air waybills identified the consignor for all four transfers as the Embassy of Libya in Ankara and the consignee as the Ministry of the Interior, Libya. Ukraine Air Alliance PJSC specifically instructed the Turkish office of ProAir-Charter-Transport GmbH to ensure that all air carriage documentation was clearly marked "NO DG,[134] NO WEAPONS, NO AMMO", which is not an International Civil Aviation Organization requirement for such documentation. The aircraft Mode S transponders were often not visible on commercial aviation tracking websites once the aircraft left Turkish air space. Full details of the case can be found in annex 49.

116.   The Panel finds that these flights transferred components for disassembled Bayraktar TB2 UCAVs, and therefore Turkey, Ukraine Air Alliance PJSC, ProAir-Charter-Transport GmbH and the carriers' agent Plures Air Cargo[135] were all in

---

[131]  The word "ton" in United Nations documents refers to "metric tonne".
[132]  See https://www.proair.de/en.
[133]  See www.uaa-avia.com.
[134]  Dangerous goods.
[135]  See https://www.plures.com.tr/en.

non-compliance with paragraph 9 of resolution 1970 (2011) on the transport of military materiel to Libya.

117.  On 6 July 2019, reports emerged that part of the second batch of eight Bayraktar TB2 UCAVs was delivered to Misrata [136] by an IL-76TD aircraft (registration UR-COZ) operated by SkyAviatrans LLC [137] (Ukraine), and owned and also contracted by Volaris Business LP[138] (United Kingdom of Great Britain and Northern Ireland). Panel investigations found that the aircraft made six flights from Ankara to Misrata from 3 to 21 July 2019 (see figure IX). The cargo manifests and air waybills again indicated that the consignor for all six transfers was the Embassy of Libya in Ankara and the consignee was the Ministry of the Interior, Libya. ProAir-Charter-Transport GmbH again chartered the aircraft. Full details of the case can be found in annex 50.

118.  The Panel cannot confirm that these flights transferred UCAV components, but finds that they did transfer military materiel, and therefore that Turkey, ProAir-Charter-Transport GmbH and the carriers' agent Plures Air Cargo were all in non-compliance with paragraph 9 of resolution 1970 (2011). On this occasion the Panel does not find SkyAviatrans LLC or Volaris Business LP in non-compliance, but does consider the due diligence protocols and procedures of the companies to be totally inadequate and not fit for purpose.

119.  On 30 July 2019, the Aviation Security Council of the State Aviation Administration of Ukraine banned flights by all Ukrainian-registered aircraft into Libya due to "the worsening security situation". [139] The SkyAviatrans IL-76TD aircraft (registration UR-COZ) gained an exemption from this ban from the Ukrainian authorities by claiming they were operating under a contract with the Libyan Red Crescent. The aircraft was subsequently destroyed by an HAF air attack against the Misrata air academy [140] on 5 August 2019 (see figure X). The Panel is not yet convinced of the veracity of the documentation supplied by SkyAviatrans to the Ukrainian authorities to obtain the exemption[141] and continues to investigate.

---

[136] See https://twitter.com/BabakTaghvaee/status/1147455606120419328.

[137] See www.skyaviatrans.com.ua.

[138] See https://beta.companieshouse.gov.uk/company/SL026852.

[139] Permanent Mission of Ukraine to the United Nations, 1 August 2019 (confidential communication to the Panel); and https://avia.gov.ua/informatsiya-shhodo-prijnyatih-rishen-radi-z-bezpeki-aviatsiyi-derzhavnoyi-aviatsijnoyi-sluzhbi-ukrayini-u-zv-yazku-iz-zagostrennyam-vijskovo-politichnoyi-situatsiyi-v-respublitsi-liviya/.

[140] 32°20'34.07"N, 15°02'35.89"E.

[141] Owing to the following reasons: (a) the Libyan Red Crescent has not responded to the Panel's enquiries; (b) although signed, no name or appointment appears on the letter; and (c) the social media accounts of the Libyan Red Crescent show no activity for the past two years.

S/2019/914

Figure IX
**IL-76TD aircraft at Misrata air academy
(6 July 2019)**



*Source*: Confidential.

Figure X
**Air strike at Misrata air academy
(5 August 2019)**



*Source*: Digital Globe GeoEye 1 WorldView2, 11 August 2019.

120.  The high attrition rate suffered by Bayraktar TB2 UCAVs as a result of HAF air and Wing Loong II UCAV strikes led to the deployment of a third batch of Bayraktar TB2 UCAVs to Misrata in late August 2019.[142]

121.  The Panel has written to Turkey and GNA requesting further information regarding the transfer to Libya of Bayraktar TB2 UCAVs in non-compliance with paragraph 9 of resolution 1970 (2011), but received no response.

## H.  Aviation: small unmanned aerial vehicles

122.  The Panel has identified the use of, for the first time in Libya, small UAVs in an intelligence, surveillance and reconnaissance role by both GNA-AF and HAF during 2019 (see table 6 and annex 51). All of these vehicles are almost certainly present in Libya in non-compliance with paragraph 9 of resolution 1970 (2011), and investigations into the supply chains continue.

Table 6
**Small intelligence, surveillance and reconnaissance unmanned aerial vehicles used in Libya[a]**

| Entity | Type | Remarks |
| --- | --- | --- |
| GNA-AF | Orbiter-3[b] | Identified from imagery of crashed UAV remnants at Sirte on 29 July 2019 |
| HAF | Orlan-10[c] | Identified from imagery of crashed UAV remnants at Sirte on 23 April 2019 |

---

[142]  Confidential source.

19-18816

| Entity | Type | Remarks |
|--------|------|---------|
| HAF | Mohadjer variant[d] | First seen in Libya on or around 16 October 2017[e] |
| HAF | Yabhon-HMD[f] | Now manufactured by Air Target Systems |

[a] See also annex 45.

[b] See https://aeronautics-sys.com.

[c] See https://www.stc-spb.ru.

[d] Now incorporated within the Iran Aviation Industries Organization. See https://en.wikipedia.org/wiki/Iran_Aviation_Industries_Organization (www.mod.ir currently inactive).

[e] Arnaud Delalande, "Someone gave Iranian-made drones to Libya's Tobruk regime: Iran or Sudan?" War Is Boring, 16 October 2017. Available at https://warisboring.com/who-gave-iranian-made-drones-to-libyas-tobruk-regime/.

[f] See http://www.ats-ae.com/.

## I.   Aviation: commercial drones

123. All parties to the conflict are using low-endurance commercial drones, such as the DJI Phantom 4, for intelligence, surveillance and reconnaissance tasks at the tactical level.[143] On 30 September 2019, a Chilong[144] CL-11 VTOL long-endurance UAV crashed near Tarhuna[145] (see figures XI and XII). This was the first example of a widely available high-specification commercial UAV being used in Libya in a military intelligence, surveillance and reconnaissance (ISR) role. Such equipment does not fall under the auspices of paragraph 9 of resolution 1970 (2011) (see recommendation 5).

Figure XI
**Crashed Chilong CL-11 VTOL UAV near Tarhuna (30 September 2019)**



*Source*: https://twitter.com/Oded121351/status/1178609339776544768, 30 September 2019.

Figure XII
**Manufacturer's image of Chilong CL-11 VTOL UAV**



*Source*: https://www.ecplaza.net/products/chilong-11-cl-11-hybrid-vtol_4419852.

[143] Borzou Daragahi, "Libya: UN-backed government defending capital from warlord Haftar now using drones on front lines", *Independent* (London), 15 May 2019. Available at www.independent.co.uk/news/world/middle-east/libya-capital-khalifa-haftar-drones-war-khaled-el-meshri-a8915246.html.

[144] Beijing Sagetown Technologies Company Limited (see www.sageuav.com). It is referred to as the YFT-CZ35 VTOL when it is marketed for military purposes (see http://www.digitaleagle-uav.com/Hybrid-Engine-VTOL-Fixed-Wing-UAV-Drone-pd45577057.html).

[145] 32°25'51.24"N, 13°37'12.45"E.

## J.   Air transfers and supply

### 1.   Military cargo aircraft

124. In its previous report (S/2018/812, para. 89) the Panel reported on the unexplained movement of large military cargo planes into Libya. The Panel continued to monitor these military flights, but no violations of the arms embargo have yet been identified.

### 2.   Civilian aircraft in support of the military operations of the forces affiliated with the Government of National Accord

125. Arms transfers to Libya by air were routine during the reporting period, and detection or interdiction was almost impossible without the implementation of an inspection regime at the country's international airports and military airbases. The majority of shipments were from airports located within the Member State that was supplying the particular weapons, and cooperation with Panel investigations in these instances was non-existent (see recommendation 3).

126. The Panel has identified a range of civilian-registered aircraft that routinely operate, or have recently operated, as military cargo aircraft in support of GNA-AF (see summary at table 7). Most are in non-compliance with paragraph 9 of resolution 1970 (2011).

Table 7
**Civilian aircraft operating in support of the Government of National Accord**

| Registration | Type | Operator | Remarks |
|---|---|---|---|
| UR-CAH | Antonov An-12BK | Ukraine Air Alliance PJSC[a] | See paragraphs 114 to 116 and annex 49 |
| UR-CGW | Antonov An-12BP | Ukraine Air Alliance PJSC | See paragraphs 114 to 116 and annex 49 |
| UR-CNT | Antonov An-12BK | Ukraine Air Alliance PJSC | See paragraphs 114 to 116 and annex 49 |
| UR-COZ | Illuyshin IL-76TD | SkyAviatrans LLC,[b] for Volaris Business LP[c] | See paragraphs 117 to 119 and annex 50 |

[a] See http://www.uaa-avia.com.
[b] See http://skyaviatrans.com.ua.
[c] See company details at https://beta.companieshouse.gov.uk/company/SL026852.

### 3.   Civilian aircraft in support of the military operations of the Haftar Armed Forces

127. The Panel has identified a range of civilian-registered aircraft that routinely operate, or have recently operated, as military cargo aircraft or support aircraft in support of HAF, in non-compliance with paragraph 9 of resolution 1970 (2011) (see summary at table 8 and annex 52 for details).

Table 8
**Civilian aircraft operating in support of the Haftar Armed Forces**

| Registration | Type | Operator | Remarks |
|---|---|---|---|
| ER-ICS | Ilyushin IL-18D | Sky Prim Air SRL[a] | Excluded from Moldovan registry on 8 July 2015 |
| | | | Unregistered and making internal flights only |
| UP-AN601 | Antonov An-26 | Space Cargo Incorporated[b] | Removed from Kazakhstan registry on 8 July 2015 |
| | | | Unregistered and making internal flights only |
| UP-17601 | Ilyushin IL-76TD | Sigma Airlines[c] | – |
| UP-17645 | Ilyushin IL-76TD | Sigma Airlines | Seen 11 January 2019. Seen flying outside Libya since April 2017 |
| UR-CMP | Ilyushin IL-76TD | Deek Aviation FZE[d] | Air operating certificate revoked on 30 July 2019[e] |
| UR-CRC | Ilyushin IL-76TD | Deek Aviation FZE | Air operating certificate revoked on 30 July 2019 |

[a] No contact details have been identified, and ownership may have been transferred to an as yet unidentified company.
[b] See http://spacecargoinc.com.
[c] See https://airsigma.pro.
[d] The company website, www.deekaviation.com, has lapsed.
[e] See https://open4business.com.ua/ukraine-suspends-operator-certificate-of-europe-air-carrier/.

128.  The relevant Member States' aviation authorities and the Libyan Civil Aviation Authority have confirmed to the Panel that the aircraft flying under registrations ER-ICS and UP-AN601 are not registered,[146] and thus both aircraft are operating in contravention to the Convention on International Civil Aviation.

129.  The Ilyushin IL-76TD aircraft (registered UR-CMP and UR-CRC) were both destroyed by a GNA-AF directed Bayraktar TB2 UCAV strike against Jufra airbase on 25 July 2019 (see figures XIII and XIV).

---

[146] Letter to the Panel dated 15 May 2019.

Figure XIII
**Destroyed IL-76TD at Jufra airbase
(26 July 2019)**



*Source*: European Space Imaging press release of 3 August 2019.

Figure XIV
**Destroyed IL-76TD at Jufra airbase
(26 July 2019)**



*Source*: https://mobile.twitter.com/Arn_Del/
status/1155525947040378880, 28 July 2019.

130. The Panel finds that Deek Aviation FZE, Sky Prim Air SRL, Space Air Cargo Incorporated and Sigma Airlines are all in non-compliance with paragraph 9 of resolution 1970 (2011) for their involvement in the transfer of military materiel to HAF in Libya.

# IV. Unity of State institutions

## A. Central Bank of Libya

131. In its 2017 report (S/2017/466, para. 213 and annex 56) the Panel reported that bank notes printed on behalf of the eastern Central Bank of Libya by the Goznak JSC company[147] in the Russian Federation were approved for circulation by the Presidency Council of GNA on 26 May 2016, against the advice of the Central Bank of Libya. The official notes are printed by De La Rue Limited.[148] The Central Bank of Libya had opposed the circulation of the currency printed by Goznak based on: (a) the fact that it was illegal currency and thus a contravention of the Banks Act (Law No. 1 of 2005 as amended by Law No. 46 of 2012); and (b) advice from international financial institutions. The Central Bank's position, which it still holds, was that the existence of parallel printed currency notes is detrimental to the economy as it causes confusion, undermines confidence in the currency and increases the likelihood of counterfeiting. A summary of the differentiating security features can be found in annex 53.

132. On 14 November 2018, the Governor of the eastern Central Bank, Ali Al-Habri, denied that the eastern Central Bank had any intention of printing new bank notes in the Russian Federation. In contradiction, on 20 November 2018, the eastern Central Bank adviser, Musbah Al-Ekari, confirmed to a Libyan television channel the total

---

[147] See www.goznak.ru.
[148] See www.delarue.com.

annual amounts of parallel currency printed by Goznak that the eastern Central Bank had introduced into circulation (see table 9).[149]

Table 9
**Parallel currency circulated by the eastern Central Bank of Libya, 2016–2018**

| Date | Printer | Denomination (Libyan dinars) | Value (Libyan dinars) | Value (United States dollars) | Gross domestic product (percentage) |
|---|---|---|---|---|---|
| 2016 | Goznak JSC | 20, 50 | 4.0 billion | 2.89 billion[a] | 11.03[b] |
| 2017 | Goznak JSC | – | 4.0 billion | 2.99 billion[c] | 7.85[d] |
| 2018 | Goznak JSC | – | 1.7 billion | 1.23 billion[e] | 2.55[f] |
| **Total** | | | **9.7 billion** | **7.11 billion** | **6.31** |

[a] Data from www.xe.com as at 1 September 2016 ($1.00 = LD 1.3843).
[b] Gross domestic product (GDP) = $26.2 billion. Data from World Bank.
[c] Data from www.xe.com as at 1 September 2017 ($1.00 = LD 1.3351).
[d] GDP = $38.1 billion. Data from World Bank.
[e] Data from www.xe.com as at 1 September 2018 ($1.00 = LD 1.3777).
[f] GDP = $48.3 billion. Data from World Bank.

133.  On 23 September 2019, the Panel was informed of the provisional withholding in transit, by a Member State, of two ISO containers containing 29 million bank notes (LD 50 denomination) with a face value of LD 1.45 billion.[150] These notes were printed by the Goznak JSC company under a contract with the eastern Central Bank dated 2 April 2018.

134.  The Member State consulted the Central Bank of Libya, and on 9 October 2019 the Central Bank requested that the Member State take the necessary actions and procedures, including but not limited to the seizure of the shipment, to prevent its illegal use.

135.  The Panel has noted open-source reports that a further LD 2 billion in currency was flown into Benina international airport on or around 28 September 2019. The Panel continues to investigate this issue.[151]

## B.  Challenges to the integrity of the National Oil Corporation

136.  On 26 December 2018, Almabruk Sultan replaced Faraj Said as the new chair of the eastern National Oil Corporation, an appointment made by the interim government. Although during the first months after his appointment the eastern National Oil Corporation remained unobtrusive, on 12 May 2019 a letter signed by a board of directors of the eastern National Oil Corporation was sent to market operators (see annex 54). This letter stated that the current chair of the National Oil Corporation was now Almabruk Sultan and that the National Oil Corporation headquarters were in Benghazi. In response to this communication, the Permanent Mission of Libya to the United Nations reiterated that the sole legitimate authority to export crude oil is the National Oil Corporation based in Tripoli and chaired by

---

[149] Abdulkader Assad, "Libya's parallel central bank admits printing 9.7 billion dinar banknotes in Russia", Libya Observer, 20 November 2018. Available at www.libyaobserver.ly/economy/libyas-parallel-central-bank-admits-printing-97-billion-dinar-banknotes-russia.

[150] The Panel submitted sample notes for independent analysis, and the finding on 4 October 2019 was that they the notes were virtually identical, though 2 mm less in length, to the notes examined in 2016 and reported in the report of the Panel for 2017 (S/2017/466).

[151] See www.alsaaa24.com/2019/09/30/الضراط-وصول-عملة-ليبية-من-روسيا-إلى-ب/; and www.facebook.com/watch/?v=2417705204974329.

Mustafa Sanalla (see annex 55). On 9 October 2019, the Panel received another letter from a board of directors of the eastern National Oil Corporation, the content of which continued to challenge the legitimacy of the National Oil Corporation in Tripoli (see annex 56).

137.  The Panel notes that, in addition to the oil wells, export terminals and related facilities in the east, HAF retains its control of the Sharara[152] and Al Feel[153] oilfields (see para. 12 above).

138.  On 2 August 2019, the Panel met with Almabruk Sultan, who indicated that the eastern National Oil Corporation would persist in trying to obtain recognition as a legitimate institution, with the ultimate goal of gaining control over all Libyan oil. He acknowledged that efforts had been made to export crude oil and he was confident that the current dynamics in the country would pave the way for a situation in which the eastern authorities would at some point be able to export crude oil. He stated that no other vessels had been loaded since MT *Distya Ameya* (IMO 9077343) (S/2017/466, para. 183).

139.  In this context, the interim government and the eastern National Oil Corporation appointed a board of directors for a "new" Brega Petroleum Marketing Company in the east ("eastern Brega"),[154] in order to gain control of the distribution of fuel in their territory (see annex 57). During October 2019 the Panel noted signs that the eastern National Oil Corporation was preparing to take control of the Inspection and Measurement Department of the National Oil Corporation in Benghazi,[155] together with National Oil Corporation subsidiaries such as Sirte Oil[156] and the Ras Lanuf Oil and Gas Processing Company.[157]

140.  Although the National Oil Corporation in Tripoli retains its leading institutional role and still controls the exploitation of natural resources, the recent decisions of the eastern National Oil Corporation are a clear threat to the integrity of the National Oil Corporation. The activities of the eastern National Oil Corporation are aggravating the institutional split in the country and eroding the capacity of the National Oil Corporation to perform its oversight duties over the export of crude oil.

141.  The Panel is of the view that the eastern National Oil Corporation will continue trying to export crude oil (see para. 144 below). It also remains possible that eastern Brega will try to exercise control over fuel distribution and the import of certain refined products (see para. 147 below).

---

[152] Middle East Monitor, "Eastern Libyan forces take over El Sharara oilfield", 7 February 2019. Available at www.middleeastmonitor.com/20190207-eastern-libyan-forces-take-over-el-sharara-oilfield/.

[153] Almarsad, "El-Fil field taken by LNA", 21 February 2019. Available at https://almarsad.co/en/2019/02/21/el-fil-field-taken-by-lna/.

[154] Brega is a subsidiary of the National Oil Corporation responsible for the distribution of fuel in the country. The "new" eastern Brega has in effect taken over all of the assets and distribution networks previously controlled by the legitimate Brega offices in the east.

[155] The Inspection and Measurement Department of the National Oil Corporation plays a crucial role, as it is the authority that conducts the final review of the quality and the quantity of the crude oil being exported.

[156] See https://sirteoil.com.ly. Founded in 1981, its headquarters are located in the port of Marsa al Brega.

[157] https://raslanuf.ly (URL no longer active). Founded in 1982, its headquarters are located in Ras Lanuf.

### C.   Libyan Investment Authority

142.  Though the Libyan Investment Authority (LYe.001) in Tripoli has asserted its control of the management of assets, the interim government has a parallel board of trustees, which in turn appointed a board of directors. The current chair of that board of trustees is Abdallah al-Thinni, prime minister of the interim government. The current chair of that board of directors is Hussein Mohamed Hussein, who was appointed on 17 September 2018. He is also party to a court case on the receivership of certain assets of the Libyan Investment Authority in the United Kingdom (see paragraph 196 below and annex 58).

## V.   Prevention of illicit exports of petroleum, including crude oil and refined petroleum products, under resolutions 2146(2014) and 2362 (2017)

### A.   Focal point pursuant to resolution 2146 (2014)

143.  On 30 July 2019, the President of the Presidency Council of GNA appointed Imad Salem Ben Rajab, the General Manager of the National Oil Corporation International Marketing Department, as the focal point pursuant to resolution 2146 (2014) (see annex 59). Since then, he has been in close contact with the Panel, providing relevant information regarding attempts to illicitly export crude oil and refined petroleum products. The Panel is still of the opinion that the designation mechanism contained in resolution 2146 (2014) is not implementable, primarily due to the lack of resources of GNA (see recommendation 7).

### B.   Prevention of illicit exports of crude oil

#### 1.   Attempts to illicitly export crude oil

144.  The Panel has documented four attempts to illicitly export crude oil by the eastern National Oil Corporation. They include: (a) two agreements to allocate crude oil, dated 8 April and 16 May 2019; (b) a document that appears to be the terms of reference for a sales and purchase contract of unknown date, but valid until 20 July 2019; and (c) an inquiry in the market to charter a vessel to export 12 million barrels of crude oil (see annex 60).

145.  Of the four cases, the third was the most concerning. Contractual aspects of this attempt were designed to allow the eastern National Oil Corporation to select the shipping company for the cargo, which is contrary to the common market practice. [158] It would have allowed the eastern National Oil Corporation to choose an ad hoc shipping company and/or nominate a vessel of a flag State sympathetic to the eastern authorities (see recommendation 9).

---

[158] In the terms of reference for the sale and purchase contract it was indicated that the terms of sale were "cost insurance and freight", instead of the standard market practice of "free on board". In cost insurance and freight agreements, the responsibilities of the seller include transporting the goods to the nearest port, loading them on a vessel, paying for the insurance and freight and assuming responsibility for the goods until they reach the buyer's nearest port. In free on board agreements, the buyer assumes all costs of shipping and also assumes all responsibility for the goods once loaded.

146. All attempts were aborted at an early stage. To the Panel's knowledge, no vessel was nominated to load the cargo. No vessels have been designated pursuant to paragraph 11 of resolution 2146 (2014).

### 2. Attempt to illicitly import aviation fuel

147. At the end of August 2019, the Panel received information that the (at the time) Brega office in the east had requested from its headquarters in Tripoli an unusually large quantity of Jet A-1 aviation fuel. This request was refused by the National Oil Corporation, which was not satisfied that Brega required such extra quantities of aviation fuel to support normal commercial air operations in the east.

148. The Panel analysed the Jet A-1 consumption in eastern Libya during 2019 (see annex 61), and identified that, although commercial aviation activity remained relatively constant, fuel consumption rose in relation to the conflict dynamics. In order to gain access to extra aviation fuel, representatives of the eastern National Oil Corporation requested that an intermediary company, Byllis Energji of Fier, Albania,[159] try to arrange the purchase of 20,000 tons of Jet A-1 fuel.[160] To the Panel's knowledge, no fuel was delivered.

149. The Panel considers that a unilateral import of this type by the eastern National Oil Corporation would primarily be used to support HAF air force operations. In such circumstances, the additional aviation fuel would be considered combat supplies and thus fall under the scope of military materiel in paragraph 9 of resolution 1970 (2011).

150. The Panel finds that such an import conducted by the eastern National Oil Corporation or any parallel institution in the east constitutes, per se, a major threat to the integrity of the National Oil Corporation and will inevitably lead to further unilateral decisions (see para. 136 above) (see recommendation 10).

## C. Prevention of illicit exports of refined petroleum products

151. Although the smuggling of refined petroleum products from Libya has decreased compared with previous years, it still continues at significant levels. Substantial profits are generated for criminal networks located within and outside Libya. The supporting logistics chain generates a basic source of income for many individuals at each link of the chain across the country, particularly in the south and far west, where there are few other economic opportunities.

152. During the reporting period, the HAF offensive against the Tripoli-based armed groups brought fuel smuggling to a temporary halt. After a few weeks, however, the networks involved resumed their operations, mainly in the west and south of the country, albeit at a lower level than before. Fuel continues to be diverted by sea and overland (see paras. 166 and 175 below).

153. Key Libyan institutions are actively involved in curbing fuel smuggling. The Libyan Coast Guard, although constrained by its limited capabilities, remained vigilant. Though it has not intercepted any vessels, the Coast Guard has increased its operational awareness. On 7 February 2019, the Office of the Attorney General issued arrest warrants for more than 100 individuals and owners of petrol stations involved

---

[159] Albanian company registration number: L717100281. Address: Rr. "Ibrahim Rugova", Sky Tower, Tirana, Albania. The Panel has a copy of the company's memorandum of incorporation for reference.

[160] This equates to 25,322,000 litres at a mid-range specific gravity of 1.2661, which would sustain consumption in the east at current rates for over three months.

in smuggling and ordered the Central Bank of Libya to freeze the accounts of the respective businesses (see annex 62).

154. Brega is responsible for the supply of fuel to the four distribution companies: Sharara Oil Services, Libya Oil, Al Rahila and Turek Saria. In November 2018, in order to improve the transparency of supply and public oversight, Brega started to publish details of the fuel deliveries made to individual petrol stations (see para. 159 below).

## 1.   Fuel distribution mechanism

155. In paragraphs 147 and 148 of its previous report (S/2018/812), the Panel explained the system for fuel imports and how demand is determined. The Panel has also noted a "major consumer's committee" that meets every month to determine import requirements. Brega has a key role, as it provides the demand estimates, which are initially calculated as the average consumption of the past five years, plus 2 per cent.

156. Once the refined products are imported, title and responsibility are transferred to Brega, which is in charge of supplying fuel to the four distribution companies. Since early 2019, the four distribution companies have been required by Brega to make advance payments for their fuel. No delivery notes to distribution companies are issued by Brega's supply department until its financial department confirms that payment has been received. Although this measure was adopted at the national level, eastern Brega has not complied with this internal procedure since the HAF offensive began.

157. Brega has also developed a list of licensed "trusted" petrol stations, based on "passing" a physical inspection. No fuel is delivered to any unlisted petrol station (see annex 63). In September 2018, the new standards to regulate petrol stations became fully binding (S/2018/812, para. 152). New licences to operate and sell fuel are granted by the National Oil Corporation. However, petrol stations are operating in contravention of the new standards by using pre-September 2018 National Oil Corporation licences that have not been revoked. In December 2018, a single office in the Ministry of Economy assumed responsibility for issuing the planning permission to build new petrol stations, which is a reversion to the pre-2011 system.

158. Refined products, gasoline and diesel are delivered to the distribution companies at LD 0.1016 ($0.072) per litre. Fuel is retailed to the petrol stations at LD 0.14 ($0.099) per litre and sold to the public at LD 0.15 ($0.11). Figures XV to XVIII below provide an indication of the quantities of petroleum products imported by the National Oil Corporation (2018 and 2019), locally refined (2015 to 2019) and distributed by Brega (2010 to 2019). See annex 64 for detailed figures.

Figure XV
**Fuel imported by the National Oil Corporation, 2018–July 2019**



*Source*: Developed by the Panel of Experts on Libya using data from the National Oil Corporation.

Figure XVI
**Fuel internally refined by the National Oil Corporation, 2015–2018**



*Source*: Developed by the Panel of Experts on Libya using data from the National Oil Company.

Figure XVII
**Fuel distributed by Brega, 2010–April 2019**

(Millions of litres)



*Source*: Developed by the Panel of Experts on Libya using data from the Brega Petroleum Marketing Company.

Figure XVIII
**Fuel distributed by Brega according to territory, 2010–2019**[a]

(Millions of litres)



*Source*: Developed by the Panel of Experts on Libya using data from the Brega Petroleum Marketing Company. Figures for 2019 are estimated.
  [a] HAF controls territory in the east and south of Libya, GNA controls the remainder.

### 2. Distribution companies

159. The National Oil Corporation devolved responsibility to the four distribution companies to ensure that they checked whether petrol stations met the new national standards and supplied fuel only to those that did, which led to the finding that over 20 per cent of the existing petrol stations did not comply with the new required national standards outlined in paragraph 157 above. However, the distribution companies continue to distribute fuel to petrol stations that hold pre-September 2018 licences. The activity continues because it provides an economic benefit to the distribution companies and forestalls the possibility of legal action should supply be denied.

160. Local distribution companies are registered as separate legal entities under the names of the four main distribution companies. This has led to confusion as to the legal status of these companies, generated legal disputes and prevented a cohesive approach.

161. The fuel distribution companies have high operating costs, mainly due to overstaffing, which they are reluctant to address. The regulated pricing structure, shown in paragraph 158 above, means that their profit margins are dictated by their operating costs and efficiency. Lack of control of operating costs and inefficient management means that the profit margin is currently low or non-existent. The business model is complicated further as historical debt remains unquantified and unresolved, while the companies continue to accrue debt with Brega. In 2017 that debt stood at LD 570 million ($403 million).[161] The requirement by Brega for advance payment (see para. 156 above) means the distribution companies face continuing major liquidity problems.

162. Authoritative sources are of the opinion that the financial situation of the distribution companies will only worsen, and that there is a real risk of a significant deterioration in their ability to effectively distribute fuel. Senior individuals, including the Minister for the Interior and Defence, are calling for the abolishment of the monopoly to ensure that owners of petrol stations can purchase refined petroleum products directly from Brega (see annex 65).

163. Since June 2019, Brega has been using mobile petrol stations to distribute fuel directly to the public in Tripoli. This ensures a reasonable level of supply during the current conflict.

### 3. Zawiyah network

164. In its previous report (S/2018/812, para. 156 and annex 47), the Panel explained the central role of the Zawiyah network in fuel diversion, organized around the Zawiyah oil complex. The Al-Nasr brigade, headed by Mohammed Kashlaf (LYi.025), operates under the umbrella of the Petroleum Facilities Guards, and is still in charge of the security of the oil complex (see para. 57 above and annex 21).

165. The Municipal Council of Zawiyah has praised the role of those in charge of providing security to the oil complex. It did, however, accuse Brega and the four distribution companies of a lack of control over the fuel distribution network, thus facilitating the conditions under which fuel is smuggled (see annex 66). The Panel continues to receive evidence indicating that the Al-Nasr brigade maintains a central role in the smuggling activities and benefits from the trafficking of fuel distributed from the oil complex.[162] A description of the network and its modus operandi can be

---

[161] Meeting with Brega high official, Istanbul, Turkey, July 2019.

[162] During the reporting period, one litre of fuel (benzene) in Zawiyah black market = LD 0.75 ($0.53). In Zuwarah, fuel sold at LD 1.75 ($1.24).

found in annex 21. From the oil complex to its final destination, whether smuggled by sea or overland, fuel transits through several key checkpoints under the control of different armed groups. A description can be found in annex 67.

### 4.   Illicit exports by sea

166. In the west, Zuwarah and Abu Kammash[163] remain the key points from which refined petroleum products, principally marine gas oil (0.1 per cent sulphur), are smuggled by sea. Details of the specifications can be found in annex 68. The Panel has also observed small diversions from Marsa al Dilah,[164] a small unfinished port west of Zawiyah.

167. In its previous report, (S/2018/812, paras. 165–167), the Panel provided a detailed description of the modus operandi for illicit exports from Libya. Fuel is normally smuggled using small single-hull product carriers, which are loaded off the coast of Zuwarah or Abu Kammash by smaller auxiliary ships or fishing boats, some of which have modified tanks. During the reporting period, the pumping station located at the Abu Kammash Chemical Factory[165] remained operational.

168. Smuggling networks from Zuwarah and Abu Kammash continued to operate during the reporting period with the support of local sponsors. The so-called Zuwarah Operations Room, headed by Zakaria Koshman, Wiyar Shalki and Osama Qutara, is in control of the Abu Kammash chemical plant and provides coverage for many of these operations.

169. The Panel has identified several fuel smugglers. One of the most active during 2019 has been Daniel Al Attushi, a Libyan national who is already included in the list of arrest warrants issued by the Office of the Attorney General in December 2017 (S/2018/812, para. 143 and annex 43).

### 5.   Vessels designated by the Committee

170. No vessels were added to the sanctions list during the reporting period. The mechanism contained in resolution 2146 (2014) requires that a focal point appointed by the Government of Libya communicate with the Committee with respect to the measures in that resolution and in particular inform the Committee of any vessels involved in illicit exports. As the focal point remained absent until 30 July 2019 (see para. 143 above), the implementation mechanism was, and still remains, ineffective (see recommendation 7).

### 6.   Vessels involved in fuel smuggling

171. In its 2016 report (S/2016/209, para. 202) and its 2018 report (S/2018/812, para. 178), the Panel reported on the modus operandi of fuel smuggling by sea. The majority of the vessels sail south from Malta heading to the Gulf of Gabes,[166] Tunisia. When 40 to 60 nautical miles off the Tunisian coast, they head east to Zuwarah. Loading is conducted by fishing boats or through dedicated pipelines (see para. 167). After the loading operation, which can take from one to two days, they usually return towards Malta, where some of the vessels loiter outside the 12 nautical mile limit of Maltese territorial waters until undertaking a ship-to-ship transfer of product (see recommendations 8 and 9).

172. During the past nine months, increased pressure by local and international actors, combined with instability in the country, has resulted in most of the vessels

---

[163] 33°04'27"N, 11°44'12"E.
[164] 32°47'33"N, 12°44'48"E.
[165] 33°05'04"N, 11°49'40"E.
[166] Centred at 34°14'13"N, 10°49'03"E.

now being loaded 70 nautical miles off the coast of Libya. See annex 69 for an indication of the area. Multiple ship-to-ship transfers are accomplished in no fewer than four days, depending on the size of the tanker being loaded.

173.  None of the vessels involved display any AIS[167] signal. If inspected, the fishing boats employed in the transfers attribute their high fuel loads to long fishing periods on the high seas. As there is no monitoring system for fisheries in Libya, the local authorities are not aware of the location, course or speed of these fishing vessels.

174.  The Panel continues to observe vessels that display suspicious navigational patterns indicating illicit activities. Some of these vessels are listed in table 10.

Table 10
**Vessels of interest**

| Name | IMO number | Flag | Remarks |
|------|-----------|------|---------|
| *Ali Mercan* | 8992730 | Panama | Products tanker (378 GT) |
| *Bonnie B* | 6810055 | Cyprus | Products tanker (1,580 GT) |
| *Maraya* | 7514517 | Samoa | Cargo ship (640 GT) |
| *Ocean* 61 | 8870865 | Panama | Products tanker (1,584 GT) |
| *Ozu* 2 | 8918887 | Unknown | Fishing trawler (276 GT) |
| *Rose* 10 | 7511125 | Panama | Products tanker (1,282 GT) |
| *Rose* 20 | 8004662 | United Republic of Tanzania | Products tanker (1,313 GT) |
| *Shahat* | 7820590 | Libya | Fishing trawler (128 GT) |
| *Sifana* (formerly *Reem* 1) | 9046758 | United Republic of Tanzania | Products tanker (780 GT) |
| *Sky White* | 7922491 | Sierra Leone | Fishing trawler (277 GT) |
| *Turu* | 8408777 | Panama | Products tanker (399 GT) |

*Source*: Confidential
*Abbreviation*: GT, gross tons.

### 7.  Illicit exports by land

175.  In its previous report (S/2018/812, para. 182), the Panel reported on refined petroleum products, mainly benzene, being illicitly exported overland from several Libyan regions. This continues today at different scales. This activity generates a small but stable profit for many individuals in regions where high rates of unemployment are prevalent and almost no other economic activities are available.

176.  Fuel smuggling in lower amounts is considered to be socially acceptable. It is broadly assumed that petroleum is a Libyan resource, from which all citizens are entitled to benefit. In many regions the informal economy is prevalent and the parallel market is open for those willing to purchase fuel and transport it at their own risk to be sold in other areas, including outside Libya.

---

[167] The Automatic Identification System (AIS) is a tracking system, and is mandatory for vessels greater than 300 gross tons.

177. In the south, most of the fuel stations remain closed or sell fuel at unofficial rates. The HAF military campaign in the south sought to put an end to this activity,[168] but the impact was low. Although some of the stations reopened to the public in January and February 2019, and parallel market fuel prices were temporarily reduced from LD 1.5 to LD 2.0 ($1.08 to $1.44) per litre to LD 0.5 ($0.36) per litre, fuel trafficking later resumed. The black-market price is currently LD 1.0 ($0.72) per litre.

178. In the east, small amounts of fuel continue to be diverted from the Sarir refinery,[169] as initially indicated in paragraph 185 of the Panel's previous report.

179. In western Libya, fuel is smuggled from Zuwarah by land to Tunisia. Porous borders and the prevalence of the informal economy on the Tunisian side of the border are contributing to the diversion. The Government of Tunisia has approved the development of an economic free zone in Ben Guardane,[170] and its impact on illicit exports of fuel remains to be assessed.

## VI.   Implementation of the assets freeze on designated entities

### A.   Overview

180. The Panel has continued its engagement with representatives of the two designated entities, the Libyan Investment Authority, also known as the Libyan Foreign Investment Company (LYe.001), the Libyan Africa Investment Portfolio (LYe.002) and all other interested parties. The Panel continues to primarily investigate: (a) the legal authority of the present Libyan Investment Authority administration; (b) the payment of interest on frozen accounts; (c) the payment of management fees; and (d) the treatment of subsidiaries. The Libyan Investment Authority has laid stress on its strategy to improve transparency, governance and accountability in the management of the company and its assets (see annex 70).

181. The Panel has consistently reported that the Libyan Foreign Investment Company is a separate legal financial entity from the Libyan Investment Authority, and should be treated as such.[171]

182. The complexity of the financial situation surrounding the frozen assets necessitates the adding of capacity to the Panel in order to make efficient and effective progress on a growing investigation portfolio during its next mandate.

### B.   Palladyne/Upper Brook case

183. In paragraphs 208 to 226 of its previous report, the Panel reported on the control of three Upper Brook investment funds worth a total of $700 million, which were established in the Cayman Islands during 2007 by the Libyan Investment Authority and the Libyan Africa Investment Portfolio. These are now commonly referred to as the Palladyne/Upper Brook funds. The funds were frozen by the United Kingdom under the Libya (Restrictive Measures) (Overseas Territories) Order 2011.

---

[168] Almarsad, "LNA says it will attack fuel smugglers", 5 March 2019. Available at https://almarsad.co/en/2019/03/05/lna-says-it-will-attack-fuel-smugglers/.

[169] 27°40'15"N, 22°29'35"E.

[170] Riadh Bouazza, "Free trade zone to be established on Tunisian-Libyan Border", Arab Weekly, 17 March 2019. Available at https://thearabweekly.com/free-trade-zone-be-established-tunisian-libyan-border.

[171] See S/2013/99, para. 225, S/2017/466, paras. 237 and 238, and S/2018/812, para. 232.

184. In 2014, the Libyan Investment Authority removed the first director it appointed, Palladyne International Asset Management, owing to concerns over the management of the funds. The appointment by the Authority of two individuals as new directors to replace Palladyne International Asset Management was immediately challenged in the Grand Court of the Cayman Islands by Palladyne International Asset Management.

185. The final judgment in the Cayman Islands was delivered on 30 January 2019,[172] and Palladyne International Asset Management appealed the judgment on 19 March 2019. This appeal is pending, and the result will certainly have an impact on the future management of these three investment funds. Immediately after the draft judgment was delivered in December 2018 to all the parties involved in the litigation, the Libyan Investment Authority removed the two directors appointed in 2014. In January 2019, the Authority reappointed Palladyne International Asset Management as the director of the three investment funds.

186. On 6 February 2019, the Chair of the Libyan Investment Authority's Board of Directors, Ali Mahmoud Hassan, was arrested. After his arrest, the remaining members of the Authority's Board of Directors denied knowledge of the decision to reappoint Palladyne International Asset Management. On 20 February 2019, the remaining members of the Board of Directors appointed Khalid Khalifa Taher (one of the Board members) as acting Chair of the Board. The Board then issued a decision voiding all decisions taken by Ali Mahmoud Hassan.

187. On 23 February 2019, the President of GNA, in his role as Chair of the Board of Trustees of the Authority, invalidated the 20 February 2019 decision taken by its Board of Directors. At the same time, the Administrative Control Authority of Libya took similar action. The rationale was that the decision by the Board of Directors had been taken in the absence of Ali Mahmoud Hassan, and was therefore invalid.

188. The Chair of the Board of Trustees then appointed his Chief of Staff, Youssef Al Mabrouk, as Deputy Chair of the Board of Directors, to act in the absence of the Chair. The Chair of the Board of Trustees then appointed Mustafa al Manea to the Authority's Board of Directors, and formed an ad hoc committee, headed by the Minister for Planning, to liaise with the Office of the Attorney General on the legal issues facing the Libyan Investment Authority as an entity.

189. Ali Mahmoud Hassan was released from prison on or about 18 April 2019. On 22 April 2019, two members of the Libyan Investment Authority's Board of Directors resigned, leaving five remaining members, including the newly appointed Deputy Chair. On 24 April 2019, the Authority's Board of Directors revoked the January 2019 decision that gave control to Palladyne International Asset Management of the Palladyne/Upper Brook companies, and appointed four new Board members to the companies.

190. On 15 May 2019, the Panel wrote to the Chair of the Libyan Investment Authority Board of Trustees seeking clarification as to the new management structure of the three funds in the Cayman Islands. On 6 June 2019, Ali Mahmoud Hassan, Chair of the Authority's Board of Directors, responded on behalf of the Chair of the Board of Trustees. In summary, the response maintained that: (a) the two directors appointed in 2014 were removed because they refused to recognize the authority of the GNA-appointed Board of Directors, and could legally act without any Board oversight; (b) Palladyne International Asset Management had been reappointed as director of the Palladyne/Upper Brook funds on short notice as a temporary solution, which also ensured that the Libyan Investment Authority remained compliant with

---

[172] Grand Court of the Cayman Islands, *Palladyne International Asset Management BV v. Upper Brook (A) Limited et al.*, Cause No. FSD 0068 of 2016 (NSJ), Judgment.

Cayman laws on due diligence; and (c) Palladyne International Asset Management knew the portfolio in detail, had provided detailed monthly performance reports on the three funds and was willing to participate in an investigation into the value and location of the assets and of its fee-charging structure.

191. Even though the Libyan Investment Authority Board of Directors emphasized that Palladyne International Asset Management provides detailed monthly reports on the three funds, the Panel is of the view that the following points merit consideration:

(a)   The monthly reports have not been certified by an Administrator since 2014;

(b)   Some of the reports seen by the Panel do not specify the location of the assets/investments but instead broadly indicate the allocation of assets in terms of geographical region and sector, rather than in terms of companies;

(c)   Since 2018, only the Libyan Investment Authority has received the reports for all three Palladyne/Upper Brook funds;

(d)   The Libyan Africa Investment Portfolio does not have complete information on its investments. Although the Portfolio had given the Authority the power to act on its behalf, it appears that at one time the Portfolio rescinded that decision; however, an order by the Deputy Chair of the Authority's Board of Directors dated 31 March 2019 overruled that action by the Portfolio.

192. The events set out above illustrate the changing decisions of the Libyan Investment Authority's Board of Directors, impeding a strategic and coherent management approach to the investment funds. Furthermore, effective and regular oversight is not being achieved as no Administrator[173] has been appointed to submit the monthly performance reports, and there is insufficient information to allow the Authority to identify the securities held by the three investment funds. Although the Authority has indicated that it will shortly appoint a forensic auditor, no other concrete steps have been established to allow it to assume effective control over the three investment funds.

**Authority over the Libyan Investment Authority**

193. The leadership disputes discussed in the previous report of the Panel (S/2018/812, paras. 222 and 223 and annex 58) continue to affect the functioning of the Authority (also known as the Libyan Foreign Investment Company), the Libyan Africa Investment Portfolio and all subsidiaries.

194. On 10 April 2019, the Supreme Court of Libya decided the two appeals filed against the judgments of the Benghazi Court of Appeals (Administrative Chamber) by the Presidency Council (S/2018/812, annex 58, paras. 8 and 9). Both judgments were overturned on the grounds of lack of jurisdiction.

195. The Panel is aware of a pending case in Libya, filed by the former Chair of the Board of Directors of the Libyan Investment Authority, Abdulmagid Breish. During 2019, the Supreme Court of Libya found that the removal of Mohsen Derrigia in March 2013 as Chair of the Board of Directors was illegal.

196. Judicial proceedings continue in the United Kingdom that highlight the ongoing disputes. Ali Mahmoud Hassan, the current Chair of the Board of Directors of the Authority, has submitted an application to the High Court of Justice of the United Kingdom to lift the receiverships that were instituted because of the leadership

---

[173] An administrator is responsible for the accounting of the investments and reporting results to the clients. The administrator prepares the monthly or quarterly statements sent to the client that show the client's holdings, gains, losses and balances. The administrator also answers questions from clients relating to these items.

dispute. There have been several hearings and the final decision is expected in November 2019. Further details of these legal issues can be found in annex 71.

## C. Management and custodian fees

197. The payment of management and custodian fees is an issue raised by the Libyan Investment Authority, who consider them to be losses incurred due to the assets freeze. The Panel is of the view that these charges are part of the cost of doing business and therefore cannot be termed or accounted for as losses.

198. In paragraphs 224 to 226 of its previous report, the Panel noted the Authority's non-compliance with the determination and notification procedure in paragraph 19 (a) of resolution 1970 (2011) with regard to payment of fees. Further cases were examined during the reporting period.

199. The Authority has provided the Panel with details of: (a) custodian fees in the amount of approximately $55 million, charged by two banks located in the United Kingdom, from 2011 onward; and (b) management fees of approximately $12.5 million charged by one of those banks. These figures, provided by the Authority, relate to the equity portfolio and demonstrate the purported side effects of sanctions. The Authority has clearly stated to the Panel that one of its custodian banks does not provide accurate data on management fees and therefore the Authority is unable to comply with the Panel's request for detailed information.

200. The system currently in place involves the custodian bank providing a monthly invoice for custodian fees, which are then debited from the account of the Libyan Investment Authority. The custodian fees include charges for services such as the maintenance of the securities records, the maintenance of cash accounts, the safekeeping of the assets and the administration of the assets. The Panel wrote directly to the bank, requesting details relating to the management of funds in its custody, but was informed that data-privacy restrictions prevented the bank from sharing such details directly. The Panel has written to the United Kingdom for clarification, but has not yet received the detailed financial data it requested.

201. A bank in Bahrain had been regularly deducting its management fees from the "free account" for the funds held, in separate bank accounts, on behalf of the Libyan Investment Authority and the Libyan Foreign Investment Company. Those funds should have been frozen, but were not due to a misinterpretation of the provisions of the assets freeze. The Member State is now taking the necessary steps to fully implement paragraph 19 (a) of resolution 1970 (2011).

202. It is clear that provisions of paragraph 19 (a) of resolution 1970 (2011) are not being properly interpreted by some Member States. The Panel recommends that Member States review the measures put in place for the proper implementation of the assets freeze and advise the financial institutions on the correct procedures to be followed, so that divergent practices do not continue and the provisions of paragraphs 19 and 20 of resolution 1970 (2011) are followed in their entirety.

## D. Subsidiaries

203. In paragraphs 218 to 221 of its previous report, the Panel reported on the treatment of subsidiaries. This has been a recurring issue during the reporting period, and requires resolution.

204. The varying approaches by Member States are affecting the proper implementation of the assets freeze, and it is difficult to ensure that the funds and

economic resources, inter alia, are being preserved for the Libyan people as intended. One case serves as an illustration. A company located in the jurisdiction of Member State "A" is owned by the Libyan Investment Authority. The physical funds for that company are held by a custodian bank in Member State "B". As that company is not specifically included in the sanctions list, Member State "B" does not consider that its assets should be frozen, even though the company is owned entirely by the Libyan Investment Authority, a designated entity. The funds are thus freely available to disburse through the custodian bank in Member State "B", thereby avoiding the assets freeze (see para. 207 below).

205.  The Panel notes that paragraph 17 of resolution 1970 (2011) is relevant: "freeze without delay all funds, other financial assets and economic resources … which are owned or controlled, directly or indirectly, by the individuals or entities listed … or by individuals or entities acting on their behalf or at their direction, or by entities owned or controlled by them."

206.  The Panel also notes that paragraph 15 of resolution 2009 (2011) provides that funds, other financial assets and economic resources belonging to the Libyan Investment Authority and the Libyan Africa Investment Portfolio outside Libya that were frozen as at 16 September 2011 shall remain frozen by Member States. Otherwise, the Libyan Investment Authority and Libyan Africa Investment Portfolio shall no longer be subject to the measures imposed in paragraph 17 of resolution 1970 (2011).

207.  Following the rule of harmonious construction, paragraph 15 of resolution 2009 (2011) should be read along with paragraph 17 of resolution 1970 (2011). The application of the assets freeze would be limited, or almost non-existent, if only assets held directly in the name of a designated entity were to be frozen. In law, direct or beneficiary ownership and/or control is an important factor in determining the assets held by a company, and should be a determining factor for the wording of the assets freeze provisions in all sanctions measures. The Panel is of the opinion that the assets of a subsidiary should be frozen where the designated entity has a controlling interest and can therefore dictate or influence the decisions of that subsidiary.

208.  The Panel has found that some Member States and financial institutions consider beneficial owners and control when determining which assets should be frozen, including those of entirely owned subsidiaries. Others do not.

209.  The Panel is of the view that the Committee's Implementation Assistance Notice 1, which clearly states that subsidiaries are not subject to the assets freeze, is in direct conflict with, and contrary to, the provisions of the resolutions. Notice 1 is not a legal instrument and thus cannot overrule or contradict the provisions of a Security Council resolution. The Panel considers that this obvious contradiction requires resolution (see recommendation 11).

## E.   Additional factors

210.  The Panel examined other issues such as: (a) problems obtaining information from financial institutions; (b) the consequences of Implementation Assistance Notice 6 on the freezing of interest and other income generated by frozen funds; and (c) the existence of a parallel Libyan Investment Authority board of directors in the east. Details are provided in annex 71.

211.  The lack of accurate and/or precise information from Member States is proving to be a major impediment to gaining a complete overview of the frozen assets. Information from one Member State identified a massive discrepancy between two

consecutive annual reporting figures, which is still being reconciled. The Panel continues to monitor the situation.

# VII. Implementation of the assets freeze and travel ban on designated individuals

## A. Update on designated individuals of the former regime

212. On 2 November 2018, the Panel interviewed Abu Zayd Umar Dorda (LYi.006), Saadi Qadhafi (LYi.015) and Abdullah Al-Senussi (LYi.018) while they were in the custody of the Tripoli Revolutionaries Brigade. The Panel explained the assets freeze and travel ban measures to the designated individuals and discussed the delisting procedure with them. The individuals stated that the asset freeze measures were not sufficiently transparent.

213. The Panel possesses additional identifying information for the following individuals:

**LYi.006**

| | |
|---|---|
| Name: | Abu Zayd Umar Dorda |
| Good quality also known as: | Dorda Abuzed OE |
| Passport number: | FK117RKO (date of issue: 25 November 2018; date of expiry: 24 November 2026; place of issuance: Tripoli) |
| Place of birth: | Alrhaybat |

**LYi.009**

| | |
|---|---|
| Name: | Aisha Muammar Muhammed Abu Minyar Qadhafi |
| Date of birth: | 1 January 1978 |
| Passport number: | 03824970 (date of issue: 4 May 2014; date of expiry: 3 May 2024; place of issuance: Muscat) |
| Identification number: | 98606612 |

## B. Update on individuals designated after the adoption of resolution 2174 (2014)

214. In 2018, the Committee designated eight individuals pursuant to paragraph 22 (a) of resolution 1970 (2011), paragraph 4 (a) of resolution 2174 (2014) and paragraph 11 (a) of resolution 2213 (2015). The Panel is investigating the status of these individuals.

215. On 16 February 2019, the Panel interviewed Mohammed Kashlaf (LYi.025) and Abd Al-Rahman al-Milad (LYi.026) in Libya. Details of the interviews can be found in annex 72.

216. The Coast Guard authorities confirmed that Abd Al-Rahman al-Milad was suspended from his duties on or about 9 April 2018. Nevertheless, they consider him

to be one of their top men and stressed his work in rescuing migrants. The Panel asked why he was working on vessels, as he was the supervisor at a small port located within the Zawiyah oil complex. The Coast Guard authorities explained that such supervisors have the authority to combat human trafficking and that they need to go to sea occasionally for the morale of personnel.

217.  In paragraph 237 of its previous report, the Panel provided additional identifying information for Mohammed Kashlaf (LYi.025). That information was subsequently found to be erroneous. The Office of the Attorney General has since provided the updated information on Mohammed Kashlaf (LYi.025).

218. The Panel has obtained additional identifying information for the following individuals:

**LYi.023**

| | |
|---|---|
| Name: | Ahmad Oumar Imhamad al-Fitouri |
| Passport number: | LY53FP76 (date of issue: 29 September 2015; place of issuance: Tripoli) |
| Address: | c) Dbabsha-Sabratah |
| National identification number: | 119880387067 |

**LYi.025**

| | |
|---|---|
| Name: | Mohammed al-Hadi al-Arabi Kashlaf |
| New name: | Mohammed Al Amin Al Arabi Kashlaf |
| Name in original script: | محمد الأمين العربي كشلاف |
| Date of birth: | 2 December 1985 |
| Passport number: | C17HLRL3 (date of issue: 30 December 2015; place of issuance: Zawiya) |

**LYi.027**

| | |
|---|---|
| Name: | Ibrahim Saeed Salim Jadhran |
| Also known as: | Ibrahim Saeed Salem Awad Aissa Hamed Dawoud Al Jadhran |
| Date of birth: | 29 October 1982 |
| Personal identification number: | 137803 |
| National identification number: | 119820043341 |
| Passport number: | S/263963 (date of issue: 8 November 2012) |

## C.   Non-compliance with the travel ban

219.  There were two instances of non-compliance with the travel ban. Abu Zayd Umar Dorda (LYi.006) was released from custody in Libya on 17 February 2019. He travelled that day from Tripoli to Tunis and then onward to Egypt. The Panel requested further details from Tunisia and Egypt. The Egyptian authorities stated that they were only informed of his travel to Cairo after his departure from Tunis. They were informed of his critical medical condition, which was confirmed after a medical examination upon his arrival in Cairo. The Egyptian authorities stated that they allowed him to stay on humanitarian grounds. Tunisia also informed the Panel that he transited the country as part of a humanitarian emergency.

220.  The Panel met Abu Zayd Umar Dorda (LYi.006) in Cairo on 6 March 2019. He stated that the Libyan authorities had released him on condition that he did not remain in Libya. He chose to travel to Egypt as he had family residing there. GNA is paying for his travel, treatment and stay in Cairo. The Libyan authorities also assured him that they would ensure further medical treatment in a European country. The Panel notes that no exemption request was submitted through either the Permanent Mission of Libya to the United Nations or through the relevant United Nations office. Libya did submit an ex post facto exemption request.

221.  Sayyid Mohammed Qadhaf al-Dam (LYi.003) has availed himself of an exemption from the travel ban since November 2015. The last extension he was given was valid until 23 May 2019. The Committee did not receive any further extension request and his continued presence in Egypt is in non-compliance with the travel ban.

## VIII.   Actions taken for the effective implementation of the assets freeze and travel ban measures

222.  Paragraph 12 of resolution 2441 (2018) established specific provisions for the implementation of the assets freeze and travel ban. In accordance with its mandate, the Panel addressed several Member States, requesting further information on the actions taken to effectively implement the measures, particularly with regard to the individuals designated by the Committee in 2018. Only two replies have been received, and they yielded no actionable information.

223.  The Panel held bilateral discussions with some Member States to inquire on their measures for effective implementation. The Panel also attended two meetings, convened by the Netherlands, at The Hague headquarters of the Judicial Cooperation Unit of the European Union (Eurojust) in January and June 2019. It emerged that, while most European countries have a legal framework to implement United Nations sanctions, the framework does not include provision for further investigations to collect evidence and identify direct or indirect assets before effective implementation takes place. In some countries, there is no mechanism to verify the implementation of sanctions. One Member State expressed its inability to answer the Panel's specific queries, as it would affect ongoing investigations. The Panel concludes that little specific information can be expected from Member States, due to either their own ongoing investigations or because no investigations have been initiated.

224.  Enquiries were also conducted in Libya with reference to seven of the eight individuals designated in 2018. The Office of the Attorney General notified the Panel that action had been initiated against some individuals long before their designation by the Committee. Arrest warrants were issued against Mohammed Kashlaf (LYi.025) and Abd Al-Rahman al-Milad (LYi.026) in December 2017 (S/2018/812, para. 143 and annex 43). Arrest warrants for the remaining individuals have since been issued.

Simultaneously, instructions have been issued to the Central Bank of Libya to freeze accounts, to the Real Estate Registration Office to identify property and to all border crossing points. Though the necessary administrative measures have been taken, Libya has not yet effectively implemented the asset freeze measures. For instance, Mohammed Kashlaf (LYi.025) confirmed that he is still paid by the government.

225.  The Panel noted that Member States are unable to effectively implement the travel ban owing to a lack of complete information, such as the full names and passport details of travellers.

226.  Passengers travel in and out of a country by land, air and sometimes sea. In order to effectively monitor the entry of designated individuals subject to a travel ban, the Member States should have an electronic passenger profiling system to screen the passenger manifests of all modes of travel. Only a few countries currently have such systems. It is, however, essential to have a system to process information of at least those travelling by air (see annex 73). The Global Travel Assessment System, which is freely available from the World Customs Organization, meets the above needs and Member States should be encouraged to use that or a similar system.

227.  During its discussions with some Member States, the Panel observed that there was a lack of awareness of the implications of non-compliance with the travel ban and assets freeze measures. Similarly, some Member States and designated individuals were often unaware of the exemption or delisting procedures available to them, despite the clear provisions in paragraphs 15 to 20 of resolution 1970 (2011), paragraph 12 of resolution 2441 (2018) and the provisional guidelines of the Committee on the conduct of its work. Furthermore, all Member States may not necessarily have national legislation specifically for the implementation of these measures subsequent to the adoption of Security Council resolutions. The Panel has explained the procedures to the national authorities and the various designated individuals it has met.

228.  It is essential to have wider dissemination of information on the modalities to implement, and the procedures to seek exemption from, the assets freeze and the travel ban. Discussions on difficulties faced in the implementation of the measures at the national level could pave the way for remedial action. This has already been initiated by the Committee.

# IX.  Recommendations

229.  The Panel recommends:

## Immunity of the Panel of Experts

### To the Security Council

Recommendation 1.   To remind Member States of their obligations under the provisions of article VI, section 22, of the Convention on the Privileges and Immunities of the United Nations to respect the immunity of experts on mission. [see para. 4]

## Arms embargo

### To the Security Council

Recommendation 2.   To consider initiating an effective inspections regime to interdict or deter arms transfers by sea as initially authorized

by paragraph 4 of resolution 2292 (2016) and extended by resolution 2473 (2019), and within Libyan ports. [see para. 64]

Recommendation 3.   To extend the scope of resolution 1970 (2011), as amended by subsequent resolutions, to initiate an effective inspections regime to interdict or deter arms transfers by air through the independent inspection of aircraft arriving at Libyan airports. [see para. 125]

Recommendation 4.   To consider requiring that the transfer of military technology such as unarmed naval or Coast Guard patrol vessels, or wheeled armoured vehicles, be subject to advance approval, in accordance with paragraph 8 of resolution 2174 (2014). [see para. 80]

Recommendation 5.   To determine whether equipment, such as electronic inhibition and jamming systems designed to decoy or down UAVs and UCAVs, or commercial UAVs used for military ISR, fall within the ambit of military-related materiel, as set out in paragraph 9 of resolution 1970 (2011). [see paras. 99 and 123]

**To the Committee**

Recommendation 6.   To provide guidance as to whether the term "combat by all means" in paragraph 3 of resolution 2214 (2015) overrides the requirements of paragraph 9 of resolution 1970 (2011) and as subsequently amended. [see para. 93]

## Measures in relation to attempts to illicitly export crude oil and refined petroleum products from Libya

**To the Security Council**

Recommendation 7.   To review the usefulness, coherence and appropriateness of the information mechanism contained in paragraph 3 of resolution 2146 (2014), in particular to enable the Committee to be informed by Member States of vessels transporting crude oil or refined petroleum products, through the auspices of the Panel. [see para. 143]

Recommendation 8.   To extend the scope of the measures contained in paragraph 5 of resolution 2146 (2014) to authorize Member States to inspect, on the high seas off the coast of Libya, vessels bound to or from Libya which they have reasonable grounds to believe are illicitly exporting crude oil or refined petroleum products. [see para. 171]

Recommendation 9.   To extend the scope of the measures contained in paragraph 11 of resolution 2213 (2015) to those entities or individuals involved in the illicit export of crude oil or refined petroleum products, and particularly to the owners of vessels listed pursuant to paragraph 11 of resolution 2146 (2014). [see paras. 145 and 171]

Recommendation 10.  To extend the scope of the measures contained in resolution 2146 (2014) to the illicit import of refined petroleum products. [see para. 150]

## Asset freeze and travel ban

**To the Committee**

Recommendation 11.  To review the applicability of Implementation Assistance Notice 1 in view of its contradiction with the resolutions. [see para. 209]

## Designation criteria

**To the Committee**

Recommendation 12.  To consider the information provided separately by the Panel on individuals meeting the designation criteria contained in the relevant Security Council resolutions.

## General

**To the Committee**

Recommendation 13.  To update the sanctions list with the additional identifying information. [see paras. 213 and 218]

S/2019/914

## X.   Annexes

# List of annexes

| | | |
|---|---|---|
| Annex 1: | Overview of the evolution of the Libya sanctions regime | 68 |
| Annex 2: | Acronyms and abbreviations | 71 |
| Annex 3: | Methodology | 74 |
| Annex 4: | Member States, organizations and institutions consulted | 83 |
| Annex 5: | Summary of Panel correspondence (14 September 2018 to 24 October 2019) | 85 |
| Annex 6: | Maps of the conflict | 90 |
| Annex 7: | Arrest warrants issued on 1 January 2019 by the AGO. | 94 |
| Annex 8: | Consultancy contract between General Dagalo and Dickens and Madson (Canada) | 100 |
| Annex 9: | Attack on NOC headquarters in Tripoli | 105 |
| Annex 10: | ISIL claim of responsibility for MFA attack of 25 December 2018 | 106 |
| Annex 11: | Initial attack on Tripoli International Airport (TIA) | 107 |
| Annex 12: | Threats to and attacks on GNA Minister of Finance | 108 |
| Annex 13: | Attack on Mitiga airport (1 September 2019) | 112 |
| Annex 14: | GNA indiscriminate use of S-125 Nova Pechora missiles | 118 |
| Annex 15: | Attack on Tajura DCIM Detention Centre (2 July 2019) | 120 |
| Annex 16: | Attack on Tebu communities in Murzuq (5 August 2019) | 137 |
| Annex 17: | Attack on Zuwarah airport (15/16 August 2019) | 149 |
| Annex 18: | Attack on Mitiga airport (6 September 2019) | 154 |
| Annex 19: | List of DCIM detention centres | 164 |
| Annex 20: | Ministry of Interior statement on DC closures | 166 |
| Annex 21: | Al-Nasr brigade, al-Nasr DC and the Zawiyah network | 169 |
| Annex 22: | ISIL (QDe.115) in Libya's killings in Fuqaha (9 April 2019) | 171 |
| Annex 23: | Arbitrary detention of Deputy Minister of Defence, Ouheida Abdallah Najim | 174 |
| Annex 24: | Disruptions to the GMMR | 175 |
| Annex 25: | Failure to implement a release order for Prime Minister Baghdadi al Mahmoudi | 182 |
| Annex 26: | The enforced disappearance of Ms. Siham Sergewa (17 July 2019) | 185 |
| Annex 27: | Summary of non-compliance with the sanctions measures (arms) in support of GNA | 186 |
| Annex 28: | Summary of non-compliance with the sanctions measures (arms) in support of HAF | 191 |
| Annex 29: | MV *Esperanza* to Al Khoms (17 December 2019) | 196 |
| Annex 30: | MV *Esperanza* to Misrata (30 December 2019) | 203 |
| Annex 31: | BMC *Kirpi* 4 x 4 on MV *Amazon* to Tripoli (18 May 2019) | 210 |
| Annex 32: | OPV *Al Karama* | 220 |

| | | |
|---|---|---|
| Annex 33: | Non-lethal maritime exceptions | 245 |
| Annex 34: | Operational naval assets | 248 |
| Annex 35: | *Al Hani* frigate (PF212) | 251 |
| Annex 36: | Illicit supply of armoured vehicles to Libya | 255 |
| Annex 37: | *Nashshab* RPG-32 anti-tank rocket launcher | 263 |
| Annex 38: | 9K-115-M *Metis* RPG-32 ATGW | 265 |
| Annex 39: | 155mm HE Laser Homing Projectile GP6 | 267 |
| Annex 40: | *Pantsir* S-1 surface to air missile system (SAM) | 270 |
| Annex 41: | Samel-90 electronic countermeasures system | 273 |
| Annex 42: | UAV inhibition and jamming system | 276 |
| Annex 43: | HAF military training in Jordan | 278 |
| Annex 44: | Operational military aviation assets | 280 |
| Annex 45: | Operational unmanned (combat) aerial vehicle (UAV and UCAV) assets | 286 |
| Annex 46: | *Blue Arrow* (BA-7) air to surface missile | 289 |
| Annex 47: | UAE *Wing Loong* II UCAV used in support of HAF operations | 293 |
| Annex 48: | Turkish *Bayraktar* TB-2 UCAV operating in support of the GNA | 296 |
| Annex 49: | Transfer of military material to GNA-AF by UAA P.J.S.C. AN-12 | 300 |
| Annex 50: | Transfer of military material to the GNA-AF by Sky AviaTrans L.L.C. IL-76 | 308 |
| Annex 51: | Small ISR UAV in Libya | 314 |
| Annex 52: | Civilian aircraft in support of HAF operations | 321 |
| Annex 53: | Summary of parallel currency security features | 329 |
| Annex 54: | Communication from the Eastern NOC | 334 |
| Annex 55: | Letter on the status of Chairman of the NOC | 337 |
| Annex 56: | Statement by the eastern National Oil Corporation | 338 |
| Annex 57: | New board of directors of Brega in the east | 339 |
| Annex 58: | Decision of the eastern LIA board of trustees | 346 |
| Annex 59: | Letter of appointment of new focal point pursuant resolution 2146 (2014) | 350 |
| Annex 60: | Documented attempts to illicitly export crude oil from eastern NOC | 351 |
| Annex 61: | Jet A-1 aviation fuel sold quantities in the east | 356 |
| Annex 62: | Arrest warrants issued by the Attorney General's Office on 7 February 2019 | 358 |
| Annex 63: | List of trusted petrol stations issued by Brega | 359 |
| Annex 64: | Quantities of refined products distributed by Brega since 2012 | 360 |
| Annex 65: | Letter calling for abolishment of the monopoly of the distribution companies | 362 |
| Annex 66: | Letters issued by the Municipal Council of Zawiyah | 363 |

**S/2019/914**

| Annex 67: | Routes employed by fuel smugglers from Zawiyah | 365 |
| Annex 68: | Specifications of the diesel oil imported by Libya | 366 |
| Annex 69: | Indication of the area where Ship-to-Ship transfers of Libyan fuel are taking place | 367 |
| Annex 70: | LIA strategy | 368 |
| Annex 71: | Legal and other issues faced by designated entities | 371 |
| Annex 72: | Designated individuals | 375 |
| Annex 73: | Suggestions for passenger profiling system | 376 |

**Annex 1:       Overview of the evolution of the Libya sanctions regime**

1.      By resolution 1970 (2011), the Security Council expressed grave concern at the situation in Libya, condemned the violence and use of force against civilians and deplored the gross and systematic violation of human rights. Within that context, the Council imposed specific measures on Libya, under Chapter VII of the Charter of the United Nations, including the arms embargo, which relates to arms and related materiel of all types, including weapons and ammunition, military vehicles and equipment, paramilitary equipment, and spare parts for the aforementioned, in addition to the provision of armed mercenary personnel. The arms embargo covers both arms entering and leaving Libya. The Council also imposed a travel ban and/or an asset freeze on the individuals listed in the resolution. Furthermore, the Council decided that the travel ban and the asset freeze were to apply to the individuals and entities designated by the Committee established pursuant to resolution 1970 (2011) concerning Libya involved in or complicit in ordering, controlling or otherwise directing the commission of serious human rights abuses against persons in Libya.

2.      By resolution 1973 (2011), the Security Council strengthened the enforcement of the arms embargo and expanded the scope of the asset freeze to include the exercise of vigilance when doing business with Libyan entities, if States had information that provided reasonable grounds to believe that such business could contribute to violence and use of force against civilians. Additional individuals subject to the travel ban and asset freeze were listed in the resolution, in addition to five entities subject to the freeze. The Council decided that both measures were to apply also to individuals and entities determined to have violated the provisions of the previous resolution, in particular the provisions concerning the arms embargo. The resolution also included the authorization to protect civilians and civilian populated areas under threat of attack in Libya. In addition, it included a no-fly zone in the airspace of Libya and a ban on flights of Libyan aircraft.

3.      On 24 June 2011, the Committee designated two additional individuals and one additional entity subject to the targeted measures. By resolution 2009 (2011), the Security Council introduced additional exceptions to the arms embargo and removed two listed entities subject to the asset freeze, while allowing the four remaining listed entities to be subjected to a partial asset freeze. It also lifted the ban on flights of Libyan aircraft.

4.      By resolution 2016 (2011)), the Security Council terminated the authorization related to the protection of civilians and the no-fly zone. On 16 December 2011, the Committee removed the names of two entities previously subject to the asset freeze.

5.     In resolution 2040 (2012), the Council directed the Committee, in consultation with the Libyan authorities, to review continuously the remaining measures with regard to the two listed entities – the Libyan Investment Authority and the Libyan Africa Investment Portfolio – and decided that the Committee was, in consultation with the Libyan authorities, to lift the designation of those entities as soon as practical.

6.     In resolution 2095 (2013), the Council further eased the arms embargo in relation to Libya concerning non-lethal military equipment.

7.     By resolution 2144 (2014), the Council stressed that Member States notifying to the Committee the supply, sale or transfer to Libya of arms and related materiel, including related ammunition and spare parts, should ensure such notifications contain all relevant information, and should not be resold to, transferred to, or made available for use by parties other than the designated end user.

8.     By resolution 2146 (2014), the Council decided to impose measures, on vessels to be designated by the Committee, in relation to attempts to illicitly export crude oil from Libya and authorized Member States to undertake inspections of such designated vessels.

9.     By resolution 2174 (2014), the Council introduced additional designation criteria and requested the Panel to provide information on individuals or entities engaging or providing support for acts that threaten the peace, stability of security of Libya or obstructing the completion of the political transition. The resolution strengthened the arms embargo, by requiring prior approval of the Committee for the supply, sale or transfer of arms and related materiel, including related ammunition and spare parts, to Libya intended for security or disarmament assistance to the Libyan government, with the exception of non-lethal military equipment intended solely for the Libyan government. The Council also renewed its call upon Member States to undertake inspections related to the arms embargo, and required them to report on such inspections.

10.    By resolution 2213 (2015), the Council extended the authorizations and measures in relation to attempts to illicitly export crude oil from Libya until 31 March 2016. The resolution further elaborated the designation criteria listed in resolution 2174 (2014).

11.    By resolution 2214 (2015), the Council called on the 1970 Committee on Libya to consider expeditiously arms embargo exemption requests by the Libyan government for the use by its official armed forces to combat specific terrorist groups named in that resolution.

12.   By resolution 2259 (2015), the Council confirmed that individuals and entities providing support for acts that threaten the peace, stability or security of Libya or that obstruct or undermine the successful completion of the political transition must be held accountable, and recalled the travel ban and assets freeze in this regard.

13.   By resolution 2278 (2016) the Council extended the authorizations and measures in relation to attempts to illicitly export crude oil, while calling on the Libyan Government of National Accord (GNA) to improve oversight and control over its oil sector, financial institutions and security forces.

14.   By resolution 2292 (2016), the Council authorized, for a period of twelve months, inspections on the high seas off the coast of Libya, of vessels that are believed to be carrying arms or related materiel to or from Libya, in violation of the arms embargo.

15.   By resolution 2357 (2017), the Council extended the authorizations set out in resolution 2292 (2016) for a further 12 months.

16.   By resolution 2362 (2017), the Council extended until 15 November 2018 the authorizations provided by and the measures imposed by resolution 2146 (2014), in relation to attempts to illicitly export crude oil from Libya. These measures were also applied with respect to vessels loading, transporting, or discharging petroleum, including crude oil and refined petroleum products, illicitly exported or attempted to be exported from Libya.

17.   By resolution 2420 (2018), the Council further extends the authorizations, as set out in resolution 2292 (2016) and extended by resolution 2357 (2017), for a further 12 months from the date of adoption of the resolution.

18.   By resolution 2441 (2018), the Council extended until 15 February 2020 the authorizations provided by and the measures imposed by resolution 2362 (2017), in relation to attempts to illicitly export crude oil from Libya.

19.   To date the Committee has published six implementation assistance notices which are available on the Committee's website.[1]

---

[1]  http://www.un.org/sc/committees/1970/notices.shtml.

## Annex 2:     Acronyms and abbreviations

| | |
|---|---|
| ACA | Administrative Control Authority |
| AGO | Attorney General's Office |
| AIS | Automatic Identification System |
| APC | Armoured Personal Carrier |
| AQ | Al-Qaida |
| ASM | Air to Surface Missile |
| ATGM | Anti-Tank Guided Missile |
| ATGW | Anti-Tank Guided Weapon |
| CBL | Central Bank of Libya |
| CCMSR | Conseil du commandement militaire pour le salut de la République |
| CEO | Chief Executive Office |
| CIHL | Customary International Humanitarian Law |
| Committee | Committee established pursuant to Security Council resolution 1970 (2011) concerning Libya |
| Council | United Nations Security Council |
| DC | Detention Centre |
| DCIM | Department for Combatting Illegal Migration |
| ECB | European Central Bank |
| ECBL | Eastern Central Bank of Libya |
| ENOC | Eastern National Oil Corporation |
| EU | European Union |
| EUBAM | European Union Border Assistance Mission |
| EUC | End-user certificate |
| Eurojust | EU Judicial Cooperation Unit |
| EUNAVFOR | EU Naval Force Mediterranean |
| EUR | Euro |
| FACT | Front pour l'alternance et la concorde au Tchad |
| GMMR | Great Man-Made River |
| GNA | Government of National Accord |
| GNA-AF | Government of National Accord Affiliated Forces |
| GSLF | Gathering of the Sudan Liberation Forces |
| GT | Gross Tonnes |
| HAF | Haftar Affiliated Forces |
| HAS | Hardened Aircraft Shelter |

S/2019/914

| | |
|---|---|
| IAFV | Infantry Armoured Fighting Vehicle |
| ICAO | International Civil Aviation Organization |
| IFV | Infantry Fighting Vehicle |
| IAN | Implementation Assistance Notice |
| IDP | Internally Displaced Persons |
| IED | Improvised explosive device |
| IHL | International Humanitarian Law |
| IMC | International Medical Corps |
| IMO | International Maritime Organization |
| IOM | International Organization for Migration |
| ISIL | Islamic State in Iraq and the Levant |
| JEM | Justice and Equality Movement |
| JSC | Joint Stock Company |
| KADDB | King Abdullah II Design and Development Bureau |
| Km | kilometres |
| LAIP | Libyan African Investment Portfolio |
| LCG | Libyan Coast Guard |
| LFB | Libyan Foreign Bank |
| LFIC | Libyan Arab Foreign Investment Company |
| LIA | Libyan Investment Authority |
| LIFG | Libyan Islamic Fighting Group |
| LNA | Libyan National Army |
| LOC | Lines of Communication |
| LRIT | Long-range identification and tracking system |
| LTP | Long Term Portfolio |
| LYD | Libyan Dinar |
| MMSI | Maritime Mobile Service Identity |
| MRAP | Mine Resistant Ambush Protected |
| MSPV | Minerva Special Purpose Vehicle |
| NGO | Non-governmental organization |
| NM | Nautical Miles |
| NOC | National Oil Corporation |
| OCHA | Office for the Coordination of Humanitarian Affairs |
| OHCHR | Office of the High Commissioner for Human Rights |
| OPV | Offshore Patrol Vessel |
| Panel | Panel of Experts |

| | |
|---|---|
| PBIED | Person-borne Improvised Explosive Device |
| PC | Presidency Council |
| PFG | Petroleum Facilities Guard |
| PGM | Precision Guided Munitions |
| PIAM | Palladyne International Asset Management |
| PPV | Protected Patrol Vehicle |
| RAMP | Reserves Advisory and Management Programme |
| RSF | Rapid Support Forces |
| SAM | Surface to Air Missile |
| SBIED | Suicide Borne IED |
| SDF | Special Deterrence Force |
| SGBV | Sexual Gender Based Violence |
| SLA | Sudan Liberation Army |
| SLA/AW | Sudan Liberation Army/Abdul Wahid |
| SLA/MM | Sudan Liberation Army/Minni Minawi |
| SRSG | Special Representative of the Secretary-General |
| TPF | Tripoli Protection Force |
| TRB | Tripoli Revolutionaries Brigade |
| UAE | United Arab Emirates |
| UCAV | Unmanned Combat Aerial Vehicle |
| UFDD | Union de Forces pour la Démocratie et le Développement |
| UFR | Union of Forces of Resistance |
| UN | United Nations |
| UNCLOS | UN Convention on the Law of the Sea |
| UNHCR | United Nations High Commissioner for Refugees |
| UNMAS | UN Mine Action Service |
| UNSMIL | UN Support Mission in Libya |
| US AFRICOM | United States Africa Command |
| US$ | United States Dollars |
| WB | World Bank |
| WCO | World Customs Organization |

**Annex 3:      Methodology**

1.      The Panel ensured compliance with the standards recommended by the Informal Working Group of the Security Council on General Issues of Sanctions (S/2006/997). Those standards call for reliance on verified, genuine documents and concrete evidence and on-site observations by the experts, including taking photographs, wherever possible. When physical inspection is not possible, the Panel will seek to corroborate information using multiple, independent sources to appropriately meet the highest achievable standard, placing a higher value on statements by principal actors and first-hand witnesses to events

2.      The Panel used satellite imagery of Libya procured by the United Nations from private providers to support investigations, as well as open source imagery. Commercial databases recording maritime and aviation data were referenced. Public statements by officials through their official media channels were accepted as factual unless contrary facts were established. Any mobile phone records from service providers were also accepted as factual. While the Panel wishes to be as transparent as possible, in situations in which identifying sources would have exposed them or others to unacceptable safety risks, the Panel decided not to include identifying information in this document and instead placed the relevant evidence in United Nations secure archives.

3.      The Panel reviewed social media, but no information gathered was used as evidence unless it could be corroborated using multiple independent or technical sources, including eyewitnesses, to appropriately meet the highest achievable standard of proof.

4.      The spelling of toponyms within Libya often depends on the ethnicity of the source or the quality of transliteration. The Panel has adopted a consistent approach in the present update. All major locations in Libya are spelled or referenced as per the UN Geographical Information System (GIS) map at appendix A.

5.      The Panel has placed importance on the rule of consensus among the Panel members and agreed that, if differences and/or reservations arise during the development of reports, it would only adopt the text, conclusions and recommendations by a majority of five out of the six members including the Coordinator. In the event of a recommendation for designation of an individual or a group, such recommendation would be done on the basis of unanimity.

6.      The Panel is committed to impartiality in investigating incidents of non-compliance by any party.

7.      The Panel is equally committed to the highest degree of fairness and has offered the opportunity to reply to Member States, entities and individuals involved in the majority of incidents that are covered in this update. Their response has been taken into consideration in the Panel's findings. The methodology for this is provided in appendix B.

8.      The Panel's methodology, in relation to its investigations concerning IHL, IHRL and human rights abuses, is provided in appendix C.

## Appendix A to Annex 3: UN GIS place name identification

Figure A.3.1
**UN GIS place names Libya**



**Appendix B to Annex 3: 'The opportunity to reply' methodology used by the Panel**

1.      Although sanctions are meant to be preventative not punitive, it should be recognized that the mere naming of an individual or entity[2] in a Panel's report, could have adverse effects on the individual. As such, where possible, individuals concerned should be provided with an opportunity to provide their account of events and to provide concrete and specific information/material in support. Through this interaction, the individual is given the opportunity to demonstrate that their alleged conduct does not fall within the relevant listing criteria. This is called the 'opportunity to reply'.

2.      The Panel's methodology on the opportunity to reply is as follows:

(a)      Providing an individual with an 'opportunity to reply' should be the norm;

(b)      The Panel may decide not to offer an opportunity of reply if there is credible evidence that it would unduly prejudice its investigations, including if it would:

     (i)      Result in the individual moving assets if they get warning of a possible recommendation for designation;

     (ii)      Restrict further access of the Panel to vital sources;

     (iii)      Endanger Panel sources or Panel members;

     (iv)      Adversely and gravely impact humanitarian access for humanitarian actors in the field; or

     (v)      For any other reason that can be clearly demonstrated as reasonable and justifiable in the prevailing circumstances.

3.      If the circumstances set forth in 2 (b) do not apply, then the Panel should be able to provide an individual an opportunity to reply.

4.      The individual should be able to communicate directly with the Panel to convey their personal determination as to the level and nature of their interaction with the Panel.

5.      Interactions between the Panel and the individual should be direct, unless in exceptional circumstances.

_____

[2]  Hereinafter just the term individual will be used to reflect both.

S/2019/914

6.      In no circumstances can third parties, without the knowledge of the individual, determine for the individual its level of interaction with the Panel.

7.      The individual, on the other hand, in making their determination of the level and nature of interaction with the Panel, may consult third parties or allow third parties (for example, legal representative or his government) to communicate on his/her behalf on subsequent interactions with the Panel.

### Appendix C to Annex 3: Violations relating to IHL, IHRL, and acts that constitute human rights abuses investigative methodology

1.      The Panel adopted the following stringent methodology to ensure that its investigations met the highest possible evidentiary standards, despite it being prevented from visiting all of Libya. In doing so it has paid particular attention to the "Informal Working Group on General Issues of Sanctions Reports", S/2006/997, on best practices and methods, including paragraphs 21, 22 and 23.

2.      The Panel's methodology, in relation to its investigations concerning IHL, IHRL and human rights abuses, is set out as below:

(a)      All Panel investigations are initiated based on verifiable information being made available to the Panel, either directly from sources or from media reports.

(b)      In carrying out any investigations on the use of explosive ordnance against the civilian population, the Panel will rely on at least three or more of the following sources of information:

(i)      At least two eye-witnesses or victims;

(ii)      At least one individual or organization (either local or international) that has also independently investigated the incident;

(iii)      If there are casualties associated with the incident, and if the casualties are less than ten in number, the Panel obtains copies of death certificates and medical certificates. In incidents relating to mass casualties, the Panel relies on published information from the United Nations and other organizations;

(iv)      Technical evidence, which includes imagery of explosive events such as the impact damage, blast effects, and recovered fragmentation. In all cases, the Panel collects imagery from at least two different and unrelated sources. In the rare cases where the Panel has had to rely on open source imagery, the Panel verifies that imagery by referring it to eyewitnesses or by checking for pixilation distortion;

a.      In relation to air strikes, the Panel often identifies the responsible party through crater analysis or by the identification of components from imagery of fragmentation; and

b.      The Panel also analyses imagery of the ground splatter pattern at the point of impact from mortar, artillery, or free flight rocket fire to identify the direction from which the

incoming ordnance originated. This is one indicator to assist in the identification of the perpetrator for ground fire when combined with other source information.

(v)    The utilisation of open source or purchased satellite imagery wherever possible, to identify the exact location of an incident, and to support analysis of the type and extent of destruction. Such imagery may also assist in the confirmation of timelines of the incident;

(vi)    Access to investigation reports and other documentation of local and international organizations that have independently investigated the incident;

(vii)    Other documentation that supports the narrative of sources, for example, factory manuals that may prove that the said factory is technically incapable of producing weapons of the type it is alleged to have produced;

(viii)    In rare instances where the Panel has doubt as to the veracity of available facts from other sources, local sources are relied on to collect specific and verifiable information from the ground. (For example, if the Panel wished to confirm the presence of an armed group in a particular area);

(ix)    Statements issued by or on behalf of a party to the conflict responsible for the incident; and/or

(x)    Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(c)    In carrying out its investigations on depravation of liberty and associated violations the Panel relies on the following sources of information:

(i)    The victims, where they are able and willing to speak to the Panel, and where medical and security conditions are conducive to such an interview;

(ii)    The relatives of victims and others who had access to the victims while in custody. This is particularly relevant in instances where the victim dies in custody;

(iii)    Interviews with at least one individual or organization (either local or international) that has also independently investigated the incident;

(iv)    Medical documentation and, where applicable, death certificates;

(v)    Documentation issued by prison authorities;

(vi)     Interviews with medical personnel who treated the victim, wherever possible;

(vii)    Investigation and other documentation from local and international organizations that have independently investigated the incident. The Panel may also seek access to court documents if the detainee is on trial or other documentation that proves or disproves the narrative of the victim;

(viii)   Where relevant, the Panel uses local sources to collect specific and verifiable information from the ground, for example, medical certificates;

(ix)    Statements issued by the party to the conflict responsible for the incident; and/or

(xx)    Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(d)     In carrying out its investigations on other violations, which can include forced displacement and threats against medical workers, the Panel relies on information that includes:

(i)     Interviews with victims, eyewitnesses, and direct reports where they are able and willing to speak to the Panel, and where conditions are conducive to such an interview;

(ii)    Interviews with at least one individual or organization (either local or international) that has also independently investigated the incident;

(iii)   Documentation relevant to verify information obtained;

(iv)    Statements issued by the party to the conflict responsible for the incident; and/or

(v)     Open source information to identify other collaborative or contradictory information regarding the Panel's findings.

(e)     The standard of proof is met when the Panel has reasonable grounds to believe that the incidents had occurred as described and, based on multiple corroboratory sources, that the responsibility for the incident lies with the identified perpetrator. The standard of proof is "beyond a reasonable doubt".

(f)     Upon completion of its investigation, wherever possible, the Panel provides those responsible with an opportunity to respond to the Panel's findings in so far as it relates to the attribution of responsibility. Detailed information on incidents will not be provided when there is a credible threat that would threaten Panel sources.

(g)    If a party does not provide the Panel with the information requested, the Panel will consider whether this is of sufficient gravity to be considered as non-compliance with paragraph 16 of resolution 2441 (2018), and thus consideration for reporting to the Committee.

3.    The Panel will not include information in its reports that may identify or endanger its sources. Where it is necessary to bring such information to the attention of the Council or the Committee, the Panel may include more source information in confidential annexes.

4.    The Panel will not divulge any information that may lead to the identification of victims, witnesses, and other particularly vulnerable Panel sources, except: 1) with the specific permission of the sources; and 2) where the Panel is, based on its own assessment, certain that these individuals would not suffer any danger as a result. The Panel stands ready to provide the Council or the Committee, on request, with any additional imagery and documentation to supports the Panel's findings beyond that included in its reports. Appropriate precautions will be taken though to protect the anonymity of its sources.

## Annex 4:     Member States, organizations and institutions consulted

1.     This list excludes certain individuals, organisations or entities with whom the Panel met, in order to maintain the confidentiality of the source(s) and so as not to impede the ongoing investigations of the Panel.

Table 4.1
**Member States, organizations, institutions and individuals consulted**

| Country / Location | Government | Representative or Organization | Institution / Individual |
|---|---|---|---|
| China | | Permanent Mission to the UN | |
| Egypt | | | Abu Zayd Umar Dorda (Lyi.006), Other individuals |
| France | Ministries of Foreign Affairs, Finance and Defence | Permanent Mission to the UN  Embassy to Libya | Individuals |
| Germany | Ministry of Foreign Affairs | Permanent Mission to the UN  Embassy to Libya (in Tunis) | |
| Italy | Ministries of Foreign Affairs, Justice and Finance  Prosecutors in Palermo and Catania | Permanent Mission to the UN  HQ EU NAVFOR | Individuals |
| Jordan | Ministry of Foreign Affairs | Permanent Mission to the UN | Individuals |
| Libya | Ministries of Foreign Affairs, Interior and Defence, Central Bank of Libya | Permanent Mission to UN  UNDP  UNSMIL | Individuals, Designated Entities,  Libyan Foreign Bank |
| Malta | Ministry of Foreign Affairs, Central Bank | Cassar Shipyard | Individuals |
| Netherlands | | Embassy to Libya  Eurojust | |
| Spain | Ministry of Justice | EU Satellite Centre | |

S/2019/914

| Country / Location | Government | Representative or Organization | Institution / Individual |
|---|---|---|---|
| Tunisia | | EU Delegation to Libya<br>EUBAM<br>UNMAS | Individuals |
| Turkey | Ministry of Foreign Affairs<br>Ministry of Customs and Trade | | Libya Investment Authority,<br>Individuals |
| United Kingdom | Foreign and Commonwealth Office and Treasury | Permanent Mission to the UN<br>Embassy to Libya (in Tunis)<br>NGO AOAV | Financial institutions,<br>Individuals |
| USA | State Department [a] | Mission to the UN<br>World Bank [a] | |

[a] By VTC.

## Annex 5:      Summary of Panel correspondence (14 September 2018 to 24 October 2019)

Table 5.1
**Correspondence with Member States (2362 (2017) Mandate) (14 September to 15 November 2018)**

| Member State | Number of letters sent by the Panel | Number of unanswered letters by Member State | Remarks |
|---|---|---|---|
| Belgium | 1 | 0 | |
| Germany | 1 | 0 | |
| Italy | 1 | 0 | |
| Jordan | 1 | 1 | |
| Libya | 2 | 1 | |
| Luxembourg | 1 | 0 | |
| Spain | 1 | 0 | |
| Sweden | 1 | 1 | |
| Switzerland | 1 | 0 | |
| Turkey | 3 | 0 | |
| UK | 1 | 0 | |
| Ukraine | 2 | 1 | |
| USA | 1 | 1 | |
| **Total** | **17** | **5** | **71% responded** |

Table 5.2
**Correspondence with Member States (2441 (2018) Mandate) (16 November 2018 to 24 October 2019)**

| Member State / Territory | Number of letters sent by the Panel | Number of unanswered letters by Member State | Remarks |
|---|---|---|---|
| Albania | 2 | 2 | |
| Algeria | 1 | 1 | |
| Angola | 1 | 1 | |
| Anguilla | 1 | 0 | |
| Antigua and Barbuda | 1 | 0 | |
| Australia | 1 | 1 | |
| Belgium | 1 | 0 | |
| Belize | 1 | 1 | |
| Bolivia | 3 | 3 | |
| Botswana | 2 | 1 | |
| Bulgaria | 5 | 1 | |
| British Virgin Islands | 1 | 0 | |
| Canada | 1 | 0 | |

S/2019/914

| Member State / Territory | Number of letters sent by the Panel | Number of unanswered letters by Member State | Remarks |
|---|---|---|---|
| Cayman Islands | 1 | 1 | |
| Chad | 3 | 0 | |
| China | 5 | 3 | |
| Egypt | 4 | 2 | |
| Eritrea | 1 | 1 | |
| Estonia | 1 | 0 | |
| Ethiopia | 1 | 1 | |
| France | 9 | 0 | |
| Germany | 3 | 3 | Requested more time |
| Greece | 3 | 0 | |
| Iran | 3 | 0 | |
| Ireland | 2 | 2 | |
| Isle of Man | 1 | 0 | |
| Israel | 1 | 1 | |
| Italy | 7 | 1 | |
| Jamaica | 1 | 1 | |
| Jordan | 12 | 10 | |
| Kazakhstan | 5 | 1 | |
| Lebanon | 1 | 1 | |
| Libya | 50 | 43 | |
| Luxembourg | 1 | 0 | |
| Malta | 9 | 1 | |
| Marshall Islands | 4 | 4 | |
| Moldova | 7 | 2 | |
| Morocco | 4 | 3 | |
| Netherlands | 5 | 0 | |
| Nigeria | 5 | 1 | |
| Norway | 1 | 0 | |
| Oman | 2 | 1 | |
| Pakistan | 1 | 1 | |
| Panama | 6 | 3 | |
| Russian Federation | 5 | 4 | |
| Saint Kitts and Nevis | 1 | 1 | |
| Samoa | 2 | 1 | |
| Seychelles | 4 | 1 | |
| Singapore | 1 | 0 | |
| South Africa | 6 | 1 | |
| Spain | 1 | 0 | |

19-18816

| Member State / Territory | Number of letters sent by the Panel | Number of unanswered letters by Member State | Remarks |
|---|---|---|---|
| Sudan | 2 | 2 | |
| Syria | 2 | 1 | |
| Tanzania | 5 | 5 | |
| Thailand | 1 | 1 | |
| Togo | 4 | 3 | |
| Tunisia | 9 | 2 | |
| Turkey | 29 | 16 | |
| Ukraine | 11 | 0 | |
| United Arab Emirates | 26 | 16 | |
| United Kingdom | 14 | 1 | |
| United States of America | 7 | 7 | |
| **Total** | **313** | **161** | **48% responded** |

Table 5.3
**Correspondence with regional organizations and other entities (2362 (2017) Mandate) (14 September to 15 November 2018)**

| Organization or entity | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| European Union | 1 | 0 | |
| **Total** | **1** | **0** | **100% responded** |

Table 5.4
**Correspondence with regional organizations and other entities (2441 (2018) Mandate) (16 November 2018 to 24 October 2019)**

| Organization or entity | Number of letters sent by the Panel | Number of unanswered letters by entity | Remarks |
|---|---|---|---|
| EuroControl | 1 | 0 | |
| EU Satellite Centre | 1 | 0 | |
| Libya CAA | 4 | 0 | |
| LNA | 16 | 15 | Including Email |
| **Total** | **22** | **15** | **32% responded** |

S/2019/914

Table 5.5
**Correspondence with commercial companies (2362 (2017) Mandate) (14 September to 15 November 2018)**

| Company | Number of letters sent by the Panel | Number of unanswered letters by company | Remarks |
|---|---|---|---|
| Commerzbank | 1 | 0 | |
| **Total** | **1** | **0** | **100% responded** |

Table 5.6
**Correspondence with commercial companies (2441 (2018) Mandate) (16 November 2018 to 24 October 2019)**

| Organization or entity | Number of letters sent by the Panel | Number of unanswered letters by company | Remarks |
|---|---|---|---|
| Akkar | 1 | 1 | |
| Berlin Aviation | 1 | 0 | |
| BMC Turkey | 1 | 0 | |
| Carter Ruck | 2 | 0 | |
| CBL | 2 | 0 | |
| Containerships | 1 | 0 | |
| Contaz | 2 | 2 | |
| Deek Aviation | 1 | 1 | |
| Dickens and Madson | 1 | 0 | |
| East CBL | 2 | 0 | |
| East NOC | 5 | 5 | |
| Ekol | 1 | 0 | |
| FlightRadar24 | 1 | 0 | |
| Global Air Transport | 2 | 0 | |
| Golden Eagle Trading F.Z.E. | 2 | 0 | |
| Goznal J.S.C. | 1 | 0 | |
| GDC Carriers | 1 | 0 | |
| Gumrukleme | 1 | 1 | |
| Hassan Energy | 1 | 0 | |
| IOMAX USA | 2 | 1 | |
| LIA | 1 | 0 | |
| Maersk | 1 | 0 | |
| Mavana | 1 | 0 | |
| Mercedes | 1 | 0 | |
| MSPV UAE | 1 | 0 | |
| NBF UAE | 1 | 0 | |
| Netoil | 1 | 1 | |
| Nexus | 1 | 1 | |

| Organization or entity | Number of letters sent by the Panel | Number of unanswered letters by company | Remarks |
|---|---|---|---|
| Nissan | 2 | 0 | |
| Palm Charters | 1 | 0 | |
| Patron Group | 2 | 2 | |
| Plures AIr | 2 | 2 | |
| ProAir Germany | 1 | 0 | |
| ProAir Turkey | 1 | 1 | |
| Reederei | 1 | 0 | |
| Satcom Universal UAE | 4 | 1 | |
| Sera Denixclik Tasimacilik | 1 | 0 | |
| Sky AviaTrans | 1 | 0 | |
| Soylu Gemi Geri | 1 | 1 | |
| Space Cargo | 1 | 1 | |
| Standard Aero | 1 | 1 | |
| Sulaco Group | 1 | 0 | |
| Toyota | 3 | 1 | |
| Ukraine Air Alliance | 1 | 0 | |
| **Total** | **63** | **23** | **63% responded** |

S/2019/914

# Annex 6:   Maps of the conflict [3]

Figure 6.1
**Map of the conflict in Tripoli**



---

[3] See appendix A for list of codes for armed groups.

S/2019/914

Figure 6.2
**Map of the wider conflict in Libya**



S/2019/914

## Appendix A to Annex 6: Map codes for armed groups in Libya

**GNA-AF Prominent Groups**

G1   166 Battalion
G2   301 Infantry Battalion
G3   302 Infantry Battalion
G4   Abu surra martyr's battalion (Ali Busriba)
G5   Border Protection Force
G6   Nawasi Brigade
G7   Tripoli Revolutionary Brigade
G8   Central Security Force Abu Salim (A. Kikli)
G9   Halbous Battalion
G10  Hateen Battalion
G11  Mahjoub Brigade
G12  Janzour Knights (Fursan Janzour)
G13  Nasr brigade
G14  National mobile force battalion
G15  Somoud battalion
G16  South Protection Force
G17  Special Deterrence Force
G18  Rahbat al-Duru' battalion
G19  Bunyan al Marsous
G20  Dhaman Battalion

**GNA-AF Other Groups**

G21  105 battalion
G22  165 Guard and Protection Force Battalion
G23  + 30 brigade
G24  411 Border Protection
G25  42 brigade
G26  6 infantry brigade
G27  Abu Ghilan Martyr's battalion
G28  Al Laa'sar brigade
G29  Al Madina battalion
G30  Al Rawased
G31  Bab Tajura battalion
G32    * Conseil de Commandement Militaire Pour le
       Salut de la Republique
G33  Farouq brigade
G34  General Security Service
G35  Hamdi bin Rajab Martyr's battalion
G36  Haitham Kathrawi battalion
G37  Ibrahim Hneish battalion
G38  * Justice and Equality Movement (JEM)
G39  Marsa brigade
G40  Martyr Mohamed al Kilani brigade
G41  Misrata country martyrs brigade
G42  Muammar Al Dhawi battalion

G43  Mustafa bin Rabia martyrs brigade
G44  Nalut military council
G45  Ousoud Tajura
G46  Tarhuna Protection Force
G47  * Union de la force de la resistance
G48  Zintan military council
G49  Zuwarah Protection Force

**HAF Prominent group**

H1   102 infantry battalion
H2   106 brigade legion
H3   116 Infantry battalion
H4   117 infantry battalion
H5   127 infantry battalion
H6   128 infantry battalion
H7   152 mechanized brigade
H8   155 infantry battalion
H9   192 infantry battalion
H10  78 infantry battalion
H11  Tawhid Salafi brigade
H12  * Gathering of the Sudan Liberation Forces
     (GSLF)
H13  9 brigade (Kaniyat)
H14  Khalid bin Al Walid battalion
H15  * Rapid Support Forces
H16  Sa'iqa special forces
H17  Tariq bin Ziyad
H18  * Sudan Liberation Army/Minni Minawi
     (SLA/MM)
H19  Barq al Nasr
H20  Soboul al Salam battalion
H21  120 special forces battalion

**HAF Other Groups**

H22  101 light infantry brigade
H23  107 infantry battalion legion
H24  111 infantry battalion
H25  115 infantry battalion
H26  12 infantry brigade
H27  121 infantry battalion
H28  123 infantry battalion
H29  124 artillery battalion
H30  129 infantry battalion
H31  134 Zaltan battalion
H32  140 infantry brigade
H33  142 infantry brigade
H34  145 infantry brigade

| | | | | |
|---|---|---|---|---|
| H35 | 153 infantry battalion | | H52 | 6th force |
| H36 | 155 infantry battalion | | H53 | 93 brigade |
| H37 | 166 infantry battalion | | H54 | Ain Mara martyrs brigade company |
| H38 | 173 infantry battalion | | H55 | Awbari zone |
| H39 | 201 battalion | | H56 | Awliya al Dam Bu Hdima |
| H40 | 21 special forces battalion (Zawiyahh) | | H57 | * Le Front pour l'alternance et la concorde au Tchad |
| H41 | 210 mechanized infantry battalion | | H58 | * Oruba battalion |
| H42 | 22 brigade | | H59 | * Sudan Liberation Army/Abdul Wahid (SLA/AW) |
| H43 | 26 combat brigade | | H60 | + * Sudanese Liberation Army/Transitional Council (SLA/TC) |
| H44 | 27 brigade | | H61 | Wadi battalion |
| H45 | 276 infantry battalion | | | |
| H46 | 298 tank battalion | | | |
| H47 | 303 infantry battalion | | | |
| H48 | 306 infantry battalion | | | |
| H49 | 4 brigade | | | |
| H50 | 409 infantry battalion | | | |
| H51 | 60 infantry support battalion | | | |

+ Denotes location and/or details not verified by the Panel.

* Denotes foreign armed group.

S/2019/914

**Annex 7:      Arrest warrants issued on 1 January 2019 by the AGO.**

Figure 7.1
**List of arrest warrants issued by the AGO against Chadian, Sudanese and Libyan nationals**





ATTORNEY'S GENERAL OFFICE

دولة ليبيا

مكتب النائب العام

عناصـــر المعارضـــة الســـودانية والتشـــادية
والاشـــتراك مـــع بعـــض عناصـــرها في القتـــال الـــدائر
بين الفرقاء الليبيين .

نأمر

أولا/ بالبحـــث والتحـــري عـــن الوافـــدين الآتـــي
ذكـــرهم بهـــذا الكتـــاب والعمـــل علـــى ضـــبطهم
واحضـــارهم لارتكـــابهم الوقـــائع المشـــار إليهـــا ســـلفا
وقيدتهم للمجموعات المسلحة وهم :

| | |
|---|---|
| المعارضة التشادية | 1/ علي أحمد عبد الله |
| المعارضة التشادية | 2/ حامد جورو مارقي |
| المعارضة التشادية | 3/ محمد موسى آدم |
| المعارضة التشادية | 4/ محمد أحمد نصر |
| المعارضة التشادية | 5/ أدم حسين |
| المعارضة التشادية | 6/ محمد عبد الله أحمد |
| المعارضة التشادية | 7/ عمر أبكر تيجاني |
| المعارضة التشادية | 8/ بشارة حجر آيبو |
| المعارضة السودانية | 9/ حسن موسى كالي |
| المعارضة التشادية | 10 / محمد المهدي علي |
| المعارضة التشادية | 11 /أبوبكر تولي |
| المعارضة التشادية | 12 / الاشي وردوقو |

ADDRESS. Saide Street - Tripoli - Libya
E-mail: info@lago.ly - P.O.Box: 82064 ص.ب Tel. +218 21 361 0004. مكتب الغرفة Tel. +218.21 3618463 هاتف المناوبة المسائية

العنوان : المقر الرئيسي / شارع السيدي . طرابلس - ليبيا

S/2019/914

ATTORNEY'S GENERAL OFFICE

مكتب النائب العام

| | |
|---|---|
| المعارضة التشادية | 13/ بركي يوسف |
| المعارضة التشادية | 14/ تيماني اردامي |
| المعارضة السودانية | 15/ جابر أبوبكر |
| المعارضة السودانية | 16/ أركومي مناوي |
| المعارضة السودانية | 17/ عبد الكريم شولي |
| المعارضة التشادية | 18/ حماد حسن عبد الرحيم |
| المعارضة التشادية | 19/ موسى الحاج ازرق |
| المعارضة التشادية | 20/ محمد نوري |
| المعارضة التشادية | 21/ محمد حسن بلماي |
| المعارضة التشادية | 22/ مسعود جدي |
| المعارضة السودانية | 23/ عبد الله جانه ـ |
| المعارضة التشادية | 24 / كنقا بي تابول |
| المعارضة التشادية | 25 / حماد حسن عبد الرحيم |
| المعارضة التشادية | 26/ موسى الحاج أزرق |
| المعارضة التشادية | 27/ محمد حكيمي |
| المعارضة التشادية | 28/ موسى محمد زين |
| المعارضة السودانية | 29 / عثمان القوني |
| المعارضة السودانية | 30 / موسى هلال |
| المعارضة السودانية | 31 / علي عمر تكاديم |

ثانيا / البحث والتحري عن الأشخاص الليبيين الآتي
ذكرهم والعمل على ضبطهم وإحضارهم وهم :

العنوان : المقر الرئيسي / شارع السيدي ، طرابلس - ليبيا
هاتف المناوبة المسائية 3818483. Tel. +218 21   هاتف الغرفة. Tel. +218 21 361 0004.

ess. Saide Street - Tripoli - Libya

19-18816



Source: AGO.

S/2019/914

Figure 7.2
**Unofficial translation of the above document**

Translated from Arabic

Attorney's General Office

Date : 02.01.2019

Ref.N°140

Mr. Head of the Libyan Intelligence Service
Mr. Head of the General Intelligence Service

Greetings,

As a reference to the ongoing investigations concerning the events mentioned in case n°5 of 2018 Ref.: e.m.h; Intelligence.

to the claims addressed to Attorney General's Office concerning the attack that took place previously by armed groups against oil fields and ports.

To the claims linked to the attack against the Taminhint , and the intervening in the combat that was between some of the Libyan tribes.

To the claims on the events linked to killings, kidnapping, and robberies against a number of Libyans in the south of Libya by groups of Chadian opposition present in Libya.

To the incoming statements from investigative bodies to the Attorney's General Office on cases of some Libyan nationals who sought the assistance of members of the Sudanese and Chadian oppositions and the cooperation of some of their members in the combat taking place between the warrying parties.

We order,

Firstly, to search and investigate on the following individuals listed in this note, apprehend and bring them in for committing the abovementioned events and their affiliation to armed groups. They are :

1.  Ali Ahmed Abdallah              Tchadian Opposition
2.  Hamed Juru Marqi               Tchadian Opposition
3.  Mohamed Mussa Adam             Tchadian Opposition
4.  Mohamed Ahmed Nasr            Tchadian Opposition
5.  Adam Hssein                    Tchadian Opposition
6.  Mohamed Abdallah Ahmed         Tchadian Opposition
7.  Omar Abakr Tijani              Tchadian Opposition
8.  Bichara Hajer Aybu             Tchadian Opposition
9.  Hasan Musa Kelley              Sudanese Opposition
10. Mahmat Mahdi Ali               Tchadian Opposition

11.  Abubakar Tolli               Tchadian Opposition
12.  Alashi Ourdugo              Tchadian Opposition
13.  Barki Yusef                 Tchadian Opposition
14.  Timan Erdimi                Tchadian Opposition
15.  Jaber Abubakar              Sudanese Opposition
16.  Arko Minnawi                Sudanese Opposition
17.  Abdelkarim Cholloy          Sudanese Opposition
18.  Hamad Hasan Abderrehim      Tchadian Opposition
19.  Musa Elhaj Azraq            Tchadian Opposition
20.  Mahmat Nuri                 Tchadian Opposition
21.  Mohamed Hasan Boulmaye      Tchadian Opposition
22.  Masud Jeddi                 Tchadian Opposition
23.  Abdullah Jennah             Sudanese Opposition
24.  Kenga Bey Tabul             Tchadian Opposition
25.  Hamad Hasan Abderrehim      Tchadian Opposition
26.  Musa Alhaj Azraq            Tchadian Opposition
27.  Mohamed Hakimi              Tchadian Opposition
28.  Musa Mohamed Zein           Tchadian Opposition
29.  Othman Al Quni              Sudanese Opposition
30.  Musa Hilal                  Sudanese Opposition
31.  Ali Omar Tqadim             Sudanese Opposition

Secondly, search and investigate the following Libyan nationals and working on apprehending them and bringing them in. They are:

1.  Abdelhakim Alkhuweldi Belhaj
2.  Hmadan Ahmed Hamdan
3.  Ibrahim Saeed Jadhran
4.  Shaaban Masud Hediyeh
5.  Ali Haouni
6.  Mokhtar Arkheiss

Please accept my highest respect and consideration

General Attorney
Siddiq Ahmed Assour
(Head of Investigations Bureau)

S/2019/914

## Annex 8:       Consultancy contract between General Dagalo and Dickens and Madson (Canada)

Figure **8.1**
**Consultancy contract dated 7 May 2019 between General Mohamed Hamdan Dagalo and Dickens and Madson (Canada) Incorporated**

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

Dickens & Madson (Canada), Inc.
740 Notre Dame West, suite 1250
Montreal, Quebec, Canada H3C 3X6

7 May 2019

CONSULTANCY AGREEMENT

       You hereby retain us, and we hereby agree, as more fully set forth below, to lobby the executive and/or legislative branches of the governments of the United States of America, Saudi Arabia, the Russian Federation and any other mutually agreed upon country or countries as well as the United Nations, the AU and any other organization or NGO on your behalf and also provide other services, all to assist the devising and execution of policies for the beneficial development of your political aims, as more fully described below, and subject to the terms and conditions set forth below.

       1. Our lobbying services shall consist of maintaining such contacts with the executive and/or the legislative branches of the aforesaid government or governments and institutions as you shall, in consultation with us, deem advisable in order to urge the institution and/or maintenance of legislative and/or executive policies favorable to you, and the elimination or prevention of such policies unfavorable to you. In particular, we shall strive, among other goals, to conduct lobbying, in the United States, the Russian Federation and other countries to assure that you attain recognition as the legitimate transitionary leadership of the Republic of the Sudan and create a supervisory role for your council. In furtherance of this objective, we will ask█████████████ to visit Sudan by the end of this month. We shall then attempt to arrange meetings for the council leadership with senior personalities in the United States. We will then strive to

Page 1 of 5

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

19-18816

S/2019/914

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

arrange a public meeting between The Honorable President Trump and yourselves. We shall also strive to arrange private meetings for you with senior Russian and other  political figures. We shall use our best efforts to ensure favorable international as well as Sudanese media coverage for you and we shall further undertake to obtain financing for you from the United States, the Russian Federation and other countries. We shall also strive to obtain funding and equipment for the Sudanese military. We will strive to obtain funding for your Council from the Eastern Libyan Military Command in exchange for your military help to the LNA (Libyan National Army).

2. Our lobbying services shall also consist of maintaining such contacts with the executive and/or the legislative branches of the aforesaid government or governments, international institutions and/or political organizations, as you shall, in consultation with us, deem advisable, in order to urge the institution and/or maintenance of legislative and/or executive policies favorable to you, and the elimination or prevention of policies unfavorable to you. More specifically we shall lobby to garner international support for the restoration of domestic tranquility in Sudan. In furtherance of this end we shall strive to obtain urgent meetings for your representatives with Heads of various Middle Eastern Governments to discuss and resolve any outstanding matters between Sudan and these Governments and enhance mutual cooperation especially in the field of internal security. We shall also strive to have the United States terrorist designation of Sudan dropped.  We shall also seek a resolution to any remaining State divestment programs and issues of U.S. Export Controls and regulations. We shall further attempt to correct unfavorable international media coverage and current misconceptions concerning the Sudan and its Government. We shall assist in the integration of South Sudan with Sudan in the form of a Sudanese Union modeled after the  European Union and the integration of the marketing of the oil and mineral reserves into a consolidated entity. We shall also strive to secure for you U.S. investment in a joint oil project involving the Republic of the Sudan and the Republic of South Sudan for the full development of existing and potential oil and gas resources. We shall endeavor, through ███████████ companies already introduced to Khartoum, as

Page 2 of 5

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

19-18816

S/2019/914

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

well as other investors and specialized companies to bring the general project forward within 3 months. We shall also attempt to provide military training and security equipment to your military forces. We shall also strive to obtain for you infrastructural and food security support through a grant or grants in aid from the Government of the Russian Federation, or some branch thereof. Such grants are to be used in the manner specified by you and in agreement with the government of the Russian Federation. These grants will include at least 300 000 MT's of high protein wheat and another 200 000 MT's of animal feed and 100,000 tonnes of diesel.

3. The lobbying services noted above shall be conducted by us if and only to the extent they are mutually agreed upon, and only to the extent allowed by law and in particular, but without limitation, only to the extent that all activities conducted by us can be, and are, in compliance with any and all laws and regulations relating to lobbying on behalf of a foreign entity, including registration and disclosure. As you know consultants are not allowed to receive any funds that devolve from government grants that they may procure for their client.

4. The other services cited by us above shall, to the extent mutually agreed upon, include assistance in providing key personnel, training, equipment, technical assistance, and development assistance, as may be appropriate.

5. The fee for this consultancy agreement shall be US$6,000,000.00 payable upon signature of this agreement by wire transfer to the following account:

Beneficiary account name:
Beneficiary address:

Beneficiary account number:
Bank name:
Bank address:

Bank routing:
Bank SWIFT:
Reference:

Page 3 of 5

Received by NSD/FARA Registration Unit   06/17/2019   3:08:08 PM

S/2019/914

Received by NSD/FARA Registration Unit  06/17/2019  3:08:08 PM

6. Any normal out-of-pocket disbursements shall be our responsibility; and the payment of any unusual out-of-pocket disbursements shall be as mutually agreed upon.

7. We will keep you fully advised on all our efforts on your behalf.

8. We shall develop a series of guidelines within which we shall have the discretion to act on your behalf, subject always to your specific instructions.

9. We shall exert reasonable efforts to secure favorable legislative and/or executive policies, including, without limitation, the specific items noted in paragraphs 1, 2 and 4 above. You are aware, however, that it is not possible in these fields to guarantee any particular results. In order to enable us to serve your interests effectively, considering the foregoing, you agree to cooperate with us fully in furnishing us with necessary information as promptly as possible.

10. The term of this agreement shall be for one year renewable upon mutual agreement.

11. This letter of agreement sets forth our entire understanding.

12. This Consultancy Agreement and any documents relating to it may be executed and transmitted between the signatories by facsimile or email, which facsimile, or email, shall be deemed to be, and utilized in all respects as, an original, wet-inked manually executed document.

Page 4 of 5

Received by NSD/FARA Registration Unit  06/17/2019  3:08:08 PM

S/2019/914

Received by NSD/FARA Registration Unit  06/17/2019  3:08:08 PM

13. If any party below breaches any material provision, or term of this contract and fails to remedy such breach within (5) days of receipt of written notice requiring it to do so if it is not reasonably possible to remedy the breach within five (5) days within such time as may be reasonable in the circumstance the two parties agree to attempt to resolve all disputes in connection with this agreement or the fulfillment of this agreement through friendly discussion. If the dispute cannot be resolved through friendly discussion, the dispute shall be arbitrated in London, United Kingdom by the LCIA with the prevailing law to be the "United Nations Convention on Contracts (1980) and the Laws of the Province of Quebec, Canada.

If the foregoing correctly sets forth your understanding of our agreement, please so indicate by countersigning below. This letter shall then constitute a binding agreement between us.

Dated as of this 7th day of May 2019.


Confirmed and accepted:

Dickens & Madson (Canada), Inc.

By: _____
       Ari Ben-Menashe, President


Confirmed and accepted:

Transitional Council of Sudan

By: _____

       H.E. Lieutenant General Mohamed Hamdan Dagalo, Deputy Leader


Page 5 of 5

Received by NSD/FARA Registration Unit  06/17/2019  3:08:08 PM

Source: U.S. Department of Justice under the Foreign Agents Registration Act. https://efile.fara.gov/docs/6200-Exhibit-AB-20190617-8.pdf

**Annex 9:       Attack on NOC headquarters in Tripoli**

1.    On 10 September 2018, an unidentified group of armed men entered the NOC headquarters by force, killing 2 and injuring 37 staff. Three IEDs were detonated, causing substantial damage to the premises. The building is still under renovation.

Figure 9.1
**Armed attacker**



Source : Confidential

Figure 9.2
**Armed attacker**



Source: Confidential

Figure 9.3
**Condition of the premises in September 2019**



Source : Confidential

Figure 9.4
**Condition of the premises in September 2019**



Source: Confidential

S/2019/914

**Annex 10:       ISIL claim of responsibility for MFA attack of 25 December 2018**

Figure 10.1
**ISIS claim of responsibility**



  **SMM Libya**
@smmlibya

" 'ISIS security cells' carry out attacks from time to time, targeting the factions and groups that remain control over the Libyan cities and towns. The latest one was in Tazerbo town in Al-Kufra region last November," #ISIS #Amaq said in a statement

#Libya #Tripoli #GNA #MFA

<div dir="rtl">

يذكـر أن الخلايـا الأمنيـة للدولـة الإسلاميـة تشـن بيـن الحيـن والآخـر،
هجمـات على الفصائـل والجماعـات التـي تسـيطر على المـدن
والبلـدات الليبيـة، كان آخرهـا في بلـدة تازربـو بمحافظـة الكفـرة
جنوب شرقي ليبيا أواخر الشهر الماضي.

</div>

## Annex 11:    Initial attack on Tripoli International Airport (TIA)

1.    Neighbourhoods surrounding TIA and the airport road have been at the frontline of conflict since HAF usurped the TIA and grounds on 5 April 2019. Although the facility was destroyed in the 2014 conflict and is no longer in operation, it remains a strategic asset. HAF briefly lost control of some areas to GNA-AF on 7 and 8 April 2019 before regaining their position. The Panel has been unable to visit the site for an assessment.

2.    A photograph of a designated individual, Abd Al-Rahman al-Milad (LYi.026) posing with GNA fighters in the vicinity of the airport was obtained by the Panel on 8 April 2019.

Figure 11.1
**HAF fighters at Tripoli international airport on 5 April 2019**

Figure 11.2
**Abd Al-Rahman al-Milad (LYi.026) near Tripoli international airport on 8 April 2019**





Source:
https://m.facebook.com/warinformationdivision/photos/
a.1621302997911303/2652748824766710/?type=3&source=54.

Source: Confidential source. The same image was subsequently published at
https://almarsad.co/en/2019/04/08/gna-forces-collaborating-with-un-sanctioned-smugglers/.

S/2019/914

**Annex 12:     Threats to and attacks on GNA Minister of Finance**

1.     On 25 September, two individuals, one with known association to the GNA-AF Nawasi brigade, Muhammad Abu Dara', attacked and threatened the GNA Minister of Finance and other staff.

Figure 12.1
**GNA Minister of Finance accuses Al-Tahir Urwah and Muhammad Abu Dara' of the attack**



19-18816

Figure 12.2
**Official translation of the above document.**

*Translated from Arabic*

**Government of National Accord
Minister of Finance**

Urgent and important

Sirs,

The facts of the case are as follows: at 2 p.m. on Wednesday, 25 September 2019, an individual named Al-Tahir Urwah, who claimed to be Deputy Chief of the Libyan Intelligence Service, came to our workplace at the Ministry of Finance Secretariat on Sikkah road. After we had shown him in, he attacked us, claiming that the Ministry of Finance had stopped disbursing the salaries of Libyan Intelligence Service staff. He refused to leave the office, forcing us depart from the office and leave him there.

After he had left the Ministry building, he came back at 3 p.m. that same day with another individual named Muhammad Abu Dara'. The latter also attacked us, leaving a 9 mm calibre bullet in my hand. He then left.

These facts are being passed on for your information and so that you can take the necessary legal measures and open an urgent investigation.

Regards,

(*Signed*) Faraj Abdulrahman Bu **Matari**
Minister of Finance

Acting Public Prosecutor
Minister of Finance

**cc:**

President of the Presidency Council of the Government of National Accord
Chief of the Superior Council of the Judiciary
Head, Audit Bureau
Head, Administrative Oversight Agency
The concerned Deputy Minister of Finance
Archive

_____

Figure 12.3

S/2019/914

**Statement by the Ministry confirming the attack**



Figures 12.4

S/2019/914

**Statements on social media by Muhammad Abu Dara' threatening GNA Minister of Finance**



Source: https://www.facebook.com/profile.php?id=100027889903236

S/2019/914

## Annex 13:    Attack on Mitiga airport (1 September 2019)[4]

### Incident details

1.     At approximately 01:30 hours (local) on 1 September 2019 explosive ordnance (EO) detonated in two locations within the airport boundaries (see figure 13.1). The attack was executed minutes after the landing of a Libyan Airlines Airbus A330-200 as the passengers from the Haj pilgrimage had disembarked and were walking to the terminal building.

Figure 13.1
**Location of EO impact points at Mitiga international airport (1 September 2019)**



Source: Google Earth Pro image is from 23 July 2019 for illustrative purposes only. The aircraft shown is not the one damaged.

---

[4] Information from UNSMIL supported by multiple media sources.

19-18816

2.      This attack was the latest in a series of attacks against Mitiga international airport using land service ammunition[5] since the conflict started on 4 April 2019. UNSMIL has recorded fifteen such attacks during the current conflict additional to HAF air strikes.[6]

3.      UNSMIL deployed an inspection team to the airport on 1 September 2019, and determined the damage reported at table 13.1. The UNSMIL technical assessment of impact area two was constrained by the removal of physical forensic evidence prior to their arrival and indistinctive crater patterns. This report will not consider this impact area further.

Table 13.1
**Damage to Mitiga international airport from EO impact**

| Impact area | Impact point | Geo-coordinates | Damage [a] |
|---|---|---|---|
| 1 | Main aircraft parking area | 32°54´17.52¨N, 13°16´35.40¨E | ▪ Fragmentation damage to rear and tail of Airbus A330-200<br>▪ Minor crater in aircraft pan (2.36m x 0.89m). |
| 2 | Main terminal car park<br>Main terminal car park<br>Main terminal car park | 32°54'20.49"N 13°16'19.58"E | ▪ 105m West of terminal and 406m from crater in aircraft pan.<br>▪ Fragmentation damage to parked vehicles.<br>▪ Minor infrastructure damage to a civilian building and retaining wall; |

[a] As reported by UNSMIL.

4.      The airport authorities suspended air operations and closed the airport, which was not re-opened for commercial traffic until 3 September 2019.

**Technical analysis of physical evidence and determination of EO type**

5.      The UNSMIL inspection team measured the crater (figure 2) on the aircraft parking pan as being 2.36m x 0.89m. It was located 41m away from the parked aircraft.

---

[5] Using ground based weapons systems as opposed to the HAF air strikes.
[6] (23, 24) June 2019, (7, 17, 22, 29) July 2019, and (3, 4, 7, 11, 15, 16, 24, 27) August 2019.

Figure 13.2
**Crater on Mitiga international airport aircraft parking pan (1 September 2019)**



Source: https://www.libyaobserver.ly/news/renewed-rocket-attacks-tripoli's-mitiga-airport-injure-hajjis.

6.      The dimensions of the crater and the distinctive "splatter" pattern identified by UNSMIL technical specialists on the ground at the aircraft parking pan are highly indicative of the impact detonation of an indirect fire weapon system of between 81mm to 107mm. Based on the current weapons systems available to armed groups in Libya today, this would mean the use of either an 82mm high mortar or 107mm Type 63 free flight rocket (FFR) system for this attack. It is almost certain that the damage was not the result of the detonation of the 6.5kg high explosive warhead of a 122mm BM 21 "Grad" FFR.

7.      The 107mm Type 63 FFR system has the greater range of the weapon options, with a maximum range of 8,500m. From this, and the analysis of the crater dimensions and "splatter" pattern, the Panel

finds it almost certain that the explosive ordnance was firing from a location along an approximate back bearing of $185^0$ (+/- $15^0$) from the impact point as shown in figure 13.3.

Figure 13.3
**Location of firing point (1 September 2019)**



Source: Image from Google Earth, 23 July 2019.

8.      Confidential sources have indicated that the firing point was highly likely to have been in the south-west corner of the area illustrated above at a location called Camp Moz.[7]

**Casualties**

9.      Two crew members of the aircraft and five aircraft technicians were reportedly injured in the attack.

---

[7]  Near 32°50'47.95"N, 13°16'8.08"E

**Attribution of responsibility**

10.     Although no armed group has yet taken responsibility for this attack, it is certain that HAF units were not responsible for this attack, as they had no ground forces anywhere near the area of the firing point.

11.     There were some claims from a confidential source that the Tajura-based GNA-AF 33rd Brigade (a.k.a. Rabhat al-Durua') was responsible for the attack as they are involved in an internal-GNA-AF conflict with the Special Deterrence Force (SDF) who control the prison at the airport in which 33rd Brigade individuals are detained. Notwithstanding this claim though, the "banana project" area has also recently being used as a staging area for the 2nd Brigade, the Nawasi battalion, the Somoud brigade and battalion 301. Elements of the now dispersed Tripoli Revolutionaries Brigade (TRB) may also have transited this area, and as they have recently had a member imprisoned by the SDF, they too would have a motive for the attack.

12.     An alternative claim is that perpetrators were from a mixed group of ex-regime supporters, Haftar supporters and criminals from Ghararaat. They are known to have previously attacked the airport in 2017/2018 and they have serious issues with the SDF.

**Analysis of violations of IHL**

13.     The Panel has initially analysed the applicable law in relation to this incident on the basis of its own independent investigations. The Panel has complied with the methodology listed at appendix C to annex 3 of this report.

**By the armed group (AG)**

14.     IHL requires that parties follow the IHL principle of distinction[8] and take all feasible precautions to distinguish between civilian objects and military objectives. The Panel finds that the impact area at the civilian airport was a civilian object and not a legitimate military objective at that time, and thus the AG failed to respect relevant principles of IHL, including those relating to proportionality,[9] as the likelihood of excessive harm to civilian objects could have reasonably been anticipated in the circumstances as the AG were certainly aware of the status of the location as a civilian international airport.

---

[8]  CIHL Rule 7 – The Principle of Distinction between Civilian Objects and Military Objectives.

[9]  Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited*".
   (Emphasis added). See CIHL Rule 14.

15.     It is reasonable to expect that the AG commander planning, directing and ordering this attack was aware of the civilian status of this part of the airport, given that this information is readily available, and the AG commander should have taken this into consideration when assessing if there were any 'concrete and direct military advantage' to the attack.[10]

16.     IHL also requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize (…) damage to civilian objects.[11] The fact that the AG was aware that this was a civilian location, where there would certainly be a congregation of civilians as a civilian aircraft had just landed, meant that they should have been particularly vigilant when undertaking a proportionality assessment and making use of available precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[12] It is also not yet clear what precautionary measures were taken, if any, by the AG. If taken, then the precautionary measures were ineffective.

**Panel findings**

17.     The Panel finds that by attacking the civilian area of Mitiga international airport at that time, that the AG were in violation of CIHL Rule 7 - The Principle of Distinction between Civilian Objects and Military Objectives,[13] CIHL Rule 14 – Proportionality in Attack14 and CIHL Rule 15 – Principle of Precautions in Attack.[15]

---

[10]  See CIHL Rule 14.
[11]  See 1) CIHL Rule 15; and 2) Article 13(1) of Additional Protocol II to the Geneva Conventions.
[12]  See commentary to CIHL Rule 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.
[13]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule7.
[14]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule14.
[15]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule15.

S/2019/914

**Annex 14:**      **GNA indiscriminate use of S-125 Nova Pechora missiles**

**Incident details**

1.      On 13 June 2019 video imagery showed GNA-AF firing an S-125 Nova Pechora[16] medium range surface to air missile (SAM) from an improvised launcher in an indirect fire role against HAF ground targets in Tripoli.

Figure 14.1
**S-125 *Nova Pechora* SAM on GNA-AF improvised launcher**

Figure 14.2
**S-125 *Nova Pechora* SAM fired from GNA-AF improvised launcher**




Source: @oded121351. Twitter Video Extract. 13 June 2019. Accessed 17 June 2019. [L] and [R].

2.      The use of  surface to air missiles (SAM) from improvised launchers in the indirect fire role against populated areas is a violation of IHL no matter the circumstances. Many factors affect the accuracy[17] and precision[18] of an indirect fire weapon system, including meteorological conditions, the suspension system of the launcher, knowledge of the ballistic trajectories for differing ranges, the condition of the rocket motor propellant, accuracy of sighting system, and the professionalism of the crew. All these require substantial modelling, field testing, statistical analysis of fall of shot under known conditions, and training. From this a Circular Error Probability (CEP)[19] can be derived. For a purpose designed free flight rocket system, such as the 122mm GRAD multi-barrel rocket launcher at

---

[16]  Alternative designation SA-3 *Goa*.
[17]  The ability to hit a designated target.
[18]  The ability to hit the designated target consistently.
[19]  The CEP is the radius of a circle around a mean point of impact in which over 50% of the rounds fired will impact. A large CEP indicates the level of precision of the weapons system.

S/2019/914

a range of 20km the CEP and variables mean that a deflection error of 160m either side of the target and a range error of 300m would not be untypical.[20] For an improvised system such as the S-125 *Nova Pechora*[21] SAM, fired in a surface to surface role, there is virtually no possibility the crew could know the CEP.

**Panel findings**

3.      The Panel finds that by firing indiscriminately towards a target within a civilian populated area the GNA-AF are in violation of CIHL Rule 11 - Indiscriminate Attacks,[22] CIHL Rule 14 – Proportionality in Attack[23] and CIHL Rule 15 – Principle of Precautions in Attack.[24]

---

[20] GICHD. February 2017. *Explosive Weapon Effects*. pp32-33. (ISBN: 978-2-940369-61-4). Geneva: GICHD.
[21] NATO designation SA-3 *Goa*.
[22] https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule11.
[23] https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule14.
[24] https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule15.

S/2019/914

## Annex 15:     Attack on Tajura DCIM Detention Centre (2 July 2019)

1.      At 23:28.41 hours and 23:39.33 hours local time[25] on 2 July 2019, two items of explosive ordnance (EO) were dropped from a military aircraft and detonated within the Dhaman military compound[26] at Tajura. One EO detonated in the detention centre and the second EO in a Dhaman brigade vehicle repair workshop and storage area (see image 15.1 for general layout of the Dhaman military compound).

Image 15.1
**Layout of Dhaman military compound and EO strikes**



Source: Imagery from Google Earth Pro. Information from confidential sources.

---

[25]   Timings obtained from security camera footage of the area. The camera is located at  32°50'3.53"N,  13°23'5.84"E and is facing NorthEast. https://www.facebook.com/100004332917324/videos/1319047484916336/?s=100024356882840&sfns=mo. The Panel notes that this is a little used social media account, last used in November 2016. The Panel is convinced of the veracity of the video. Accessed on 5 July 2019.

[26]   ضمان كتيبة. EO Strike 1, 32°50'3.58"N, 12°23'9.50"E; EO Strike 2, 32°50'3.79"N, 13°23'5.50"E.

19-18816

2.      On 6 July 2019 Maxar Technologies Incorporated (www.maxar.com) released satellite imagery of the aftermath of the attack that were taken on 3 July 2019 (images 15.2 and 15.3). The Panel has re-orientated this imagery to allow for an easy direct comparison to image 15.1.

Image 15.2
**Maxar satellite image of Dhaman compound and EO strikes (3 July 2019)**



S/2019/914

Image 15.3
**Maxar satellite image of area of EO strikes (3 July 2019)**



**Casualties**

3.      The initial UN OCHA report[27] stated that local health sector partners had indicated that at least 53 refugees and migrants were killed, with 130 injured, and this has been widely reported. Notwithstanding this, a highly experienced independent investigator informed the Panel that there was minimal evidence to support this when the site was visited on 3 July 2019, less than fifteen hours post-attack. Only very low levels of human remains or tissue were observed, blood levels were very low on the surrounding infrastructure and surfaces, and there was no strong distinctive smell associated with decaying remains or body tissue. There were not the usual levels of such evidence that would be

---

[27]  OCHA. Humanitarian Update. *Attack on Tajura detention centre*. 3 July 2019.

expected, even after the evacuation of casualties and cadavers, if an item of explosive ordnance had detonated within such a densely occupied building. The Panel continues to investigate casualty levels, but currently cautions against the accuracy of the initial local health sector reports, as this incident is being used in the propaganda war between the parties to the conflict.

**Notification and warnings**

4.      The locations of all DCIM detention centres and refugee/migrant camps were routinely notified to all parties to the conflict, but the Panel could not identify any formal protocols for notification.[28] OHCHR had certainly informed parties to the conflict of the geo-coordinates of detention facilities,[29] and reminded them[30] of their obligations regarding the protection of civilians and civilian objects. In a statement on 8 May 2019 UNHCR had called for refugees and migrants in detention centres in conflict areas to be immediately evacuated to safety.[31]

5.      The Panel notes, for example, that the geo-coordinates provided to the Panel by UNHCR for the DCIM detention centre, ($32^050'03.3"$N, $13^023'08.1"$E), were for a single point only located 30m equidistant between the detention centre and the Dhaman brigade vehicle workshop (see image 15.3). If these had been sent to the parties then they would require interpretation by a strike targeting team[32] as to which building was the DCIM detention centre.

6.      The Panel investigated how the notification system worked, including the level of geo-coordinate detail disseminated and made recommendations of best practice (an extract of which is at appendix A).

**Technical analysis of physical evidence and determination of EO type**

7.      Post blast crater photogrammetry analysis by the Panel of imagery (image 15.4) determined that the size of the crater resulting from the air strike that impacted on the detention centre, was 4.3m

---

[28]  The Panel has learned that, for example, on 5 May 2019 UNSMIL used the Viber messaging app to pass the geo-coordinates for some locations, including the Tajura DCIM detention centre, to the leadership of both parties to the conflict. The Panel developed an Advisory Note covering best practices for humanitarian deconfliction (see appendix A)
[29]  Panel Source. OHCHR also asserts both parties to the conflict were informed of the geo-locations of the detention facilities. https://www.ohchr.org/EN/NewsEvents/Pages/DisplayNews.aspx?NewsID=24784&LangID=E.
[30]  OCHA. Situation Report No 23. 10 May 2019.
[31]  Ibid.
[32]  International best practice requires "legal sign off" before a strike is authorized by the responsible commander. This only occurs after selection of the ordnance to be used, and bomb damage impact and blast predictions.

diameter.[33] The crater profile is highly indicative of that typically caused by the sub-surface detonation of a high explosive (HE) aircraft (A/C) bomb.

Image 15.4
**Post blast crater**



Source: Extracted from  https://www.nytimes.com/video/world/africa/100000006594125/libya-airstrike-migrant.html?smid=pl-share.

8.      This crater size and profile falls within the dimensional parameters for the detonation of approximately 90kg of high explosives (TNT equivalent) at a burial depth of 1.2m (figure 15.1).

Figure 15.1
**Explosive Engineers Tool Box prediction of crater size and profile**



Source: Explosive Engineers Tool Box (EETB).  Assumes initiation at a burial depth of 1.2m due to impact.

---

    [33]  A confidential source later reported measuring the crater as 4.2m x 2.8m.

9.      This explosive mass estimate is close to the 91.4kg (TNT equivalent) explosive mass of the Mark 82 variant HE A/C bomb or a similar type. The damage levels physically observed, and the security camera imagery of the explosion, provide qualitative evidence in support of this technical estimate.

10.     The Panel thus finds that an HE A/C bomb with an explosive content of approximately 90kg was almost certainly the cause of the explosion.

11.     Explosives engineering analysis predicts that for an explosive device the size of an HE A/C bomb (net explosive content (NEC) of 90 kg) the blast overpressure will result in 99 per cent fatalities at a radius of up to 8.3m from the point of detonation, with permanent hearing damage expected out to a radius of 42.4m.[34] These figures will be reduced to a degree as the A/C bomb detonated sub surface inside a space protected by the concrete walls between the rooms in the detention centre. Fatalities and injuries from fragmentation effects would be dependent on the spatial density of the inhabitants, who would act as "fragmentation traps".[35]

**Attribution of responsibility**

12.     Although various allegations as to the perpetrators of the incident have been made, the Panel notes that at a press conference in Benghazi on 3 July 2019, Ahmed al-Mismari, the HAF spokesperson, admitted that the HAF had conducted the air strikes.[36] He reportedly went on to say that the HAF regarded the base as a legitimate target and that the HAF had repeatedly targeted it with airstrikes and artillery. The Panel notes that no claim was made that  solely HAF-owned air assets were used in the air strikes.

13.     On 4 July 2019, the GNA Minister of Interior and Defence, Fathi Bashagha, claimed that the attack was conducted by the United Arab Emirates using an American manufactured F-16 jet.[37] He then went on to suggest that Egypt could also be complicit by allowing the UAE aircraft to refuel in Egypt.

---

[34]  See C. N. Kingery and G. Bulmash, "Airblast parameters from TNT spherical air burst and hemispherical surface burst", Technical Report ARBRL-TR-0255 (Ballistics Research Laboratory, Aberdeen Proving Ground, Maryland, United States, April 1984). Assuming peak reflected pressure surface burst.

[35]  The Panel does not yet have sufficient information to model this aspect of the warhead's capability with any degree of acceptable accuracy for this incident.

[36]  https://www.yenisafak.com/en/news/haftar-forces-admit-to-libya-migrant-camp-airstrike-3484837. Accessed on 5 July 2019.

[37]  https://www.wsj.com/articles/libyas-tripoli-government-blames-u-a-e-for-deadly-airstrike-11562255129. Accessed on 5 July 2019.

14.     The Panel has established that, until now, the only night operational capability[38] for the delivery of explosive ordnance by the HAF was the *Wing Loong* unmanned combat air vehicle (UCAV), and possibly the IOMAX Archangel. The HAF is not operating any assets under its sole control with a night operational capability to accurately and precisely deliver HE A/C bombs of the type used in this incident. The attack on Tajura shows some of the hallmarks of the use of precision guided munitions (PGM), as the odds of two unguided 'dumb' aircraft bombs both hitting the roofs of buildings, in what is a relatively under developed area in terms of low spatial density infrastructure, would be very low.

15.     The Panel also has independent evidence from a reliable confidential source[39] that an unknown number of *Mirage* 2000-9 fighter ground attack (FGA) were using Al Khadim airbase,[40] and Jufra[41] as operating bases at that time. The HAF does not possess such aircraft types. A full maintenance and weapons support team would also need to be provided by the supplying Member State, as the HAF has neither the training, equipment or explosive ordnance types to support the operation of such an aircraft type. The *Mirage* 2000-9 has a fully night operational capable airframe, with the capability to also deliver PGM.

16.     Therefore, the Panel finds it highly probable that the air strike was conducted using PGM at night by a modern FGA aircraft owned and operated by a Member State, acting in direct support of the HAF. The Panel reserves identification of this Member State until further physical evidence or imagery emerges to increase attribution confidence levels, and continues to investigate the circumstances of the air strikes.

## Continuity of evidence

17.     The Panel has concerns about the continuity of physical evidence and hence the veracity of the claims by the local health partners to OCHA as to the effects of the explosion within the DCIM detention centre.

18.     Firstly, there appears to be a disparity between the damage levels observed immediately post blast from the security camera imagery (image 15.5) and those that were recorded by the media and other investigators the next day (image 15.6). The security camera footage clearly shows a determined

---

[38] This is the capability to accurately and precisely deliver explosive ordnance against a specific target using the avionic system paired to the airframe and weapons system, as opposed to a pilot's judgement as to the right release point using passive night vision goggles (PNG).

[39] Two further confidential sources have also indicated that *Mirage* 2000-9 aircraft are now operating in Libya in support of the HAF.

[40] Centred on 31°59'59.10"N, 21°11'40.22"E. The Panel has previously reported on the development and use of Al Khadim airbase by the UAE in paragraphs 124 to. 125 and annex 35 of S/2017/466, and pargraphs 111 to 113 of S/2018/812.

[41] Centred on 29°11'54.15"N, 16°0'4.86"E.

effort to break down a door to allow the migrants to egress the building post blast. This would not have been required if the wall had been destroyed by the blast.  Similarly, the security camera imagery shows an intact roof gutter line and a wall where the door is; that roof line and wall is no longer there in image 15.6. Independent investigators also report a small bulldozer working in the immediate area on their arrival, but the activity stopped during the period of their visit.

Image 15.5
**Immediate post-blast imagery from security camera[42]**



Image 15.6
**Post-blast imagery from media[43]**



Sources: Source: 1) Extracted from
https://www.facebook.com/100004332917324/posts/1319048021582949?s=100024356882840&sfns=mo. Accessed on 5 July 2019.
[L]; and 2) extracted from  https://almarsad.co/en/2019/07/06/satellite-images-and-video-footage-reveal-new-facts-on-tripoli-migrants-detention-centre/.  Accessed on 6 July 2019. Verified by ground eye-witnesses that visited on 3 July 2019 [R].

19.     Secondly, the opinion of an independent investigator concerning the low levels of forensic evidence vis-à-vis human remains and tissue (see earlier) are to a degree supported by the imagery. Close examination of images 15.4 shows no signs of blood splatter on the white colour walls in the immediate area of the bomb crater. This is highly unusual for the claimed number of casualties with what would have been a very high occupational spatial density at the time of the explosion.[44]

20.     Thirdly, the security camera video imagery shows the 10:52 minutes between the explosions, and a further 3:09 minutes imagery post explosion. No individuals were observed leaving the detention centre. In the time shown post the second explosion the rescuers had still not managed to unlock or

---

[42] Source: Extracted from https://www.facebook.com/100004332917324/posts/1319048021582949?s=100024356882840&sfns=mo. Accessed on 5 July 2019.

[43] Source: Extracted from  https://almarsad.co/en/2019/07/06/satellite-images-and-video-footage-reveal-new-facts-on-tripoli-migrants-detention-centre/. Accessed on 6 July 2019. Verified by ground eye-witnesses that visited on 3 July 2019

[44] The Panel estimates, based on photogrammetry and the claimed casualty levels, that each individual would have been occupying  no more than 2.2m$^2$ of floorspace.  That figure assumes everyone in that part of the detention centre was a fatality or injury.

break down the door to gain access to the detention centre building, and no migrants or refugees had emerged from that side of the building. This evidence contrasts the claims mentioned in the OCHA humanitarian update[45] that some refugees and migrants were fired upon by guards as they tried to escape.

21.     The Panel makes no findings regarding these continuity of evidence related issues, but includes them for background and to assist in any future independent investigation.

**Analysis of violations of IHL**.

22.     The Panel has initially analysed the applicable law in relation to this incident on the basis of its own independent investigations. The Panel has complied with the methodology listed at appendix C to annex 3 of this report.[46]

**By the HAF**

23.     Although it is highly probable that the airframe that delivered the explosive ordnance in this attack was operated by a Member State, those operations were almost certainly in support of the HAF against targets developed by and agreed upon with the HAF air operations organization. Thus, the HAF bears a large burden of command and operational responsibility for the attacks. The Member State supporting the HAF with the air assets used in this attack will also highly probably have violated IHL, and the Panel continues to investigate this aspect.

24.     The Panel investigations demonstrated that, while it is possible that some individual fighters may have been present in the Dhaman brigade workshop and storage area, there were civilians, including children, in the detention centre at the time of the air strikes.

25.     IHL requires that parties follow the IHL principle of distinction[47] and take all feasible precautions to separate civilians and military objectives. The Panel finds that although it is possible that the air strike targeted some GNA-AF fighters, the HAF and the Member State failed to respect relevant principles of IHL, including those relating to proportionality,[48] as the likelihood of excessive harm to civilians and civilian objects could have reasonably been anticipated in the circumstances because:

---

[45]  OCHA. Humanitarian Update. *Attack on Tajura detention centre*. 3 July 2019.
[46]  The Panel has had its findings confidentially and independently peer reviewed by a legally qualified expert from another Panel.
[47]  See Article 50 of Additional Protocol I to the Geneva Conventions. https://ihl-databases.icrc.org/ihl/INTRO/470.
[48]  Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, <u>which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited</u>*". (Emphasis added). See CIHL Rule 14.

(1)      This likelihood of excessive harm to civilians and civilian objects could have reasonably been anticipated in the circumstances because: (i) the detention centre was a civilian object *prima facie* immune from attack; (ii) the detention centre was functional on the day of the air strike; and (iii) that the timing of the attack at night would be such as to cause a disproportionately high number of civilian casualties. It is reasonable to expect that a commander ordering these air strikes should have been aware of the above factors, given that this information is readily available, and should have taken them into consideration when assessing the 'concrete and direct military advantage' of the air strikes.[49]

(2)      The Panel notes that the HAF has not provided any information that demonstrated that a significant number of those who died or injured were fighters affiliated to the GNA-AF. Instead, initial information collected by the UN and other organizations from local health partners suggest that the attack may have resulted in the deaths of at least 53 refugees and migrants, with 130 injured,[50] although this data is still being investigated by the Panel and should be viewed with caution at this time (see above).

(3)      It is also relevant that one aircraft bomb detonated inside the detention centre, and not "near" the detention centre in an area the fighters affiliated to the GNA-AF may have been expected to gather.

26.  IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.[51] The fact that the HAF and Member State would be aware that it was a detention centre and thus a civilian location where there would ordinarily be a congregation of civilians (see above), meant that the HAF and/or Member State should have been particularly vigilant when undertaking a proportionality assessment and making use of available precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[52] It is also not yet clear what precautionary measures were taken, if any, by the HAF and/or

---

[49]  See CIHL Rule 14.

[50]  In the Galic Trial Judgement (2003), the International Criminal Tribunal for Former Yugoslavia held in respect of a shelling at a football tournament that "*Although the number of soldiers present at the game was significant, an attack on a crowd of approximately 200 people, including numerous children, would clearly be expected to cause incidental loss of life and injuries to civilians excessive in relation to the direct and concrete military advantage anticipated*". See http://www.icty.org/x/cases/galic/tjug/en/gal-tj031205e.pdf.

[51]  See 1) CIHL Rule 15; and 2) Article 13(1) of Additional Protocol II to the Geneva Conventions.

[52]  See commentary to CIHL Rule 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.

Member State, including confirmation that the detention centre was not operational, on the day of the attack. If taken the precautionary measures were ineffective.

## By the GNA-AF

27.   Imagery from a confidential source taken the morning after the air strike clearly shows the remains of a 4x4 'Technical' with a quad 14.5mm heavy machine gun mounted in the rear of the vehicle (image 15.7). 23 mm ammunition was also observed on the floor in the same area as the vehicle, which was located in the damaged workshop and storage area of the Dhaman brigade (image 15.8).[53] This evidence confirms that this particular building was a legitimate military target, but this alone does not justify offensive action against the building (see above).

Image 15.7
**Destroyed Quad 14.5mm heavy machine gun**



Image 15.8
**Ammunition for ZSU 23-2 anti-aircraft cannon**



Sources: Confidential [L] and [R].

28.   IHL requires that parties follow the IHL principle of distinction and take all feasible precautions to separate civilians and military objectives.[54]

---

[53]   An open source released a report after the drafting of this letter that provides further evidence of the presence of weapons, ammunition and military equipment in the GNA Dhaman Brigade workshop and store. https://almarsad.co/en/2019/07/06/satellite-images-and-video-footage-reveal-new-facts-on-tripoli-migrants-detention-centre/. Accessed on 7 July 2019. This evidence was supported by the observations of a ground eye-witness.

[54]   CIHL Rules 23 and 24.

29.   IHL requires that persons deprived of their liberty be held in premises which are removed from the combat zone,[55] and that in case of displacement all possible measures be taken in order that the civilian population may be received under satisfactory conditions of safety.[56]

30.   The Panel finds that the GNA-AF has violated IHL by locating a DCIM detention centre within a known military compound as:

> (1)     Feasible precautions were not taken to separate the civilians held in the DCIM detention centre from the wider military objective of the Dhaman military compound;

> (2)     That persons deprived of their liberty and held in the DCIM detention centre were not removed from the combat zone;  and

> (3)     Satisfactory conditions of safety were not established.

## Summary of findings

29.   The Panel finds that:

> (1)     The HAF deliberately planned and directed two air strikes on the Dhaman military compound on 2 July 2019 that resulted in civilian fatalities and casualties;

> (2)     A Member State deliberately executed at least two air strikes, on the Dhaman military compound on 2 July 2019 that resulted in civilian fatalities and casualties;

> (3)     The Panel is unconvinced that the HAF and the Member State respected principles in relation to proportionality in this incident. If precautionary measures were taken, they were largely inadequate and ineffective;[57]

---

[55]   CIHL Rule 121.
[56]   CIHL Rule 131.
[57]   A further indicator that the IHL principles in regard to proportionality are being deliberately ignored by the HAF was the recent statement by the HAF Spokesperson, Ahmed Al-Mismari, that buildings in Tripoli with rooftop antennae would be legitimate targets for air strikes. https://twitter.com/Lyobserver/status/1148132108109352960 and https://www.facebook.com/HamzaAlibye/videos/2398685393743262/?s=505040097&sfns=mo. Accessed on 8 July 2019.

(4)    As the HAF had been notified of the geo-coordinates for the DCIM managed detention centres, the HAF is: 1) highly probably responsible for IHL violations regarding the failure on its part to undertake the requisite detailed assessments relating to proportionality and precautions in this attack; and 2) almost certainly responsible for failing to ensure that relevant precautions were taken to minimize the effects on civilians as a result of the air strikes;

(5)    Those officers of the HAF that passed the information, or who were otherwise involved in the intelligence gathering and targeting processes in relation to this incident, may also be responsible for any IHL violations to the extent of their contribution; and

(6)    The GNA violated IHL by locating a DCIM detention centre within the perimeter of a known military compound, and also by the failure to immediately evacuate the DCIM detention centre after the first air strike of 7 May 2019.

**Appendix A to Annex 15: Humanitarian deconfliction – best practice**[58]

**Background**

1.   The processes and mechanisms used are often referred to as *deconfliction mechanisms*, *humanitarian notification for deconfliction* or *humanitarian deconfliction.* This document will use the latter term.

2.   OCHA defines deconfliction[59] as *the exchange of information and planning advisories by humanitarian actors with military actors in order to prevent or resolve conflicts between the two sets [of] objectives, remove obstacles to humanitarian action, and avoid potential hazards for humanitarian personnel.*

3.   In effect, the aim should be notify parties to the conflict of the presence of humanitarian agencies and protected facilities in order to allow those agencies to safely engage in their operational activities, or to ensure the parties are aware of the location of facilities protected by international humanitarian law (IHL). It can also contribute to the development of humanitarian space, which allows humanitarian actors to provide assistance and services according to humanitarian principles and in line with IHL.

4.   There are debates as to whether the term notification should be used, as deconfliction may suggest that military permission is needed for humanitarian actors to engage in their work. That discussion will continue, but is not an issue for Libya currently, where protection has to be the priority.

5.   On 3 May 2016 the Security Council adopted resolution 2286 (2016), which covers the protection of medical facilities during conflict in accordance with IHL. On 25 May 2017 the Secretary General emphasised the recommendations in resolution 2286 (2016),[60] in particular that parties to armed conflict should: *record[…] and map […] the presence of personnel exclusively engaged in medical duties, their means of transport and equipment, as well as hospitals and other medical facilities, and regularly update this information, including through enhanced information exchanges and real-time coordination with medical and humanitarian actors on the ground and the use of appropriate technology.*

---

[58]   Extract from Panel Advisory of 2 August 2019.
[59]   https://www.unocha.org/sites/unocha/files/Stay_and_Deliver.pdf.
[60]   https://news.un.org/en/story/2017/05/558172-attacks-hospitals-and-medical-staff-symptoms-grave-disregard-international-law.

6.   Humanitarian deconfliction to the highest standards of accuracy has become essential due to the introduction of precision guided munitions (PGM) with a circular error probability (CEP)[61] of less than 5m. When added to the danger area of the PGM warhead, for example 75m for a medium sized PGM, it allows a strike planning team[62] to select targets within just over 80m of a civilian object and still argue that the principle of proportionality had been met and that appropriate precautionary measures had been taken.[63]

7.   Although some international organizations, such as ICRC and MSF, have their own bilateral arrangements to parties to a conflict, and OCHA in Yemen have developed a sophisticated humanitarian deconfliction system to contribute to a "no-strike" list of the Saudi Arabia-led coalition, there are no international standards or guidelines. The concept is evolving as experience is gained in ongoing conflicts.

8.   The use of a humanitarian deconfliction mechanism does not absolve the parties to a conflict from their obligations under IHL to: 1) protect the civilian population from the effects of armed force; and 2) protect the provision of, and access to, impartial medical assistance and humanitarian aid in non-international armed conflicts such as Libya today.

9.   Although the use of a humanitarian deconfliction mechanism does not necessarily prevent the indiscriminate use of explosive ordnance, the Head of OCHA in Yemen has stated that their system is "largely effective".   It may also assist in longer-term investigations in to IHL violations and the establishment of accountability. It is fundamentally a humanitarian imperative to protect life.

**Implementation of an effective humanitarian deconfliction mechanism**

10.   There are a range of tasks necessary to develop and then implement an effective humanitarian deconfliction mechanism (see table 15.A.1). A coordinated multi-agency approach is essential to success.

---

[61]   Circular Error Probability is a measure of a weapon system's precision or accuracy. It is defined as the radius of a circle, centred about the mean, whose boundary is expected to include the landing points of 50 per cent of the warheads.

[62]   International best practice requires "legal sign off" before a strike is authorized by the responsible commander. This only occurs after selection of the ordnance to be used, and bomb damage impact and blast predictions.

[63]   Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited*". (Emphasis added). See CIHLR 14.

Table 15.A.1
**Development and implementation tasks**

| # | Activity | Remarks |
|---|----------|---------|
| 1 | Determine interested parties within the international community | ▪ Plus others as appropriate. |
| 2 | Engage in dialogue with parties to the conflict to introduce the concept to them. | ▪ SRSG engagement? |
| 3 | Agree lead agency | ▪ This has traditionally been OCHA. |
| 4 | Appoint individual as Humanitarian Deconfliction Co-ordinator (HDC) | ▪ Responsible for the development, accuracy and dissemination of a consolidated no-strike list.<br>▪ Should be a senior appointment due to the sensitivity of role and impact of inaccurate data. (P4/P5 equivalent).<br>▪ HDC will require support to develop initial list. |
| 5 | Agree geo-coordinate system to be used | ▪ Decimal (15.0008763N) or Long/Lat (32$^0$50'03.3"N).<br>▪ Conversion between the two can lead to "data garbling".<br>▪ Long/Lat best if Google Earth Pro to be used for mapping. |
| 6 | Agree mapping system to be used | ▪ Google Earth Pro readily available.<br>▪ Essential all agencies use same system to reduce coordinate errors. |
| 7 | Develop notification list format and mapping file | ▪ Examples at annex A.<br>▪ Locations can also be plotted on Google Earth and shared via .kmz files. |
| 8 | Agencies send location details to HDC | ▪ |
| 9 | HDC develops "no strike" list | ▪ This will initially be a time-consuming process. |
| 10 | "No strike" list sent to participating agencies for review and confirmation | ▪ Agencies to confirm the accuracy of their data in the list. |
| 11 | Participating agencies confirm accuracy or amendments to "no strike" list | ▪ |
| 12 | Amended "no strike" list developed and finalised. | ▪ |
| 13 | "No strike" list disseminated to participating agencies. | ▪ Secondary checks at agency discretion. |
| 14 | "No strike" list disseminated to conflicting parties | ▪ Wide dissemination to senior individuals in, and HQ, of both parties |

S/2019/914

| | | |
|---|---|---|
| | until a single point of contact established. "Shot gun" approach initially. | |
| | ▪ Individuals' requested to sign for" the receipt of the "no strike" list. | |
| | ▪ If no signature obtained then record the name, appointment, contact details, and time and date handed over. | |
| 15 | Repeat serials 7 to 13 | ▪ Weekly, or as major changes to list due to relocation or new establishment of "safe places" |

## Key factors

11.  Key factors to consider include:

(1)   The locations of corner points of individual buildings in isolation is essential;

(2)   Large facilities such as hospitals can be boundary corner point coordinates;

(3)   A common geo-coordinate system must be agreed and used;

(4)   A common mapping system must be agreed and used;

(5)   One individual should be nominated as the HDC; and

(6)   It is essential that parties to conflict formally accept receipt of each "no strike" list.

**Annex 16:      Attack on Tebu communities in Murzuq (5 August 2019)**

**Introduction**[64]

1.      The indiscriminate use of explosive ordnance (EO) during the air strikes that took place on the 5 August 2019 against Tebu neighbourhoods in Murzuq was indicative of  a developing pattern of similar IHL violations by the HAF.

**Background**

2.      These air strikes are as the result of heightened tensions and clashes between the Tebu ethnic group (30% of the city's population) and the Ahali community (66% Arab Fezazna and 4% Tuarag) in the Murzuq area over the last year. These clashes have allegedly included the shelling of the Ahali communities in early August 2019 by the Tebu resulting in a reported nineteen fatalities. It is assessed that the 5 August 2019 air strikes were the result of an effort by the Ahali to persuade the HAF to support them against the Tebu.

3.      Tensions between the two communities exist due to: 1) Tebu resentment of past Ahali support for Gaddafi; 2) Ahali support for HAF auxiliary forces led by the Awlad Suleiman and Zwai tribes; 3) Ahali resentment towards the expansion of Tebu political and economic influence since 2011; 4) the restriction, or lack of access, of the Ahali community to the Tebu controlled local health services; 5) Ahali concerns that the Tebu are changing the demographic composition of the area; and 6) control over smuggling networks. The situation in the area is complex and fragile.

4.      After the fall of Gaddafi in 2011 the Tebu took over control of the city administration, to the detriment of the Ahali community, Arab tribes, and other minority groups. In February 2019 the HAF, supported by the Arab tribes namely the Fezzan, Awlad Suleiman and Zwai tribes, besieged the city of Murzuq and temporarily took control, which effectively re-established Ahali domination for few days. After the withdrawal of the HAF in late February 2019, latent tensions escalated again as the Tebu retook control. This make the imposition of internal security within the city almost impossible, although mediation by tribal elders permitted temporary ceasefires, which were almost immediately broken shortly after. Fifteen individuals were killed during two days of violence in early June 2019 and the HAF Khaled Ibn al-Walid battalion intervened in an attempt to establish law and order. Conflict reignited after their intervention with allegedly 60 individuals being killed since the start of August

---

[64]  Developed from a confidential source's internal report and other Panel sources.

S/2019/914

2019.[65] There is a real risk that the conflict will escalate further as the Tebu are neither internally unified nor aligned to either of the main parties to the wider armed conflict in Libya.

**Incident details**

5.    At 02:47 hours local time on 5 August 2019 four consecutive air strikes targeted Tebu neighbourhoods in Murzuq.[66] One air strike impacted very close to a civilian wedding location in Blad District (Al Qalaa neighbourhood), shortly followed by a second after first responders had attended. The Panel has not yet assessed whether this was a deliberate "double tap" attack.[67]  The other two air strikes impacted in District 17. Locations are shown in image 16.1.

Image 16.1
**Ethic community and EO strike area**



Source: Imagery from Google Earth Pro. Information from confidential sources.

---

[65]  It is not yet clear if this data includes the casualties from the air strikes.
[66]  Centred approximately on 25°54'50"N, 13°54'38"E.
[67]  "Double tap" refers to a deliberate practice where there is a short delay after the first strike allowing the attendance of first responders and investigators, who are then targeted by the second strike.

**Casualties**

6.      The initial open source reports indicated 42 fatalities and more than 60 injured. The Panel has obtained medical records from Murzuq hospital that confirms the 42 casualties (see appendix A).

**Technical analysis of physical evidence and determination of EO type**

7.      The Panel has only obtained limited imagery (extracted from video)[68] of the air strike locations so far, but this is sufficient to confirm that the location had been subjected to high explosive attack (images 16.2 and 16.3).

Image 16.2
**Damaged infrastructure with characteristics of high explosives damage**

Image 16.3
**Damaged infrastructure with characteristics of high explosives damage**




Source: Confidential

8.      There was initially only one image of a fragment from an item of explosive ordnance available to date (image 16.4) for visual analysis, but that fragment is sufficient for the Panel to identify the explosive ordnance used at that point as almost certainly a BA-7 *Blue Arrow* air to surface missile

_____

[68] https://twitter.com/AlarabyTV/status/1158377118830514178?s=08, 5 August 2019.

(ASM) (image 16.5). Further imagery was made available on 29 August 2019 from a confidential source (image 16.6 and 16.7), which confirms this initial assessment. This missile type is used in Libya exclusively from the *Wing Loong* II unmanned combat air vehicle (UCAV), which are flown in operational support of the HAF by a Member State.

Image 16.4
**EO fragment at air strike**



Notes:
1. Rearward facing equally spaced bolt.
2. Reduction in fuselage diameter (identifiable after "trumpeting" due to impact).

Image 16.5
**BA-7 ASM at Paris Air Show**

Notes:
1. One of eight rearwards facing equally spaced bolts
2. Reduction in fuselage diameter.

Image 16.6
**BA-7 fragment at air strike**



Image 16.7
**BA-7 fragment at air strike**



Sources: Confidential and Janes' IHS. www.janes.ihs.com.

### Attribution of responsibility

9.      On the same day as the air strikes, the HAF spokesperson, Ahmed Al Mesmari, stated that the air operations room of the HAF had targeted the Government of National Accord (GNA) backed armed

group of Hassan Musa al-Souqy (a.k.a. al-Tibaoui) (the Southern Protection Force) with aviation assets.[69] This group is probably supported by Chadian mercenaries, and there is a real risk that it will retaliate for the air strikes.

10.    The Ministry of the Interior, House of Representatives and Mayoralty of Murzuq have also alleged that HAF were the perpetrators, and all three organizations have condemned the attack and either condemned UNSMIL or asked for a UN investigation (see appendix B).[70]

11.    Based on technical analysis and an understanding of the conflict dynamics in the area the Panel finds that the air strikes were planned and directed by the HAF, and executed by a Member State acting in their direct operational support.

**Analysis of violations of IHL**

12.    The Panel has initially analysed the applicable law in relation to this incident on the basis of its own independent investigations. The Panel has complied with the methodology listed at appendix C to annex 3 of this report.

**By the HAF and Member State**

13.    Although it is almost certain that the airframe that delivered the explosive ordnance in this attack was a *Wing Loong* II UCAV operated by a Member State, those operations were in support of the HAF against targets developed by and agreed upon with the HAF air operations organization. Thus, the HAF bears a large burden of command and operational responsibility for the attacks. The Member State supporting the HAF with the air assets used in this attack will also highly probably have violated IHL, and the Panel continues to investigate this aspect.

14.    IHL requires that parties follow the IHL principle of distinction[71] and take all feasible precautions to separate civilians and military objectives. The Panel finds that the HAF and the Member State failed to respect relevant principles of IHL, including those relating to proportionality,[72] as the likelihood of excessive harm to civilians and civilian objects could have reasonably been anticipated in the circumstances because:

---

[69] https://www.youtube.com/watch?v=-Mq1uB1x3Oc&t=141s. Accessed 7 August 2019.
[70] Official UN translations have been requested. The Panel summarizes the contents of each letter in the annex.
[71] See Article 50 of Additional Protocol I to the Geneva Conventions. https://ihl-databases.icrc.org/ihl/INTRO/470.
[72] Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited*". (Emphasis added). See CIHL Rule 14.

(1)    the location was obviously a civilian community; and

(2)    the timing of the attack at night would be such as to cause a disproportionately high number of civilian casualties.

14.    It is reasonable to expect that the HAF commander planning, directing and ordering these air strikes was aware of the above factors, given that this information is readily available, and the HAF commander should have taken them into consideration when assessing if there were any 'concrete and direct military advantage' to the air strikes.[73]

15.    IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.[74] The fact that the HAF and member State would have been aware that this was a civilian location, where there would ordinarily be a congregation of civilians (see above), meant that they should have been particularly vigilant when undertaking a proportionality assessment and making use of available precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[75] It is also not yet clear what precautionary measures were taken, if any, by the HAF and/or Member State. If taken, then the precautionary measures were ineffective.

**Summary of findings**

17.    The Panel finds that:

(1)    The HAF deliberately planned and directed at least one air strike, and almost certainly a further three, on a primarily Tebu area of Murzuq on 5 August  2019 that resulted in civilian fatalities and casualties;

(2)    A Member State deliberately executed at least one air strike, and almost certainly a further three, on a primarily Tebu area of Murzuq on 5 August  2019 that resulted in civilian fatalities and casualties;

---

[73]  See CIHL Rule 14.
[74]  See 1) CIHL Rule 15; and 2) Article 13(1) of Additional Protocol II to the Geneva Conventions.
[75]  See commentary to CIHL Rule 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.

(3)      The Panel is unconvinced that the HAF and the Member State, and their respective commanders, respected principles in relation to proportionality in this incident. If precautionary measures were taken, they were largely inadequate and ineffective;  and

(4)      Any individuals that passed the information, or who were otherwise involved in the intelligence gathering and targeting processes in relation to this incident, may also be responsible for any IHL violations to the extent of their command responsibility.

S/2019/914

## Appendix A to Annex 16: List of fatalities from Murzuq hospital

Image A.16.1
**Murzuq Hospital list of fatalities**

S/2019/914

دولة ليبيا

وزارة الصحة

**مستشفى مرزق العام**

التاريـــخ: 7 8 2019

الرقم الإشاري: ............

| | | |
|---|---|---|
| 16 | بشير أرزي الأمين | 31 |
| 20 | أحمد رجب إجي | 32 |
| 29 | عبد القادر بوبكر بابي | 33 |
| 24 | سعد كوكي صديق | 34 |
| 27 | عبد الرزاق محمد أدم | 35 |
| 51 | عبد الرحمن مالوما أدم | 36 |
| 18 | أحمد هلالي عادل | 37 |
| 16 | سند علي بركة | 38 |
| 26 | بلقاسم طاهر السنوسي | 39 |
| 19 | مصطفى علي ابوبكر | 40 |
| 23 | محمد عبد الله بوعلي | 41 |
| 29 | حسين إبراهيم وردكو | 42 |

ملحوظـــــــة: هـذا الكشف مبـدي قابل للإضافـة والتعـديل.

يعتمد

مكتب الشؤون الطبية بالمستشفى

2019/8/7

إدارة
الشؤون الطبية

☏071.3162965          ☏071.3162965

Source: Confidential

## Appendix B to Annex 16: Official Libyan statements

Image B.16.1
**Statement of House of Representatives**



PANEL SUMMARY

This document denounces the air strikes, the silence of the UN, and calls on UNSMIL and the international human rights NGOs to take action (although it is not specific on what type of action it expects).

Image B.16.2
**Statement of Ministry of Interior**



**STATE OF LIBYA**
**GOVERNMENT OF NATIONAL ACCORD**
MINISTRY OF INTERIOR
The Minister's Office

بيـان وزارة الـداخلية بحكومة الوفاق الوطني بشـأن القصف العشوائي الذي تعرضت
له مدينة مرزق

**تديـن** وزارة الداخليـة بحكومة الوفاق الوطني وتستنكر بأشد العبـارات القصف الجوي
العشوائي الذي تعرضت له مدينة مرزق "حي القلعة السكني"، مساء يوم أمس الأحد الموافق
4 أغسطس 2019م، والذي راح ضحيته عشرات القتلى والجرحى المدنيين، مؤكدةً بأن المجرم
الذي قام بهذا العمل الجبان سينال جزاءه جراء هذه الهجمة الوحشية التي قام بها المجرم
حفتر والتي تعتبر من جرائم الحرب، وأن هذه الأعمال تؤكد على وحشية هذا الهجوم الذي لا
مبرر له سوى ترهيب وقتل الأمنيين.

**وتدعـو** وزارة الداخلية المجتمـع الدولـي بكافة مكوناتـه، وبعثة الأمـم المتحدة إلى تحمل
مسؤولياتهم عن هذه الأعمال الوحشية التي تقوم بها المجموعات المسلحة الخارجة عن
الشرعية، وإجراء تحقيق في جرائم الحرب التي يرتكبها حفتر وأتباعه ليتم تقديم ومحاسبة
مرتكبيها والواقفين وراءها.

**كما** تدعو الوزارة حكمـاء ومشائخ المنطقة إلى الحوار والإحتكام لصوت العقل ونبذ العنف
والخروج بالمنطقة من هذا النفق المظلم وألا يبقوا أسرى لأحقاد الماضي.

**وتتقـدم** الوزارة بأحر التعازي للأسر التي فقدت أقرباءها، داعيةً الله عز وجل أن يتقبلهم
بواسع رحمته وأن يلهم أهليهم وذويهم جميل الصبر والسلوان، وأن يعجل بالشفاء للجرحى
والمصابين، مؤكدةً بأن مثل هذه الأعمال لا يمكن أن يقوم بها شخص يحمل ذرة إنسانية.

حفظ الله ليبيا وشعبها

وزارة الداخلية
حكومة الوفاق الوطني

صدر في 2019/8/5م

☎ +218 21 480 3538      📠 +218 21 480 3783-84

PANEL SUMMARY

This document denounces the raid (naming the location as the Al Kalaa neighbourhood), requests dialogue between the elders to reduce tensions and calls for a UN investigation into the "war crime".

S/2019/914

Image B.16.3
**Statement of Mayoralty of Murzuq**



PANEL SUMMARY

This document denounces the attack, states casualties of 43 dead and 60 injured, and accuses the HAF. It also holds the SRSG, Ghassan Salame, responsible as they allege he considers "Haftar's militia as an army".

## Annex 17:      Attack on Zuwarah airport (15/16 August 2019)

**Incident details**

1.      The HAF air force attacked Zuwarah international airport[76] with air delivered explosive ordnance (EO) at 07:09 hours (local time) on 15 August and at 07:30 hours (local time) on 16 August 2019,[77] reportedly delivered by a Sukhoi SU-22 fighter ground attack (FGA) aircraft. On 15 August 2019 the HAF spokesperson, Ahmad al-Mismari stated that they had targeted the airport as it was being used as base for Turkish unmanned aerial vehicles (UAV).[78] In his statement he claimed that the strikes had avoided the runway (see later). The airport was closed until 18 August 2019, and all air operations suspended until the runway had being repaired.

2.      UNSMIL deployed an inspection team to the airport on 17 August 2019, and much of the information contained in this annex is from that visit. UNSMIL determined the following damage (also see figure 17.1):

Table 17.1
**Damage to Zuwarah international airport from EO impact**

| Air strike date | Impact point | Geo-coordinates | Damage [a] |
|---|---|---|---|
| 15 Aug 2019 | Runway 06/24 (NE) | 32⁰57'20.6"N, 12⁰01'17.2"E | ▪ Crater |
| 15 Aug 2019 | Off edge of Runway 06/24 (NE) | 32⁰57'19.6"N, 12⁰01'18.9"E | ▪ Crater (1.6m) |
| 15 Aug 2019 | Off edge of Runway 06/24 (NE) | 32⁰57'19.6"N, 12⁰01'18.5"E | ▪ Crater (1.0m) |
| 15 Aug 2019 | Off edge of Runway 06/24 (NE) | 32⁰57'29.5"N, 12⁰01'17.3"E | ▪ Crater (1.4m) |
| 16 Aug 2019 | Building under construction for new fire station | 32⁰57'01.6"N, 12⁰01'05.7"E | ▪ Virtually no damage to building<br>▪ Pre-fabricated guard building severely damaged |
| 16 Aug 2019 | Guard building | 32⁰57'01.8"N, 12⁰01'06.1"E | ▪ Three civilian vehicles damaged<br>▪ One military vehicle damaged |

ᵃ Crater dimensions are for diameter in m.

---

[76]  Centred on 32°57' 22.22"N, 12° 01' 23.61"E.
[77]  UNSMIL information.
[78]  https://twitter.com/spoxlna/status/1161997777917947904, 15 August 2019. Accessed 25 August 2019.

Figure 17.1
**Location of EO impact points at Zuwarah international airport (15 and 16 August 2019)**



**Technical analysis of physical evidence and determination of EO type**

3. The UNSMIL inspection team measured the crater to the side of the runway as 1.0m, 1.4m and 1.6m.

4. Initial reports were that RBK cluster bomb units (CBU) were the EO used for the strike. The Panel supports this reporting based on:

(1) One recovered fragment (figures 17.2 and 17.3) has a virtually identical profile, shape and approximate dimensions (400mm v 450mm) as that of the nose of an RBK-500 CBU (example at figure 17.4).

(2)      Other recovered fragments (figures 17.5 and 17.6) have the same shape and approximate dimensions (30cm v 25cm) as the ZAB-2.5M incendiary bomblet dispensed by the RBK-500 CBU (example at figure 17.7), which contains 117 bomblets.

Figure 17.2
**Recovered fragment** [a]



Figure 17.3
**Recovered fragment** [b]



Figure 17.4
**RBK-500 CBU** [c]



Figure 17.5
**Recovered fragments** [d]



Figure 17.6
**Recovered fragment** [e]



Figure 17.7
**RBK-500 CBU** [f]



[a] UNSMIL.
[b] UNSMIL. (Image rotated for comparative effect).
[c] UNMAS Libya.
[d] UNSMIL.
[e] Ibid
[f] UNMAS Libya

5.      It is highly likely that the crater damage was due to the impact of CBUs that had not dispensed their bomblets during flight. This could be due to either: 1) a failure within the expulsion system within the CBU itself; or 2) the delivery aircraft attack profile was too fast and at too low level to allow correct functioning of the expulsion unit.

6.      The RBK-500 CBU is one of the ordnance types that are ballistically paired to be delivered from a SU-22 FGA, has been seen in Libya before and is known to be in the possession of the HAF air force.

## Casualties

7.     The airport manager reported that there were two casualties from the air strike on 16 August 2019 among the guards from GNA-AF 105 battalion.

## Attribution of responsibility

8.     HAF has taken responsibility for this air strike.

## Analysis of violations of IHL

9.     The Panel has initially analysed the applicable law in relation to this incident on the basis of its own independent investigations. The Panel has complied with the methodology listed at appendix C to annex 3 of this report.

## By the HAF

10.   The Panel is unconvinced of the veracity of the HAF claim that they conducted air strikes against the airport due to UCAV usage as:

(1)     The only hanger large enough to store or hide a UCAV was untouched and over 280m from the buildings damaged;

(2)     The buildings damaged were not large enough to store or hide a UCAV in; and

(3)     It is not logical to hit one end of the runway, as the UCAV have short take-off profiles and could easily use the rest of the runway.

11.     The airframe that delivered the explosive ordnance in this attack is known by the Panel to be operational with the HAF, and the HAF air operations centre almost certainly planned, directed and ordered these attacks. The HAF thus bears the command and operational responsibility for these attacks.

12.     IHL requires that parties follow the IHL principle of distinction[79] and take all feasible precautions to distinguish between civilian objects and military objectives. The Panel finds that the civilian airport was a civilian object and not a legitimate military objective at that time, and thus the HAF failed to respect relevant principles of IHL, including those relating to proportionality,[80] as the

---

[79]  CIHL Rule 7 – The Principle of Distinction between Civilian Objects and Military Objectives.
[80]  Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects,*

likelihood of excessive harm to civilian objects could have reasonably been anticipated in the circumstances as the HAF air operations organization must have been aware of the status of the location as a civilian international airport.

13.      It is reasonable to expect that the HAF commander planning, directing and ordering these air strikes was aware of the civilian status of the airport, given that this information is readily available, and the HAF commander should have taken this into consideration when assessing if there were any 'concrete and direct military advantage' to the air strikes.[81]

14.      IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize (…) damage to civilian objects.[82] The fact that the HAF were aware that this was a civilian location, where there would ordinarily be a congregation of civilians (see above), meant that they should have been particularly vigilant when undertaking a proportionality assessment and making use of available precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[83] It is also not yet clear what precautionary measures were taken, if any, by the HAF and/or Member State. If taken, then the precautionary measures were ineffective.

**Panel findings**

15.      The Panel finds that by attacking Zuwarah international airport at that time that the HAF were in violation of CIHL Rule 7 - The Principle of Distinction between Civilian Objects and Military Objectives,[84] CIHL Rule 14 – Proportionality in Attack[85] and CIHL Rule 15 – Principle of Precautions in Attack.[86]

---

*or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited*". (Emphasis added). See CIHL Rule 14.

[81]  See CIHL Rule 14.
[82]  See 1) CIHL Rule 15; and 2) Article 13(1) of Additional Protocol II to the Geneva Conventions.
[83]  See commentary to CIHL Rule 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.
[84]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule7.
[85]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule14.
[86]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule15.

S/2019/914

## Annex 18:     Attack on Mitiga airport (6 September 2019)[87]

**Incident details**

1.      At approximately 03:30 hours (local) on 6 September 2019, one item of explosive ordnance (EO) detonated on the perimeter wall north area of the airport and the other two EO impacted in the sea. This was followed at  04:45 hours (local) by the detonation of three more items of EO on the runway[88] and two taxiways[89] (see figure 18.1).

Figure 18.1
**Location of EO impact points at Mitiga airport (6 September 2019)**



Source: Base image from Google Earth Pro, 23 July 2019.

---

[87]  Information from UNSMIL supported by multiple media sources.
[88]  EO 1 at 32°53'59.61"N, 13°16'32.57"E.
[89]  EO 2 at 32°53'38.43"N, 13°16'9.91"E, and EO 3 at 32°53'44.18"N, 13°16'54.95"E.

2.      This attack was the latest in a series of attacks against Mitiga airport using land service ammunition[90] since the conflict started on 4 April 2019. UNSMIL has numerous attacks during the current conflict additional to HAF air strikes.[91]

3.      UNSMIL deployed an inspection team to the airport on 6 September 2019, and determined the damage reported at table 18.1. The UNSMIL technical assessment of the impact areas was assisted by the fact that no physical forensic evidence prior had been removed prior to their visit.

Table 18.1
**Damage to Mitiga airport from EO impact (6 September 2019)**

| Impact point | Impact point | Geo-coordinates | Damage [a] |
|---|---|---|---|
| 1 | Aircraft parking apron | 32°53'59.61"N, 13°16'32.57"E | ▪ Minor crater in aircraft pan (2.08m x 1.49m).<br>▪ Remnants of 122mm free flight rocket (FFR) main body in crater at $30^0$ angle of entry. |
| 2 | Taxiway | 32°53'38.43"N, 13°16'9.91"E | ▪ Tail unit of 9M22U 122mm FFR in tarmac. |
| 3 | Taxiway | 32°53'44.18"N, 13°16'54.95"E | ▪ Minor damage.<br>▪ Fragmentation probably from a 122mm FFR. |

[a] As reported by UNSMIL.

**Technical analysis of physical evidence and determination of EO type**

5.      At impact point 1, the dimensions of the crater (2.08m x 1.49m) and the distinctive "splatter" pattern identified by UNSMIL technical specialists on the ground at the aircraft parking pan are highly indicative of the impact detonation of an indirect fire weapon system, in this case a 122mm FFR (figure 18.2). The direction of fire was identified from this splatter pattern as being along a bearing of $180^0$ (+/- 15°). The $30^0$ angle of entry indicates that the rocket was fired at near maximum range.

6.      The tail unit of a 9M22U 122mm FFR was positively identified by the UNSMIL ammunition specialist at the scene of impact point 2, whereas there was little useful fragmentation for identification purposes at impact point 3.

---

[90] Using ground based weapons systems as opposed to the HAF air strikes.
[91] Covered in annex 13.

Figure 18.2
**Crater at impact point 1 (6 September 2019)**



Source: Base image from Google Earth Pro, 23 July 2019.

7.     The standard 9M22U 122mm FFR (often referred to as the "Grad") is fired from the BM21 multi-barrel rocket launcher (MBRL) to a maximum range of 20,380m. From this, and the analysis of the crater dimensions and "splatter" pattern, the Panel finds it almost certain that the explosive ordnance was firing from a location along an approximate back bearing of $180^0$ (+/- $15^0$) using a centre line between the impact points as shown in figure 18.3.  The location area has previously been identified as one in which the BM21 MBRL system has been based and operated from.

8.     A confidential source provided information and satellite imagery of the launcher location for this attack being at 32°41'52.45"N, 13°18'30.59"E (also see figure 18.3).

Figure 18.3
**Location of firing point (6 September 2019)**



Source: Base image from Google Earth Pro, 23 July 2019. BM21 location is from confidential satellite imagery.

S/2019/914

## Subsequent attacks

18.   A further FFR strike against the airport took place at 23:49 hours on 9 September 2019. One 9M22U 122mm FFR impacted in the proximity of the control tower and the other next the Air Afriqiyah hanger.

Figure 18.4
**Mitiga airport under attack (9 September 2019)**

Figure 18.5
**Impact damage (9 September 2019)**




Source: Confidential.

## GNA-AF response

8.       As part of the "drone propaganda war" the GNA-AF released heavily edited video imagery of a UCAV strike against a BM21 MBRL on 8 September 2019 that the GNA-AF alleged had been used in the attacks on Mitiga. The Panel geo-located the position of the BM21 MBRL[92] and established it was 23,120m from the impact point of the 6 September 2019 attacks. Therefore it could not have initiated the attack against Mitiga on 6 September 2019 from this particular location as it would have been outside the maximum range of the system (see figures 18.6 and 18.7). Notwithstanding that, the GNA-AF strike against this particular BM21 MBRL raises potential IHL concerns.

---

[92]  32°41′52.45″N, 13°18′30.59″E.

Figure 18.6
**Location of BM21 MBRL (10 July 2019)**



Source: Google Earth Pro (10 July 2019)

Figure 18.7
**GNA-AF imagery of UCAV strike against BM21 MBRL (X 2019)**



Source: Extract from video (2.21 to 2.40min) at https://www.youtube.com/watch?v=d65m6F-r_AY&feature=youtu.be (Imagery orientated to face north).

9.      Although imagery of the UCAV strike was almost certainly released for internal propaganda reasons, it illustrates an operational limitation of the Turkish supplied and operated *Bayraktar* TB2 UCAV. This UCAV is limited in the quantity and size of explosive ordnance that it can deliver, and thus the amount of net explosive mass that can be delivered onto a target. In this case, although the precision guided munition destroyed the BM21 MBRL, there was insufficient explosive mass to ensure total destruction of the payload of 9M22U 122mm FFRs. After the initial explosion (see figure 18.8) at least three 9M22U 122mm FFR were launched ballistically (see figures 18.9 and 18.10) as a result of this initial explosion.  On launch the missiles  were subjected to the forces of firing, as in a planned launch, and thus the fuzing systems would have been armed as designed. These rockets would then fly in a ballistically stable profile, then impact and detonate indiscriminately within the surrounding civilian area. Although the maximum range of the system is 20,380m, it is much more likely that the missiles would land and detonate at lesser ranges.

Figure 18.8
**UCAV initial missile strike on BM21 MBRL**



Source: Extracted from video at https://www.youtube.com/watch?v=d65m6F-r_AY&feature=youtu.be, (@ 2.31 min).

Figure 18.9
**Resultant uncommanded 9M22U 122mm FFR launch BM21 MBRL (3 seconds after strike)**



Source: Extracted from video at https://www.youtube.com/watch?v=d65m6F-r_AY&feature=youtu.be, (@ 2.34 min).

Figure 18.10
**Resultant uncommanded 9M22U 122mm FFR launch BM21 MBRL (10 seconds after strike)**



Source: Extracted from video at https://www.youtube.com/watch?v=d65m6F-r_AY&feature=youtu.be, (@ 2.41 min).

**Casualties**

10.   None reported.

**Attribution of responsibility**

11.     Although the 122mm BM21 MBRL is ubiquitous in Libya the location of the firing point area makes it certain the HAF was responsible for this attack. The following HAF units were known to be in vicinity of the launch area at the time:[93]

  (1)     9th brigade (formerly the 7th brigade, a.k.a. the Kanyat);

  (2)     155th brigade;

  (3)     192nd brigade; and

  (4)     Tariq bin Ziyad battalion.

**Analysis of violations and potential violations of IHL**

12.     The Panel has initially analysed the applicable law in relation to this incident on the basis of its own independent investigations. The Panel has complied with the methodology listed at appendix C to annex 3 of this report.

**By the HAF affiliated armed group**

13.     The use of FFR in the indirect fire role against populated areas is a violation of IHL no matter the circumstances. Many factors affect the accuracy[94] and precision[95] of an indirect fire weapon system, including meteorological conditions, the suspension system of the launcher, knowledge of the ballistic trajectories for differing ranges, the condition of the rocket motor propellant, accuracy of sighting system, and the professionalism of the crew. All these require substantial modelling, field testing, statistical analysis of fall of shot under known conditions, and training. From this a Circular Error Probability (CEP)[96] can be derived. For the BM21 MBRL firing the 9M22U 122mm FFR at a range of

---

[93]   Confidential source.
[94]   The ability to hit a designated target.
[95]   The ability to hit the designated target consistently.
[96]   The CEP is the radius of a circle around a mean point of impact in which over 50% of the rounds fired will impact. A large CEP indicates the level of precision of the weapons system.

nearly 20km the CEP and variables mean that a deflection error of 160m either side of the target and a range error of 300m would not be untypical.[97]

14.     IHL requires that parties follow the IHL principle of distinction[98] and take all feasible precautions to distinguish between civilian objects and military objectives. The Panel finds that the impact areas at the civilian airport were civilian objects and not legitimate military objectives at that time, and thus HAF failed to respect relevant principles of IHL, including those relating to proportionality,[99] as the likelihood of excessive harm to civilian objects could have reasonably been anticipated in the circumstances as the HAF were certainly aware of the status of the location as a civilian international airport.

15.     It is reasonable to expect that the HAF commander planning, directing and ordering this attack was aware of the civilian status of this part of the airport, given that this information is readily available, and the HAF commander should have taken this into consideration when assessing if there were any 'concrete and direct military advantage' to the attack.[100]

16.     IHL also requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize (…) damage to civilian objects.[101] The fact that the HAF were aware that this was a civilian location, where there would ordinarily be civilians working shifts, meant that they should have been particularly vigilant when undertaking a proportionality assessment and making use of available precautionary measures to minimize the incidental loss of civilian life and damage to civilian property.[102] It is also not yet clear what precautionary measures were taken, if any, by the HAF. If taken, then the precautionary measures were ineffective.

---

[97]  GICHD. February 2017. *Explosive Weapon Effects*. pp32-33. (ISBN: 978-2-940369-61-4). Geneva: GICHD.
[98]  CIHL Rule 7 – The Principle of Distinction between Civilian Objects and Military Objectives.
[99]  Under IHL "*launching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited*". (Emphasis added). See CIHL Rule 14.
[100]  See CIHL Rule 14.
[101]  See 1) CIHL Rule 15; and 2) Article 13(1) of Additional Protocol II to the Geneva Conventions.
[102]  See commentary to CIHL Rule 14, and the United States Department of Defense Law of War Manual (2015), p.1033, which requires combatants to assess in good faith the information that is available to them, when conducting attacks.

**Potentially by the GNA-AF**

17.      IHL requires military commanders and those responsible for planning and executing decisions regarding attacks to take all feasible precautions to avoid, and in any event to minimize, incidental loss of civilian life, injury to civilians and damage to civilian objects.[103]

18.      If the uncommanded launches of 9M22U 122mm FFRs as a result of the *Bayraktar* TB2 UCAV strike against the BM21 MBRL was an isolated incident (paragraphs 8 and 9), then it could not have been "reasonably foreseen" by the GNA-AF and is thus not a violation of IHL.

19.      However, if uncommanded launches of 9M22U 122mm FFRs are a frequent or routine occurrence whenever BM21 MBRL are attacked by the precision guided munitions from a *Bayraktar* TB2 UCAV, then the situation could be "reasonably foreseen". The impact of the  9M22U 122mm FFRs would then be considered as indiscriminate, and routine violations of IHL would be occurring.

**Panel findings**

20.      The Panel finds that by attacking the civilian area of Mitiga airport at that time that a HAF was in violation of CIHL Rule 7 - The Principle of Distinction between Civilian Objects and Military Objectives,[104] CIHL Rule 14 – Proportionality in Attack[105] and CIHL Rule 15 – Principle of Precautions in Attack.[106]

---

[103]  See Article 13(1) of Additional Protocol II to the Geneva Conventions and CIHL Rule 15.
[104]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule7.
[105]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule14.
[106]  https://ihl-databases.icrc.org/customary-ihl/eng/docs/v1_rul_rule15.

## Annex 19:     List of DCIM detention centres

Table 19.1
**List of DCIM detention centres as of 20 October 2019**

| Region | Area | Detention centre | Status | # Detainees |
|--------|------|------------------|--------|-------------|
| West | Tripoli | Ain Zara | Non Operational | 0 |
| West | Tripoli | Qasr bin Ghashir | Non Operational | 0 |
| West | Tripoli | Gharyan | Non Operational | 0 |
| West | Tripoli | Zintan | Operational | Unavailable |
| West | Tripoli | Zliten | Operational | Unavailable |
| West | Tripoli | Tajura | Operational[107] | 200 |
| West | Misrata | Misrata (Karareem) | Non Operational | 203 |
| West | Zuwarah | Zuwarah | Operational | 278 |
| West | Zawiya | Abu Isa | Operational | 105 |
| West | Tripoli | Abu Salim | Operational | 677 |
| West | Tripoli | Elsabaa | Operational | 516 |
| West | Tripoli | Janzour (Subsidiary DC) | Operational | 72 |
| West | Sabratha | Sabratha | Operational | 50 |
| West | Zawiya | Shohada' Nasr | Operational | 1229 |
| West | Sirte | Sirte | Operational | 106 |
| West | Khoms | Suq al Khamis | Operational | 191 |
| West | Tripoli | Tariq al Sikka | Operational | 257 |
| South | Sebha | Sebha | Operational | Unavailable |
| South | Sebha | Brak al Shati | Operational | Unavailable |
| East | Tobruk | Tobruk | Operational | 22 |
| East | Benghazi | Ganfouda | Operational | 222 |

---

[107] Of the three DC ordered closed by the GNA Ministry of Interior on 1 August 2019, the Tajura facility continues to house detainees. There are two DC in Khoms. Khoms "One" DC is not listed as it was previously ordered closed in addition to the 1 August 2019 order, and is confirmed as closed. The Misrata DC is also confirmed closed.

| Region | Area | Detention centre | Status | # Detainees |
|--------|------|------------------|--------|-------------|
| East | Bayda | Baya | Operational | 16 |
| East | Ajdabiya | Ajdabiya | Operational | Unavailable |
| East | Shahat | Shahat | Operational | 40 |
| East | Kufra | Kufra | Operational | 150 |

Source: Confidential.

S/2019/914

**Annex 20:     Ministry of Interior statement on DC closures**

Figure 20.1
**Ministry of Interior statement of 1 August 2019**



Figure 20.2
**Official translation**

Issued on 1 August 2019

**Ministry of the Interior Decisions**

**Decision of the Acting Minister of the Interior
No. 1421 (2019) concerning the closure of illegal migrant shelters**

The Acting Minister of the Interior,

Having reviewed the Constitutional Declaration of 3 August 2011 and its amendments;

The Libyan Political Agreement, which was signed on 17 December 2015;

Act No. 10 (1992) on security and police;

Act No. 19 (2010) on countering illegal migration;

Act No. 6 (1987) on the entry into, residency in and exit from Libya of aliens, and its amendments;

Cabinet Decision No. 125 (2015) regarding the implementing regulation for Act No. 6 (1987) on the entry into, residency in and exit from Libya of aliens, and its amendments;

Presidential Council Decision No. 4 (2016) on the formation of the Government of National Accord;

Presidential Council Decision No. 12 (2016) on the delegation of authority in relation to mandates;

Government of National Accord Presidential Council Decision No. 1371 (2018) on mandates;

Cabinet Decision No. 145 (2012) adopting the organizational structure and the competencies of the Ministry of the Interior and organizing its administrative apparatus;

Cabinet Decision No. 386 (2014) on the establishment of the Department for Combating Illegal Migration;

Minister of the Interior Decision No. 982 (2012) on the adoption of the internal organization of the Ministry of the Interior;

The letter dated 10 August 2019 from the Chief of Staff of the Minister of the Interior;

*Decides*

**Article 1**

The following illegal migrant shelters shall be closed: 1. The Misratah shelter;
2. The Tajura' shelter;
3. The Khums shelter.

**Article 2**

The directors of the shelters covered by article 1 of the present decision shall categorize residents and take appropriate measure to carry out deportation.

**Article 3**

The present decision shall enter into force on the date of its issuance. All provisions that contravene its provisions are rescinded.


 (*Signed*) Fathi Ali **Bashagha** Acting Minister of the Interior

**Annex 21:    Al-Nasr brigade, al-Nasr DC  and the Zawiyah network**

1.    On 5 July 2014, the then commander of the Petroleum Facilities Guards, put Mohamed Kashlaf (LYi.025), the head of al-Nasr brigade, in charge of the security of the Zawiyah oil complex. Al-Nasr brigade, with a force of around 3.000 men, has controlled the security of the complex and surrounding areas since 2014. The al-Nasr DC is located on the southern edge of the oil complex.

2.    The brigade is involved in a range of illicit activities. It expanded operations to organizing logistics for truck tankers in and out of the oil complex (see paragraph 158 of S/2018/812). The brigade knows which regional fuel stations in Zawiyah, Surman, Sabratah, Al Ajaylat participate in smuggling, and collects the ¨taxes¨ paid by the trucks that load and deliver back and forth.

3.    Trafficking and extortion of migrants is another income source for individuals within the brigade's network. The al-Nasr DC is a known hub for human trafficking where migrants are subject to various forms of human rights abuses. Several migrants interviewed by the Panel named and positively identified the individual who heads the al-Nasr DC as "Osama" or "Osama Zawiyah." Either he or the individuals under his control facilitated the exploitation, abuse and extortion of migrants. Sexual exploitation and violence, beatings, starvation, and other degrading treatment, including to minors, frequently occur. Osama is a close associate of Mohamed Kashlaf.

4.    Despite Libyan authorities' attempted closure of al-Nasr DC following the designation of Kashlaf in June 2018, it remains fully operational. The adjacent Zawiyah port, approximately 3 km away from the DC, also remains a main disembarkation point for migrants intercepted at sea by the LCG. Abd Al-Rahman al-Milad (LYi.026) a.k.a. Al Bija was previously the commander of that port.

5.    Following an attack on the Qasr bin Ghashir DC on 23 April 2019, as a result of the conflict in Tripoli, the al-Nasr DC received approximately 800 transferred migrants. The facility exceeds capacity, housing as of September 2019 approximately 1,230 migrants. The resources provided to the DC by the Libyan authorities are not adequately managed and are overstretched.[108]

6.    Kashlaf works closely with his brothers Nuri and Abdallah and also with his cousins Walid, Khamza and Samir. Walid Kashlaf plays an essential role in moving and investing the revenues generated by the network. Abd Al-Rahman al-Milad a.k.a. Al Bija is also a known close associate.

7.     The Kashlaf clan, from the tribe Awlad Abuhumeira, operates under the umbrella of Ali Boushriba, the tribe's most influential element in Zawiyah.

---

[108]  Confidential sources.

Figure 21.1
**Exact location of the Al-Nasr DC**



Source: © 2019 DigitalGlobe Inc.

**Annex 22:      ISIL (QDe.115) in Libya's killings in Fuqaha (9 April 2019)**

**Incident details**

1.      On 9 April 2019, open source media reported[109] that at least thirteen vehicles belonging to ISIL in Libya entered the town of Fuqaha where they immediately cut electricity power and phone communication lines/cell towers. Their first target was Abdelkafi Ahmed Abdelkafi, a member of the municipal guard who was taken by force from his house to the municipality building where he was slaughtered. Once in the Municipality building they abducted Miftah Sasi, Head of the Municipal Guard, and burned the building. Another victim of this assault was Ahmed Sassi, Head of the Municipality, whose house was stormed, and he was murdered in his sleep, then burned along with his house. The group killed at least three other people and burned more than two other buildings, before leaving the town of Fuqaha at 01:45 hours (local time).

2.      On 9 April 2019, ISIL in Libya published a statement in its official media branches taking responsibility for the killing of the Head of the Municipal Guard and the Head of the Municipality, together with other "wanted" individuals and arrested others. They also admitted to burning the municipality building and two other civilian houses.

Figure 22.1
**Statement of ISIL in Libya on the Fuqaha attack (9 April 2019)**



Source: https://ou7zytv3h2yaosqq.f101.ml/38002. Accessed 10 June 2019.

---

[109] https://www.libyaobserver.ly/news/gunmen-attack-fuqaha-town-al-jufra-central-libya,

3.      On 9 April 2019, open source media quoted the Head of the Municipality of Jufra, who stated that members of HAF, supported by some of the local population, intercepted some members of ISIL Libya, killing five of them and freeing Miftah Sasi.[110]

4.      On 9 April, ISIL media branch 'A'amaq' published a statement claiming the incursion in Fuqaha was aimed against Haftar affiliates. The statement also again claimed the killing of the Head of the Municipal Guard and the Head of the Municipality, as well as the killing and apprehension of other HAF members.

Figure 22.2
**Statement of ISIL (Qde.115) on the Fuqaha attack**



Source: https://ou7zytv3h2yaosqq.f101.ml/38007. Accessed 10 June 2019.

---

[110]  http://aldiywan.ly/2019/04/09/عميد-بلدية-الجفرة-مقتل-5-من-مرتكبي-مجزر/.

5.      **On** 15 April 2019, ISIL in Libya again released video imagery of their 8 April 2019 incursion into Al Fuqaha, which showed events very similar to the aforementioned crimes. Screenshots of this imagery are at figures 22.3 to 22.7.

Figure 22.3

**Burning of a civilian house** [a]



Figure 22.4

**Abduction of civilians**



Figure 22.5

**Headquarters of the Fuqaha municipal Guard**



Figure 22.6

**Miftah Sassi in custody of ISIL Libya**



[a] All imagery (22.3 to 22.6) from video extract. https://ou7zytv3h2yaosqq.f101.ml/38052. 15 April 2019. Accessed 10 June 2019.

**Annex 23:        Arbitrary detention of Deputy Minister of Defence, Ouheida Abdallah Najim**

1.    On 22 April 2019, GNA Deputy Minister of Defence, Ouheida Abdallah Najim, while returning home from his office, was abducted in Tripoli. An unidentified group of armed men stopped his convoy and took him, his driver and one security member of his team by force. All were transferred to an unknown location in Misrata.

2.    Abdallah Najim spent 42 days arbitrarily detained in that unknown location. During this period, no explanation or information was provided for his arbitrary detention.

3.    On or about 3 June 2019 he was taken back to Tripoli and abruptly released in the premises of the AGO. This latter office conveyed that it had no grounds for detaining or arresting him.

4.    To date, Abdallah Najim is neither aware of the reasons behind his abduction and detention, nor of the identities or affiliations of the perpetrators.

5.    It is the Panel's understanding that an official investigation has not yet been launched.

**Annex 24:     Disruptions to the GMMR**

**Background**

1.    Libya's national water supply system is nearly completely derived from underground aquifers in southern desert areas pumped via the GMMR and underground wells. Even though disruptions to supply remain localized, the entire system is growing increasingly fragile due to infrastructure deterioration, theft, and intermittent attack. Two such attacks occurred in May and July 2019, of which one is detailed below.

Figure 24.1
**Map of the Great Man-Made River (GMMR)**



Source: Britannica

2.      The gradual stripping of metals from the pumping stations and other wells to sell for scrap has severely degraded infrastructure over time. Attacks on and thefts to wells have dramatically increased since mid-2017 (see figure 24.2). The Panel estimates that 100 wells in the Hasawna area alone have been destroyed. The main pumping station at Qasr bin Ghashir that delivers water to the capital is severely degraded from repeated acts of vandalism.

Figure 24.2
**Total number of wells destroyed since August 2016**



Source: Libyan Water Authority

## Incident details

In October 2017, the SDF arrested al-Mabruk Hneish. In retaliation, HAF 219 brigade purportedly led by his brother, Khalifa Hneish, took control of the southern Hasawna water control station and

threatened to disrupt the supply if al-Mabruk was not released. A negotiation produced the resumption in the water supply, but al-Mabruk remained in detention.

4.    On 19 May 2019, 219 brigade took control of the southern Hasawna water control station and then denied supply to the western coastal region including Tripoli (population of approximately 2.5 to 3 million). Water supply was denied for approximately 36 hours (see appendix A). The Panel considers that such a lengthy denial of supply falls within the ambit of an "attack against an object indispensable to the survival of the civilian population".

5.    Negotiations took place during the period of water denial, resulting in the eventual release of al-Mabruk Hneish in June 2019.

**Attribution of responsibility**

6.    Although 219 brigade was in control of the local area during the time of this incident, and there is little doubt that an incident in non-compliance with CIHL 54 – "attacks against objects indispensable for the survival of the population" took place, the Panel has not yet been able to find compelling evidence of the individual or organization responsible.

**System vulnerability**

7.    The design of the complete water system means that there are vulnerable points throughout the system that if attacked or captured means that Tripoli can easily be threatened with the denial of supply and has been illustrated above.

S/2019/914

## Appendix A to Annex 24. Documentary evidence

Figure A.24.1
**Statement by the United Nations Resident and Human Coordinator, dated 20 May 2019**



**United Nations**          الأمم المتحدة

Office of the UN Resident and Humanitarian Coordinator
مكتب المنسق المقيم للأمم المتحدة ومنسق الشؤون الإنسانية
LIBYA   ليبيا

### UN Humanitarian Coordinator for Libya strongly condemns the blockage of the Great Man-Made River, cutting off water supply for hundreds of thousands of Libyans

*Tripoli, 20 May 2019*

On 19 May 2019, during late night hours, a water control station in the Jabal al-Hasawna – southwestern Libya, was deliberately shut down cutting off water supply from the Great Man-Made River (GMMR) to Tripoli and some cities in the western and middle areas of Libya.

*The UN Humanitarian Coordinator, Maria Ribeiro, condemns in the strongest terms this act that aims to deprive hundreds of thousands of already embattled Libyans of safe drinking water. "Such attacks against civilian infrastructure that are essential for the survival of the civilian population may be considered war crimes," Ribeiro stressed.*

Continuous attacks on the water system further jeopardise levels of health and hygiene among the civilian population, particularly those most vulnerable, including children, and cause further hardship and possible displacement.

The Humanitarian Coordinator reminds all parties of their obligations under International Humanitarian Law and International Human Rights Law to ensure the safety of all civilians and civilian infrastructure, including schools, hospitals, and public utilities, especially water and electricity.

Note for editors:

Since the beginning of 2018, there has been a dramatic increase in the number of wells being sabotaged. Currently, 96 out of 366 wells feeding the Man-Made River are out of service. This was already creating increasing water shortages for the estimated 1.5 million people, including some 600,000 children, who rely on the MMR as their primary supplier of freshwater.

Figure A.24.2
**Statement by the administration of the Great Man Made River dated 21 May 2019**







جهاز تنفيذ وإدارة
مشروع النهر الصناعي

التاريخ : ١٤ رمضان ١٤٤٠ هـ
الموافق : ٢٠١٩ / ٥ / ٢١ م
الرقم :

بيان جهاز تنفيذ وإدارة مشروع النهر الصناعي

بشأن حادثة إيقاف ضخ المياه بمنظومة الحساونة سهل الجفارة

تعرض موقع الشويرف التابع لمنظومة الحساونة سهل الجفارة مساء يوم الأحد الموافق 19 مايو 2019 إلى حادثة اعتداء تمثلت في قيام المواطن بلقاسم احنيش بتهديد الموظفين بالموقع من اجل إيقاف عمليات ضخ المياه بالمنظومة الأمر الذي ترتب عليه انقطاع المياه لقرابة 36 ساعة على كل المدن والمناطق الواقعة بالمنطقتين الغربية والوسطى ، وفي هذا الخصوص فأن جهاز تنفيذ وإدارة مشروع النهر الصناعي يؤكد على ما يلي :-

- أن جهاز تنفيذ وإدارة مشروع النهر الصناعي ينأى بنفسه عن كل التجاذبات والخلافات والصراعات وأنه يرفض بشكل واضح وصريح أن تستخدم المياه والتي هي هبة الله للجميع في المساومة أو التلويح باستخدامها لإملاء أية شروط او مطالب خاصة.

- يمثل مشروع النهر الصناعي الشريان الرئيسي للإمداد المائي بالدولة الليبية حيث يكافح مستخدموه الوطنيين على مدار الساعة وفي ظروف تشغيلية قاهرة من اجل استمرار تدفق مياهه لتغذية كل المدن والمناطق الواقعة على مساراته على حد سواء.

- قام هذا المواطن في عدة مرات سابقة بتهديد الموظفين بقوة السلاح من اجل إيقاف ضخ المياه بمنظومة الحساونة سهل الجفارة كان اولها في شهر اكتوبر 2017 وقام فعلياً بتنفيذ تهديده وإيقاف الضخ بالمنظومة في شهر نوفمبر 2017 مطالباً بضرورة أطلاق سراح أخيه المدعو المبروك احنيش والموقوف بمدينة طرابلس ، وفي هذا الصدد ينوه الجهاز إلى ما يلي :-

• انه غير معني البتة بمثل هذه المطالب ويستغرب في الوقت ذاته أن يتم إقحامه فيها والتي تطال عواقبها الوخيمة كل الشعب الليبي.

• قام جهاز تنفيذ وإدارة مشروع النهر الصناعي وفور حدوث الاعتداءات والتهديدات السابقة بمخاطبة وإبلاغ السلطات الرسمية بالدولة للاضطلاع بمسؤولياتها لحماية هذا المشروع الحيوي كما قام بالتواصل مع كل الفعاليات الشعبية والاجتماعية من اجل معالجة هذه الأشكالية.



| المقر الرئيسي : بنغازي. المعاري | www.gmmra.org - e-mail: gmrp@gmrp.ly | طرابلس. قصر بن غشير |
|---|---|---|
| +218 61 222 6941   +218 61 222 5091- 92 | | +218 21 361 9440   +218 21 569 2015 |
| +218 61 222 0195   +218 61 224 0330 | | +218 21 361 9174   +218 21 360 1482 - 83 |
| 9468.641+ص | | 1188+ص |

S/2019/914

- إن الوضع الراهن لم يعد يحتمل المزيد من التهاون في حماية هذا المشروع الاستراتيجي والذي يمثل الأمن القومي للدولة وأن الوقت قد حان من أجل تفعيل القانون وتجريم إي اعتداء على هذا المشروع واعتباره جريمة ضد الإنسانية.

- أن جهاز تنفيذ وإدارة مشروع النهر الصناعي بواجه تحديات وعقبات هائلة تجعله غير قادر على الاستمرار في عمليات تشغيله وصيانته وفقاً للمعايير والمواصفات الفنية والقياسية المصممة له وسيتم خلال الأيام القليلة القادمة إصدار بيان لاحق يوضح هذه التحديات بشكل واضح وصريح من أجل قيام الجهات المختصة بالدولة بتحمل مسؤولياتها في هذا الشأن وذلك للحيلولة دون توقف عمليات ضخ مياهه لتأمين الاحتياجات الحضرية والزراعية بالدولة الليبية.

حفـــــظ الله ليبيـــــا





**Panel summary of the above statement**

This confirms the stoppage of water supply in May 2019 to the cities in central and western Libya. It identifies the perpetrator as Belqasim Hneish and highlights that there were two previous instances in October and November 2017, where this individual had attacked the Hassawna water complex and disrupted the water flow.

**Annex 25:      Failure to implement a release order for Prime Minister Baghdadi al Mahmoudi**

1.      The Panel has identified the failure to implement a release order in favour of former Prime Minister Baghdadi al Mahmoudi, adopted after a severe deterioration of his health condition was medically confirmed.

2.      The release order was issued by the Ministry of Justice on 10 July 2019, and endorsed by the President of the Presidency Council on 20 July 2019.

3.      The Panel is investigating the kidnapping and later assassination on 7 August 2019 of Walid al Tarhouni, a senior official of the Ministry of Justice, as there are indications that his death is connected to the release decision.

Figure 25.1
**Release order issued by the Ministry of Justice on 10 July 2019**



S/2019/914

Figure 25.2
**Release order endorsed by the GNA on 20 July 2019**



**Annex 26:      The enforced disappearance of Ms. Siham Sergewa (17 July 2019)**

**Incident details**

1.     On 17 July 2019, a group of masked and armed men entered the home of Ms. Siham Sergewa, a Member of the House of Representatives and women's rights activist, shot and wounded her husband, physically assaulted one of her sons and abducted her to an unknown location.

2.     Media reported that HAF affiliated groups were more likely to be guilty, as her kidnap effectively silenced her opposition to the HAF offensive against Tripoli[111] [112].

3.     On 18 July 2019, UNSMIL released a statement[113] deploring the enforced disappearance of Siham Sergewa and called on the relevant authorities to investigate the matter and for her immediate release.

4.     On 4 August 2019, the official Facebook page of the 'interim government' posted a video and a statement[114] of Ibrahim Bushnaf, minister of interior of the 'interim government' accusing "terrorist groups" and "sleeper cells" of the kidnapping, but produced no evidence to support their accusation of terrorist entities. Ibrahim Bushnaf indicated that investigations were being conducted on the case.

5.     On 7 August 2019, UNSMIL released a statement[115] expressing the concern over the continued enforced disappearance of Ms. Siham Sergewa, noting that the statements made by the 'interim government' authorities do "not convey any reassurance about the wellbeing and the whereabouts of Ms. Sergewa".

6.     On 17 October 2019, UNSMIL released a statement[116] condemning once again the abduction and the disappearance of Ms. Sergewa, and reiterating the legal responsibility of relevant authorities in eastern Libya to establish her fate and whereabouts.

7.     Attempts by the Panel to contact Ms. Siham Sergewa's close family members were unsuccessful. The Panel sought details of the ongoing investigations from the 'interim government' and is yet to receive a response. The fate of Siham Sergewa is unknown to date.

---

[111]  https://libyaalahrar.tv/2019/08/05/أولياء-الدم-أم-ار هابيون-اختطفوا-سرقي/.
[112]  https://edition.cnn.com/2019/07/20/africa/libya-sergewa-intl/index.html
[113]  https://unsmil.unmissions.org/unsmil-statement-continued-enforced-disappearance-house-representative-member-siham-sergawa
[114]  https://www.facebook.com/117982735202495/videos/784011072017339/.
[115]  https://unsmil.unmissions.org/unsmil-statement-continued-enforced-disappearance-house-representative-member-siham-sergawa.
[116]  https://unsmil.unmissions.org/three-months-after-kidnapping-mp-sergewa-unsmil-calls-her-immediate-releases-and-all-victims

## Annex 27:     Summary of non-compliance with the sanctions measures (arms) in support of GNA[117]

1.      Tables 27.1 to 27.3 summarizes the non-compliances with paragraph 9 of resolution 1970 (2011) covering, air and aviation violations, land service equipment violations and maritime violations identified or confirmed during the period of this report. The Panel also finds the GNA to be in non-compliance with  paragraph 9 of resolution 1970 (2011) for all these cases.

Table 27.1
**Air and aviation non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph9 to 1970 (2011) | Remarks |
|---|---|---|---|
| New equipment | Bayraktar-TB2 UCAV [a] | ▪ Turkey ▪ GNA | ▪ The Member States have not responded to Panel enquiries. ▪ Supply and import. |
| New equipment | *Orbiter*-3 UAV [b] | ▪ GNA | ▪ The supply chain has yet to be ascertained as Member State has not responded to Panel enquiries. ▪ Import. |
| Transportation | Ilyushin IL-76TD Registered UR-COZ | ▪ Turkey ▪ Turkish Office of ProAir-Charter-Transport GmbH[c] ▪ Plures Air Cargo,[d] Turkey | ▪ Destroyed on ground at Misrata international airport on 6 August 2019. ▪ Panel identified 130 tonnes of suspicious freight cargo on five flights between 3 to 6 July 2019 consigned by the Libyan Embassy, Ankara to the Ministry of Interior, Libya. |

---

[117]  Also included at table 27.4 is a case of illegal import of blank firing pistols by an organised criminal group(s).

| Generic Type | Means / Equipment | | Responsible party(ies) in non-compliance with paragraph9 to 1970 (2011) | Remarks |
|---|---|---|---|---|
| Transportation | Ilyushin IL-18 UR-CNT | Registered | ▪ Turkey<br><br>▪ Ukraine Air Alliance P.J.S.C. [e]<br><br>▪ Turkish Office of ProAir-Charter-Transport GmbH<br><br>▪ Plures Air Cargo, Turkey | ▪ Panel identified 4.1 tonnes and 8.9 tonnes of UAV components consigned on two flights on 28 May 2019, by the Libyan Embassy, Ankara to the Ministry of Interior, Libya. |
| Transportation | Ilyushin IL-18 UR-CGW | Registered | ▪ Turkey<br><br>▪ Ukraine Air Alliance P.J.S.C.<br><br>▪ Turkish Office of ProAir-Charter-Transport GmbH<br><br>▪ Plures Air Cargo, Turkey | ▪ Panel identified 5.2 tonnes and 6.9 tonnes of UAV components consigned on two flights on 30 May 2019 by the Libyan Embassy, Ankara to the Ministry of Interior, Libya. |
| Transportation | Ilyushin IL-18 UR-CAH | Registered | ▪ Turkey<br><br>▪ Ukraine Air Alliance P.J.S.C.<br><br>▪ Turkish Office of ProAir-Charter-Transport GmbH<br><br>▪ Plures Air Cargo, Turkey<br><br>▪ | ▪ Panel identified 5.4 tonnes and 5.3 tonnes of UAV components consigned on two flights on 31 May and 2 June 2019 by the Libyan Embassy, Ankara to the Ministry of Interior, Libya.<br><br>▪ |

[a] https://baykarsavunma.com/#en.

[b] https://aeronautics-sys.com.

[c] https://www.proair.de/en.

[d] https://www.plures.com.tr/en.

[e] http://www.uaa-avia.com/en.

Table 27.2
**Land service non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| New equipment | *Kirpi* 4 x 4 APC [a] | ▪ Presidency of Defence Industries,[b] Turkey<br><br>▪ Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Limited Sti,[c] Turkey<br><br>▪ GNA | ▪ The Member States have not responded to Panel enquiries.<br>▪ Delivery to Libya confirmed verbally by Minister of Interior of Libya to Panel on 31 July 2019.<br>▪ Supply and import. |
| New equipment | Toyota armoured trucks | ▪ GNA Ministry of Interior, Libya | ▪ The Member States have not responded to Panel enquiries.<br>▪ Delivery to Libya confirmed verbally by Minister of Interior of Libya to Panel on 31 July 2019.<br>▪ Import. |
| New equipment | Counter-UAV RF Inhibition and Jamming System | ▪ | ▪ Under investigation |

[a] https://www.bmc.com.tr/en.

[b] https://www.ssb.gov.tr/Default.aspx?LangID=2.

[c] http://www.akdenizroro.com.tr/en/.

Table 27.3
**Maritime non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| Military support | Landing Ship Tank *Ibn Ouf* (L132) | ▪ Italian Navy [a] | ▪ Maintenance work to an armed naval vessel in December 2017 and January 2018. |
| Transportation | MV *Amazon* (IMO 7702657) | ▪ Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Ltd STI (Turkey) | ▪ Moldova forcibly removed the vessel's flag status on 25 May 2019.<br>▪ Provisionally registered with Togo International Registration Bureau on 14 June 2019.<br>▪ Togo cancelled the provisional registration on 20 August 2019. |

[a] Italian vessels *Capri* (A5353) and *Tremeti* (A5349).

Table 27.4
**Organised crime non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| Illegal import by organised criminal group | Atak Zorak Type 2918 blank firing pistols x 5,000 | ▪ Aykar Makliyat Uluslararsi,[a] Turkey | ▪ Seized by customs at Al Khoms on 17 December 2018. |
| Illegal import by organised criminal group | Ekol P29 blank firing pistols x 20,000 | ▪ Brother Company for International Trade Toys Shop,[b] Tunisia<br>▪ Al Kasr Textile Factory, Tripoli, Libya | ▪ Seized by customs at Misrata on 30 December 2018. |

[a] https://www.aykardenizcilik.com/en/index.php.

[b] Mr Nofal Mustafa, +216 24 524XXX.

**Annex 28:    Summary of non-compliance with the sanctions measures (arms) in support of HAF**

1.    Tables 28.1 to 28.3 summarizes the non-compliances with paragraph 9 of resolution [1970 (2011)](#) covering, air and aviation violations, land service equipment violations and maritime violations identified or confirmed during the period of this report. The Panel also finds HAF to be in non-compliance with paragraph 9 of resolution [1970 (2011)](#) for all these cases.

Table 28.1
**Air and aviation non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| Confirmed | *Wing Loong* II UCAV [a] | ▪ United Arab Emirates | ▪ Paired with the Blue Arrow (BA-7) air to surface missile system. |
| New equipment | Mohadjer-2 UAV [b] | ▪ | ▪ The supply chain has yet to be fully ascertained as Member State has not responded to Panel enquiries. |
| New equipment | Orlan-10 UAV [c] | ▪ | ▪ The supply chain has yet to be fully ascertained as Member State has not responded to Panel enquiries. |
| New equipment | Yabhon-HMD UAV [d] | ▪ United Arab Emirates | ▪ The supply chain has yet to be fully ascertained as Member State has not responded to Panel enquiries. |
| Transportation | Antonov AN-26 Displaying UP-AN601 | ▪ Space Cargo Inc,[e] UAE | ▪ De-registered by Kazakhstan aviation registry on 7 September 2015.<br>▪ UP-AN601 markings were removed from aircraft in May 2015, but have subsequently been remarked as a "false flag"<br>▪ Now flying illegally within Libya as a "stateless" aircraft. |
| Transportation | Ilyushin IL-76TD Registered UR-CMP | ▪ Deek Aviation FZE,[g] UAE | ▪ Destroyed on ground at Jufra air base on 25 July 2019. |
| Transportation | Ilyushin IL-76TD Registered UR-CRC | ▪ Deek Aviation FZE, UAE | ▪ Destroyed on ground at Jufra air base on 25 July 2019. |
| Transportation | Ilyushin IL-76TD Registered UP-17601 | ▪ Sigma Airlines,[h] Kazakhstan | ▪ Identified flying in military support in April and June 2019.<br>▪ Made suspicious flights from Jordan from 23 to 26 June 2019. |

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| Transportation | Ilyushin IL-76TD Registered UP-17645 | ▪ Sigma Airlines, Kazakhstan | ▪ Identified at Tamanhant, Sebha on 29 January 2019. |
| Transportation | Ilyushin IL-76TD Registered UP-17655 | ▪ | ▪ Still under investigation. |
| | | ▪ | ▪ |

[a] http://enm.avic.com/index.shtml.

[b] Iran Aviation Industries Organization (IAIO). www.mod.ir.

[c] https://www.stc-spb.ru.

[d] http://www.ats-ae.com. No URL for Adcom Systems.

[e] http://spacecargoinc.com.

[f] http://www.europeair.kiev.ua. Ceased trading on 9 August 2019 under Order No908.

[g] www.deekaviation.com. URL not operable. Q4-76, Block Q4 Street, Al Ruqa Al Hamra, Sharjah, UAE.

[h] https://airsigma.pro.

[j] Uses www.sonnig.com, which diverts to www.sipj.net.

Table 28.2
**Land service non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| New equipment | *Panthera* F9 APC [a] | ▪ | ▪ The supply chain has yet to be ascertained. |
| New equipment | *Mbombe* 6 x 6 IAFV [b] | ▪ Jordan | ▪ South Africa confirmed that it has not transferred to Libya, and that Jordan is the only other manufacturer<br>▪ Only Jordan manufactures with the "snakehead" turret seen in Libya. |
| New equipment | *Mared* 8 x 8 IAFV | ▪ Jordan | ▪ Jordan has not responded to Panel enquiries, but this system is not manufactured by anyone else, first displayed in 2018 and has not been sold to any other Member State. |
| New equipment | *Caiman* 6 x 6 MRAP [c] | ▪ | ▪ The supply chain has yet to be ascertained. |
| New equipment | *Irigiri* 8 x 8 IAFV[d] | ▪ | ▪ The supply chain has yet to be ascertained as Member State has not responded to Panel enquiries. |
| New equipment | *Ratel*-60 IAFV [e] | ▪ | ▪ Responsibility yet to be ascertained as Member State has not responded to Panel enquiries. |
| New equipment | MIM-23 *Hawk* SAM [f] | ▪ United Arab Emirates | ▪ Providing close air defence at Jufra air base. |
| New equipment | *Pantsir* S-1 SAM[g] | ▪ United Arab Emirates | ▪ Providing close air defence at Al Khadim and Jufra air bases. |
| New equipment | *Blue Arrow* (BA-7) air to surface missile [h] | ▪ United Arab Emirates | ▪ Paired with the *Wing Loong* II UCAV. |
| New equipment | *Nashshab* RPG-32 variant anti-tank rocket launcher [j] | ▪ Jordan | ▪ Jordan has not responded to Panel enquiries, but this system is not manufactured by anyone else, and has not been sold to any other Member State. |
| New equipment | 155mm High Explosive Laser Guided Projectile GP6[k] | ▪ United Arab Emirates | ▪ The supply chain has yet to be fully ascertained as the UAE has not responded to Panel enquiries. |

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| New equipment | Radio Frequency (RF) Inhibition and Jammer System[l] | ▪ | ▪ Responsibility yet to be ascertained as Member State could not identify initial export. |
| Military support | Military training in Jordan[m] | ▪ Jordan | ▪ Jordan has not responded to Panel enquiries, but the name of the school is on the wall of a building in the imagery. |
| | | ▪ | ▪ |

[a] http://www.mspv.com.

[b] http://www.kaddb.com.

[c] https://www.baesystems.com/en-us/our-company.

[d] https://www.army.mil.ng/corps-services/.

[e] No URL as company closed.

[f] http://raytheon.com.

[g] www.ump.mv.ru.

[h] http://en.norincogroup.com.cn.

[j] https://www.jadara.jo.

[k] http://en.norincogroup.com.cn.

[l] https://www.samel90.com.

[m] https://www.jaf.mil.jo.

19-18816

Table 28.3
**Maritime non-compliances**

| Generic Type | Means / Equipment | Responsible party(ies) in non-compliance with paragraph 9 to 1970 (2011) | Remarks |
|---|---|---|---|
| New equipment | Offshore Patrol Vessel (OPV) *Al Karama* [a] | ▪ Universal Satcom Services F.Z.Z., UAE<br>▪ Reema Sami Abdullah Al Omari<br>▪ | ▪ CEO, Al Omari, also in non-compliance due to her personal involvement in the transfer.<br>▪ |

[a] https://universalsatcom.com. Closed by UAE authorities for trading outside area of licence permissions.

**Annex 29:   MV *Esperanza* to Al Khoms (17 December 2019)**

1.      Between 13 to 17 December 2019 the MV Esperanza (IMO 9252785) offloaded three containers (serial numbers CSOU 410121-9, CSFU 964715-0 and CSFU 964827-0), which during a subsequent inspection by Al Khoms port customs authorities were found to contain 3,000 *Atak Zoraki* 2918 blank firing pistols.[118]

2.      Two Turkish companies consigned the containers to three consignee companies in Libya (table 29.1).

Table 29.1
**Consignors and Consignees**

| Container | Consignor in Turkey | | Consignee in Libya | |
|---|---|---|---|---|
| CSFU410121-0 | Aykar Makliyat Uluslararsi [a] | Siyavuspasa Man Barbaros 5 SK, Kocksinan Is Hane No: 2/20, Istanbul | Al Sahab Company | |
| CSFU964715-0 | Hama Kagit Tekstil Insaat [b] | San Bolgesi Mah Ayrosan 6 Fblok No: 1/49, Ikitelli, Istanbul | Nardeen Al-Haya Company | +2189449XXXX3 |
| CSFU964827-0 | Aykar Makliyat Uluslararsi | Siyavuspasa Man Barbaros 5 SK, Kocksinan Is Hane No: 2/20, Istanbul | Qraulin Company | |

[a] http://www.aykardenizcilik.com/en/iletisim.php.
[b] hamatekstil@gmail.com.

3.      The Bills of Lading and Cargo Manifests for the three containers do not list the weapons (see appendix A).

4.      As of 20 October 2019 the Turkish investigation into this incident was still ongoing, and the Panel continues to monitor.[119]

---

[118] Confidential source in Misrata.
[119] Communication from Member State of 5 August 2019.

## Appendix A to Annex 29: Shipping documentation

Image A.29.1
**Bill of Lading Container CSOU410121-9**



S/2019/914

Image A.29.2
**Cargo Manifest Container CSOU410121-9**



Image A.29.3
**Bill of Lading Container CSFU964715-0**



S/2019/914

Image A.29.4
**Cargo Manifest Container CSFU964715-0**



19-18816

S/2019/914

Image A.29.5
**Bill of Lading Container CSFU964827-0**



S/2019/914

Image A.29.6
**Cargo Manifest Container CSFU964827-0**



Sources: Confidential

**Annex 30:      MV *Esperanza* to Misrata (30 December 2018)**

1.      On 30 December 2018 the MV *Esperanza* (IMO 9252785) offloaded a container (serial number CSOU 125725-5), which during a subsequent inspection by Misrata port customs authorities on 7 January 2019 was found to contain 20,000 Ekol-Voltran P29 blank firing pistols.

2.      The pistols were sold by the manufacturer (Voltran) to a Turkish company, Bahriye Nur Karabilgin / Cem Gumrukleme Gida, on 10 December 2018. The invoice listed the price as TRY 849,600 (US$ 159,569).[120] Yet the invoice from Bahriye Nur Karabilgin / Cem Gumrukleme Gida listed the price at US$ 114,000 to a company listed on their invoice as "Brothers Company for International Trade Toys Shop, Liberty Shipping Logistic (LLC), Tunisa". Neither the Tunisian authorities nor the Panel could elicit a response from this company.

3.      Bahriye Nur Karabilgin / Cem Gumrukleme Gida listed the weapons at US$ 114,000 on their invoice to the Tunisian company. This equates to a loss of approximately US$ 45,000 (see appendix A). Panel investigations continue as to the rationale for this, but Bahriye Nur Karabilgin / Cem Gumrukleme Gida has not responded to the Panel enquiries.

3.      Analysis of the available shipping documentation (see appendix B) identified a discrepancy between the consignee listed on the Bill of Lading (Alfasr Textile Factory, Libya) and that listed on the Export Customs Declaration (Brothers Company for International Trade).[121]

4.      Bahriye Nur Karabilgin / Cem Gumrukleme Gida incurred an administrative monetary penalty imposed on them by the Ministry of Trade of Turkey for export irregularities.

5.      The full supply chain is at figure 30.1.

---

[120]   Exchange rate on 10 December 2018 was US$ 1.00 = TRY 5.32434.
https://www.xe.com/currencycharts/?from=US$&to=TRY.

[121]   Company address is Société Brothers International Trading Company L.L.C. (registered number 1223805C), 9 Rue El Amir Abdelkader , Jammal, Monastir, Tunisia.  The company is now not located at this address and trading activities have ceased. Owned by Ramiz Arbouk (ID 04190992), 85 Avenue La Liberte, 5020 Jemmel, Monastir, Tunisia. A contact number for Brothers Company for International Trade of +216 24 5XXXX2 was provided on shipping order.

S/2019/914

Figure 30.1
**Supply chain for 20,000 Ekol-Voltran P29 blank firing pistols**



5.    The Panel finds Société Brothers International Trading Company LLC of Tunisia in non-compliance with paragraph 9 of resolution 1970 (2011).

**Appendix A to Annex 30: Invoice for sale of EKOL P29 blank firing pistols**

Image A.30.1
**Voltran invoice**



S/2019/914

Image A.30.2
**CEM Gumrukleme invoice**



Sources: Confidential

19-18816

**Appendix B to Annex 30:  Documentation for blank firing pistol transfer on MV *Experanza* (30 December 2018)**

Table B.30.1
**Analysis of Ekol P29 blank firing pistol transfers (Misrata) (seized on 7 January 2019)**

| Date | Document | Purchaser | Shipping Agent | Consignee | Remarks |
|------|----------|-----------|----------------|-----------|---------|
| 10 Dec 2018 | Voltran Invoice 15714<br><br>(Image A.X.1) | Bahriye Nur Karabilgin / Cem Gumrukleme Gida Silah Hiozm, Dis Tic, Feritpaşa Mah. Rauf Denktaş Cad. No: 8/Z091, Konya, Turkey | Contaz Ship Management Ltd,[a]<br>Kat 7, Bay Plaza,<br>Hal Yolu Caddesi 5,<br>Kozyatagi Mah,<br>Kadikoy, 34742 Istanbul, Turkey | | |
| 22 Dec 2018 | Bill of Lading MER1802199<br>(Image B.X.2) | | Contaz Ship Management | Alfasr Textile Factory Tripoli Libya | No address for consignee Container CSOU125725-5 Declared as toys |
| 22 Dec 2018 | Customs Declaration | | | Brothers Company for International Trade Toys Shop, Tunis, Tunisia | False documentation |

[a] www.contaz.com.

Image B.30.1
**Contaz bill of lading**

S/2019/914


S/2019/914

**Annex 31:    BMC *Kirpi* 4 x 4 on MV *Amazon* to Tripoli (18 May 2019)**

1.    On 30 April 2019, Mr Fathi Bashagha, Minister of the Interior and Defence of the Government of National Accord (GNA), reportedly visited Turkey, where military cooperation between the two countries was discussed.[122]

2.    The Panel received confidential information, and then noted subsequent media coverage (see annex A), that at about 12:00 hours (Local)[123] on Saturday, 18 May 2019 a consignment of armoured vehicles was unloaded at the Ro-Ro Terminal on Pier 3 in Tripoli port, Libya, from the motor vessel (MV) *Amazon* (IMO 7702657), then a Moldovan-flagged Ro-Ro cargo vessel.[124]

3.    The Panel has identified the armoured vehicles as *Kirpi* 4 x 4 Mine Resistant Ambush Protected (MRAP) vehicles manufactured by BMC of Turkey[125] (see figures 31.1 and 31.2).[126] Imagery of the interior of the vehicles indicates that these are 'new' vehicles (see figure 31.3).

| Figure 31.1 | Figure 31.2 | Figure 31.3 |
|---|---|---|
| **BMC *Kirpi* offloading from *Amazon*** [a] | ***BMC* company imagery of Kirpi** [b] | ***Kirpi* vehicle interior** [c] |

  

[a] https://m.facebook.com/100035146145193/posts/130283384819866/#_=_.
[b] https://www.bmc.com.tr/en/defense-industry/kirpi.
[c] Confidential source.

4.    Although no weapons were observed on the *Kirpi* 4x4 MRAP vehicles, they are designed to be fitted with heavy machine guns if turreted or fitted with specialist weapons mounts. As these vehicles

---

[122]   www.libyaobserver.ly/inbrief/interior-minister-arrives-turkey-discuss-military-and-security-cooperation.
[123]   All timings are Local.
[124]   Satellite imagery of the vehicle entering port is at appendix A.
[125]   BMC, Oruç Reis Mahallesi Tem Otoyolu, Atış Alanı Mevkii Tekstilkent Caddesi No.12, Koza Plaza A Blok 4, Kat No:1004, Esenler, İstanbul, Turkey. www.bmc.com.tr.
[126]   All imagery was originally from a confidential source unless otherwise indicated.

were supplied turreted, the Panel considers that, due to the ease of weapon mounting for the end user, neither paragraph 9 nor paragraph 10 of resolution 2095 (2013) applies. Once armed by the GNA their military utility changes from being protective vehicles to vehicles with an offensive capability.

5.      Some of the vehicles were then subsequently seen on social media video been driven in convoy through the streets of Tripoli. The Panel has identified that the vehicles were received on behalf of: 1) the Al Somoud Brigade commanded by designated individual Salah Badi (LYi.028) by his assistant Ashraf Mami, of the Al Somoud Brigade; and 2) the Al Marsa militia commanded by Mohamed Bin Ghuzzi, (see figure 31.4).[127] Vehicles were also supplied to the 33 infantry regiment led by Bashir Khalfalla.

Figure 31.4
**Ashraf Mami (L) and Mohammed bin Ghuzzi (R) at Tripoli port on 18 May 2019**



Source: https://scontent-mxp1-1.xx.fbcdn.net/v/t1.0-9/60704862_2223762161005751_3543772288954400768_n.jpg?_nc_cat=108&_nc_eui2=AeEv3DBM4WxxRHSAJPkYNi3bdnI6acveHVAai0vOpoXjughTiKR9dD_oZZelABEFbmeqqPzxIsN2P7RfwzrzlHEgd5JBmQ3uhu2ZMaLJjfcQsA&_nc_oc=AQniNnUh1np4_SqOj5d6o2AXmHOPaqIbH2sQqZrQYldN4rbsr_CIgP2Jc9pg8bv_7Tg&_nc_ht=scontent-mxp1-1.xx&oh=aaff8485e7eeca1d1c7d413531912a0a&oe=5E12151E.

6.      The Panel also identified that at least two Ford 2533 commercial trucks equipped with gantries and an empty flatbed, and painted in a military olive green, were also discharged from the vessel (figures 31.5 and 31.6). These were equipped with gantries that were almost certainly designed to support the antennae of a command, control, computers and communication (C4) system for unmanned combat aerial vehicles (UCAV) (see figure 31.7 for comparison). The Panel assesses that these were the vehicles to carry the C4 system for the *Bayraktur* TB2 UCAV.

---

[127] https://almarsad.co/en/2019/06/07/the-case-of-the-illegal-ukranian-flights-from-turkey-to-libya-special-rep7ort/, and confidential source.

Figure 31.5
**Ford 2533 truck offloaded from** *Amazon*



Figure 31.6
**Ford 2533 trucks offloaded from** *Amazon*



Figure 31.7
**Ford 2533 trucks with C4 gantry on manufacturers' website**



Source for 31.9: https://baykarsavunma.com/sayfa-Komuta-Kontrol--Haberlesme-Bilgisayar-ve-Istihbarat-C4I.html. Accessed 2 September 2019.

7.      The Panel identified that the ship's voyage commenced at Samsun, Turkey, on 9 May 2019, with its declared destination being Izmir, Turkey. The vessel transited the Bosphorous on 11 May 2019 and went 'dark' for the night of 14/15 May 2019 after having been last identified in the vicinity of Izmir port. Izmir is also the location of the Pınarbaşı production plant[128] of the *Kirpi* 4 x 4 armoured vehicles. The vessel re-appeared on its automatic identification system (AIS) at 12:18 hours on 15 May 2019. It then changed its destination to Tripoli at 15:16 hours on 15 May 2019. Table 31.1 shows the timeline for the vessel's voyage, and the route is illustrated at appendix B.

Table 31.1
**Timeline and route of** *Amazon*

| Port | Arrival | | Departure | | AIS | Remarks |
|------|---------|------|-----------|------|-----|---------|
| | Time | Date | Time | Date | | |
| Samsun, Turkey | 18:25 | 21 April 2019 | 20:47 | 9 May 2019 | ✓ | - |
| Bosphoros, Turkey | 06:53 | 11 May 2019 | 08:41 | 12 May 2019 | ✓ | Transit |
| Dikili, Turkey | 20:47 | 13 May 2019 | 18:01 | 14 May 2019 | ✓ | At anchor |

_____
[128]   https://www.bmc.com.tr/en/corporate/about.

| Port | Arrival | | Departure | | AIS | Remarks |
| | Time | Date | Time | Date | | |
|------|------|------|------|------|-----|---------|
| Izmir, Turkey | 22:09 | 14 May 2019 | 12:48 | 15 May 2019 | ✓ | - |
| Izmir port area, Turkey | 22:56 | 14 May 2019 | 12:18 | 15 May 2019 | *Dark* | Possible Izmir port visit |
| Egri Liman Channel | 16:06 | 15 May 2019 | - | - | ✓ | Changed destination to Tripoli |
| Tripoli, Libya | 12:02 | 18 May 2019 | - | - | ✓ | Last AIS log 4:05 hours, 19 May 2010 |

Source: Confidential.

8.     The Panel has confirmed that the vessel docked at Tripoli port, Ro-Ro Terminal on Pier 3, on 18 May 2019 at 12.02 hours and departed on 20 May 2019 at 12:26 hours. The vessel sailed to Samsun port, Turkey arriving at 14:20 hours on 28 May 2019.

9.     The vessel is owned by Maya Roro S.A.,[129] and was operated by Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Limited Sti.[130]

10.     As a result of this illicit shipment the Moldovan Flag Administration forcibly excluded the MV *Amazon*, MV *Beril* (IMO 7600720) and MV *Mira* (IMO 7637319), all owned or operated by Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Ltd STI from the Moldovan Flag Registry, (see appendix C). The MV *Amazon* was subsequently provisionally reflagged under the Togo Maritime Administration on 14 June 2019. On learning of the illicit activities of the MV *Amazon* the Togo Maritime Administration also promptly cancelled the provisional registration on 20 August 2019 (see appendix D).

11.     The Panel identified that the vehicles were sold to the Presidency of Defence Industries, as BMC have only directly exported such vehicles to Qatar, Turkmenistan or Tunisia.[131] In a meeting with the Panel on 31 July 2019 the Minister of Interior and Defence, Fathi Bashagha, acknowledged the transfer of *Kirpi* armoured vehicles for the Ministry of Interior through the port of Tripoli on 18 May 2019.

---

[129] c/o Akdeniz Roro Deniz Tasimac, Dagilgan Kume Evleri 30/A, Evci Mah, Akdeniz, 33100 Mersin, Turkey.
[130] Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Ltd STI, Dagilgan Kume Evleri 30/A, Evci Mah, Akdeniz, 33100 Mersin, Turkey.
     http://www.akdenizroro.com/filo.html (the remainder of the website is inaccessible as at 10 June 2019). Note same physical and web address as vessel owner Maya Roro S.A.
[131] Letter to Panel from BMC dated 1 July 2019.

12.   The Panel thus finds Turkey, the GNA and Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Limited Sti. in non-compliance with paragraph 9 of resolution 1970 (2011) for their certain involvement in the procurement and physical transfer of military material to the GNA.

**Appendix A to Annex 31: Satellite imagery of MV *Amazon* entering Tripoli port**

Figure A.31.1
**Satellite image of BMC *Kirpi* on deck of MV *Amazon*** on docking



Source: Confidential.

## Appendix B to Annex 31: Route of MV *Amazon* between 21 April and 18 May 2019

Figure B.31.1
**Route of MV *Amazon***



Source: Developed by panel.

S/2019/914

## Appendix C to Annex 31: Moldovan Flag Administration decision of 25 May 2019

 

MINISTERUL ECONOMIEI
SI INFRASTRUCTURII
AL REPUBLICII MOLDOVA
AGENŢIA NAVALĂ

şos. Hânceşti, 53 et.5
MD-2028 Chişinău
Tel./ Fax.: +37322735345
e-mail info@maradmoldova.md

MINISTRY OF ECONOMY
AND INFRASTRUCTURE
OF REPUBLIC OF MOLDOVA
NAVAL AGENCY

şos. Hânceşti, 53 floor 5
MD-2028 Chişinău
Tel./ Fax.: +37322735345
e-mail info@maradmoldova.md

No. 237 from 25th of May 2019

TO OWNER: MAYA RORO S.A.
MARSHALL ISLANDS

TO OWNER: TUNA SHIPPING S.A.
MARSHALL ISLANDS

TO OPERATOR: Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Ltd Sti
Kat 4, Ataturk Bulvari 140, Kale Mah, Ilkadim, 55030 Samsun, Turkey.

To Legal Representant of the owners in Moldova – Lawyers office „Leonid Karagheaur..
Str. Tighina 65, Chisinau, Republic of Moldova

Copy To RO: MARITIME LLOYD

Subject: m/v AMAZON, m/v BERIL, m/v MIRA - Lost Flag of the Republic of MOLDOVA

By present, the Naval Agency of the Republic of Moldova, notifies the owners and operational company of the vessels m/v AMAZON (IMO 7702657), m/v BERIL (IMO 7600720) and m/v MIRA (IMO 7637319) due to illegal actions of transporting 50 military vehicles type KIRPI 4x4 to port Tripoli (Libya) on 18 May 2019 through the vessel AMAZON, against the arms embargo imposed by the Resolution 1970 (2011) Adopted by the Security Council at its 6491st meeting on 26 February 2011, the Naval Agency notifies of the exclusion of mentioned vessels from the State Ship Registry of the Republic of Moldova on basis of:

1) Government Decision No. 855 from 30.07.2007 on the approval of the Ships Registration Rules in the Republic of Moldova article. 73, letter d) that stipulates „shipowner, bareboat-charterer, operator or crew violate international mandatory sanctions for the Republic of Moldova and the provisions of the international treaties to which the Republic of Moldova is a party„ „as mentioned all vessels operated by the Akdeniz Roro Deniz Tasimaciligi Turizm Sanayi ve Ticaret Ltd Sti will be subject for force exclusion of the vessels form the registry;

2) Resolution 1970 (2011) Adopted by the Security Council at its 6491st meeting, on 26 February 2011,which impose arms embargo in point 9 „that all Member States shall immediately take the necessary measures to prevent the direct or indirect supply, sale or transfer to the Libyan Arab Jamahiriya, from or through their territories or by their nationals, or using their flag vessels or aircraft, of arms and related materiel of all types,

S/2019/914

*including weapons and ammunition, **military** vehicles and equipment, paramilitary equipment, and spare parts for the aforementioned, and technical assistance, training, financial or other assistance, related to military activities or the provision, maintenance or use of any arms and related materiel, including the provision of armed mercenary personnel whether or not originating in their territories,;*

3) Letter requests and notifications of the Naval Agency no.223 from 21.05.2019, no.228 from 22.05.2019 and no.235 from 24.05.2019 and refusal of the owner and operational company to cooperate on the mentioned case;

4) Confirmation of the transported of armored military vehicles KIRPI 4x4 and „cargo manifest,, copy presented, by the owner of vessel AMAZON (IMO 7702657) on 18 May 2019 by the mentioned operator and owner.

5) Internal Order no. 57-P from 25th of May 2019 of the exclusion from the State Ship Registry of the mentioned vessels.

6) Owner's declaration of vessel's non-involvement with criminal acts or omissions from 19.10.2016, accordingly to:

- **point A.1** *..that the aforementioned vessel while registered as Republic of Moldova ship will not be involved in the transportation of any armaments and/or ammunition whatsoever,,*

- **point B.6** *,, will not be involved in any way in the disputes between nations and parties, or support civil unrest in any country,,*

- **point C.7** *..the vessel shall immediately be de-rigestered to the full cost of vessel's, and the flag state will not be liable for any form of claim arising from de-registration of said vessel...*

Basing on the above mentioned, the Naval Agency as Maritime Administration of the Republic of Moldova notifies the owners and operational company of the forced exclusion of the vessels m/v AMAZON (IMO 7702657), m/v BERIL (IMO 7600720) and m/v MIRA (IMO 7637319) , **the exclusion from the State Ship Registry of the Republic of Moldova from 26**[th] **of May 2019.**

The mentioned ships lost the Flag of the Republic of Moldova, all flag certificates, class and statutory certificates issued in the name of the Government of the Republic of Moldova **are no more valid and must be returned back to the Administration in original.** All MoUs will be notified about this decision.

Best regards,

Director of Naval Agency
Igor ZAHARIA

Ex. Vadim Pavalachi
Head of Department „Ships registration, seafarers, State Ships Register,,
+373 791 12 123

Source: Member State

S/2019/914

**Appendix D to Annex 31 Togo Flag Administration decision of 20 August 2019**



**REPUBLIQUE TOGOLAISE**
TRAVAIL – LIBERTE – PATRIE

**TOGOLESE MARITIME AUTHORITY**
INTERNATIONAL SHIP REGISTRY

**Our Ref: 0041NOC/TG/08/19**

### NOTICE OF CANCELLATION OF REGISTRY

| Name of Vessel | IMO | Official Number | Call Sign |
|---|---|---|---|
| **AMAZON** | **7702657** | **TG-01380L** | **5 V H N 3** |

By this notification this Administration has decided to cancel the subject vessel "AMAZON" with IMO No.7702657 from its International Registry as EX OFFICIO as from 20/AUGUST/2019 due to violation of Security Council Resolutions related to arms embargo on Libya.

Therefore, following certificates issued by our Administration for the vessel "AMAZON "have been **CANCELLED** due to the fact that the vessel's activities are in conflict with certain Security Council Resolutions.

- Provisional certificate of Registry with reference No.TG/REG/139-38512/2236
- Provisional Radio License with reference No. TG/RSL/139-38512/1838
- Provisional Minimum Safe Manning with reference No.TG/MSM/139-38512/1943

Should any Togolese certificate be circulated or used for the subject vessel as of 20TH August 2019, this Administration holds the right to take full and any needed legal action against owners, managers, operators of the vessel.

**As well, this notification CAN NOT be used in substitution for deletion certificate.**

This cancellation will be validated with immediate effect as from 20TH August 2019.

**For the International Ship Registry of Togo**
**Vera N. Medawar**
**Registrar**

Source: Member State.

**Annex 32:   OPV *Al Karama***

**Rationale for classification as military equipment**

1.      Naval ships are differentiated from civilian ships by their design, construction and purpose. Generally, naval ships are damage resilient, with the ability to seal off multi-compartments for damage control purposes to enable the vessel to "float and fight" after multiple catastrophic events. Civilian vessels have lesser damage control measures designed in to them, which enables the vessel to "float" after a single catastrophic event. OPV *Al Karama* is a naval ship by design and construction.

2.      Naval ships are either armed, or have the capability of being armed, with weapon systems. When decommissioned the vessel has its armaments removed, but the ability to remount armaments on its deck and superstructure generally remains. The design of the vessel specifically includes hard mounting points on the deck and superstructure for naval ordnance that will absorb and safely transfer the forces of firing. Civilian vessels are not designed with the capability to mount naval ordnance, and thus their superstructure may not be capable for weapons use. OPV *Al Karama* was designed to mount one 40mm cannon and two 20mm cannons. On arrival in Benghazi, OPV *Al Karama* was then re-equipped with one 40mm cannon and two 20mm cannons in exactly the same positions that they were in during Irish naval service. OPV *Al Karama* is a naval ship by its capability to mount naval ordnance with no strengthening of deck or superstructure required.

3.      Merchant vessels are designed to carry passengers or cargo. OPV *Al Karama* was designed to carry a naval crew not passengers. The storage on OPV *Al Karama* is designed to support its naval operations, e.g. ammunition magazines for the weapons, food supplies for the crew and spare parts. It does not have holds suitable for the efficient and cost-effective movement of civilian cargo. Its accommodation is not designed for passengers.

4.      Naval vessels are painted grey. Civilian vessels are not, to avoid confusion for obvious reasons. The then *Avenhorn* was transferred to the new UAE owners still painted naval grey, despite there been time and the capability to repaint a civilian colour. There was time though to paint the new name *Al Karama* ("Dignity") on the vessel for the voyage, and this is the name that it entered Libyan military service under.

5.      Although the Dutch purchasers had drawn up tentative plans for conversion to a "yacht" no work had been done to prepare the vessel for such a conversion before it was sold.

6.      The vessel *Avenhorn* was registered by the Dutch purchasers in Belize as a "Patrol Vessel" and sold as such. They were told that it was to be used for counter-piracy operations near Egypt. The vessel then had its registration transferred to Panama by the new UAE owners, where it was declared as a "Pleasure Yacht" and renamed *Al Karama*. This was a deliberate mis-declaration by the new UAE owners. After delivery to the Libyans on 17 May 2018 the OPV *Al Karama* was then removed from the Panama registry on 23 July 2018 by the new UAE owners, who declared it was for "demolition". Another deliberate mis-declaration by the new UAE owners, and another indication of a deliberate attempt to disguise the transfer of the vessel.

7.      The vessel left Rotterdam bound for Alexandria, Egypt on 4 May 2018. When the vessel was south of Sicily on the morning of 15 May 2018 the crew were instructed by the new UAE owners to divert to Benghazi, Libya and deliver the vessel to a Rear Admiral Farag. The crew were falsely told that the vessel had been sold "in transit".[132] The vessel arrived in Benghazi on 17 May 2018, flying the Libyan naval flag, and was met by senior naval officers aboard the armed Libyan Coast Guard patrol vessel '247 Izrig'.[133]

**Non transmission of AIS or LRIT**

8.      The offshore patrol vessel (OPV) *Al Karama* (IMO 7820693), is still not transmitting its automatic identification system (AIS) or long-range identification and tracking system (LRIT), which is a requirement for civilian vessels. Signals from these systems were last detected in the port of Benghazi on 22 May 2018 and since then the vessel has remained 'dark'.

**Naval operations**

9.      The OPV *Al Karama* was next observed leaving harbour on 29 March 2019 when taking part in a joint naval exercise at sea with HAF naval infantry and the '247 Izrig' (figures 32.3 and 32.4).[134] It was last seen alongside in Ras Lanuf on 26 April 2019 (see appendix 11).

---

[132] Confidential source(s).
[133] https://www.youtube.com/watch?v=v6SZfyRc_ww.
[134] https://www.facebook.com/warinformationdivision/posts/2632791356762457?__tn__=. Accessed 9 April 2019.

Figure 32.3
**OPV *Al Karama* at sea (28 Mar 2019)**



*Source:*
www.facebook.com/warinformationdivision/photos/pcb.263279135
6762457/2632789716762621/?type=3&theater.

Figure 32.4
**OPV *Al Karama* at sea (R) with patrol vessel 247 Izreg (L) (28 Mar 2019)**



*Source:*www.facebook.com/warinformationdivisio
n/photos/pcb.2632791356762457/26327899100
95935/?type=3&theater.

**Evidence of non-compliance**

10.     The findings of the Panel are supported by independent and corroborated testimonies of witnesses and the documentary and imagery evidence shown in the appendices at table 32.1:

Table 32.1
**Documentary and imagery evidence**

| Appendix | Evidence Type | Remarks |
|---|---|---|
| 1 | Documentary | International Merchant Marine Registry of Belize registration certificate dated 3 August 2017, which registers the *Al Karama* (then known as the *Avenhorn*) as a <u>patrol vessel</u>. Certificate obtained by Russel Ventures. |
| 2 | Documentary | Contract of Sale signed 1 February 2018 between Universal Satcom Services F.Z.E. (UAE) and Ahl Ai-Thiqa Security and Safety Equipment Imports Company, Benghazi Libya). Note that this predates the sale of the vessel to Universal Satcom Services F.Z.E. from the then owner, Russell Ventures Limited (Seychelles) (the parent company of Dick van der Kamp Shipsales, Netherlands) |
| 3 | Documentary | Memorandum of Agreement dated 26 February 2018 for sale of the *Al Karama* (then known as the *Avenhorn*) by Russell Ventures Limited (Seychelles) to Universal Satcom Services FZE |

| Appendix | Evidence Type | Remarks |
|----------|---------------|---------|
| 4 | Documentary | Bill of Sale dated 29 March 2018 for sale of the *Al Karama* (then known as the *Avenhorn*) by Russell Ventures Limited (Seychelles) to Universal Satcom Services FZE |
| 5 | Documentary | Invoices from Russell Ventures Limited (Seychelles) to Universal Satcom Services FZE dated 26 February and 9 March 2018 |
| 6 | Documentary | Payments from Universal Satcom Services FZE to Dick van der Kamp Shipsales BV, acting for Russell Ventures Limited (Seychelles) dated 27 February, 26 March, 27 March and 28 March 2018 |
| 7 | Documentary | Panama Registration Authority Navigation Special Registry certificate of 23 April 2018, which registers the *Al Karama* (then known as the *Avenhorn*) as a <u>pleasure yacht</u>. Certificate obtained by Universal Satcom Services FZE |
| 8 | Documentary | Email dated 27 May 2018 from Reema Sami Abdullah Al Omari to Dick van den Kamp Shipsales confirming the sale of the vessel to the "Libyan Ministry of Transportation" during its voyage to Alexandria, Egypt |
| 9 | Documentary | Government of Fujairah company registration certificate for Universal Satcom Services FZE identifying Reema Sami Abdullah Al Omari as Owner. |
| 10 | Documentary | Company certificate for Ahl al-Thiqa Security and Safety Equipment Imports Company, Benghazi. |
| 11 | Imagery | Imagery from confidential source showing OPV *Al Karama* to in Ras Lanuf on 20 April 2019. |
| 12 | Imagery | Plan showing retrofitting of weapons to *Al Karama* |

### Appendix 1 to Annex 32: International Merchant Marine Registry of Belize registration certificate dated 3 August 2017

Image 32.1.1
**Certificate of registration**



Source: Member State.

**Appendix 2 to Annex 32:   Contract of Sale dated 1 February 2018[135] for sale of the vessel by Universal Satcom Services F.Z.E. to Ahl al-Thiqa Security and Safety Equipment Imports Company, Benghazi[136]**

Image 32.2.1
**Contract of Sale**

عقد بيع

Universal Satcom Services FZE      Fujairah Free Zone, P. O Box 50462
Contract No. 2018/05/001V

---

[135]  Better quality image has been requested from source.
[136]  Note that the preambular text predates  (1 February 2018) the purchase of the vessel from Russel Ventures Limited, although the front cover is dated 17 April 2019.

S/2019/914



8) ان يقوم الطرف الثاني باستضافة الطاقم في مخازن خلال فترة التدريب، و ان يقوم لاحقا بترتيب سفرهم خارج أثينا

9) يبقى الطرف الأول مسؤولا عن البضاعة بعد تسليمها للطرف الثاني حيث سيتم الغاء جميع سجلات و العله منذ لحظة تسليمه
و على الطرف الثاني عمل الترتيبات اللازمة لاستصدار التراخيص و الشهادات اللازمة، و هذه الشهادات هي:

- International Tonnage certificate
- Minimum Safe Manning Certificate
- Authorization Letter from Panama Maritime Authority
- Seaworthiness Certificate
- Navigation Special Registry Certificate
- Radio Station Provisional License

تم توقيع العقد و قبوله من قبل

الطرف الثاني   شركة كل الثقة لاستيراد معدات الأمن و
السلامة
التوقيع
التاريخ

الطرف الأول   شركة بحار سلامة دعم لدعم
التوقيع
التاريخ

Universal Satcom Services FZE     Fujairah Free Zone, P. O Box 50462
Contract No. 2018/05/001V

Source: Confidential

19-18816

Image 32.2.2
**Official translation of the above document**

Translated from Arabic

Contract for the sale of a vessel

Universal Satcom Services FZE
17 April 2018

Universal Satcom Services FZE
Fujairah Free Zone, PO Box 50462
Contract No. 2018/05/001V

**Contract of sale**

On **Thursday, 1 February 2018**, the present contract was concluded between:

1.     Universal Satcom Services, a company specialized in technical maritime services, registered in the Fujairah Free Zone, United Arab Emirates, represented in the present contract by Rima Sami al-Umari in her capacity as Director-General of the company, and referred to hereinafter as "the first party".

2.     The Ahl al-Thiqa Safety and Security Equipment Import Company, a company specialized in providing safety and security equipment, registered in Benghazi, Libya, represented in the present contract by Mr. Bushnaf Hasan Hamad and referred to hereinafter as "the second party".

**Introduction**

The two parties have agreed that the first party shall provide a maritime vessel with the technical specifications set out in the annex to the present contract, and that the second party shall pay the funds specified in the contract in accordance with the conditions specified therein.

The two parties have agreed to the following:

1.     The introduction set forth above shall constitute an inseparable part of the contract.

2.     The first party undertakes to supply the maritime vessel and hand it over to the second party within a period of no more than 90 days as of the date of the contract, and to take receipt of the instalment.

3.    The value of the contract for the supply of the vessel, under the present contract, shall be US$ 1,500,000 (one million five hundred thousand United States dollars).

4.    Terms of payment:
     50 per cent of the value of the contract upon signature;

     25 per cent of the value of the contract once the vessel has been shown and inspected at the port of Alexandria by the second party;

     25 per cent of the value of the contract upon definitive receipt of the vessel in the port of Benghazi.

5.    The prices agreed upon in the present contract shall be final and fixed, and shall not be subject to increase. No changes to the value of the contract may be requested owing to currency fluctuation; or any rise in market prices; or costs of production, labour or transport; or changes in taxes and duties; or the imposition or new taxes or duties; or any other reason.

     In addition to the cost, the prices shall include all expenses and fees incurred by the first party in fulfilling the contract, including transport fees; port and dock duties; storage, unloading, assembly, testing and verification expenses, and any other commitments that are needed in order to supply the vessel to which the present contract refers.

6.    The first party affirms that the vessel shall be handed over in good and proper condition, and without any flaw.

7.    The crew that will convey the vessel to the port of Benghazi shall provide technical training to the crew of the second party, namely general training on how to operate the vessel and the equipment on board, for a period of no more than a week from the date of the handover.

8.    The second party shall host the crew in Benghazi during the training period and shall then make arrangements for them to travel out of Libya.

9.    The first party disclaims all responsibility for the vessel after it has been handed over to the second party. The vessel's flag and all its registration markings shall be removed from the moment of its handover, and the second party shall make the necessary arrangements to obtain the required licences and certificates, which are as follows:

     International tonnage certificate;

Minimum safe manning certificate;
Authorization letter from Panama Maritime Authority;
Seaworthiness certificate;
Navigation special registry certificate;
Radio station provisional licence.

The contract has been signed and accepted by:

| | |
|---|---|
| The first party: Universal Satcom Services company; | The second party: the Ahl al-Thiqa Safety and Security Equipment Import Company. |
| Signed: (*Signature, seal*) | Signed: (*Signature, seal*) |
| Date: | Date: |

**PANEL NOTE:**

The technical specifications referred to are not included in this document but are in the possession of the Panel.

S/2019/914

**Appendix 3 to Annex 32:   Memorandum of Agreement dated 26 February 2018[137] for sale of the *Al-Karama***

Image 32.3.1
**Memorandum of agreement**



Source: Confidential.

---

[137]  First page only for clarity. Remainder available from the Panel's records.

**Appendix 4 to Annex 32: Bill of Sale dated 29 March 2018 for sale of the *Al-Karama***

Image 32.4.1
**Bill of Sale**

BILL OF SALE (Body Corporate)

| IMO Number | Name of Ship | Number, year and port of registry | | | Whether a sailing, steam or motor ship | Horse power of engines (if any) |
|---|---|---|---|---|---|---|
| 7820693 | **AVENHORN** | Belize / 141720373 | | | Motorvessel | 4800 |
| | | | Metres | Centi-metres | Number of Tons (where dual tonnages are assigned the higher of these should be stated) | |
| Length | | | 65 | 20 | GT | NT |
| Breadth | | | 10 | 40 | | |
| Moulded depth | | | 6 | 70 | | |
| | | | | | 995 | 299 |

and as described in more detail in the Register Book.

We, (a) RUSSELL VENTURES LTD (hereinafter called "the transferors") having our principal place of business at First Floor, Commercial House 1, Eden Island, Seychelles in consideration of the sum of US$ 525.000,- (Say FivehundredTwentyFive Thousand United States Dollars) paid to us by (b)

UNIVERSAL SATCOM SERVICES FZE, Fujairah Free Zone, P.O. Box: 50462, Fujairah, UAE (hereinafter called "the transferees") the receipt whereof is hereby acknowledged, transfer 100 % of the shares in the Ship above particularly described, and in her boats and appurtenances, to the said transferees.

Further, we, the said transferors for ourselves and our successors covenant with the said transferees and (c) their assigns, that we have power to transfer in manner aforesaid the premises hereinbefore expressed to be transferred, and that the same are free from all encumbrances (d), mortgages, maritime liens, taxes or any other debts or claims whatsoever.

IN WITNESS whereof we have executed this Bill of Sale on the 29th March 2018

In the presence of ( e ) Notary Public

(a)  Name in full of Body Corporate  (b) Full name(s), and address(es) or transferee(s) with their description in the case of individuals, and adding "as joint owners" where such is the case. (c) "his", "their" or "its". (d) if any subsisting encumbrance add "save as appears by the registry of the said ship". (e) Signatures and description of witnesses, i.e. Director, Secretary, etc. (as the case may be)

S/2019/914

Seen for legalization of the signature of Mirjam Waalboer, born in Hellevoetsluis on the thirtiest day of October nineteenhundred sixty nine, holder of Identitycard number IRRJD7L00, on the 29th day of March 2018, by me Mr Ernst Hitzemann, civil law notary practising at Spijkenisse.



A P O S T I L L E

(Convention de La Haye du 5 octobre 1961)

1. Country: THE NETHERLANDS
   This public document
2. has been signed by **mr. E. Hitzemann**
3. acting in the capacity of notary at Spijkenisse
4. bears the seal/stamp of aforesaid notary

Certified

5. in Rotterdam           6. on 29-03-2018
7. by the registrar of the district court of Rotterdam
8. no. 18/2335

9. Seal/stamp           10. Signature:

M.M. Nijdam - Sibum

Source: Confidential.

**Appendix 5 to Annex 32: Invoices from Russell Ventures Limited  (Seychelles) to Universal Satcom Services FZE**

Image 32.5.1
**Invoices**



RUSSELL VENTURES LTD

First Floor, Commercial House 1, Eden Island, Seychelles

INVOICE FOR 10 % DEPOSIT

Universal Satcom Services Fze,
Fujairah Free Zone,
Pobox 50462
Fujairah,
United Arab Emirates

INVOICE NR. AV-01                    DATED: 26th February 2018

Herewith we debit you for the 10 % deposit of the Vessel "Avenhorn" as per Memorandum of Agreement dated 26th February 2018

**Details of Vessel** :
Name: Avenhorn
Flag: Belize
IMO nr. 7820693

Amount payable:          US$ 52.500,-

                         (Say FiftyTwoThousandFiveHundred United States Dollars)

**Payment Terms:** Payment in full to be made via Telegraphic Transfer

Bank Details:
Beneficiary Name: Dick van der Kamp Shipsales BV
Beneficiary Bank: ABN AMRO Bank
Address: Raadhuislaan 91, 3201 EM Spijkenisse, The Netherlands
IBAN nr. : NL79ABNA0584993625
Account nr : 584993625
Swift Code: ABNANL2A

S/2019/914

# RUSSELL VENTURES LTD

First Floor, Commercial House 1, Eden Island, Seychelles

### INVOICE FOR 90 % BALANCE OF THE PURCHASE PRICE

Universal Satcom Services Fze.
Fujairah Free Zone
Pobox 50462
Fujairah
United Arab Emirates

**INVOICE NR. AV-02**                    **DATED: 9th March 2018**

Herewith we debit you for the 90 % balance of the purchase price for the Vessel
"Avenhorn" as per Memorandum of Agreement dated 26th February 2018.

Details of the Vessel:
Name  :      Avenhorn
Flag   :      Belize
IMO nr.;      7820693

Amount payable      US$ 472,500,-

        (Say FourHundredSeventyTwoThousandandFiveHundred United States Dollars)

Vat 0

**Payment Terms:** Payment in full to be made via Telegraphic Transfer

Bank Details
Beneficiary Name    :    Dick van der Kamp Shipsales BV,
Beneficiary Bank    :    ABN AMRO Bank
Address                  :    Raadhuislaan 91, 3201 EM Spijkenisse, The Netherlands
IBAN nr.               :    NL79 ABNA 0584 9936 25,
Account nr.           :    584993625
Swift Code            :    ABNANL2A

RUSSELL VENTURES LIMITED
RER OF SEYCHELLES

Source: Confidential.

**Appendix 6 to Annex 32:  Example payments from Universal Satcom Services FZE to Dick van der Kamp Shipsales BV, acting for Russell Ventures Limited (Seychelles)**

1.    Four payments were made of US$ 52,500 (27 February 2018), US$ 157,500 (22 March 2019), US$ 157,500 (27 March 2019) and US$ 157,500 (28 March 2019). Documentation for one payment only is included in the report, the remainder is in the possession of the Panel.



Source: Confidential

S/2019/914

**ABN·AMRO**                           **Rekeningafschrift**

| Soort rekening (in USD) | Rekeningnummer | Datum afschrift | Aantal bladen | Blad | Volgnr |
|---|---|---|---|---|---|
| VREEMDE VALUTA REKENING | 58.49.93.625 | 05-04-2018 | 2 | 002 | 5 |

| Boekdatum (Rentedatum) | Omschrijving | Bedrag af (debet) | Bedrag bij (credit) |
|---|---|---|---|
| | Deal Ticket ID 4207369 | | |
| 28-03 (28-03) | ONZE REF:    SW2803003324595<br>OORSPR. USD157500,00<br>ONTV AAB      USD      157.450,00<br>GEDEELDE KOSTEN OPDR./BEGUNST.<br>/012001154808<br>UNIVERSAL SATCOM SERVICES FZE<br>FULL PAYMENT AVENHORN VESSEL RFB<br>FT 180871QY2K | | 157.450,00 |
| 27-03 (27-03) | ONZE REF:    SW2703003317790<br>OORSPR. USD157500,00<br>ONTV AAB      USD      157.450,00<br>GEDEELDE KOSTEN OPDR./BEGUNST.<br>/012001154808<br>UNIVERSAL SATCOM SERVICES FZE<br>/RFB/FT180864P4PN PARTIAL PAYMEN<br>T 2ND AVEN HORN VESSE L | | 157.450,00 |
| 26-03 (26-03) | ONZE REF:    SW2603003306867<br>OORSPR. USD157500,00<br>ONTV AAB      USD      157.450,00<br>GEDEELDE KOSTEN OPDR./BEGUNST.<br>/012001154808<br>UNIVERSAL SATCOM SERVICES FZE<br>PARTIAL PAYMENT AVENHORN VESSEL<br>RFB FT18081LB4PN | | 157.450,00 |

Source: Confidential

**Appendix 7 to Annex 32:   Panama Registration Authority Navigation Special Registry
certificate of 23 April 2018**

Image 32.7.1
**Panama Registration Certificate**



S/2019/914

Image 32.7.2
**Extract showing reason falsely declared for deregistration (ORIGINAL)[138]**

**ALKARAMA**
IMO No.7820693; Distintivo de Llamada HO9840; año de construcción 1979; tonelaje bruto 995.00; tonelaje neto 299.00; eslora 59.17 mts.; manga 10.40 mts.; puntal 6.70 mts.

- **CANCELACIÓN:** Clasificación de Yate de Placer, con registro oficial N°D-1992-392-PEXT, cancelada del registro panameño el 23 de julio de 2018, para demolición.
- **Propietario Registrado:** Universal Satcom Services FZE, dirección Fujairah Free Zone, P.O. Box 50462, Fujairah, UAE. Emiratos Árabes Unidos.

Image 32.7.3
**Extract showing reason falsely declared for deregistration (OFFICIAL UN TRANSLATION)**

*Alkarama*

International Maritime Organization (IMO) number: 7820693; call sign: HO9840; year of build: 1979; gross tonnage: 995.00; net tonnage: 299.00; length: 59.17 metres; breadth: 10.40 metres; depth: 6.70 metres.

- **Deregistration:** The *Alkarama*, a pleasure yacht with official registration number D-1992-392-PEXT, removal from the Panama Registry on 23 July 2018, for demolition.

- **Registered owner:** Universal Satcom Services FZE; Fujairah Free Zone, P.O. box 50462, Fujairah, United Arab Emirates.

Sources: Member State

---

[138]  Member State letter to Panel dated 31 October 2018.

19-18816

## Appendix 8 to Annex 32: Email dated 27 May 2018 from Reema Sami Abdullah Al Omari to Dick van den Kamp Shipsales

Image 32.8.1
**Email from Reema Al Omari**

Re: Alkarama

**Onderwerp:** Re: Alkarama
**Van:** reema@universalsatcom.com
**Datum:** 27-05-18 01:35
**Aan:** dvdk@vanderkamp.com
**CC:** johnny pacheco <johnnypacheco1963@yahoo.com>, Mirjam Waalboer
<mirjam@vanderkamp.com>

**Reema Al Omari**

Hello Dick

Hope you are well

I received good offer to sell the ship to the Ministry of Transportation in Libya during its journey to Alexsandra... so I decided to sell it.

Please keep me updated with any vessels that you have to sell in the future i might be able to sell it for you

Thanks

Reema Omari
CEO
Universal Satcom

**Reema Al Omari**

On May 22, 2018, at 2:28 PM, D van der Kamp Shipsales – DVDK
<dvdk@vanderkamp.com> wrote:

Dear Reema, Johnny,

We are called by journalists saying vessel is in Libya , there is a you tube film that Libyan Navy is awaiting the vessel.

Please clarify this matter.

Thank you,

regards
--

**D. van der Kamp Shipsales BV**
**The Netherlands**
**Tel +31–181–321754 – Fax +31–181–322910**
shipsales@vanderkamp.com – www.vanderkamp.com
**As brokers/ managers only – All offers given in good faith but without guarantee**
**– Sub unsold**

1 van 1

23-03-19 10:55

**Appendix 9 to Annex 32:   Government of Fujairah company registration certificate for Universal Satcom Services FZE**

Image 32.9.1
**Company registration certificate**



Source: Confidential.

**Appendix 10 to Annex 32:   Company certificate for Ahl al-Thiqa Security and Safety Equipment Imports Company, Benghazi**

Image 32.10.1
**Company certificate**



Source: Confidential.

Image 32.10.2
**Panel translation**

Copy of the commercial registry                                      16/12/2012

Commercial name : Ahl al-Thiqa Company for Safety and Security Apparel Imports

Company created by: Contract of establishment ……        Based in Benghazi

Duration of the company: 25 yrs       Starting from 11/12/2012 Ending on 11/12/2037

Capital :        500,000 LYD
Paid/Cash :     150,000 LYD

Members of the Board of Directors:

**S/2019/914**

| Name | Nationality | Position | Date of nomination | Based | Address |
|------|-------------|----------|--------------------|-------|---------|
| Bushnaf Hasan Hamed | Libyan | Commissioner | 16/12/2012 | Benghazi | Benghazi |
| Hani Fathi Belkacem | Libyan | Member | 16/12/2012 | Benghazi | Benghazi |

| Name | Nationality | Position | Date of nomination | Based | Address |
|------|-------------|----------|--------------------|-------|---------|
| Bushnaf Hasan Hamed | Libyan | Legal Advisor | 16/12/2012 | Benghazi | Benghazi |

**Appendix 11 to Annex 32: OPV *Al Karama* (fitted with weapons) (Ras Lanuf – 26 April 2019)**

Image 32.11.1
***Al Karama* in Ras Lanuf**



Source: Confidential

## Appendix 12: Plan showing retrofitting of weapons to *Al Karama*

Image 32.12.1
**Retrofitting of *Al Karama***



Source: Confidential

## Annex 33:      Non-lethal maritime exceptions

### 'Stan Patrol 1605' Class patrol boats

1.      A Member State transferred eight 'Stan Patrol 1605' Class patrol boats to the Libyan Coast Guard on 10 January and 22 April 2013. The vessels were manufactured by Damen Shipyard Group of the Netherlands,[139] and are referred to in paragraph 77 of S/2018/812. Although the vessels were unarmed on transfer, they were fitted with generic equipment mounts,[140] which are also particularly suitable for the mounting of light weapons. The Panel has identified that a number of these vessels have then been armed subsequent to transfer, thus converting them into armed naval vessels.

2.      The current names, weaponry mounted on them, and last known locations of the vessels are at table 33.1. Imagery is at figures 33.1 to 33.4.

Table 33.1
**Names and last identified locations of Libyan Coast Guard Stan Patrol 1605 Class vessels**

| # | Name | Location | Coordinates | Date | Remarks |
|---|------|----------|-------------|------|---------|
| 217 | Burdi | Tobruk | 32°04'36.77"N, 23°58'52.58"E | Oct 2017 | |
| 227 | Sloug | Ras Al Hilal | 32°52'58.06"N, 22°11'22.92"E | May 2018 | |
| 237 | Besher | Benghazi | 32°06'03.31"N, 20°02'51.62"E | Feb 2016 | Identified as armed with one BMP-1 73mm Gun. |
| 247 | Izreg | Benghazi | 32°06'03.31"N, 20°02'51.62"E | Mar 2019 | Identified as armed with one ZSU-23-2 cannon. |
| 257 | Libda | Al Khoms | 32°40'42.56"N, 14°14'25.21"E | Jan 2019 | |
| 267 | Talil | Zawiyah | 32°47'33.45"N, 12°44'52.61"E | Nov 2018 | Identified as armed with two 12.7 x 108mm DShK-M variant heavy machine gun. |
| 277 | Tukra | Az Zuwaytinah | 30°57'15.21"N, 20°06'42.18"E | Mar 2018 | |
| 287 | Qaminis | Misrata | 32°22'20.46"N, 15°12'57.72"E | Dec 2018 | Unarmed on 25 April 2016. |

Source: Some data from confidential source.

---

[139] https://products.damen.com/en/ranges/stan-patrol/stan-patrol-1605/deliveries/spa-1605-burdi-sloug-besher-izreg.
[140] Letter from Member State of 16 April 2019.

Image 33.1
**237 Besher** (Left)
Benghazi based



Image 33.2
**247 Izreg**
Benghazi based



Image 33.3
**247 Izreg**
Benghazi based



Image 33.4
**267 Talil**
Zawiyah based



Sources: 1) 33.1 and 33.2 from https://www.albawabhnews.com/show.aspx?id=1789870; 2) 33.3 from https://www.youtube.com/watch?time_continue=1&v=lp2S4czOoUs. (0.27 min); and https://www.facebook.com/1431260937150207/photos/a.1835184040091226/1985294058413556/?type=3&theater; and 4) 33.4 from https://www.facebook.com/warinformationdivision/photos/pcb.2632791356762457/2632789800095946/?type=3&theater.

**'Corrubia' Class patrol boats**

3.      A Member State has confirmed the transfer of two 'Corrubia' Class patrol boats to the Libyan Coast Guard, which were previously in service as G92 'Alberti'[141] and G115 'Zannotti'.[142] The first vessel was delivered on 21 October 2018 and named 'Fezzan (658)' by the Libyan Coast Guard. The second vessel was delivered in 24 November 2018 and named 'Ubari (660)' (figures 33.5 and 33.6).

---

[141] http://www.gdf.gov.it/repository/re.t.l.a/centro-navale/bandi-di-gara-e-contratti/anno-2016/affidamento-del-servizio-ordinaria-e-straordinaria-manutenzione-g.-92-alberti.
[142] http://www.gdf.gov.it/repository/re.t.l.a/centro-navale/bandi-di-gara-e-contratti/anno-2017/fornitura-materiale-elettrico-occorrente-al-201cg.-115-zanotti201d.

4.      The 'Corrubia' Class Patrol Boat is a 27m monohull designed as a multiple role tactical platform, and normally has a standard weapon fit of a 30mm / 82 calibre Breda-Mauser Cannon, 1 x 12.7mm medium machine gun and 2 x 7.62mm medium machine guns. The Panel received details of the demilitarization of these vessels prior to transfer from the Member State,[143] and that States' rationale that the transfer fell under the auspices of paragraph 10 of resolution 2095 (2013).

Figure 33.5
**Fezzan (658) in Tripoli (21 Oct 2018)**



Figure 33.2
**Ubari (660) in Tripoli (24 Nov  2018)**



Sources: 1) www.libyaakhbar.com/libya-news/30905.html and www.libyaobserver.ly/news/italy-sends-libya-boat-"fezzan"; and 2) www.libyaobserver.ly/inbrief/libyan-coast-guard-receives-new-vessel-italy.

_____
[143]  Letter from Member State of 31 May 2019.

**Annex 34:      Operational naval assets**

1.      The Panel has compiled an analysis of the current and potentially future operational vessels of the Libyan Navy and Coast Guard. The data, which is at tables 34.1 and 34.2 is not yet exhaustive as research continues.

Table 34.1
**Operational Libyan Navy / Coast Guard vessels[144]**

| Generic Type | Type | Hull # | Vessel Name | Location | Remarks |
|---|---|---|---|---|---|
| Patrol Vessel | Damen Stan Patrol 1605 [a] | 217 | *Burde* | Tobruk | Probable HAF controlled. |
| | | 227 | *Sloug* | Ras Al Hilal | Probable HAF controlled |
| | | 237 | *Besher* | Benghazi | HAF controlled. |
| | | 247 | *Izreg* | Benghazi | HAF controlled. |
| | | 257 | *Libda* | Al Khoms | |
| | | 267 | *Talil* | Zawiyah | Loose GNA-AF control. |
| | | 277 | *Tukra* | Az Zuwaytinah | |
| | | 287 | *Qaminis* | Misrata | |
| Patrol Vessel | Damen Stan Patrol 2606 | | | | Delivered in 2013. [b] |
| Patrol Boat | Raidco RPB20 | 317 | *Akrma* | Benghazi | HAF controlled. Delivered in April 2013.[c] |
| | | 327 | *Janzur* | Benghazi | HAF controlled |
| Patrol Boat | Corrubia Class | 658 | *Fezzan* | Tripoli | Donated 2018 by Italy (ex G115 *Zanotti*) |
| | | 660 | *Ubari* | Tripoli | Donated 2018 by Italy (ex G192 *Aliberti*) |
| Patrol Boat | PV30-LS Class | 634 | *Sadadah*[e] | | Six ordered for Coast Guard from Croatia 2006 - 2008.[f] Reported non-operational. |
| Patrol Boat | Hameln Class | 206 | *Al-Kifah* | Tripoli | Seen 2017.[g] |
| Patrol Boat | Bigliani Class | 644 | *Zuwarah* | | Maintained by Italy in May 2017 (ex G83 *Macchi*). |
| | | 648 | *Ras Al Jadar* | | Maintained by Italy in May 2017 (ex G86 *Buoncore*). |

---

[144]  Multi source Panel research.

19-188/6

| Generic Type | Type | Hull # | Vessel Name | Location | Remarks |
|---|---|---|---|---|---|
| | | 654 | *Sabratha* | | Maintained by Italy in May 2017 (ex G82 *Galiano*). |
| | | 656 | *Zawia* | | Maintained by Italy in May 2017 (ex G84 *Fortuna*). |
| Fast Attack Craft-Missile | Combattante Class II G | 534 | *Shafak* | Tripoli | Under request to go to Tunisia for repair. |
| Fast Attack Craft-Missile | Osa II Class | | | | Not confirmed. |
| Offshore Patrol Vessel | Aisling Class | *P23* | *Al-Karama* | Benghazi | HAF controlled. |
| Minesweeper | Natya Class (Type 266ME) | | | | Not confirmed |
| Frigate | Koni II Class | 212 | *Al Hani* | Malta | Embargoed. |
| Landing Ship Tank | PS700 Class | 132 | *Ibn Ouf* | Tripoli | Refitted in France 2012. Maintained by Italy in 2017/2018. Plans for refit by France in 2019. |
| | | 134 | *Ibn Haritha* | Tripoli | Repaired in Abu Sitta 2018. |
| Salvage Vessel | Spasilac | 722 | *Al Munjed* | Tripoli | Under repair in 2017. |

[a] Donated by Netherlands in 2013.

[b] http://amiinter.com/pdf/MediterraneanDNavies-Oct2013.pdf.

[c] Ibid.

[d] J.Binnie. Janes HIS. 23 June 2013.

[e] 634 listed but not confirmed. Alternates are 638 *Marsit*, TBC *Tagreft*. Originally numbered 301 – 306.

[f] https://www.adria-mar.hr/index.php?option=com_content&view=article&id=46&Itemid=67&lang=en. Accessed 24 July 2019.

[g] https://twitter.com/jeremybinnie/status/920571076580724736?lang=en. Accessed 24 July 2019.

Table 34.2
**Proposed Libyan Navy / Coast Guard vessels**

| Generic Type | Type | Qty | Supplier | Remarks |
|---|---|---|---|---|
| Patrol Boat | FPB 98 Mk1 | 2 | OCEA S.A. France | Under Committee consideration. |
| Patrol Boat | Tuzla Class | 4 | Dearsan and Gulhan,[a] Turkey | Under Committee consideration. |
| Patrol Boat | '500' Class | 10 | Italy | To be donated by Italy. CP515-CP522, CP526 and CP535. Italy considers the vessels do not fall under the list of embargoed goods (*military equipment*) referred to in resolution 1973 (2011) and as subsequently amended. |

[a] http://www.dearsan.com/en/products/57m-patrol-boat.html.

**Annex 35:    *Al Hani* frigate (PF212)**

**Introduction**

1.      The work on the frigate by Cassar Shipyard was primarily focused on ensuring that the vessel is seaworthy with a navigation capability. The two diesel engines have been overhauled, which will now allow the vessel to cruise at 12 knots, with a theoretical top speed of 16 to 18 knots, but the primary single gas turbine is irreparable and is only in the vessel now for ballast and trim requirements. The integrity of the hull was achieved by replacing over 950m$^2$ of the steel plate of the hull. The navigational radar is a commercial after-fit and is operational.

**Offensive capability**

2.      It is highly unlikely that the major weapons systems on the frigate can function effectively, even if the ammunition were now available in Libya and in good condition. In 2014 the Libyan Navy plan was for the vessel to got to Cassar Shipyards in Malta for the seaworthiness work, and when complete the vessel was to proceed to Poland for maintenance and overhaul of the major weapon systems. The requirement for the work in Poland being a strong indicator of the ineffectiveness of the weapon systems at that time. There is now no intention that the work planned for Poland will ever take place due to the further degradation of the weapon systems over the last five years.[145]

3.      Figure 35.1 is a schematic of the vessel showing the location of the major weapons systems cross-reference against Table 1, which summarises the Panel's assessment operability of the weapons systems. The red code letters refer to the weapons systems shown in tables 35.1 and 35.2.

Figure 35.1
**Silhouette of Koni II Class frigate**



Source: www.janes.ihs.com/. Accessed 5 March 2019.

---

[145]  Interview with the Chief Engineer of *Al Hani*, 9 March 2019.

Table 35.1
**Type and status of major weapons systems fitted to *Al Hani* (PF212)**

| Code | Type | # | Fire Control Radar | Range (m) | Remarks |
|------|------|---|--------------------|-----------|---------|
| A | AK-230 30mm 63 Calibre Cannon | 4 | MR-104 Rhys (Drum Tilt) | 2,000 | ▪ Operable after maintenance. Currently rusted. ▪ Manual line of sight operation only |
| B | AK726 76mm 59 Calibre Gun | 4 | MR-105 Turel (Hawk Screech) | 15,700 | ▪ Operable after maintenance. Currently rusted. ▪ Manual line of sight operation only |
| C | S4K33 Osa-MA2 Surface to Air Missile Twin Launchers (SA-N-4 Gecko) | 2 | 4R33 Baza MPZ-301 (Pop Group) | 10,000 | ▪ Inoperable |
| D | 4K51 P-15M 'Termit' Ship to Surface Missile Launchers (SS-N-2C Styx) | 4 | 3Ts-25 Garpun (Plank Shave) | 8,000 | ▪ Inoperable |
| E | RBU-6000 Smerch-2 213mm Twelve Tube Anti-Submarine Mortar Launcher | 1 | Hercules MG322 Sonar | 5,500 | ▪ Possibly operable |
| F | Type 40 USET-95 400mm Torpedo Twin Tubes | 2 | Active / Passive Homing | 10,000 | ▪ Possibly operable |

Note 1: Status of weapon systems determined during Panel inspection on 9 March 2019.

4.    Notwithstanding the Panel's assessment of the weapon systems' operability, the Panel considers that it may be prudent for the vessel to undertake some basic demilitarization of the weapons systems prior to final handover to the Libyan Navy. This would deter any attempts to try and even obtain basic functionality of the weapons systems. Cassar Shipyard have indicated that this could be easily done at low cost. Table 35.2 summarizes the Panel's recommendations for such weapon system demilitarization.

Table 35.2
**Panel recommendation for basic demilitarization of major weapons systems fitted to *Al Hani* (PF212)**

| Code | Type | Remarks |
|------|------|---------|
| B | AK726 76mm 59 Calibre Gun | ▪ Remove and destroy MR-105 Turel (Hawk Screech) control panel from operations room. |
| C | S4K33 Osa-MA2 Surface to Air Missile Twin Launchers (SA-N-4 Gecko) | ▪ Remove and destroy 4R33 Baza MPZ-301 (Pop Group) control panel from operations room.<br>▪ Cut a one-metre length out of the umbilical control cable at the launcher end.<br>▪ Weld a steel bar across the guidance elevation rails inside the launcher.<br>▪ Manufacture and weld a 10mm thick steel circular plate and fit over top of missile launcher. |
| D | 4K51 P-15M 'Termit' Ship to Surface Missile Launchers (SS-N-2C Styx) | ▪ Remove and destroy 3Ts-25 Garpun (Plank Shave) control panel from operations room.<br>▪ Cut a one-metre length out of the umbilical control cable at the launcher end.<br>▪ Full circular weld shut around the forward and rear launch tube covers.<br>▪ Cut 4 x 200mm diameter holes along inner side of launch tube to act as an escape vent for launch motor gases. |
| E | RBU-6000 Smerch-2 213mm Twelve Tube Anti-Submarine Mortar Launcher | ▪ Remove and destroy launcher. |
| F | Type 40 USET-95 400mm Torpedo Twin Tubes | ▪ Full circular weld shut around the forward and rear tube covers.<br>▪ Cut 4 x 200mm diameter holes along inner side of launch tube to act as an escape vent for expulsion gases. |

**Operational capability**

5.      Although referred to as a frigate, the age, design, lack of operable major weapons systems means that this vessel presents little threat to other naval vessels, particularly if the recommended demilitarization action is initiated to prevent any attempts to bring major weapons systems back into service. It is only suitable now for the patrolling of littoral coastal waters and seamanship training.

6.      Theoretically the 76mm naval guns with their 15.7km maximum range could present a threat to the coastal strip. Their effectiveness though would be very limited unless the vessel had quality communications to well-trained naval gunfire support spotting teams ashore. Even if utilised in this role

the blast effects of the approximate 0.5kg high explosive content of a single 76mm shell are no worse than those of the 82mm mortars in plentiful supply to the major armed groups within Libya. This risk is assessed by the Panel as currently low.

**Annex 36:    Illicit supply of armoured vehicles to Libya**

1.    The Panel has compiled a summary of the wheeled armoured vehicle assets available to the armed groups in Libya, and imagery to assist identification is at appendix A. Some of these vehicles may have been transferred to Libya for protective use under the auspices of paragraph 9 of resolution 2095 (2013), and have subsequently been modified to provide an offensive military capability (see appendix B).

2.    Wheeled armoured vehicles include, wheeled infantry armoured fighting vehicles (IAFV), infantry fighting vehicles (IFV), light armoured vehicles (LAV), light armoured multi-purpose vehicles (LAMV), mine resistant ambush protected (MRAP) vehicles, protected patrol vehicles (PPV) and armoured personnel carriers (APC). The technical differences between type are often minimal and dependent on: 1) armour protection levels; 2) crew capacity; 3) the ability to mount turreted weapons; and 4) the manufacturer's marketing strategy. Their ease of modification with a weapons fit makes them a "force multiplier", and removes them from a "non-lethal" status.

Table 36.1
**Armoured vehicle assets**

| *Entity* | *Name* | *Type* | *Manufacturer* | *State* | *Supplier* | *Reported* | *Remarks* |
|---|---|---|---|---|---|---|---|
| Libyan Government [a] | *Cobra* [b] | LAMV | Streit | UAE | UAE | Paragraph 118 and annex 26 to S/2016/209 | ▪ Delivered in August 2012 in violation of para 9(b) of resolution 1970 (2011). |
| Libyan Government [a] | *Cougar* [c] | LAMV | Streit | UAE | UAE | Paragraph 118 and annex 26 to S/2016/209 | ▪ Delivered in August 2012 in violation of para 9(b) of resolution 1970 (2011). |
| Libyan Government [a] | *Spartan* [d] | LAV | Streit | UAE | UAE | Paragraph 118 and annex 26 to S/2016/209 | ▪ Delivered in August 2012 in violation of para 9(b) of resolution 1970 (2011). |

| Entity | Name | Type | Manufacturer | State | Supplier | Reported | Remarks |
|---|---|---|---|---|---|---|---|
| Saw'iq brigade, Zintan | *Jais* [e] | MRAP | Nimr | UAE | UAE | Paragraph 119 and annex 27 to S/2016/209 | ▪ Delivered in 2013. |
| GNA-AF | *Kirpi* 4X4 [f] | MRAP | BMC | Turkey | Turkey | New 2019 | ▪ Delivered 18 May 2019. |
| HAF | *Al Mared* 8 x 8 [g] | IAFV | KADDB | Jordan | Jordan | New 2019 | ▪ First seen 19 May 2019. |
| HAF | *Al Wahsh* 4 x 4 [h] | PPV | KADDB | Jordan | Jordan | Annex 28 to S/2018/812 | ▪ |
| HAF | *Caiman* [j] | MRAP | BAE Systems | UK | | Annex 28 to S/2018/812 | ▪ Seen at Derna, August 2017.<br>▪ Seen at Benghazi, May 2018. |
| HAF | *Jais* | MRAP | Nimr | UAE | | Annex 28 to S/2018/812 | ▪ Seen at Derna, August 2017. |
| HAF | *Mbombe* 6 x 6 [k] | IAFV | Paramount | South Africa | Jordan | New 2019 | ▪ First Seen Benghazi 19 May 2019. |
| HAF | *Panthera* T6 4 x 4 | APC | MSPV [l] | UAE | | Paragraph 142 and annex 29 to S/2016/209 and<br><br>Paragraph 160 and annex 40 to S/2017/466 | ▪ Delivered April/May 2015.<br>▪ Delivered 17 April 2016 on *Bahro Abha*. |
| HAF | *Panthera* F9 4 x 4 | APC | MSPV [m] | UAE | | Annex 28 to S/2018/812 | ▪ Seen at Derna, June 2018. |
| HAF | *Spartan* [n] | LAV | Streit | UAE | | Annex 28 to S/2018/812 | ▪ Seen at Derna, June 2018. |
| HAF | *Tygra* [p] | APC | Mezcal | UAE | | Paragraph 160 and annex 40 to S/2017/466 | ▪ Supplied 17 April 2016 on *Bahro Abha*. |
| HAF | *Irigiri* [q] | APC | Nigerian Army | | | New 2019 | ▪ Single source reported as seen in Tripoli 2015. Also seen in January 2016 in cargo hold of ship.[s] |
| HAF | *Ratel*-60 [r] | IFV | Sandock Austral | South Africa | | New 2019 | ▪ First seen 18 April 2018 near Tripoli with HAF 302 Battalion.[t] |

[a] The vehicles supplied to the Libyan government in 2012 are now in use by both parties to the conflict.

[b] https://www.armored-cars.com/cobra-lamv/.

[c] https://www.armored-cars.com/cougar-lamv/.

[d] https://www.armored-cars.com/spartan-asv/.

[e] https://www.nimr.ae/product/jais4x4/.

[f] https://www.bmc.com.tr/en/defense-industry/kirpi.

[g] http://www.kaddb.com/en-us/KADDBs-PORTFOLIO/LAND-SYSTEMS.

[h] http://www.kaddb.com/en-us/KADDBs-PORTFOLIO/LAND-SYSTEMS.

[j] https://www.baesystems.com/en/product/caiman-mrap-vehicles.

[k] http://www.paramountgroup.com/capabilities/land/mbombe-6/.

[l] http://mspv.com/military/.

[m] http://mspv.com/military/.

[n] https://www.armored-cars.com/spartan-asv/.

[p] http://www.mezcalarmor.com/Armored-Personnel-Carriers/Tygra.

[q] http://www.vanguardngr.com/2012/06/army-to-unveil-first-nigerian-built-apc/.

[r] https://www.armyrecognition.com/south_africa_african_army_wheeled_armoured_vehicle/ratel_20_6x6_armoured_infantry_fighting_vehicle_20mm_cannon_technical_data_sheet_specifications_pictures_video_11601163.html.

[s] https://twitter.com/DonKlericuzio/status/684663686108151808.

[t] https://twitter.com/Oded121351/status/1118808298491396096.

S/2019/914

## Appendix A to Annex 36: Identification imagery of wheeled armoured vehicles

Table A.36.1
**Armoured vehicle imagery**



**Name: COBRA LAMV**
**Manufacturer: Streit Armoured Cars (UAE)**
**Affiliation: GNA-AF**
**First Seen: 2012**
**First Reported:  S/2016/209, para. 118 and annex 26**



**Name: COUGAR LAMV**
**Manufacturer: Streit Armoured Cars (UAE)**
**Affiliation: GNA-AF**
**First Seen: 2012**
**First Reported:  S/2016/209, para. 118 and annex 26**



**Name: SPARTAN LAV**
**Manufacturer: Streit Armoured Cars (UAE)**
**Affiliation: GNA-AF / HAF**
**First Seen: 2012**
**First Reported:  S/2016/209, para. 118 and annex 26**



**Name: KIRPI MRAP**
**Manufacturer: BMC TURKEY**
**Affiliation: GNA-AF**
**First Seen: 2019**
**First Reported: NEW**

19-18816



**Name: RATEL-60 IFV**
**Manufacturer: Sandock Austral, South Africa**
**Affiliation: HAF**
**First Seen: 2016**
**First Reported: Not previously reported**



**Name: JAIS MRAP**
**Manufacturer: NIMR (UAE)**
**Affiliation: Saw'iq Brigade, Zintan / HAF**
**First Seen: 2013**
**First Reported: S/2016/209, para. 119 and annex 27**



**Name: MARED 8x8 IAFV**
**Manufacturer: KADDB (Jordan)**
**Affiliation: HAF**
**First Seen: 2019**
**First Reported: NEW**



**Name: AL WAHSH 4x4 PPV**
**Manufacturer: KADDB (Jordan)**
**Affiliation: HAF**
**First Seen: 2016**
**First Reported: S/2016/209, annex 26**

S/2019/914



**Name: CAIMAN MRAP**
**Manufacturer: BAe Systems / Armor Holdings (UK / USA)**
**Affiliation: HAF**
**First Seen: 2012**
**First Reported: S/2016/209, annex 26**



**Name: MBOMBE 6 x 6 IAFV**
**Manufacturer: Paramount (South Africa)**
**Affiliation: HAF**
**First Seen: 2019**
**First Reported: NEW**



**Name: PANTHERA T6 APC**
**Manufacturer: MSPV (UAE)**
**Affiliation: HAF**
**First Seen: 2016**
**First Reported: S/2016/209, annex 26**



**Name: PANTHERA F9 APC**
**Manufacturer: MSPV (UAE)**
**Affiliation: HAF**
**First Seen: 2018**
**First Reported: S/2018/812, annex 28**





**Name: TYGRA APC**
**Manufacturer: Mezcal (UAE)**
**Affiliation: HAF**
**First Seen: 2016**
**First Reported: S/2017/466, para. 160 and annex 40**

**Name: IGIRIGI APC**
**Manufacturer: Army (Nigeria)**
**Affiliation: HAF**
**First Seen: 2015**
**First Reported: Not previously reported**

S/2019/914

## Appendix B to Annex 36: Examples of modified wheeled armoured vehicles

1.      This appendix provides examples of wheeled armoured vehicles, which may have been transferred to Libya for protective use under the auspices of paragraph 9 of resolution 2095 (2013), that have subsequently been modified to provide an offensive military capability.

Figure B.36.1
**Streit *Spartan* LAV modified with a Type 63 107mm multi barrel rocket launcher fitted to 'snakehead' cupola [a]**

Figure B.36.2
**Streit *Cougar* LAMV modified with a 9M133 *Kornet* ATGW b**





Figure B.36.3
**KADDB *Al Wahsh* PPV modified with an 73mm SPG-9 recoilless gun fitted to 'snakehead' cupola [c]**



[a] https://twitter.com/towersight/status/1169271329033531392, 4 September 2019.
[b] https://twitter.com/Oded121351/status/1084717353361911808, 14 January 2019.
[c] https://twitter.com/Oded121351/status/1102829446191558656, 5 March 2019.

**Annex 37:** *Nashshab* **RPG-32 anti-tank rocket launcher**

1.      On 28 May 2019 the Panel identified from open source information the possession of the RPG-32 *Nashshab* shoulder-launched anti-tank rocket system by HAF (image 37.1). This weapon system is produced in Jordan by a co-operative venture between the Joint Stock Company "Scientific Production Association "Bazalt" (JSC "SPA "Bazalt") of Russia (http://bazalt.ru/en/) and the King Abdullah II Design and Development Bureau (KADDB) (http://www.kaddb.com/) called the Jadara Equipment and Defence Systems (initially the Jordan Russian Electronics Systems Company) (JRESCO) (https://www.jadara.jo) (image 37.2). The Panel notes that, according to authoritative open source information,[146] the Royal Jordanian Army is the only known user of this weapons system to date.

Image 37.1
**RPG-32 *Nashshab* with HAF (28 May 2019)**



Source: https://twitter.com/Mansourtalk/status/1133996109448253440?s=08. 30 May 2019.

Image 37.2
**Original manufacturers image** [a]



Source: https://www.jadara.jo/jadara-products. Accessed 11 June 2019.

---

[146]  www.janes.ihs.com.

S/2019/914

3.     On 27 June 2019, GNA-AF captured a range of ammunition and military equipment from HAF. Among this ammunition was at least one RPG-32 *Nashshab* rocket tube (image 37.3). The image clearly shows all of the markings on the rocket tube, which should assist the Jordanian authorities in assisting the Panel in establishing the supply chain for the RPG-32 *Nashshab* to Libya.

Image 37.3
**RPG-32 *Nashshab* captured from HAF at Gharyan (27 June 2019)**



Source: Confidential

4.     The Panel has written to Jordan requesting clarification of the supply chain for this weapon system but has received no response.

5.     The Panel finds Jordan in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material to the LNA.

**Annex 38:       9K-115-M *Metis* RPG-32 ATGW**

1.      The 9K115-2 *Metis*, or a variant was first observed as possibly being in use in Libya during 2016.[147] The presence was confirmed by open source imagery on 21 December 2018 (figure 38.1) and 14 July 2019 (figures 38.2 and 38.3).

Image 38.1
**9K-115-M *Metis* ATGW confirmed in Libya (21 December 2018**



Source: https://twitter.com/Oded121351/status/1076092905331351552, 21 December 2018. Accessed 29 August 2019.

_____

[147] https://twitter.com/Oded121351/status/745852183934033920, 23 June 2016. Accessed 29 August 2019.

S/2019/914

Image 38.2
**9K115-2 Metis with GNA-AF(14 July 2019)**

Image 38.3
**9K115-2 Metis with GNA-AF (14 July 2019)**




Sources: 1) https://twitter.com/rahbaTajura/status/1150532386419089412. Accessed 29 August 2019. [L]; and 2) https://twitter.com/rahbaTajura/status/1150532386419089412/photo/4. Accessed 29 August 2019. [R].

2.      This ATGW system is designed and manufactured by the KPB Instrument Design Bureau (www.kpbtula.ru) of the Russian Federation. The Panel has written to the Member State requesting information to assist in the identification of the supply chain of these ATGW to Libya.

3.      The Panel identified open source information[148] alleging that the ATGW were supplied by Turkey. The Panel considers this unlikely and investigations continue.

4.      Panel investigations into the supply chain of these ATGW continue.

---

[148]  Source: Wolfram Lacher, (2019) "Who is Fighting Whom in Tripoli: How the 2019 Civil War is Transforming Libya's Military Landscape," SANA Briefing Paper, Box 1, Photo 4, p.14, Geneva: Small Arms Survey. http://www.smallarmssurvey.org/fileadmin/docs/T-Briefing-Papers/SAS-SANA-BP-Tripoli-2019.pdf.

**Annex 39:        155mm HE Laser Homing Projectile GP6**

1.        The Panel identified from open source information[149] that on 27 June 2019, forces affiliated to the GNA captured ammunition from the HAF. This ammunition included some projectiles with characteristics virtually identical to the 155mm High Explosive (HE) Laser Homing Projectile (LHP) GP6, which is manufactured by the China North Industries Group Corporation Limited (NORINCO).[150]

2.        A sealed ammunition container was marked "UAE Armed Forces, Joint Logistics Command C and F Section". Analysis of the imagery has identified the following markings and documentation, which with the cooperation of the manufacturer's Member State would allow the supply chain for this particular ammunition to be established.

    (a)        Ammunition container for a Contract Number, (DP3/2/6/1/2006/23/A) with a Lot Number of 3-14-519;

    (b)        Packed 155mm HE LHP Projectile with a Lot Number of 3 356 2014;

    (c)        Unpacked 155mm HE LHP Projectile with a Lot Number of 3 354 2014;

    (d)        Quality Certificate for "GP6 155mm Laser Homing Projectile" dated 25 December 2014 for Lot Number "G6-3-14-356". Inspected by "Huligiang"; and

    (e)        Packing Note dated 25 December 2014 for "GP6 155mm Laser Homing Projectile", Code No. "GP6 155/45, for Series No. "G6-3-14-356". Manufactured by "China North Industries Corporation".

---

[149]  Video imagery of post capture is at https://www.facebook.com/138077846597370/videos/2124863734479235/?v=2124863734479235. (See 1 min 36 sec to 2 min 09 sec)

[150]  www.norinco.com.

**S/2019/914**

Image 39.1

**Extract from open source video showing ammunition container markings**



Image 39.2

**Ibid**



Image 39.3

**155mm HE LHP projectile**
**Lot Number 3 356 2014**



Image 39.4

**155mm HE LHP projectile**
**Lot Number 3 354 2014**



Image 39.5

**QC for 155mm HE LHP projectile**
**Lot Number 3 356 2014**



Image 39.6

**Packing Note for 155mm HE LHP projectile**
**Lot Number 3 356 2014**



Sources: 1) Extract from video imagery of post capture is at
https://www.facebook.com/138077846597370/videos/2124863734479235/?v=2124863734479235. and 2)
https://www.facebook.com/138077846597370/posts/567454386993045?s=518287117&sfns=xmo.

3.     The Panel has identified that the United Arab Emirates has previously taken delivery of 155mm HE LGP GP6 ammunition from the manufacturer.[151] The Panel thus finds that, based on: 1) it being a confirmed system in Emirati use; 2) the accurate markings on the primary ammunition packaging; 3) the colour being distinctive of Chinese rather than Russian Federation ammunition; 4) the previous use of Chinese 155mm precision guided munitions in Libya;[152] 5) the fact that the explosive type is marked "A-IX-II" (seen on Chinese ammunition) rather than "A-IX-2" (seen on Russian Federation manufactured ammunition); and 6) the prior use of Chinese manufactured 155 mm precision guided artillery projectiles in Libya,[153] that this Chinese manufactured ordnance was a post-delivery transfer to Libya by the United Arab Emirates.

4.     The Panel has written to the United Arab Emirates requesting clarification of the supply chain for this weapon system but has received no response.

5.     The Panel finds the United Arab Emirates in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material to the HAF.

---

[151]  Christopher F Foss. *UAE confirms Chinese 155mm AH4 gun howitzer acquisition*. Jane's Defence Weekly. http://www.janes.ihs.com/. 28 February 2019.
[152]  https://armamentresearch.com/chinese-gp1-series-guided-artillery-projectiles-in-libya/.
[153]  In paras. 157 to 159 of Panel report S/2017/446 the Panel were inconclusive as to the identity of remnants of a similar projectile. Although a Jane's report had identified the remnants as being from a Russian manufactured 155mm Krasnopol precision guided artillery projectile, the Panel subsequently, in paras.115 and 117 of Panel report S/2018/812, assessed the projectile remnants as being from a Chinese 155mm GP-1A precision guided artillery projectile.

**Annex 40:** *Pantsir* **S-1 surface to air missile system (SAM)**

1. Analysis of open source and confidential satellite imagery identified that at least two *Pantsir* S-1 SAM systems were deployed to provide air defence cover for Jufra air base between 5 March and 19 April 2019 (see figures 40.1 to 40.4).

Figure 40.1
**Jufra air base (5 March 2019)**[a]

Figure 40.2
**Jufra air base (19 April 2019)** [b]



Figure 40.3
**Jufra air base (5 March 2019)**[c]

Figure 40.4
**Jufra air base (19 April 2019)**[b]

[a] Google Earth. Accessed 19 August 2019. Location at $29^0 13'10.0"$N, $15^0 59'44.2"$E.
[b] Confidential source.
[c] Google Earth. Accessed 19 August 2019. Location at $29^0 12'31.13"$N, $16^0 00'3.64"$E.

2.      The Panel confirmed from open source imagery (see figure 40.5) the deployment of *Pantsir* S-1 surface to air missile (SAM) systems in support of HAF during a road move north in the area of Gharyan.[154] The Panel also noted an unverified media report[155] that refers to a statement made by a representative of the GNA-AF Joint Operations Room of West Libya on 20 June 2019, which claims that its forces destroyed four *Pantsir* S-1 SAM systems on 18 June 2019.

Figure 40.5
**_Pantsir_ S-1 in support of HAF near Gharyan (18 June 2019)**



Source: https://www.jana-ly.co/منتقل-روسي-جوي-دفاع-منظومة-وصول-بالصور/.

The *Pantsir* S-1 SAM system(s) seen in Libya use the MAN SX45 Heavy Mobility Truck as the system's ground mobility and transporter erector launcher (TELAR) platform. Only the UAE uses this configuration for their *Pantsir* S-1 systems[156] (figures 40.6 and 40.7). All other export variants are mounted on either a 1) BAZ-6909 8x8; 2) Ural-53234 8x8; 3) KamAZ-6560 8x8; or 4) Asrolog MKZT-79230 chassis.

---

[154]   32⁰31'36.67"N, 13⁰13'2.94"E.
[155]   https://www.libyaobserver.ly/news/libyan-air-force-destroys-russian-air-defense-system-used-haftars-forces.
[156]   Binnie J. *UAE may have deployed Pantsir S-1 to Libya.* Jane's Defence Weekly. 19 June 2019. London.

Figure 40.6
**_Pantsir_ S-1 in support of HAF near Gharyan (18 June 2019)** [a]



Figure 40.7
**_Pantsir_ S-1 in UAE on MAN SX45 platform** [b]



[a] https://twitter.com/Oded121351/status/1141224351045443584.
[b] Extracted from UAE military promotional video at https://www.mod.gov.ae/.

The Panel has written to the United Arab Emirates requesting clarification of the supply chain for this weapon system but has received no response.

The Panel finds the United Arab Emirates in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material to HAF.

**Annex 41:     Samel-90 electronic countermeasures system**

1.     In its report S/2018/812[157] the Panel first reported on the HAF use of a roof mounted electronic countermeasures (ECM) system during a visit to Tunis on 18 September 2017. The Panel identified the system in use again during a visit by the HAF leadership to the Tamanhint air base in Sebha on 13 February 2019.[158]

2.     The Panel made a preliminary identification of the ECM system and requested the assistance of the manufacturer's Member State in the positive identification of the system. The Member State response was that there were *insufficient identification details (...) to confirm Bulgarian origin*. The Panel then consulted with independent ECM specialists[159] who confirmed that this system was very likely a Bulgarian manufactured Samel-90 mobile improvised explosive device (IED) jammer radio frequency (RF) inhibition system.[160] This finding was based on imagery analysis (figures 41.1 to 41.6), which confirmed that:

   a.   The antenna array is identical in antenna length, separation, and colour coding on the HAF system and that shown on the manufacturer's website; and

   b.   The roof container is identical in size and shape on both systems.

3.     An extensive open source search of ECM systems identified no other Radio Frequency (RF) Inhibition and Jammer Systems with these very specific characteristics.

4.     The panel considers that the direct supply of this ECM system from the manufacturer, or by the manufacturer's Member State, is highly unlikely. It is almost certainly present due to post-delivery diversion by the initial purchaser, or subsequent owner.

5.     The Panel finds the supplier in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material to HAF. The Panel continues to investigate.

---

[157] Para. 121 and annex 33.
[158] https://twitter.com/Oded121351/status/1095925042272260097.
[159] https://solutions-ew.com.
[160] https://www.samel90.com/en/products/category/jammer-solutions-military-equipment-surveillance-systems/jammer-solutions-mobile-jammer.

S/2019/914

Image 41.1
**HAF ECM equipment at Tamanhint (Sebha) air base (13 February 2019)**

Image 41.2
**HAF ECM equipment from manufactuers website**




Note virtually identical type and length of rear antennae array.

Image 41.3
**HAF ECM equipment at Tamanhint (Sebha) air base (13 February 2019)**

Image 41.4
**HAF ECM equipment from manufactuers website**



Note the Red, Yellow and Dark Green  colour coding and antennae profiles are identical on the forward antennae array, albeit in a different layout.

19-18816

Image 41.5

**HAF ECM equipment at Tamanhint (Sebha) air base (13 February 2019)**

Image 41.6

**HAF ECM equipment from manufactuers website**





Note the virtually identical profile, colouring and design of the roof mounted containers

Sources: 1) LH images from  https://twitter.com/Oded121351/status/1095925042272260097, 14 February 2019; and b) RH images from https://www.samel90.com/en/products/product/jammer-solutions-military-equipment-surveillance-systems/jammer-solutions/mobile-jammer/mobile-jammer, accessed 7 September 2019

**Annex 42:     UAV inhibition and jamming system**

1.     The Panel noted a report in open source media[161] of the presence of an unusual antennae array on the roof of the Tripoli Security Directorate in Libya. The Panel is unconvinced that the array is for the declared purpose of *enhancing communications with the transmitters of the traffic and licensing unit in Tripoli*, as the antennae are not the type normally used for law enforcement high frequency (HF) or very high frequency (VHF) communications.

2.     The suspicious antennae array consists of a V-dipole antenna and a flat plate antennae facing skywards, all connected to the base equipment by, probably, eight coaxial cables. This particular antennae array shares many characteristics with those used for the inhibition and jamming of UAV or UCAV, an example being the Gergedan IHA Anti Drone and RCIED Jammer System manufactured by Aselsan A.S. (www.aselsan.com.tr), see figures 42.1 to 42.4.

Image 42.1
**GNA ECM equipment on Tripoli SecurityDirectorate  (3 August 2019)**

Image 42.2
**ECM equipment from manufactuers website**



Note virtually identical angle and length of V-Pole antennae.

---

[161]   https://www.libyaobserver.ly/inbrief/tripoli-security-directorate-denies-installation-drone-antenna-over-its-building. Accessed 5 August 2019.

Image 42.3

**GNA ECM equipment on Tripoli SecurityDirectorate  (3 August 2019)**

Image 42.4

**ECM equipment from manufactuers website**



Note the similarity in the plate antenna and tripod.

Sources: 1) LH images from https://www.libyaobserver.ly/inbrief/tripoli-security-directorate-denies-installation-drone-antenna-over-its-building. Accessed 5 August 2019; and 2) RH images from Comparison source: Gergedan IHA Anti Drone RCIED Jammer System. https://www.aselsan.com.tr/GERGEDANIHA_AntiDrone_Rcied_Jammer_System_4224.pdf. Accessed 5 August 2019.

3.      The Panel consulted with independent ECM specialists[162] who confirmed that this system was very likely designed primarily for the inhibition and jamming of UAVs.

4.      The Panel considers that, as this inhibition and jamming system has clear military utility, being specifically designed to decoy or down UAV and UCAV by the emission of active electromagnetic signals, it falls within the category of military equipment pursuant to paragraph 9 of resolution 1970 (2011).

---

[162]  https://solutions-ew.com.

S/2019/914

## Annex 43:     HAF military training in Jordan

1.      A wide range of recent open source imagery (see images 43.1 to 43.6) dated  26 April 2019 showed imagery of individuals from the HAF Tariq Bin Ziyad battalion graduating from a recent military training course(s) at the Prince Hashem bin al Hussein School for Special Operations.[163]

2.      The training was visited by general Khayri al Tamimi, Head of the HAF general commander's office (shown circled in images 43.1 and 43.3).

Image 43.1
**Jordanian SOF Officers accompany general Khayri al Tamimi**



Image 43.2
**Vehicle checkpoint (VCP) drills**



Image 43.3
**HAF general Khayri al Tamimi meets students**



Image 43.4
**Confidence training**



---

163
  https://ipfs.io/ipfs/QmXoypizjW3WknFiJnKLwHCnL72vedxjQkDDP1mXWo6uco/wiki/Joint_Special_Operations_Command_(Jordan).html.
  Geo-coordinates: 32°0'55"N   36°7'49"E.

Image 43.5
**Prisoner handling training**

Image 43.6
**Unarmed combat training**





Sources: 1) https://twitter.com/Oded121351/status/1122025974743302145/photo/1; 2) https://m.facebook.com/story.php?story_fbid=847197048962469&id=253215761693937; 3) https://alurdunyya.net/2757; https://m.facebook.com/story.php?story_fbid=1187692564722517&id=258861140939002; 4) https://www.libyaakhbar.com/libya-news/929549.html; 5) https://www.alderaah-news.net/world/4693555/الجيش-الليبي-يعلن-عن-عقد-اجتماعات-مهمة-في-الأردن; and 6) https://mena-monitor.org/news/اللواء-التميمي-يتفقد-الضباط-الليبيين/. Accessed 27 April 2019.

3.      The Panel finds Jordan in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military support to HAF.

**Annex 44:      Operational military aviation assets**

1.      The panel is compiling an analysis of the current military aviation assets of the GNA-AF and HAF. The data, which is at tables 44.1 and 44.2 is not yet exhaustive as research continues. Aircraft shown in *red italics* have been damaged or destroyed since the start of the conflict on 4 April 2019.

Table 44.1
**GNA-AF operational military aviation air assets**

| Type | Model | Tail # | Serial # | Construction # | Last seen | Remarks |
|------|-------|--------|----------|----------------|-----------|---------|
| Transport Helicopter | Mi-2 | 06 | | 529946106 | Jun 2018 | ▪ |
| | Mi-2 | 86 | | 529913086 | Aug 2018 | ▪ |
| | Mi-8 | 1464[a] | | | 2016 | ▪ From Egypt. |
| | Mi-8 | | | | | ▪ |
| | Mi-171E | 7304 | | 171E00196137304U | Apr 2019 | ▪ Ex-Air Transport Europe, Slovakia. |
| | Mi-171E | 7305 | | 171E00196137304U | Apr 2019 | ▪ Ex-Air Transport Europe, Slovakia. |
| | *CH-47 Chinook* | *LC010* | | | *Aug 2018* | ▪ *Damaged on 4 Apr 2019 .*[b] |
| Attack Helicopter | Mi-24 | 918 | | | Apr 2019 | ▪ |
| | Mi-24 | 962 | | | Apr 2019 | ▪ |
| | Mi-35[c] | 954 | | | | ▪ From Sudan. |
| | Mi-35 | 959 | | | | ▪ |
| | KA50/52 Alligator/Hokum | | | | Possible | ▪ Single source |
| Fighter Ground Attack | *Mirage F-1AD* | *403* | | | *Apr 2019* | ▪ Crashed on 24 April 2019 due to engine failure |
| | *Mirage F-1ED* | *501* | | | *May 2019* | ▪ Shot down May 2019.[e] |

| Type | Model | Tail # | Serial # | Construction # | Last seen | Remarks |
|------|-------|--------|----------|----------------|-----------|---------|
| | *Mirage F-1ED* | *508* | | | *Apr 2019* | ▪ Cannibalized at Misrata. |
| | Mirage F1-BD | 205 ? | | | | ▪ Missing parts and need engine. At Mitiga. |
| | MiG-23MLD | 117 | | 2960326117/18125 | Apr 2019 | ▪ Tripoli military parade. Probably ex-6117. |
| | MiG-23MLD | 474 | | 2960326474/18418 | Apr 2019 | ▪ Probably ex-6474. |
| | MiG-23U | 8212 | | | Apr 2019 | ▪ |
| | MiG-23 | 7202 | | | Apr 2019 | ▪ |
| Ground Attack | *G2A-E Galeb* | 116 | | | *Apr 2019* | ▪ One shot down on 4 July 2019. Registration number not yet known |
| | G2A-E Galeb | 134 | | | Apr 2019 | ▪ |
| | G2A-E Galeb | 173 | 10173 | | Sep 2018 | ▪ |
| | G2A-E Galeb | 182 | 10182 | | Feb 2019 | ▪ |
| | G2A-E Galeb | 187 | 10187 | | Apr 2019 | ▪ |
| | G2A-E Galeb | 205 | 10205 | | Apr 2019 | ▪ |
| | G2A-E Galeb | 207 | 10207 | | Apr 2019 | ▪ |
| Trainer / Ground Attack | Aero L-39C Albatross | 1102 | | | Apr 2019 | ▪ |
| | Aero L-39C Albatross | 1108 | | | Apr 2019 | ▪ |
| | Aero L-39C Albatross | 1939 | | 131939 | Apr 2019 | ▪ |
| | Aero L-39C Albatross | 1941 | | | Apr 2019 | ▪ |
| | Aero L-39C Albatross | 3602 | | | Apr 2019 | ▪ |
| | *Aero L-39C Albatross* | *3605* | | | *Jul 2019* | ▪ One shot down on 4 July 2019.[g] Registration number not yet known. |
| | *Aero L-39C Albatross* | *9440* | | | *Aug 2019* | ▪ One destroyed at Misrata on 7 Aug 2019.[h] |
| | Aero L-39C Albatross | 9441 | | 931441 | Apr 2019 | ▪ |
| | *Aero L-39C Albatross* | *9443* | | *931443* | *Apr 2019* | ▪ One shot down on 10 April 2019. Registration number not yet known. |

| Type | Model | Tail # | Serial # | Construction # | Last seen | Remarks |
|------|-------|--------|----------|----------------|-----------|---------|
|  | *Aero L-39C Albatross* | 9445 |  |  | *Apr 2019* | ▪ One crashed due to engine malfunction. Registration number not yet known. ▪ |

[a] Reported in paragraph 134 to S/2016/209.

[b] https://medium.com/war-is-boring/libyas-chinook-helicopters-are-old-as-hell-97595e4e94ca. Accessed 24 July 2019.

[c] Reported in paragraph 85 to S/2014/106.

[d] https://twitter.com/Oded121351/status/1120921862039642112. Accessed 25 April 2019.

[e] https://www.independent.co.uk/news/world/middle-east/libya-national-army-pilot-portugal-captured-tripoli-fighter-jet-lna-a8903176.html. Accessed 24 July 2019.

[f] https://thedefensepost.com/2019/07/05/libya-lna-l-39-downing/. Accessed 24 July 2019.

[g] https://twitter.com/BabakTaghvaee/status/1147109862532423680.

[h] https://www.egypttoday.com/Article/2/73685/LNA-destroys-fighter-jet-on-Misrata-Airport-runway.

Table 44.2
**HAF operational military air assets**

| Type | Model | Tail # | Serial # | Construction # | Last seen | Remarks |
|------|-------|--------|----------|----------------|-----------|---------|
| Transport Helicopter | Mi-2 | 23 | | | Sep 2018 | ▪ |
| | Mi-2 | 057 | | 5410225057 | | ▪ Ex Sudan 373. |
| | Mi-2 | 089 | | | Oct 2017 | ▪ |
| | Mi-8/17 | | | | May 2018 | ▪ |
| | Mi-8/17 | | | | May 2018 | ▪ |
| | Mi-8/17 | | | | May 2018 | ▪ |
| Utility Helicopter | AW-109 | 5A-DTJ | | | May 2018 | ▪ |
| Attack Helicopter | Mi-24P | 785 | 2175[a] | | Feb 2019 | ▪ |
| | Mi-24P | 353[b] | | | Apr 2019 | ▪ Painted grey. |
| | Mi-35P | 193 | | | July 2019 | ▪ Painted grey. |
| Fighter Ground Attack | MiG-23UB | 8008[c] | | | July 2019[d] | ▪ |
| | MiG-23UB | 7502[e] | | | Aug 2019 | ▪ Two seater. Possibly above. |
| | Mig-23BN | 4136 | | | Aug 2019 | ▪ Maintenance in Labraq.[f] |
| | MiG-21F[g] | 243[h] | | | Apr 2019 | ▪ Eight MiG-21 delivered from Egypt pre-Mar 2015. |
| | | | | | | ▪ |
| | Mig-21UM | | | | Apr 2019 | ▪ |
| | *Mig-21F* | *404[j]* | | *75066404* | *Apr 2019* | ▪ *One shot down on 14 Apr 2019.[k]* ▪ *Registration number not confirmed.* |
| | *Su-22UM-3K* | *16* | | | *Apr 2019* | ▪ *Al-Watyah.[l]* |
| | *Su-22UM-3K* | *23* | | | *Oct 2019* | ▪ *One destroyed at Al-Watyah on 19n June 2019.[m] Other over Tripoli on 10 October 2019.[n]* |
| | *Mirage F-1AD* | *402* | | | *Apr 2019* | ▪ *Needs major inspection and is not flying.* |
| | *Mirage F-1ED* | *515* | | | | ▪ *Needs major inspection and is not flying.* |

| Type | Model | Tail # | Serial # | Construction # | Last seen | Remarks |
|---|---|---|---|---|---|---|
| Ground Attack | IOMAX Archangel[p] | 2282 | | | Jul 2016 | ▪ From UAE. |
| | IOMAX Archangel | | | | | ▪ |
| | IOMAX Archangel | | | | | ▪ |
| | IOMAX Archangel | | | | | ▪ |
| | *IOMAX Archangel* | | | | | ▪ *Destroyed May 2019.* |
| | *IOMAX Archangel* | | | | | ▪ *Destroyed May 2019.* |
| Trainer / Ground Attack | Aero L-39C Albatross[q] | N393WA | 533623 | | May 2018 | ▪ Operated by Sonnig S.A.[r]<br>▪ Was last seen in 2018 demilitarized. |
| | *Aero L-39C Albatross*[s] | *9444* | | | *Jul 2019* | ▪ Emergency landing in Tunisia on 22 July 2019. |
| Trainer | Marchetti SF-260WL | 310 | | 29-004 | | ▪ |

[a] Reported in paragraph 122 to S/2017/446.

[b] 1) https://twitter.com/Arn_Del/status/1119000886041292801. Accessed 18 April 2018. and 2) https://twitter.com/aldin_ww  Accessed 20 April 2018.

[c] https://libya.liveuamap.com/en/2019/13-april-video-preparations-of-lna-air-force-today-for-strikes. Accessed 13 April 2019; and https://twitter.com/SaharaNws/status/1153608120708542464/photo/1  Accessed 22 July 2019.

[d] Coordinates 29°11'59.43"N, 16°00'18.75"E. Jufra Airbase.

[e] https://twitter.com/Mansourtalk. Accessed 21 April 2019.

[f] https://twitter.com/Oded121351/status/1155695244828205057. Accessed 4 August 2019.

[g] Reported in paragraph 135  and annex 28 to S/2016/209.

[h] https://twitter.com/lna_not. 10 April 2019.

[j] https://twitter.com/lna_not. 9 April 2019.

[k] https://southfront.org/pro-gna-forces-shot-down-mig-21-of-libyan-national-army-near-tripoli/. Accessed 26 July 2019.

[l] https://twitter.com/search?q=aldin&src=typd. 19 April 2019.

[m] https://twitter.com/Oded121351/status/1154735552539252352. Accessed 26 July 2019.

[n] https://www.marsad.ly/en/2019/10/09/libyan-army-downs-warplane-for-haftars-forces-in-southern-tripoli/. Accessed 11 October 2019.

[p] Reported in paragraph 128 to S/2017/446 as AT-802i.

[q] Reported in paragraph 92 and annex 28 to S/2018/812.

[r] Now http://www.sipj.net.

[s] Reported in paragraph 92 and annex 28 to S/2018/812.

## Annex 45:      Operational unmanned (combat) aerial vehicle (UAV and UCAV) assets

1.      The panel has complied an analysis of the current UAV and UCAV assets of the GNA-AF and HAF. The data, which is at tables 45.1 and 45.2 is not yet exhaustive as research continues. UAV/UCAV shown in *red italics* have been damaged or destroyed since the start of the conflict on 4 April 2019.

Table 45.1
**GNA-AF operational UAV/UCAV assets**

| Type | Model | Tail # | Serial # | Last seen | Remarks |
|------|-------|--------|----------|-----------|---------|
| Unmanned Combat Aerial Vehicle (UCAV) | *Bayraktar TB2* | | | *Jun 2019* | ▪ UCAV destroyed at Mintage on 6 Jun 2019.[a] |
| | *Bayraktar TB2* | | | *Jun 2019* | ▪ One destroyed at Mitaga on 6 Jun 2019.[b] |
| | *Bayraktar TB2* | | | *Jun 2019* | ▪ UCAV destroyed at Mitiga on 30 Jun 2019.[c] |
| | *Bayraktar TB2* | | | *Jul 2019* | ▪ Report of 6 Jul 2019 stated four UCAV destroyed.[d] Details not known. |
| | Bayraktar TB2 | | | Jul 2019 | ▪ 8 x UCAV delivered 3 - 6 Jul 2019. Highly likely by Sky Aviatrans IL-76 (UR-COZ). |
| | *Bayraktar TB2* | | | *Jul 2019* | ▪ UCAV destroyed on 22 Jul 2019. Details TBC. |
| | *Bayraktar TB2* | | | *Jul 2019* | ▪ Report of 31 Jul 2019 now claims 8 UCAV destroyed.[e] |
| | *Bayraktar TB2* | | | *Jul 2019* | ▪ Ibid |
| | *Bayraktar TB2* | | | *Jul 2019* | ▪ Ibid |
| | *Bayraktar TB2* | | | *Aug 2019* | ▪ UCAV destroyed near Sirte on 3 Aug 2019.[f] |
| | *Bayraktar TB2* | | | *Aug 2019* | ▪ Reported destroyed near Al Nimwah air base on 5 Aug 2019.[g] |
| | Bayraktar TB2 | | | Jul 2019 | ▪ |
| | *Bayraktar TB2* | | | *Oct 2019* | ▪ Near Misrata. |
| Unmanned Aerial Vehicle (UAV) | Orbiter 3 | | | | ▪ Three alleged donated by Turkey. |
| | *Orbiter 3* | | | *Jul 2019* | ▪ UAV destroyed on 29 Jul 2019.[h] |
| | *Orbiter 3* | | | *Jul 2019* | ▪ UAV destroyed on 31 Jul 2019.[j] |

| Type | Model | Tail # | Serial # | Last seen | Remarks |
|------|-------|--------|----------|-----------|---------|
|      | Possible Vestel Karayel |  |  |  | ▪ Imagery limited.[k] |
|      |       |  |  |  | ▪ |

[a] https://www.egypttoday.com/Article/1/71282/Libyan-army-destroys-2nd-Turkish-drone-at-Mitiga-Int-l. Accessed 24 July 2019.

[b] Ibid.

[c] https://www.express.co.uk/news/world/1147321/turkey-news-libya-civil-war-Khalifa-Haftar-Recep-Tayyip-Erdogan-world-war-3. Accessed 24 July 2019.

[d] 1) https://aawsat.com/english/home/article/1801511/lna-sarraj-seeking-weapons-turkey-compensate-militia-losses; and 2) https://www.egypttoday.com/Article/1/71282/Libyan-army-destroys-2nd-Turkish-drone-at-Mitiga-Int-l. Accessed 24 July 2019.

[e] https://m.aawsat.com/english/home/article/1837556/libya's-sarraj-admits-receiving-arms-turkey. Accessed 31 July 2019.

[f] https://twitter.com/libyaalahrartv/status/1157625597687939072?s=12. Accessed 4 August 2019.

[g] https://www.alaraby.co.uk/english/indepth/2019/8/21/the-significance-of-drones-in-the-libyan-conflict.Accessed 5 September 2019.

[g] https://twitter.com/BabakTaghvaee/status/1155930634000318464. Accessed 29 July 2019

[h] https://twitter.com/Mansourtalk/status/1156901216762421248?ref_. Accessed 8 August 2019

[j] https://twitter.com/Oded121351/status/1146768533281497093. Accessed 7 August 2019.

Table 45.2
**HAF operational UAV/UCAV assets**

| Type | Model | Tail # | Serial # | Last seen | Remarks |
|------|-------|--------|----------|-----------|---------|
| Unmanned Combat Aerial Vehicle (UCAV) | *Wing Loong* II UCAV | | | | ▪ Maintained and operated by UAE. Two identified on satellite mage of 23 Jul 2016, IHS 1650890, CNES. Possible up to eight deployed, but unconfirmed. |
| | *Wing Loong II UCAV* | | | *Aug 2019* | ▪ UCAV destroyed near Abugrein on 3 Aug 2019.[a] Probably at 31°19'21.10"N, 15°16'25.32"E. |
| | *Wing Loong II UCAV* | | | *Oct 2019* | ▪ Near Tripoli |
| Unmanned Aerial Vehicle (UAV) | *Yabhon-HMD* | | | *Jun 2019* | ▪ Four captured by GNA at Gharyan on 29 Jun 2019. |
| | *Yabhon-HMD* | | | *Jun 2019* | ▪ |
| | *Yabhon-HMD* | *25* | | *Jun 2019* | |
| | *Yabhon-HMD* | *26* | | *Aug2019* | ▪ Inspected by Panel on 4 Aug 2019. |
| | *Possible Orlan-10* | | | *Apr 2019* | ▪ Destroyed on 29 Apr 2019 east of Sirte by GNA forces.[b] |
| | | | | | ▪ |

[a] https://twitter.com/libyaalahrartv/status/1157625597687939072?s=12. Accessed 4 August 2019. Well reported.

[b] Twitter, @oded121351. 29 April 2019.

**Annex 46:** *Blue Arrow* **(BA-7) air to surface missile**[164]

1.      During the night of 19/20 April 2019, GNA-AF units were attacked by aerially delivered explosive ordnance whilst 28 km along the road heading south west from Al Azizya to Yefren. The Panel obtained from a confidential source, imagery of missile remnants at the scene and this has been used in this analysis.

2.      The Panel also has imagery from two other night strikes near Camp Moz[165] and Wadi Rabia, which show similar component types as the Al Azizya strike.[166] Video imagery[167] shows other air attacks on Tripoli, which are almost certainly from air to surface missiles as: 1) the explosive ordnance is in powered flight, indicating a rocket motor; and 2) the missile trajectory is flat, not parabolic, indicating it is operating under guidance and not in free flight.

3.      The Panel identified a range of characteristics that are virtually identical to those of the *Blue Arrow* BA-7 (LJ-7) air to surface missile (ASM) or variant (see table 1 and appendix A for the Al Azizya air strike).[168] The Panel has compared the imagery against a range of known ASM and only the BA-7 ASM has the specific characteristics shown in table 46.1.

Table 46.1
**Analysis of recovered components**

| Images in Annex | Component | Technical comment |
|---|---|---|
| A / B | Missile fuselage | ▪ Reduction in missile diameter |
| C / D | Missile fuselage | ▪ Eight rearward facing equally spaced securing bolts |

4.      The only aviation asset currently available to the parties at that time with a known night flying capability were the two HAF Mi-24P attack helicopters. These do not have the capability to fire BA-7 missiles with any degree of accuracy. The BA-7 ASM is ballistically paired[169] to very few delivery

---

[164] Also see Wing Loong II annex 47.

[165] Near 32°50'47.95"N, 13°16'8.08"E.

[166] Although the Panel is still analysing those images in detail and corroborating the source, the images show other unique characteristics of the BA-7 such as the profile of the rear fins and venturi.

[167] https://sputniknews.com/middleeast/201904281074523730-air-strike-libya-tripoli/.

[168] Imagery from Al Azizya air strike on 19/20 April 2019 is at appendix B.

[169] This is a process to integrate the weapons system to an airframe type and then operationally qualify it for use. It requires software upgrades to the delivery system avionics, sighting and release systems to ensure that when the missile is aimed and delivered to a target that it actually follows the correct ballistic trajectory to accurately strike that target. The use of instrumented range facilities is needed for live firing trials to ensure

systems, and it is the technical assessment of the Panel that the weapon system has not been ballistically paired with any of the indigenous aviation assets identified in Libya to date.[170] Such ballistic pairing requires a high level of technical skill, supported by extensive live trials on instrumented ranges to validate the ballistic pairing. No such ranges have ever been identified in Libya.

5.      The BA-7 ASM is ballistically paired to fly with the *Wing Loong* II series of unmanned aerial vehicle (UAV) that have been operated in Libya in support of HAF by the United Arab Emirates since 2016.

6.      The Panel has written to the United Arab Emirates requesting clarification of the supply chain for this weapon system but has received no response. The Panel thus finds the United Arab Emirates in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material and support to HAF.

---

accuracy and confidence in the integrated systems.

[170]   See annex 44.

## Appendix A to Annex 46: Imagery analysis (Al Azizya air strike 20 April 2019)

Image A.46.1
**Comparison of remnants against confirmed BA-7**





A. Imagery of missile remnant
Note: Reduction in fuselage diameter (identifiable after
"trumpeting" due to impact)

B. BA-7 Missile Paris Air Show
Note: Reduction in fuselage diameter





C. Imagery of missile remnant
Note: Rearward facing equally spaced bolt

D. BA-7 Missile Paris Air Show
Note: One of eight rearwards facing equally spaced bolts

Sources: 1) Confidential source; and 2) Janes IHS Defence.

## Appendix B to Annex 46: Imagery from Al Aziziya airstrike (20 April 2019)

Image B.46.1
**Still imagery showing of BA-7 Blue Arrow remnants**






Source: Confidential

**Annex 47:      UAE *Wing Loong* II UCAV used in support of HAF operations**

1.      On 3 August 2019, a crashed *Wing Loong* II UCAV being used in support of HAF operations was located near Abughrayn by GNA-AF (see images 47.1 to 47.4).

Image 47.1
**Crashed *Wing Loong* II UCAV near Abugrein
(3 August 2019)**



Image 47.2
**Ibid**



Image 47.3
**Ibid**

Image 47.4
**Ibid**



Sources: 1) https://twitter.com/libyaalahrartv/status/1157625597687939072?s=12; and 2) Confidential source.

2.      The serial numbers of three *Blue Arrow* (BA-7) ASM located at the crash site were identified from the imagery as: 1) E-111-002 dated 15 September 2015; 2) E-013-002 dated 15 September 2015;

and 3) E-236-001 dated 15 January 2015 (see images 47.5 to 47.7). A tracing request was sent to the country of manufacture.

Image 47.5
**Blue Arrow (BA-7) ASM serial number E-111-002 dated 15 September 2015**



Image 47.6
**Blue Arrow (BA-7) ASM serial number E-013-002 dated 15 September 2015**



Image 47.7
**Blue Arrow (BA-7) ASM serial number E-236-001 dated 15 September 2015**



Image 47.8
**Blue Arrow (BA-7) ASM at crash site**



Sources: 1) https://twitter.com/libyaalahrartv/status/1157625597687939072?s=12; and 2) Confidential source.

3.      The Panel has written to the United Arab Emirates requesting clarification of the supply chain for this weapon system but has received no response.

4.      The Panel finds the United Arab Emirates in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military material to the HAF.

**Annex 48:      Turkish *Bayraktar* TB-2 UCAV operating in support of the GNA**

## Operations

3.      The Panel became aware of the presence of a medium altitude long endurance UAV being operated in support of the GNA-AF on 14 May 2019 when open source information showed the remnants of a UAV that was downed in the area of Jufra. The first clear video imagery of a UAV operating over Tripoli was posted on social media on 4 June 2019 (figure 48.1), which was of a very different design to the *Wing Loong* II UCAV known to be operating in support of HAF at that time. Confirmatory imagery has appeared widely on social media since, including clear video imagery of a *Bayraktar* TB2 UCAV taxying on Mitiga international airport runway on 28 August 2019.[171]

Figure 48.1
**Probable HAF *Bayraktar* TB2 UCAV over Tripoli (4 June 2019)**



Source: Extracted from video at https://www.youtube.com/watch?v=Fe-cc6jb5uQ&feature=youtu.be. Accessed 2 September 2019. Also see: https://twitter.com/ly_box/status/1137857595862130688.

2.      Until late July 2016 the *Bayraktur* TB2 UCAV operations were primarily against HAF positions on the front line between the two parties around Libya. This was due to their range being line of sight limited to between 150 to 200km. This changed on 26 July 2019 when Jufra air base, which is 360km

---

[171] https://www.addresslibya.com/en/archives/49934.

from Misrata, was attacked and two IL-76TD aircraft were destroyed on the ground.[172] As the strike was obviously conducted using precision guided munitions, and no fixed wing aircraft were identified in the area, this was a very strong indicator that ground based relay units had being placed strategically at the edge of GNA-AF controlled areas. These relay systems would extend the range of a *Bayraktur* TB2 UCAV by another 150km to 200km, thus bringing Jufra within their range.[173]

### Casualty rate

3.    HAF has  specifically targeted the GNA-AF UCAV capability with some degree of success, but the claimed number of *Bayraktar* TB2 losses (15) now exceeds the twelve reported as been delivered to the GNA-AF. This is illustrative of the major propaganda battle surrounding the "drone war". Table 48.1 summarises the confirmed and claimed *Bayraktar* TB2 losses to date.

Table 48.1
**Summary of HAF *Bayraktar* TB2 UCAV destroyed (14 May 2019 to date)**

| *Date* | *Location* | *Confirmed* | *Claimed* | *Remarks* |
|--------|-----------|-------------|-----------|-----------|
| 14 May 2019 | Jufra | Imagery [a] | | ▪ |
| 01 Jun 2019 | Gharyan | | HAF [b] | ▪ |
| 06 Jun 2019 | Mitiga | | HAF [c] | ▪ Destroyed on ground by FGA. |
| 06 Jun 2019 | Mitiga | | HAF [d] | ▪ Destroyed on ground. |
| *13 Jun 2019* | Mitiga | | Media [e] | ▪ Destroyed on ground. Date TBC. |
| *13 Jun 2019* | Mitiga | | Ibid | ▪ Destroyed on ground. Date TBC. |
| 30 Jun 2019 | | | Media [f] | ▪ |
| 25 Jul 2019 | Jufra | Imagery | HAF [g] | ▪ |
| 1 Aug 2019 | Mitiga | | Media [h] | ▪ Destroyed on ground. |
| 5 Aug 2019 | Al Nimwah | | HAF [j] | ▪ Destroyed on ground. |
| 3 Sep 2019 | Wadi al-Rabie | | HAF [k] | ▪ Shot down. |
| 13 Sep 2019 | Jufra | | HAF | ▪ |
| 13 Sep 2019 | Jufra | | HAF | ▪ |
| 13 Sep 2019 | Kufru | | HAF | ▪ |
| 19 Oct 2019 | Misrata | | HAF | ▪ |

[a] Includes https://www.addresslibya.com/en/archives/45885. Multiple sources.
[b] https://aawsat.com/english/home/article/1750766/lna-announces-downing-turkish-drone-tripoli-battles.

---

[172]  1) European Space Imaging Press Release of 3 August 2019. Image of 29 July 2019; and 2) https://mobile.twitter.com/Arn_Del/status/1155525947040378880, 28 July 2019; and 3) https://www.bloomberg.com/news/articles/2019-07-26/tripoli-government-says-it-struck-haftar-s-main-forward-airbase. Accessed 2 September 2019.
[173]  A confidential source has also confirmed the likely deployment of ground based relay stsems.

S/2019/914

c https://www.addresslibya.com/en/archives/46875.
d https://www.addresslibya.com/en/archives/46880.
e https://www.africaintelligence.com/mce/corridors-of-power/2019/06/13/recep-tayyip-erdogan-s-drones-fly-to-fayez-sarraj-s-rescue,108361236-art.
f https://www.africaintelligence.com/mce/corridors-of-power/2019/07/04/fayez-sarraj-to-get-eight-more-turkish-drones,108364176-art.
g Includes https://www.addresslibya.com/en/archives/48741. Multiple sources.
h https://www.addresslibya.com/en/archives/49064.
j https://www.alaraby.co.uk/english/indepth/2019/8/21/the-significance-of-drones-in-the-libyan-conflict.
k https://twitter.com/Oded121351/status/1168782590804971520.
l http://english.alarabiya.net/en/News/north-africa/2019/09/13/Libyan-army-destroys-Turkish-aircraft-positions-in-Misrata.html.

**Turkish military support to UCAV operations**

4.     The Panel noted that in a statement to the media on 6 June 2019, the commander of the HAF air force organization, major general Mohammad Al-Manfour, commented on the presence of thirty Turkish fighters working for militias allied to the GNA-AF.[174] A subsequent more extensive media report[175] on 30 June 2019 produced a list of twenty-one names and imagery of eighteen Turkish passports of a claimed Turkish military support team in Libya led by Major General Irfan Tut Ozert. The other three individuals being from Pakistan. The report also showed imagery from a security camera showing the team checking in to their hotel in Tripoli.

5.     Supporting documentation for the media report included a handwritten memo (figure 48.2) allegedly from the GNA Minister of Interior and Defence, Fathi Bashagha, to the immigration authority requesting entry facilitation for five members of the team; but the Panel notes that these names do not match any on the eighteen passport copies published.

6.     On 23 July 2019, the Panel met with the Turkish Ministry of Foreign Affairs (MFA) in Ankara, Turkey. The MFA stated that the above event was to review the security of their Embassy, but provided no further details. One of the passports published proved to be of an official at the meeting in Ankara. The Panel assesses that most of the team were deployed to operate and maintain the *Bayraktar* TB2 UCAV. Turkey has yet to respond to the Panel request for clarification.[176]

---

174 https://www.addresslibya.com/en/archives/46872. Accessed 2 September 2019.
175 https://almasad.co/en/2019/06/30/bayraktar-killer-drones-run-by-turkish-military-experts-in-tripoli-exclusive-al-marsad-report/. Accessed 2 September 2019.
176 Panel letter of 12 July 2019.

Figure 48.2
**Handwritten note on headed Ministry of Interior paper allegedly from GNA Minister of Interior**



Figure 48.3
**Panel translation**

On the instructions of the Minister of Interior, please provide the afore mentioned people with access visas to the Libyan territory upon their arrival at Mitiga airport.

Source: Confidential source.

7.     A subsequent media report claims that further Turkish military personnel arrived at Misrata international airport on 23 August 2019 on board a Libyan Wings commercial flight from Ankara or Istanbul.[177]

8.     The Panel has written to Turkey requesting clarification of the supply chain for this weapon system but has received no response.

---

[177] https://ahvalnews.com/libya-turkey/mercenaries-arrived-turkey-libyas-misrata-says-lna-spokesperson.

**Annex 49:      Transfer of military material to GNA-AF by UAA P.J.S.C. AN-12**

1.      Three Ukrainian registered Antonov AN-12BK aircraft (registrations UR-CAH, UR-CAJ and UR-CNT) and one Ukrainian registered Antonov AN-12BP aircraft (registration UR-CGW) were identified by the Panel operating in support of the GNA-AF as a military cargo aircraft. The aircraft were operated by Ukraine Air Alliance P.J.S.C.[178] of 21 Vozziednannia Avenue, 02154 Kiev, Ukraine, but owned by Cargo Air Chartering[179] of X1-05, SAIF Zone, PO Box 8408, Sharjah, United Arab Emirates.

2.      Ukraine Air Alliance P.J.S.C was approached by the Turkish office of ProAir-Charter-Transport GmbH[180] (ProAir Charter) with a proposal for ten charter flights during May and June 2019 to transfer aviation spare parts to Libya. All cargo on these flights was consigned by the Libyan Embassy in Ankara to the Ministry of Interior in Tripoli. The Panel obtained copies of the Air Waybill and Cargo Manifest for ten flights made between 27 May and 16 June 2019 from Istanbul to Misrata by the Antonov AN-12 aircraft (UR-CAH, UR-CAJ, UR-CGW and UR-CNT) that transported 62.5 tonnes of UAV components (see sample at appendix A). The Panel is in the possession of all the other Air Waybills and Cargo Manifests for these flights.

3.      On 29 May 2019 the operations department of Ukraine Air Alliance P.J.S.C sent an Email (at 15:53 hours from to specifically instruct ProAir Charter to ensure that the Air Waybills were all clearly and exactly marked in the handling information part of the form as "*NO DG,[181] NO AMMO, NO WEAPON*" (see appendix B). Such information is not routinely submitted, nor required, unless designed to try and disguise the military nature of a cargo. The same Email instructed ProAir Charter to ensure that the nature of the cargo exactly matches "*generator, spare parts, consumer goods etc*" on documentation. The cargo on the flights shown at table 49.1 was all listed as "Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres)". The Panel wrote to Turkey and the GNA-AF requesting clarification of the cargo but received no response.

4.      On 29 May 2019 ProAir Charter sent an Email (using same Email addresses) to Ukraine Air Alliance P.J.S.C confirming that "*all unmanned aerial vehicle components (…) are not related to DG, AMMO, WEAPON and dual-use cargo*" (see appendix B). The Panel is unaware of any large commercial unmanned aerial vehicles (UAV) being used by the Ministry of Interior of Libya, and none

---

[178] http://www.uaa-avia.com/.
[179] http://www.cargoairchartering.aero.
[180] https://www.proair.de/en. Baris Mah, Belediye Cad, Ginza Lavinya Apt 30D, Beylikduzu, Istanbul, Turkey. (Fax: +90 212 872 0780).
[181] Dangerous Goods.

have ever been observed at airports or in flight. The only UAV identified as operating from GNA-AF airfields is the Bayraktar TB2 unmanned combat aerial vehicle (UCAV).

5.      The Antonov AN-12 has a load capacity of 20 tonnes, yet the flights listed in table 49.1 were for loads of between 4.1 to 8.9 tonnes, which indicates that the cargo "bulked out" the load compartment before maximum weight could be achieved. This is indicative of large bulky items such as the fuselage or wings of a UAV that are large, yet air filled and relatively light. All flights took place at night between approximately 23:45 hours to 06:30 hours, and the aircraft Mode S transponders were often not seen on commercial aviation tracking websites once the aircraft had left Turkish air space. Both these suggest an attempt to disguise their destination. ProAir Charter also obtained diplomatic clearance from the Ministry of Foreign Affairs of Turkey to fly to Misrata with aviation spare parts. Again this is unusual for a commercial flight.

6.      The cargo agent used for all flights was Plures Air Cargo[182] of No 9, Block B3, Egs Business Park, Yeşilköy, Bakırköy, Istanbul, Turkey, who would also certainly have been aware of the true nature of the cargo based on the external packaging. This is the same cargo agent used for the suspicious flights of Ilyushin IL-76TD aircraft (UR-COZ) (see annex 50).

Table 49.1
**Ukraine Air Alliance P.J.S.C. AN-12 aircraft flights using flight number UKL4073 from Ankara to Misrata**

| Departure Date | # | Flight | From | To | Mass (tonnes) | Declared Cargo |
|---|---|---|---|---|---|---|
| 28 May 2019 | UR-CNT | UKL4073 | Ankara | Misrata | 4.1 | ▪ Drone parts<br>▪ Was initially for 8.9 tonnes but that cargo too big for aircraft. |
| 29 May 2019 | UR-CAJ | UKL 4075 | Ankara | Misrata | 5.2 | ▪ Furniture parts |
| 30 May 2019 | UR-CGW | UKL4073 | Ankara | Misrata | 5.2 | ▪ Ground Control Station, Data Terminal System, Aviation Spare Parts, Mobile Tool Case, Drone Fuselage |
| 30 May 2019 | UR-CGW | UKL4073 | Ankara | Misrata | 6.9 | ▪ Brake Disc Set, Nose Landing Gear, Generator, Wing Pitot, Mechanical Tools |

[182] https://www.plures.com.tr/en. Also listed on the Air Waybill as Plures Travel Akt Turism Kargo Havacilik Insaat TIC Ltd STI, Istanbul, Turkey.

| Departure Date | # | Flight | From | To | Mass (tonnes) | Declared Cargo |
|---|---|---|---|---|---|---|
| 31 May 2019 | UR-CAH | UKL4073 | Ankara | Misrata | 5.4 | ▪ Generator, UAV Wing and Tail, Fuelling Station |
| 1 June 2019 | UR-CAJ | UKL4073 | Ankara | Misrata | 4.3 | ▪ Ground Control Station, UAV Fuselage, Radio Tools |
| 2 June 2019 | UR-CAH | UKL4073 | Ankara | Misrata | 5.3 | ▪ Generator, UAV Fuselage |
| 15 June 2019 | UR-CNT | UKL4082 | Ankara | Misrata | 6.2 | ▪ UAV Fuselage, UAV Wing, Ground Data Systems, Spare Parts, Tools |
| 15 June 2019 | UR-CAJ | UKL4085 | Ankara | Misrata | 5.9 | ▪ Ground Control Stations, Fuelling Station, Spare Parts, Tools |
| 16 June 2019 | UR-CAJ | UKL4087 | Ankara | Misrata | 5.1 | ▪ Drone Fuselage, Drone Wings, Fuel Station, Tripods, Tools |
| | | | | TOTAL | 53.6 tonnes | |

7.    An analysis of the Cargo Manifests for the above flights identified that components for at least three complete UCAV (table 49.2).

Table 49.2
**Analysis of UCAV components shipped between 28 May – 16 June 2019.**

| Departure Date | # | UAV Fuselage | UAV Wings | Ground Control Station | Data Terminal Station | Other UAV Components |
|---|---|---|---|---|---|---|
| 28 May 2019 | UR-CNT | | | | | 1 |
| 29 May 2019 | UR-CAJ | | | | | 0 |
| 30 May 2019 | UR-CGW | | | 1 | 1 | 1 |
| 30 May 2019 | UR-CGW | | | | | 1 |
| 31 May 2019 | UR-CAH | | 1 | | | 1 |
| 1 June 2019 | UR-CAJ | 1 | | 1 | | |

| Departure Date | # | UAV Fuselage | UAV Wings | Ground Control Station | Data Terminal Station | Other UAV Components |
|---|---|---|---|---|---|---|
| 2 June 2019 | UR-CAH | 1 | | | | 1 |
| 15 June 2019 | UR-CNT | 1 | 1 | | | 1 |
| 15 June 2019 | UR-CAJ | | | 1 | | 1 |
| 16 June 2019 | UR-CAJ | 1 | 1 | | | 1 |
| | TOTALS | 4 | 3 | 3 | 1 | 9 |

8.     On 30 July 2019, the Aviation Security Council of the Aviation Service of Ukraine issued instructions that banned flights by all Ukrainian registered aircraft from conducting flights into Libya due to "the worsening security situation".

9.     The Panel has written to Turkey, Ukraine Air Alliance P.J.S.C., Pro Air Charter and Plures Air Cargo requesting clarification and further information on the activities of these particular aircraft. Only Ukraine Air Alliance P.J.S.C responded.

10.   The Panel finds Turkey, Ukraine Air Alliance P.J.S.C., ProAir Charter and Plures Air Cargo in non-compliance with paragraph 9 of resolution 1970 (2011) for their almost certain involvement in the transfer of military material to the GNA-AF.

### Appendix A to Annex 49: Air freight documentation (example)

Image A.49.1
**Cargo Manifest (UR-CNT) flight UKL 4073 from Istanbul to Misrata**

CARGO MANIFEST

I.C.A.O. ANNEX 9 APPENDIX 3

| Owner or Operator | : | UKRAINE AIR ALLAINCE | Date | : 27 MAY 2019 |
| Marks of Nationality | : | UKRAINE / URCNT | Flight No | : UKL4073 |
| Point of Loading | : | (ESB) ANKARA | Point of Unloading | : (MRA) MISRATA |

| AWB NO | NUMBER OF PACKAGES | NATURE OF GOODS | GROSS WEIGHT (KG) | FINAL DESTINATION |
|--------|--------------------|-----------------|--------------------|-------------------|
| 271 0001 0710 | 23 | DRONE PARTS | 4.100 | Misrata, Libya |
| TOTAL | 23 | | 4.100 | |

TRANSFER CARGO

N . I . L

SERVICE  CARGO

N . I . L

Source: Confidential.

S/2019/914

Image A.49.2
**Air Waybill (UR-CNT) flight UKL 4073 from Istanbul to Misrata**



Source: Confidential.

S/2019/914

## Appendix B to Annex 49: Email correspondence

Image B.49.1
### Ukraine Air Alliance P.J.S.C Email to ProAir Charter (29 May 2019)



PLS MAKE SURE TO PREPARE FOLLOWING POINTS BEFORE POSITIONING TO AVOID ANY DELAY WITH FUTURE FLIGHTS;
- NATURE OF ALL CGO EXACTLY MATCHES IN AWB (GENERATOR, SPARE PARTS, CONSUMER GOOD & ETC...)
- CONFIRM AGAIN FOR ALL CARGO AND PUT IN ALL FUTURE AWB FOLLOWING REMARK: NO DG, NO MIL, NO AMMO, NO WEAPONS.
- PLS PREPARE AWB & CGO MANIFEST FOR EACH FLIGHT & PROVIDE HARD COPY TO CAPTAIN BEFORE DEPARTURE.

PLS SEND ME A COPY OR SCREEN OF EACH LIBYAN PERMISSION & COPY OF ORIGINAL REQUEST TO LIBYA.

THANK YOU FOR YOUR PROMPT REPLAY.

BEST REGARDS,

Source: Confidential.

Image B.49.2
## ProAir Charter Email to Ukraine Air Alliance P.J.S.C (29 May 2019)



Source: Confidential.

**Annex 50:       Transfer of military material to the GNA-AF by Sky AviaTrans L.L.C. IL-76**

1.      The panel identified a Ukrainian registered Ilyushin IL-76TD (registration UR-COZ) operating in support of the GNA-AF as a military cargo aircraft. The aircraft was operated by Sky AviaTrans L.L.C. of 37/97 Jilanskaya Str, 01033 Kiev, Ukraine,[183] but owned by Volaris Business LP of Suite 4199, 5 Mitchel House, Edinburgh, EH6 7BD.

2.      On 1 August 2018 Sky AviaTrans L.L.C. and Volaris Business LP concluded an agreement on the provision of air services, in which Sky AviaTrans L.L.C. would transport cargo for Volaris Business LP. The contract[184] places the onus on Volaris Business LP obtaining the relevant flight documentation, import/export permits and customs clearances, and makes it clear that the aircraft shall not be used to transport military related cargo. The document was signed on behalf of Volaris Business LP by O.M. as a director of the company. O.M. is also listed as an "individual person with significant control" on Form SLP PSC01 received at Companies House, Scotland on 6 June 2018, where Volaris Business LP is registered as a "wholesale" business. The document was signed on behalf of by Sky AviaTrans L.L.C. by O.K. as the Finance Director, as O.M. is also a Director of Sky TransAvia L.L.C.[185]

3.      On 4 June 2019 Sky AviaTrans L.L.C.  was approached by the Turkish office of ProAir-Charter-Transport GmbH[186] (ProAir Charter) with a proposal for five charter flights during May and June 2019 to transfer car spare parts to Libya. For all these flights the Libyan Embassy in Ankara consigned the cargo to the Ministry of Interior in Tripoli. All the Air Waybills were marked in the Handling Information part of the form as "NO DG,[187] NO AMMO, NO WEAPON". Such information is not routinely submitted, nor required, unless designed to try and disguise the military nature of the cargo.

4.      The Panel obtained examples of the Air Waybill and Cargo Manifest for the flights made between 3 – 21 July 2019 from Ankara to Misrata by the Ilyushin IL-76TD aircraft (UR-COZ) (see sample at appendix A). The Panel is in the possession of all the other Air Waybills and Cargo Manifests for these flights.

---

[183] http://skyaviatrans.com.ua/about-us/. Although their Air Operator Certificate lists a different address of 6 Mykola Shepekliev St, 03062 Kiev, Ukraine. Tel +38 44 287 5707.
[184] No 03-08/18 dated 1 August 2018.
[185] Company directorship identified from the signatory of a letter (reference 164/1) from Sky AviaTrans L.L.C to the Libyan Embassy dated 12 August 2019.
[186] https://www.proair.de/en. Baris Mah, Belediye Cad, Ginza Lavinya Apt 30D, Beylikduzu, Istanbul, Turkey. (Fax: +90 212 872 0780).
[187] Dangerous Goods.

5.      The cargo on the flights shown at table 50.1 was all listed as "Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres)". The Panel wrote to Turkey and the GNA requesting clarification of the cargo but received no response. The Panel considers it neither realistic nor credible that the GNA would either fly, nor need, a total of 138.1 tonnes of vehicle parts over such a short period, and would be highly unlikely to use such an expensive delivery means. Additionally, it would be unusual to specifically charter an aircraft with a payload of 48 to 52 tonnes dependant on type, and then only use approximately 50% capacity on each flight. The tonnages shipped, if vehicle parts as claimed, would not "bulk out" the cargo space.[188] Thus the veracity of the documentation is not accepted by the Panel as a true reflection of the cargo. Due to the duplicity documentation surrounding these flights, combined with the identity of the consignor and consignee, and the low cargo payloads for the aircraft type the Panel considers that the cargo was military material of high volume and relatively low mass, such as the fuselage and wings of unmanned combat aerial vehicles (UCAV).[189]

6.      The cargo agent used for all flights was Plures Air Cargo[190] of No 9, Block B3, Egs Business Park, Yeşilköy, Bakırköy, Istanbul, Turkey, who would also certainly have been aware of the true nature of the cargo based on the external packaging. This is the same cargo agent used for the suspicious flights of Antonov AN-12 aircraft (UR-CAH, UR-CGW and UR-CNT) (see 0annex 49).

Table 50.1
**Sky AviaTrans IL-76TD (UR-COZ) aircraft flights from Ankara to Istanbul**

| Departure Date | # | From | To | Mass (tonnes) | Declared Cargo |
|---|---|---|---|---|---|
| 3 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 21.2 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |
| 3 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 31.1 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |
| 4 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 27.5 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |
| 5 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 25.1 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |

---

[188]  The distance from Ankara to Misrata is 1,810km, and the maximum range of a IL-76TD with maximum load of 50 tonnes is 4,000km, so the Panel has discounted any argument that the differential between the actual cargo loads and the maximum cargo load was required for fuel to negate refuelling in Misrata.

[189]  Also see allegation in paragraph 7 of https://www.al-monitor.com/pulse/originals/2019/09/turkey-gulf-libya-is-becoming-a-scene-of-proxy-war.html, 11 September 2019.

[190]  https://www.plures.com.tr/en. Also listed on the Air Waybill as Plures Travel Akt Turism Kargo Havacilik Insaat TIC Ltd STI, Istanbul, Turkey.

S/2019/914

| Departure Date | # | From | To | Mass (tonnes) | Declared Cargo |
|---|---|---|---|---|---|
| 6 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 25.1 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |
| 21 July 2019 | UR-COZ | Ankara (Esenboga) | Misrata | 8.1 | ▪ Spare Parts (Mirrors, Lights, Indicators, Brake Systems, Tyres) |
| | | | TOTAL | 138.1 tonnes | |

7.      On 30 July 2019, the Aviation Security Council of the Aviation Service of Ukraine issued instructions that banned flights by all Ukrainian registered aircraft from conducting flights into Libya due to "the worsening security situation". Sky AviaTrans L.L.C. obtained an exemption from this instruction and on 5 August 2019 the aircraft was destroyed on the ground at Misrata air academy.

Figure 50.1
**Sky AviaTrans IL-76TD (UR-COZ) destroyed at Misrata (5 August 2019)**



Source: https://hyser.com.ua/community/105551-molniya-sbit-ukrainskiy-transportnyy-samolet-il-76-otorvalo-hvost-pervye-podrobnosti-chernogo-vtornika.

8.      The Panel has written to Turkey, Volaris Business LP, Sky AviaTrans L.L.C., Pro Air Charter and Plures Air Cargo requesting clarification and further information on the activities of this particular aircraft. Only Sky AviaTrans L.L.C. responded.

9.    The Panel finds Turkey, Pro Air Charter and Plures Air Cargo in non-compliance with paragraph 9 of resolution 1970 (2011) for their involvement in the transfer of military material to the GNA.

10.   Although the Panel has not found Volaris Business LP and Sky AviaTrans L.L.C. in non-compliance, the companies' system of due diligence requires significant revision. There were enough indicators surrounding these flights to suggest that this contract was not as it seemed (see paragraph 5 above). Even a simple analysis of the declared cargo would have revealed to the company that you cannot physically fit 40 car tyres in a  0.35m x 1.22m x 1.22 m package; the maximum would be 10. Similarly a declared weight of a package of 4,000kg is 3,500kg more than the weight of 40 car tyres.

S/2019/914

### Appendix A to Annex 50: UR-COZ sample Cargo Manifest and Air Waybill

Image A.50.1
**Cargo Manifest (UR-COZ) flight KTR7721 from Ankara to Misrata**



Source: Confidential.

Image A.50.2
**Air Waybill (UR-COZ) flight KTR7721 from Ankara to Misrata** [a]



Source: Confidential.

## Annex 51:   Small ISR UAV in Libya

### A.   *Orbiter*-3

1.   On 29 July 2019 an unarmed ISR UAV was downed near Surt by GNA-AF.[191] The remnants from the UAV on the imagery analysed by the Panel have characteristics virtually identical to those of the Orbiter-3 UAV variants designed and manufactured by Aeronautics Limited.[192]

Image 51.1 to 51.4
**Remnants of downed Orbiter-3 UAV**

   

Sources: 1) https://twitter.com/BabakTaghvaee/status/1155930634000318464, 29 July 2019; and 2) Extract from video imagery at https://twitter.com/Mansourtalk/status/1156901216762421248. 1 August 2019.

2.   The panel considers that the direct supply of this UAV from the manufacturer, or by the Member State, is unlikely. It is more likely present due to post-delivery diversion by the original purchaser, or subsequent owner, and is certainly a non-compliance with paragraph 9 of resolution 1970 (2011) by the supplier and the GNA-AF. Panel investigations continue and a response from the manufacturer's Member State is awaited.

### B.   *Orlan*-10

3.   The remnants shown in images 51.5 to 51.7 are from an unarmed ISR UAV that was downed by militia affiliated to the HAF on the outskirts of Sirte on, or about, 29 April 2019. The UAV is fitted with the same electro-optical payload that has a distinctive array of twelve lens (image 51.7) and has

---

[191]   A second was reportedly shot down near Al-Aziziya on 30 July 2019, but the Panel has been unable to obtain imagery to verify this. https://www.marsad.ly/en/2019/08/08/israel-made-drones-downed-over-libya/. Accessed 22 August 2019.
[192]   https://aeronautics-sys.com.

been seen on Orlan-10 UAV recovered from other conflict zones.[193] The remnants shown in images 51.8 to 51.10 are from an unarmed ISR UAV that crashed in Ain Zara and was recovered by the GNA-AF affiliated 27 Brigade on, or about, 20 September 2019. The remnants from the UAV on the imagery of both incidents analysed by the Panel have characteristics virtually identical to those of the *Orlan*-10 UAV variants designed and manufactured by the Special Technological Centre,[194] Saint Petersburg, Russian Federation.

Images 51.5 to 51.7
**Remnants of downed Orlan-10 UAV (29 April 2019)** [a] [b]

  

Images 51.8 to 51.10
**Remnants of downed Orlan-10 UAV (20 September 2019) c**

  

---

[a] https://twitter.com/Oded121351, 29 April 2019.
[b] https://twitter.com/imp_navigator/status/1123126784059428864, 30 April 2019.
[c] https://www.facebook.com/447617966027848/posts/510190706437240/, 20 September 2019.

---

[193] Binnie J. *Russian UAV recovered in Libya*. Janes Defence Weekly. 30 April 2019. London.
[194] https://www.stc-spb.ru.

4.      The panel considers that the direct supply of this UAV from the manufacturer, or by the Member State, is unlikely. It is more likely present due to post-delivery diversion by the original purchaser, or subsequent owner and is certainly a non-compliance with paragraph 9 of resolution 1970 (2011) by the supplier and HAF. Panel investigations continue and a response from the manufacturer's Member State is awaited.

## C.      *Mohadjer* variant

5.      Images 51.13 is of an unarmed ISR UAV identified in the possession of the HAF in late 2017.[195] The Panel has identified characteristics on the UAV virtually identical to those of a *Mohadjer* UAV variant designed and manufactured by Qods Aviation Industry Company,[196] Tehran, Iran (image 51.14).

Image 51.13
**Mohadjer-10 variant UAV with HAF (October 2017)**

Image 51.14
**Mohadjer-10 variant UAV manufacturers image (October 2017)**



Sources: 1) https://warisboring.com/who-gave-iranian-made-drones-to-libyas-tobruk-regime/. 16 October 2017 [L]; and 2) https://thearkenstone.blogspot.com. Photographer Hossain Zohrevand. [R].

5.      The panel considers that the direct supply of this UAV from the manufacturer, or by the Member State, is unlikely. It is more likely present due to post-delivery diversion by the original purchaser, or subsequent owner, or battlefield capture from the GNA-AF. The Islamic State of Iran, in response to Panel enquiries, stated that "(…) similar variants can be easily built by any party who has the necessary knowhow". Their response did not explicitly deny that the pictured UAV was a *Mohadjer* variant UAV.

---

[195] www.africaintelligence.com/MCE/power-brokers/2017/10/05/haftar-s-strage-iranian-drone,108274620-BRC, 5 October 2017. Accessed 22 August 2019.
[196] Now incorporated within the Iran Aviation Industries Organization (IAIO). www.mod.ir.

The transfer of the UAV to Libya is certainly a non-compliance with paragraph 9 of resolution 1970 (2011) by the HAF and a supplier yet to be identified. Panel investigations continue.

### D.    Yabhon-HMD

6.    On I June 2019 an unarmed ISR UAV was downed near Surt[197] by the GNA-AF.[198] On 27 June 2019 components for three UAV of the same type were captured by the GNA-AF at Gharyan (image 51.15). From imagery the Panel identified characteristics virtually identical to those of the Yabhon-HMD variant designed and manufactured by Adcom Systems, Mussafah, Abu Dhabi, United Arab Emirates (https://adcomsystems.weebly.com/). The Panel wrote to the United Arab Emirates who stated that the imagery was not that of a Yabhon-HMD variant UAV.

7.    On 4 August 2019 the Panel inspected remnants from one of these captured UAV, that had been subsequently recovered to Tripoli (images 51.15 to 51.22). The Panel identified characteristics virtually identical to those of the Yabhon-HMD variant, and a parachute and fuel control unit (FCU) designed and manufactured by Adcom Systems, and identified components marked Advanced Target Systems, Abu Dhabi, United Arab Emirates.

Image 51.15
**UAV components captured at Gharyan (27 June2019)**

Image 51.16
**UAV inspected by Panel (4 August 2019)**

Image 51.17
**UAV inspected by Panel (4 August 2019)**







---

[197]  Video imagery of the UAV immediately after capture is at https://twitter.com/TurkishAF_/status/1135129231367778304, 2 June 2019. Accessed 22 August 2019.

[198]  A second was reportedly shot down near Al-Azizya on 30 July 2019, but the Panel has been unable to obtain imagery to verify this. https://www.marsad.ly/en/2019/08/08/israel-made-drones-downed-over-libya/. Accessed 22 August 2019.

S/2019/914

Image 51.18
**Parachute marked ATS, Abu Dhabi**

Image 51.19
**Enhanced image of parachute markings**





Image 51.20
**ATS Fuel Control Unit**
**Serial Number N2 039**

Image 51.21
**ATS RF Transceiver 1/5U**
**Serial Number RT 2027**

Image 51.22
**ATS Servo Control Unit**





Sources: 1) 51.15 from https://twitter.com/Oded121351/status/1144301014771818501, 27 June 2019. Accessed 22 August 2019; and 2) Images 51.16 to 51.22 taken by Panel. 4 August 2019.

8.     The Panel challenges the initial assessment of the United Arab Emirates, and in light of the additional evidence finds that these UAV are almost certainly a variant of the Yabhon-HMD UAV. The Panel finds that the transfer of this UAV type to Libya is a non-compliance with paragraph 9 of resolution 1970 (2011) by HAF and a supplier yet to be confirmed. Panel investigations continue.

## E.    Sea Cavalry SD-60B

9.     The Panel identified from open source information[199] that a UAV was captured near Benina, Libya on 17 August 2019 by HAF. The remnants from the UAV on the imagery analysed by the Panel (images 51.23 and 51.24) have characteristics very similar to those of the Sea Cavalry SD-60B UAV designed and manufactured by Xiamen Hanfeiying Aviation Technologies (probably also trading as Xiamen Han's Eagle Aviation Technology Company Limited)[200] (image 51.25).

Image 51.23
**UAV captured near Benina (17 August 2019)**



Image 51.24
**UAV captured near Benina (17 August 2019)**



---

[199] https://twitter.com/Oded121351/status/1162959265830723584, 17 August 2019.
[200] http://www.hans-eagle.com/EN/products/hqbyd/4.html.

Image 51.25
**Sea Cavalry SD-60B manufacturers image**



Sources: 1) 51.23 and 51.24 from  https://twitter.com/0ded121351/status/1162959265830723584, 17 August 2019; and 2) 51.25 from http://www.hans-eagle.com/EN/products/hqbyd/4.html.

10.     Sea Cavalry UAV Intelligence Surveillance and Reconnaissance (ISR) variants are known to be either on trial or in use by the Chinese People's Liberation Army Navy (PLAN).[201] Open source information[202] placed the PLAN frigate Xi'an (Hull No 153) of the 32nd Naval Escort Fleet in transit off the coast of Benghazi on 14 and 15 August 2019. The vessel was in transit from Malta to Alexandria. The Panel assesses it as likely that the UAV was lost over Libya during maritime environmental and operational trials as to the UAV's ISR capabilities. The Panel does not consider this to be a non-compliance with paragraph 9 of resolution 1970 (2011) by the Member State.

201   https://www.janes.com/article/87009/chinese-navy-deploys-new-vtol-uav.
202   https://www.africaintelligence.com/mce/corridors-of-power/2019/09/05/the-chinese-army-loses-its-first-drone-in-libya,108371106-eve?CXT=PUB.

**Annex 52:     Civilian aircraft in support of HAF operations**

1.    This annex contains further information on aircraft either confirmed as, or very highly suspected of, providing military aviation transport support to HAF.

**Space Cargo Inc - Antonov AN-26 (UP-AN601)**

2.    An Antonov AN-26 aircraft (flying under registration UP-AN601) has been observed routinely operating in support of HAF as a military cargo aircraft (figures 52.1 and 52.2). The Panel has identified that this aircraft was removed from Kazakhstan national aircraft registry (see appendix A) on 22 June 2015 after sale to Space Cargo Inc (PO Box 7812, Sharjah Airport International Free Zone, A4-703, Sharjah, United Arab Emirates) (http://spacecargoinc.com). The Libyan Civil Aviation Authority have also confirmed that the aircraft is not on their registry.[203]

Figure 52.1
**Antonov AN-26 UP-AN 601 at Bani Walid (1 November 2017)**

Figure 52.2
**Antonov AN-26 UP-AN 601 at Sharara oil field (18 February 2019)**




Sources: 1) 52.1 from https://twitter.com/MOHBENLAMMA/status/925780874662170625. Accessed 23 February 2019; and 2) 52.2 from https://twitter.com/0ded121351/status/1097582983542919168. Accessed 23 February 2019.

3.    The aircraft is marked with the logo of a United Arab Emirates  based company, H.A.D Jet Cargo LLC (Office 805, Prime Tower, Al Abraj Street, Business Bay, Dubai (PO Box 214995), (www.hadjetcargo.com). The company has confirmed to their authorities that they have never owned, operated, lease or otherwise dealt with this aircraft.[204]

---

[203]   LCAA letter of 15 May 2019.
[204]   HADJet letter of 2 August 2019.

4.    The aircraft is therefore flying in Libya with false markings under a false national air registry number, (UP-AN601), which is in contravention with the requirements of the Convention on International Civil Aviation (the Chicago Convention).205

5.    The Panel has written to Space Cargo Inc requesting information relating to the activities of this aircraft in Libya but has received no response.

6.    The Panel notes that the Antonov AN-26 is also designed to be used in the light bomber role when fitted with four BDZ-34 weapon hard points on its fuselage. The Panel is monitoring this matter.

**Sky Prim Air S.R.L. - Ilyushin IL-18D (ER-ICS)**

7.    An Ilyushin IL-18D aircraft (flying under Moldovan registration ER-ICS) is still routinely flying in support of HAF as a military cargo aircraft (figures 52.3 and 52.4). This aircraft was removed from the Moldovan national aircraft registry on 8 July 2015 (see appendix B).

8.    The LCAA have confirmed to the Panel that this aircraft does not hold a Libyan registration.206 This aircraft is therefore also flying in Libya with false markings under a false national air registry number, (ER-ICS), which is in contravention with the requirements of the Chicago Convention.

Figure 52.3
**Ilyushin IL-18D in Benghazi (June 2017)**[a]

Figure 52.4
**Ilyushin IL-18D in Gharyan (May 2019)**[a]




Sources: 1) 52.3 from http://www.airliners.net/photo/Untitled/Ilyushin-Il-18D/4434469/L; 2) 52.4 from https://m.facebook.com/100013292748991/posts/678218769297875?sfns=xmo.

9.    It was reported on the AeroTransport DataBase (www.atdb.org) that the aircraft had been transferred to the Kazakhstan national air registry as UP-18496. The Kazakh authorities have investigated this and found that an Ilyushin IL-18GR is registered with their registry as IL-**I**8496 by

---

205  https://www.icao.int/publications/pages/doc7300.aspx.
206  LCCA letter to Panel of 10 July 2019.

Southern Sky, but it is not the same aircraft. ER-ICS has serial number 099-03, whereas IL-I8496 has serial number 092-02.

10.      The Panel identified in its report S/2017/466[207] that aircraft ER-ICS is owned and operated by Sky Prim Air S.R.L of Moldova. The Panel has written to Moldova to request any relevant information arising as the result of a reported investigation by their national authorities into Sky Prim Air S.R.L. owned by Grigore Ghilan. Notwithstanding this, the Panel finds Sky Prim Air S.R.L in non-compliance with paragraph 9 of resolution 1970 (2011) for the provision of military support to HAF, and continues to investigate.

**Deek Aviation F.Z.E. - Ilyushin IL-76TD (UR-CMC and UR-CMP)**

11.      Two Ilyushin IL-76TD aircraft (registered UR-CMP and UR-CRC) were destroyed by a GNA air strike against Jufra air base on 26 July 2019 (see figures 52.5 and 52.6).

Figure 52.5
**Destroyed IL-76TD at Jufra air base (26 July 2019)**

Figure 52.6
**Ibid**




Sources: 1) 52.5 European Space Imaging Press Release of 3 August 2019. Image of 29 July 2019. [L]; and 2) 52.6 https://mobile.twitter.com/Arn_Del/status/1155525947040378880, 28 July 2019. Accessed 4 September 2019 [R].

12.      The panel has identified that although the aircraft were owned by Infinite Seal Incorporated (British Virgin Islands),[208] and operated by Europe Air L.L.C. of Ukraine, on 1 October 2014 Europe Air L.L.C. concluded a general agreement on cargo transportation with Deek Aviation F.Z.E.[209] (Q4-

---

[207]  Paras. 3 and 4 to annex 35.

[208]  Trident Chambers, PO Box 146, Road Town, Tortola, British Virgin Islands.

[209]  The company website (www.deekaviation.com) has lapsed. General Manager is Rajiv Kumar Sharma. +971 6 57XXXX2.

76, Block Q4 Street, Al Ruqa Al Hamra, Sharjah, United Arab Emirates). The contracts[210] place the onus on the relevant flight documentation and customs clearances being obtained by Deek Aviation F.Z.E and makes it clear that the aircraft shall not be used to transport military related cargo.

13.     Deek Aviation F.Z.E were contracted by Global Aviation Services Group (http://www.global-aviationgroup.com)[211] to transport humanitarian aid. The Panel has a copy of the Cargo Manifest and Air Waybill for the flight made by these aircraft on 25 July 2019 immediately prior to their destruction. The documentation is completed for a flight from Fujairah (OMFJ), United Arab Emirates to Labraq airport (HLTQ), Al Bayda, Libya and then onward to Jufra air base (HL69). The aircraft manifest states that the cargo for UR-CMP was 15.785 tonnes of Medicinal Equipment, Medicine and Food Stuff and for UR-CRC was four ambulance vehicles with a mass of 12.1 tonnes; both cargos to be delivered to Labraq airport. The cargo capacity of a single IL-76TD is 52 tonnes, which means both loads could probably have been carried on a single aircraft.[212] No documentation was provided for any cargo that may have been carried from Al Bayda to Jufra. Deek Aviation F.Z.E has not yet responded to the Panel's requests for further information and the investigation continues.

14.     Europe Air L.L.C. had its Air Operating Certificate suspended by the Ukrainian civil aviation authorities on 27 July 2019,[213] the lease agreement with Infinite Seal Incorporated was terminated on 9 August 2019[214] and the Europe Air L.L.C. ceased trading that day.[215]

**Sigma Airlines – Ilyushin IL-76TD (UP-I7601 and UP-I7645)**

15.    Two Ilyushin IL-76TD aircraft (registered UP-I7601 and UP-I7645) have been identified as flying in support of HAF as a military cargo aircraft (figures 52.7 and 52.8 for UP-I7601, and figures 52.9 and 52.10 for UP-I7645).

---

[210]  No 28052014-1013407230 dated 28 May 2014 for UR-CCMC, and No 27042018-1013409303 dated 27 April 2018 for UR-CRP.
[211]  PO Box 2828, Tripoli, Libya, aradi@global-aviationgroup.com, +218 21 351 4068.
[212]  A standard ambulance is 6m long x 2.3m wide. The load compartment of an IL-76TD is 24.5m long x 3.4 m wide. This would leave a floor cargo space free of 26m$^2$, highly probably enough space for 15.8 tonnes of other cargo at one tonne per m$^2$.
[213]  https://open4business.com.ua/ukraine-suspends-operator-certificate-of-europe-air-carrier/.
[214]  Letter 181-IS
[215]  Order No: 908.

Figure 52.7
**IL-76TN (UP-I7601) (April 2019)**



Figure 52.8
**IL-76TN (UP-I7601) (June 2019)**



Sources: 1) Original – confidential source; then 2) reproduced on
https://twitter.com/DavidBiutitaman/status/1144498937329438720, 17 June 2019. [L]; and 2)
https://twitter.com/Arn_Del/status/1144981837212717056, 29 June 2019. [R].

Figure 52.9
**IL-76TN (UP-I7645) at Tamanhint air base (Sebha),
(29 January 2019)**



Figure 52.10
**IL-76TN (UP-I7645) at Tamanhint air base
(Sebha), (29 January 2019)**



Source: Extracted from video imagery from HAF media office at https://www.youtube.com/watch?v=llUD4rD1jfA&feature=youtu.be,
29 January 2019 in which the HAF themselves refer to the aircraft as a "military cargo place".

16.   The Ilyushin IL-76TD aircraft (UP-I7601 and UP-I7645) are owned by Air Almaty J.S.C. (LMY)
of Kazakhstan, but have been leased to, and operated by, Sigma Airlines[216] (SGL) of Kazakhstan since
October 2017.[217]

---

[216]   https://airsigma.pro/. Markov Str 11, Almaty, 050013, Kazakhstan. The company also has an office in Ajman, United Arab Emirates.

[217]   http://www.aerotransport.org/php/go.php?query=operator&qstring=Sigma+Airlines&where=126307&luck=. Restricted access.

17.    The Panel finds Sigma Airlines in non-compliance with paragraph 9 of resolution [1970 (2011)](#) for the provision of military support to HAF.

18.    The Panel also continues to maintain an overview of the activities of one other Ilyushin IL-76TD aircraft operated by Sigma Air (registration UP-17655).

**Appendix A to Annex 52:  Removal of Antonov AN-26 (UP-AN601) from Kazakhstan Civil Aviation Authority register**

Figure A.52.1
**Certificate of removal**



**ҚАЗАҚСТАН РЕСПУБЛИКАСЫ**
**ИНВЕСТИЦИЯЛАР ЖӘНЕ ДАМУ МИНИСТРЛІГІ**
**АЗАМАТТЫҚ АВИАЦИЯ КОМИТЕТІ**
*MINISTRY OF INVESTMENTS AND DEVELOPMENT*
*OF THE REPUBLIC OF KAZAKHSTAN*
*CIVIL AVIATION COMMITTEE*

**К У Ә Л І К**
*CERTIFICATE*

**ӘУЕ КЕМЕСІНІҢ ҚАЗАҚСТАН РЕСПУБЛИКАСЫНЫҢ**
**АЗАМАТТЫҚ ӘУЕ КЕМЕЛЕРІНІҢ  МЕМЛЕКЕТТІК ТІЗІЛІМІНЕН ШЫҒУЫ ТУРАЛЫ**
*OF  DE-REGISTRATION FROM CIVIL AVIATION AUTHORITY REPUBLIC OF KAZAKHSTAN*

**№ 196**

Осымен куәландырамыз, әуе кеме түрі:  **Ан-26**
*Hereby is confirm that present Aircraft type:*    *An-26*

Сериялық (зауыттық) нөмірі: **0503**
*Serial Number:*        *0503*

Меншік иесі:  **SPACE CARGO INC.**
*Which belong to:*  *SPACE CARGO INC.*

Қазақстан Республикасының азаматтық әуе кемелерінің мемлекеттік тізілімнен ШЫҚТЫ.
*was taken the State Register Civil aircraft Republic of Kazakhstan off.*

**Төраға**                                    **Б. Сейдахметов**
*Chairman*                                *B. Seidakhmetov*

М.О.

**2015 жыл 08 қазан**
*October 08, 2015*

S/2019/914

**Appendix B to Annex 52:  Removal of Ilyushin IL-18D (ER-ICS) from Moldova Civil Aviation Authority register**

Figure B. 52.1
**Certificate of removal**

REPUBLICA MOLDOVA
AUTORITATEA AERONAUTICĂ
CIVILĂ



REPUBLIC OF MOLDOVA
CIVIL AVIATION
AUTHORITY

CERTIFICAT DE RADIERE A ÎNMATRICULĂRII
*CERTIFICATE OF DEREGISTRATION*
*No./Nr.* CD-0418

Prin prezentul se certifică că aeronava de tipul ILYUSHIN IL-18D, nr. de serie 187009903, cu înmatriculare anterioară ER-ICS, a fost radiată din Registrul Aerian al Republicii Moldova, iar însemnele de înmatriculare ER-ICS au fost anulate.

*This is to certify that the aircraft type ILYUSHIN IL-18D, serial number 187009903, formerly bearing nationality and registration marks ER-ICS, has been removed from the Aviation Register of the Republic of Moldova and the marks ER-ICS have been cancelled.*

Data eliberării: 08.07.2015
*Date of issue:*

Director interimar
*Acting director*

Semnătura: _____ Radu BEZNIUC
*Signature:*

L.Ş.
*Stamp*

19-18816

19-18816

**Annex 53:        Summary of parallel currency security features**

1.        Annex 56 to Panel report S/2017/416 summarised the difference in security features between the CBL 20LYD and CBL 50LYD denomination notes printed by De La Rue Limited in 2013 and the parallel ECBL currency 20 LYD and 50 LYD denomination notes printed by *Goznak* J.S.C. in 2016.

2.        Tables 53.1 and 53.2 are an update to that report,[218] and summarize the security features of the higher denomination CBL 50 LYD notes printed by De La Rue Limited in 2013 and the parallel ECBL currency 50LYD denomination notes printed by *Goznak* J.S.C. in 2016 and 2019. The specialist report concluded that "the noticeable differences between the notes may cause uncertainty to the people and result in a reduced public acceptability". The currency is vulnerable to counterfeiting. Some of the security features are not fully explained in order to protect the security of the currency. In general bank notes have three levels of security features: 1) Level 1 for public recognition; 2) Level 2 for bank tellers; and 3) Level 3 for Central Banks.

Table 53.1
**Summary of publicly recognisable (Level 1) security features CBL 50 LYD denomination notes v *Goznak* 50 LYD denomination notes**

| # | Feature | CBL 50 LYD (2013) | "Goznak" 50LYD (2016) | Remarks |
|---|---------|-------------------|------------------------|---------|
| 1 | SPARK® Orbital™ feature printed in silk screen with optical variable ink. | Present. | Missing, replaced with an inferior Moon and Star printed in offset, which is fluorescent under ultra-violet (UV) light. | ▪ Key public recognition feature (Level 1). |
| 2 | Position and size of serial number figures. | Vertical and to the right of the holographic stripes with increasing size figures. | Two horizontal serial numbers with equal size figures. | ▪ Public recognition is compromised by differences in appearance. |

---

[218] Based on a security analysis by an internationally accredited and recognized testing laboratory used widely by Central Banks; Ugra (www.ugra.ch). 2013 CBL note serial number 0073446 and 2016 ECBL parallel note serial number 183001 were tested. EBCL 2019 notes serial numbers 1080001 and 1080002 were then compared against the 2016 results.

S/2019/914

| # | Feature | CBL 50 LYD (2013) | "Goznak" 50LYD (2016) | Remarks |
|---|---------|-------------------|------------------------|---------|
| 3 | Obverse design in intaglio Printing: Lighthouse image. | Original size. | Reduced in size. | ▪ Reduction necessary to accommodate the horizontal, red serial number. |
| 4 | Embossed latent image with denomination value in metallic ink on front side. | Present. | Missing. | ▪ Key public recognition feature (Level 1). |
| 5 | Windowed security thread. | Present (lenticular). | Different to original (holographic). | ▪ Significant change. |
| 6 | Embedded security thread. | Appears as a continuous black line when viewed against the light. | Missing. | ▪ Key public recognition feature (Level 1). |
| 7 | Holographic foil stripe. | Demetallized design. | Non demetallized. Different colours. Holographic images switch at different angles. | ▪ Key public recognition feature (Level 1). |

19-18816

Figure 53.1
**2013 CBL LYD50 (Obverse)**



Figure 53.2
**2016 *"Goznak"* LYD50 (Obverse)**



Figure 53.3
**2013 CBL LYD50 (Reverse)**



Figure 53.3
**2016 *"Goznak"* LYD50 Reverse)**



S/2019/914

Table 53.2

**Summary of <u>Machine and Central Bank</u> recognisable (Levels 2 and 3) security features CBL 50 LYD notes v "*Goznak*" 50 LYD denomination notes**

| # | *Feature* | *CBL 50 LYD (2013)* | *"Goznak" 50LYD (2016)* | *Remarks* |
|---|-----------|---------------------|-------------------------|-----------|
| A | Infra-red @900nm. | Right half of rock arch visible. | Rock arch split into two images. | ▪ This will affect machines that validate notes by reading the infra-red pattern. |
| B | Level 3 Covert feature - Enigma® feature. | Present. | Not Present. | ▪ Required for Central Bank only authentication. |
| C | Gemini® feature. | Present. | Yellow/Green in daylight. Yellow/Red under UV light. | ▪ Professional recognition is compromised by differences in appearance. |
| D | Detectable magnetic ink on horizontal serial number on left of notes. | Normal. | Lower levels detected. | ▪ Level 3 security feature ▪ This could affect the set-up of note sorting machines. |
| E | Embedded magnetic thread. | Present. | Uses a windowed thread with magnetic properties. | ▪ This could affect the set-up of note sorting machines. |
| F | Cornerstone® on corners to strengthen notes | Present. | Not present. | ▪ This will reduce the life cycle of the ECBL parallel currency. |

Figure 53.5
**2013 CBL LYD50 (Obverse)**



Figure 53.6
**2016 *"Goznak"* LYD50 (Obverse)**



Figure 53.7
**2013 CBL LYD50 (Reverse)**



Figure 53.8
**2016 *"Goznak"* LYD50 Reverse)**



S/2019/914

**Annex 54:     Communication from the Eastern NOC**

Figure 54.1
**Communication from the Eastern NOC**



S/2019/914



المؤسسة الوطنية للنفط
NATIONAL OIL CORPORATION

الإشاري :
الملـــف :
التاريـخ :
الموافـق :

**Attachment A:**

1. First of all it is pertinent to know that the current formal chairman of the board of NOC is Mr. Almabruk Sultan and not Mr M. Sanallah. Mr. Sultan was appointed by the Libyan Government, which is endorsed by Libyan House of Representatives (The parliament) on 26/12/2018. Sanallah, on the other hand was only appointed by an unrecognized acting minister of oil during the era of the Libyan Dawn government which is neither recognized internationally nor had any legitimacy in Libya. He was relieved from his position by the legitimate Libyan government and Parliament in 2014.

2. The official NOC Headquarter is in the city of Benghazi according to Parliament Law No.4 (2018) and not in Tripoli as alleged by Sanallah.

3. The on going presence of criminal militias in Tripoli and its persistent influence and control of how Libyan oil and gas revenue is handled was in part one of the main reasons that the government and its principal institutions, including NOC was relocated to Benghazi.

4. Our concern with splitting the NOC and the implications of this on the unity of the country and its governance was the main reason we felt that a graded peaceful transition of the leadership of NOC was needed. However it soon became obvious that pressure from various Tripoli region Militias continued to permit unabated the smuggling of subsidized petroleum products. Militias in Tripoli were also allowed to protect the NOC building in Tripoli and to oversee much of its transactions and embezzle it to pay enormous salaries and fees for shady security operations.

5. Despite the success of Libyan National Army (LNA) in recapturing and securing most of the Oil Fields and operations in Libya, Sanallah failed to acknowledge this to our international oil partners and continued to deal in his principal with criminal militias. There is no question that our company could not have increased and sustained its oil production at the 1.2 million daily barrels if it was not for the security achieved by LNA.

6. Our headquarters and its official board in Benghazi continued to tolerate much of the illegal measures taken by Mr. Sanallah so not to disturb production or compromise confidence with our international partners. However more recently we have noticed that Sanallah was loosing his presumed neutrality and making statements contrary to the realities on the ground and the delicacy needed to navigate around the risky potential of splitting the NOC, which we categorically refuse.



1

📞 (00218)614782560 - (00218)614782561   📍 بنغازي – البركة
📧 info@libya-noc.org   f https://m.facebook.com/NOCL.LIBYA/

S/2019/914



المؤسسة الوطنية للنفط
**NATIONAL OIL CORPORATION**

الإشاري :                                       التاريخ :
الملف :                                         الموافق :

7. As the war to liberate Tripoli from the wrath of controlling criminal militias commenced, Sanallah put the essential principal of neutrality in jeopardy by allowing our Libyan Petro-Air carriers to fly militias and their casualties from Misratah and Tripoli to Turkey, a country blatantly engaged in illegal weapon and fighter transfers to Libya.

8. There are many illegal and suspicious decisions made by Mr. Sanallah such as signing an inappropriate exclusive contract with Glencore to market Sarir-Messla blend and others. These have resulted in opening several investigations by us, the legitimate NOC based in Benghazi and by the energy oversight committee of the Libyan Parliament.

9. Despite numerous investigations and reports by the Libyan Audit Bureau, including one of 2017 (The annual report of Libyan Audit Bureau (LAB2017), page 209- year 2017) where it was clearly expressed that Sanallah's solo decision making and the lack of transparency has lead to suspicious transactions and potential kick backs which could be accountable under international and US laws.

10. Unexplained transactions; in the same report (LAB2017), page 219- line 21, Sanalla covered for paid business trips for 77 persons, expected to be militia members.

11. In his hungry quest for staying in the position illegally, Sanllah accusing the legitimate and legal NOC of participating in smuggling operations, ignoring intentionally that NOC is the only legitimate and legal body according to Libyan Laws and regulations.

12. NOC will take all required legal actions against Sanallah's actions and his disruptive and irresponsible statements.

**National Oil Corporation**



2

📞 (00218)614782560 - (00218)614782561   📍 بنغازي - البركة
✉ info@libya-noc.org 📘 https://m.facebook.com/NOCL.LIBYA/

## Annex 55:    Letter on the status of Chairman of the NOC

Figure 55.1
**Letter from the Permanent Mission of Libya to the United Nations**



MINISTRY OF FOREIGN AFFAIRS
LIBYAN MISSION
TO THE UNITED NATIONS - NEW YORK

وزارة الخارجية
بعثة ليبيا
لدى الأمم المتحدة – نيويورك

No.   000572

18 June 2019

Excellency,

    I have the honor to refer to your letter no. S/AC.52/2019/PE/OC.186 dated 17 June 2019, regarding a communication dated 12 May 2019, signed by an unnamed individual on behalf of a Board of Directors of the "Libyan Interim Government" National Oil Corporation located in Benghazi.

    In this regard, the Mission would like to reiterate and affirm that the National Oil Corporation in Tripoli, presided by Mr. Mustafa Sanaallah is the sole legitimate authority recognized by and works under the auspices the Government of National Accord to export crude oil and refined petroleum products.

    Henceforth, I would like to express my gratitude for your kind information and humbly urge the Panel not to merit communications that are not course through the Permanent Mission of the State of Libya to the United Nations.

    Please accept the assurances of my highest consideration.

Elmahdi Elmajerbi
Ambassador & Chargé d'Affaires



Lipika Majumdar Roy Choudhury
Coordinator
Panel of Experts Established
Pursuant to resolution 1973 (2011)
Concerning Libya

309 East 48th Street, New York, NY 10017 • Tel: 212-752-5775 • Fax: 212-593-4787 • Email: info@libyanmission-un.org

S/2019/914

## Annex 56: Statement by the eastern National Oil Corporation

Figure 56.1

**Undated statement issued by the eastern NOC, received by the Panel on 9 October 2019**

National Oil Corporation

### Statement No. 4 by the National Oil Corporation for 2019

The National Oil Corporation is concerned about statements made repeatedly by the Head of the United Nations Support Mission in Libya (UNSMIL), Ghassan Salamé, in connection with his interference in Libyan internal affairs in general and oil-related issues in particular; in doing so, he is clearly overstepping the terms of reference of his mandate in Libya.

In that regard, the Corporation, which is an agency of the Libyan Interim Government and sanctioned by the House of Representatives, wishes to stress that it is the sole sovereign institution charged with all administrative and technical aspects of the management of the oil sector, in accordance with the country's current regulations and laws.

It also wishes to underline that, under Libyan law, claims by Mustafa San'allah that he is the Chair of the National Oil Corporation and has the support of the so-called international community will avail him nothing when he is called to account before the Libyan courts, in particular given that he has thrown in his lot with the government of the militias.

UNSMIL and its head, to the extent that they have the right at all, should focus above all on combating the smuggling of fuel and oil derivatives that is going on in the west and south-west of the country, which amounts to the squandering of oil revenue, and having all those responsible placed under international sanctions.

Moreover, the head of UNSMIL should not turn a blind eye to the violations being committed by the parallel corporation in Tripoli by blocking the delivery of fuel to the civilian airports of Benghazi, Abraq and Zintan. Those violations amount to crimes against humanity.

In conclusion, the task with which the head of UNSMIL has been entrusted is to act impartially and without breaching the laws of the State of Libya.

God save Libya!

Board of Directors
[Stamp of the National Oil Corporation,
Statements, Board of Directors]

19-18816

**Annex 57:** **New board of directors of Brega in the east**

Figure 57.1
**Decision of the eastern NOC appointing a new board of directors of Brega in the east**



**S/2019/914**

Figure 57.2
**Official translation**

*Translated from Arabic*

**Libyan Interim Government**          **National Oil Corporation - Benghazi**

**Decisions**

**Decision No. 125 (2019) of the Board of Directors concerning the reconfiguration of the Board of Directors of the Brega Petroleum Marketing Company**

*The Board of Directors*

- Having considered the interim Constitutional Declaration of 3 August 2011, as amended, and:

- Act No. 25 (1955) concerning petroleum, as amended;

- Decision No. 10 (1979) reorganizing the National Oil Corporation;

- Decision No. 75 (2007) concerning the salaries of national employees of the National Oil Corporation;

- Decision No. 17 (2007) concerning rules and conditions of employment of the National Oil Corporation;

- Decision No. 267 (2007) concerning rules and conditions of employment of the National Oil Corporation;

- Act No. 12 (2010) concerning work relations and its implementing regulation;

- Decision No. 247 (2013) identifying the headquarters of certain entities;

- Decision No. 24 (2014) of the House of Representatives expressing confidence in the Libyan Interim Government;

- Decision No. 4 (2017) of the Office of the Presidency of the House of Representatives amending Decision No. 10 (1979);

- Decisions No. 276 and No. 277 (2017) of the Cabinet recording a judgment regarding the National Oil Corporation;

- Decision No. 879 (2018) of the Cabinet containing a dismissal and recording a judgment;

- Memorandum *ra-mim-alif*-669-18 of 11 February 2018 concerning the reconfiguration of the boards of directors of the subsidiary oil companies of the National Oil Corporation;

- The meeting of the tenth plenary assembly of the Board of Directors on 4 September 2019;

*Decides*:

Article 1

The Board of Directors of the Brega Petroleum Marketing Company is hereby reconfigured with the following membership:

| | |
|---|---|
| Mr. Khayrullah Salih Abdulsalam | Chair |
| Mr. Fathullah Muhammad Khayr al-Fazzani | Member |
| Mr. Abdulsalam Faraj Abdullah Isma'il | Member |
| Mr. Faraj Abdullah Zammut | Member |

Article 2

The new Board of Directors appointed by virtue of the present Decision shall act in accordance with the laws and regulations in force and the Basic Statute of the company with a view to achieving its goals and those of the oil sector and shall comply with the plans adopted for that purpose.

**S/2019/914**

Article 3

     This decision shall enter into force on the date of its issuance, and the relevant parties shall be required to implement it.

                                Board of Directors

                       Issued in Benghazi on 8 September 2019

19-18816

Figure 57.3
**Decision from the "interim government" endorsing the above decision adopted by the eastern NOC**



Figure 57.4
**Official translation**

**Libyan Interim Government**

**Presidency of the Cabinet**

**Decisions**

**Decision No. 90 (2019) of the Prime Minister containing the record of a judgment on Decision No. 125 (2019) of the Board of Directors of the National Oil Corporation regarding the reconfiguration of the Board of Directors of the Brega Petroleum Marketing Company**

The Prime Minister

Having considered:

- The interim Constitutional Declaration of 3 August 2011, as amended;

- The Financial Regulation Act of the State;

- Act No. 1 (1955) concerning petroleum, as amended;

- Act No. 10 (1979) reorganizing the National Oil Corporation;

- Act No. 12 (2010) enacting the Work Relations Act and its implementing regulation;

- Act No. 3 (2019) adopting the 2019 General Budget of the State;

- Decision No. 22 (2014) of the House of Representatives appointing the Head of the Libyan Interim Government;

- Decision No. 24 (2014) of the House of Representatives expressing confidence in the Libyan Interim Government;

- Decision 10 (2018) of the House of Representatives expressing confidence in certain ministers;

- Decision No. 3 (2019) of the House of Representatives expressing confidence in certain ministers;

- Decision No. 10 (1979) of the then General People's Committee reorganizing the National

Oil Corporation;

    - Decision No. 526 (2016) of the Cabinet endorsing the organizational structure and regulating the administration of the Cabinet Office;

    - Decision No. 125 (2019) of the Board of Directors of the National Oil Corporation concerning the reconfiguration of the Brega Petroleum Marketing Company;

    - Memorandum No. 38/2/1 of the Board of Directors of the National Oil Corporation dated 9 September 2019;

<div align="center">

*Decides*

</div>

Article 1

    By virtue of the present Decision and the requirements of the public good, Decision No. 125 (2019) of the Board of Directors of the National Oil Corporation concerning the reconfiguration of the Brega Petroleum Marketing Company is hereby endorsed.

Article 2

    This decision shall enter into force on the date of its issuance, the relevant parties shall be required to implement it, and it shall be published in the *Official Gazette*.

        (*Signed*) Abdallah Abdulrahman **al-Thinni**

        Prime Minister

        Issued on 13 Muharram A.H. 1441 (12 September 2019)

**Annex 58:**      Decision of the eastern LIA board of trustees

Figure 58.1
**Decision of the eastern NOC appointing a new chairman and board of directors of Brega in the east**



S/2019/914



Libyan Investment Authority
المؤسسة الليبية للاستثمار

قرار مجلس الأمناء رقم (2) لسنة 2019 م بإعادة تشكيل مجلس إدارة
المؤسسة الليبية للاستثمار

بعد الاطلاع :

- على قانون النظام المالي للدولة؛
- على القانون رقم (12) لسنة 2011 م وبشأن علاقات العمل واللائحة التنفيذية؛
- على قرار رقم (208) لسنة 2006 م بشأن تأسيس المؤسسة الليبية للاستثمار
- على القانون رقم (13) لسنة 2010 م بشأن التنظيم الإداري المؤسسة الليبية للاستثمار
- على قرار مجلس وزراء الحكومة الليبية الموقتة رقم (3) لسنة 2014 م وبشأن إعادة تشكيل مجلس أمناء المؤسسة الليبية للاستثمار.
- وعلى ما تقرر في اجتماع مجلس أمناء المؤسسة الليبية للاستثمار المنعقد بتاريخ 2018/11/8 المنعقد بتاريخ 2018/11/8 م بمقر ديوان رئاسة الوزراء بمدينة البيضاء
- وعلى ما تقرر في اجتماع مجلس إدارة المؤسسة الليبية للاستثمار المنعقد بتاريخ 2018/11/15 م بمدينة بنغازي

قــــرر

مادة (1)

يعاد تشكيل مجلس إدارة المؤسسة الليبية للاستثمار على النحو التالي :

| | |
|---|---|
| د. حسين محمد حسين | رئيسـا |
| د. الطاهر عبد الله القلموز | عضوا |
| الاستاذ. نجاة محمد يونس | عضوا |
| السيد. محمد احمد ابوكلش | عضوا |
| السيد. حسن خليل حسن | عضوا |
| السيد. محمد علي زيدان | عضوا |
| السيد. فوزي فرج موسى | عضوا |

مادة (2)

يعمل به من تاريخ صدوره وعلى الجهات المعنية تنفيذه

مجلس أمناء المؤسسة الليبية للاستثمار          صدري البيضاء2019/2/20م

شارع سالم سويكر المتفرع من شارع دبي – بنغازي – ليبيا
Email: info@lia.com.ly

Source: confidential

Figure 58.2
**Panel translation**

<div align="center">

**Decision of the Board of Trustees n°2 of 2018**
**On dismissing the Chairman of the Board of Directors of LIA and appointing a new one.**

</div>

After reviewing :

- The financial law of Libya.
- Law n°12 of 2011 on establishment of work relations and its executive list
- Decision n°208 of 206 on the establishment of LIA
- Law n°13 of 2010 on the administrative organization of LIA
- Decision n°2 of 2014 of the ministerial council of the interim government on the restructuring of the board of trustees
- On the outcome of the second regular meeting of the board of trustees on 17.9.2018 in Al Bayda

<div align="center">

**Decides :**

**Article 1:**

</div>

To dismiss Dr. Abdessalam Ahmed Al Kezzah from his duties as Chairman of the Board of Directors of LIA

<div align="center">

**Article 2:**

</div>

To appoint dr. Hussein Mohamed Hussein as new head of the BOD of LIA.

<div align="center">

**Article 3:**

</div>

This decision is valid upon issuance

**Signed**:  Board of trustees of LIA

**The Libyan Investment Authority**

**Decision of the LIA Board of Trustees n°2 of 2019 to restructure its Board of Directors**

After reviewing :

- Law n°12 of 2011 on establishment  of work relations and its executive list
- Decision n°208 of 206 on the establishment of LIA
- Law n°13 of 2010 on the administrative organization of LIA
- Decision n°2 of 2014 of the ministerial council of the interim government on the restructuring of the Board of Trustees
- The outcome of the second regular meeting of the Board of Trustees on 17.9.2018 in Al Bayda
  (d)
  (e) Decided to :

## Article 1:

Restructure the LIA's Board of Director as follows:

| | |
|---|---|
| Husein Mohamed Husein | Chairman |
| Taher Abdallah Al Gala'ouz | member |
| Najat Mohamed Younis | member |
| Mohamed Ahmed Abukelch | member |
| Hasan Khalil Hasan | member |
| Mohamed Ali Zaydane | member |
| Fawzi Faraj Musa | member |

## Article 2:

This decision is valid upon issuance

**Signed**: Board of Trustees of LIA

Issued in Al Bayda on 20.2.2019

Source: Confidential

S/2019/914

## Annex 59:     Letter of appointment of new focal point pursuant resolution 2146 (2014)

Figure 59.1
**Letter of appointment of new focal point**



**Annex 60:      Documented attempts to illicitly export crude oil from eastern NOC**

Figure 60.1
**Allocation Certificate dated 8 April 2019**



S/2019/914

Figure 60.2
**Allocation Certificate dated 16 May 2019**



المؤسسة الوطنية للنفط
**NATIONAL OIL CORPORATION**

التاريخ :
الموافق : 16/05/2019

الإشاري : C.O.M.19.05.0156
الملف :

To              : HASSAN ENERGY LIMITED
Attention       : Mr. MOHAMMED A. HAY
Reference No.   : C.O.M.19.05.0156
Subject         : Allocation Certificate

Allocation Certificate No 05/05/2019

National Oil Corporation of Libya (NOC) has the pleasure to allocate to **HASSAN ENERGY LIMITED** in our call, 1,000,000 bbls of Sarir/Messla blend crude oil loading Marsa El Hariga port On FOB **HASSAN ENERGY LIMITED (2018-C-007)** Contract No. **[005-May-2019],** to be loaded between 01st of July 2019 to 15th of August 2019, as per contract No. **HASSAN ENERGY LIMITED (2018-C-007) [005-May-2019]** And we will accommodate your nominated vessel accordingly.

Yours Sincerely,

Libyan Internal Goverment
National Oil Corporation

Crude, Gas & Products
Marketing Manager

**Dr. Farag H. Gaith**
**Acting/ Crude, Gas & Products Marketing Manager**
**International Marketing**

cc:
  – Member of the Board of Director for marketing.
  – Crude Dept.
  – Company file

بنغازي – البركة   (00218)614782560 - (00218)614782561
info@libya-noc.org   https://m.facebook.com/NOCL.LIBYA/

Figure 60.3
**Terms of reference for a Sales and Purchase contract, valid until 20 July 2019**



DEAL TERMS OF REFERENCE
Producer:
National Oil Company (NOC) – Libya
Seller:
ALLOCATION HOLDER (via NETOIL)
Buyer: TBN
Refinery:
To be notified by the buyer at least 14 days before first day of laycan for loading

Product: Crude oil
Origin: Libya
Grade:
Approx. blend of Sarrir 65% · Messla 35% (+/- operational tolerance)
Specifications:
API 36.5 [Assay Reports Attached]
Contractual Quantity:
Total Quantity 01 million US Barrels (+/- 5% operational tolerance)
Quantity:
Cargo to be 1,000,000 BBL (+/- 5 % Seller's option) Term of Contract:
First cargo Spot & then we agree on a Contract for subsequent deliveries Terms of delivery: CIF

Load-port:
Mersa al Hariga (Libya)
Discharge port: To be notified
Date range for loading:
First Cargo to be available for loading within 15 days after signing of SPA and receipt of Letter of Credit,
Price:
Based on FOB ex El Hariga; dated Brent Per US Barrel plus the freight as actual Pricing period:
05 days around BL date, 2 days before BL, 2 days after BL (1-1-0-1-1) where 0 is BL date; in case of BL
date is non-publication, then three immediate publications prior BL date and two after BL date shall be
used for pricing.

Payment:
By Irrevocable, Confirmed Letter of Credit (LC) payable at sight upon presentation of valid shipping
documents; LC to be issued from an acceptable Bank in verbiage provided by the Seller Documents for
payment:
1. Commercial Invoice (1 original + 3 copies) 2. Certificate of Origin 3. Original 3/3 Bill of Lading 4.
Certificates of Quality & Quantity issued by jointly appointed surveyor at Load- port 5. Time Chart 6.
Ullage Report 7. Master's Receipt for documents Invoiced Quantity: As per Bill of Lading
        Page | 2

Quality:
To be determined at Load-port before loading of the Vessel by jointly appointed surveyors; costs to be
shared equally Survey & Inspections:
By jointly appointed Independent Inspectors at Load-port
Insurance:
Seller to arrange and pay for Insurance of the cargo

S/2019/914

Title:
Title of the Oil to pass to the Buyer upon payment received in the Seller's designated bank account
Risk:
Risk of loss or damage shall pass to the Buyer when the Oil passes through the manifold connection of the Performing Vessel at Load-port.
Taxes & Duties:
Each part to pay their respective taxes
Laytime:
36 + 6 Hours SHINC
Vessel Nomination:
To be nominated by the Seller for acceptance of Buyer and Port Authorities, approvals shall not be withheld without assigning valid reasons
Demurrage:
As per CP of performing vessel
ISPS:
Parties shall comply with the requirements of International Code of Security of Ship & of Port Facilities.
Non-Disclosure:
Parties shall keep all information discreet & confidential and shall not share with third parties.
General Terms & Conditions: INCOTERMS & as agreed in SPA
        Page | 3

Applicable Law:
UN Convention on Contracts for the International Sale of Good of Vienna, 11 April 1980 Arbitration & Place:
International Chamber of Commerce at London
Validity:
This Term sheet is valid for signing of SPA between the Buyer & the Seller until 20 July 2019, subject to usual due diligence clearance
PROCEDURE:
1. Seller to issue this TOR/Deal Recap;
2. Buyer to negotiate & agree
3. Seller to issue draft of SPA & LC (open for negotiations) 4. Parties sign SPA & LC verbiage 5. Parties nominate their respective banks for transaction 6. Seller to nominate vessel and share Q-88 7. Seller to obtain approvals of nominated vessel from NOC and Load-port authorities 8. NOC to advise Load date range 9. Nominated vessel to tender NOR within Laydays for Loading 10. NOC shall provide permissions to Inspectors to conduct surveys, take samples and to perform their duties safely.
11. NOC shall issue Documents pertaining to Shipment.
12. Shipping documents are prepared
13. NOC shall let Vessel depart promptly and ensure safety of Vessel to International waters 14. Seller &/or NOC to lodge Shipping Documents in the Bank for Payment 15. Payment affected as agreed 16. Transaction completes We look forward hearing from you a favorable reply and hope to have a mutually beneficial long-term relationship with your esteemed company.

Thanking you in anticipation, Yours truly.

19-18816

Figure 60.4

**Inquiry in the market to charter a tanker to export crude oil from Marsa el Hariga (Tobruk), dated 30 September 2019**



**Sent:** Monday, September 30, 2019 5:15 PM

**Subject:** FW: Libya

Below inquiry received bss Libya/Curacao

Begin forwarded message:

**Subject: Libya**
**Date:** 30 September 2019 at 15:25:31 EET
**To:**

To               :
Kind Attention  : Chartering Desk
Date             : 30.09.2019

Privately Count Energy
12 X 1 Million barrels crude oil
Load 1/2 sp(s) Libya intention Marsa El Hariga / Tubrok
Discharge 1/2 sp(s) Curacao
Laycan Oct 2019 thru Sept 2020 – first cargo to be lifted 1 Oct / 15 Nov 2019
Laytime 96 hrs shinc
2.5 pct comm

Pls offer firm

Sources: Confidential.

S/2019/914

**Annex 61:     Jet A-1 aviation fuel sold quantities in the east**

Figure 61.1
**Jet A-1 aviation fuel sold quantities in the East.**



Source: Confidential

19-18816

Figure 61.2
**Unofficial translation**

**Brega Petroleum Marketing Company**

**Company Internal Communications**

| From Ali Mohamed Al Maqsabi | To Mr. Muftah Salim Salama |
|---|---|
| **Quality: Inventory Control Coordinator** | **Quality: Supply and Maritime Transport Control Specialist** |
| **Date: July 7, 2019** | **Subject: aviation kerosene sales during the first half of 2019** |

**After greetings,**

**Upon your request, please find below the sold quantities of aviation kerosene, in the Central region warehouses during the first half of 2019 in Litre regular grade**

| Sales Month | Al Mangar warehouse sales | Tobruk warehouse sales | Brega warehouse sales | Sarir warehouse sales | Airports warehouses sales |
|---|---|---|---|---|---|
| January | - | 1,022,000 | 40,000 | - | 3,478,089 |
| February | - | 1,290,000 | 40,000 | - | 3,507,958 |
| March | - | 925,000 | 525,000 | - | 4,487,080 |
| April | 2,095,000 | 1,035,000 | 199,000 | - | 6,558,457 |
| May | 205,000 | 1,920,000 | 180,000 | - | 8,763,620 |
| June | - | 1,170,000 | 100,000 | 732,000 | 7,307,491 |
| Total | 2,300,000 | 7,362,000 | 811,000 | 732,000 | 34,102,695 |

**Overall total = 45,307,695  litres equivalent of 36,000 metric tons**

**Regards,**

**Inventory Control Coordinator**

**Ali Mohamed Al-Maqsabi**

Source: Confidential

**Annex 62:      Arrest warrants issued by the Attorney General's Office on 7 February 2019**

Figure 62.1
**Arrest warrants issued by the AGO on 7 February 2019**


1.     The Panel holds a copy of the above indicated document.


Figure 62.2
**Official translation of the above**

2.     The Panel holds a copy of the above indicated document.

**Annex 63:     List of trusted petrol stations issued by Brega**

Figure 63.1
**List of trusted petrol stations issued by Brega**

1.    The Panel holds a copy of the list of trusted petrol stations issued by Brega.

## Annex 64:     Quantities of refined products distributed by Brega since 2012

Table 64.1
**Quantities of refined petroleum products distributed by Brega, 2012 to April 2019, in litres.**

| Year | Region | Gasoline | Diesel | Kerosene |
|------|--------|----------|--------|----------|
| 2012 | East | 1,296,561,000 | 426,747,200 | 67,379,000 |
|  | Tripoli | 1,582,850,000 | 455,382,600 | 135,243,000 |
|  | Misrata | 523,033,000 | 247,243,500 | 0 |
|  | Zawiyah | 764,710,000 | 326,092,000 | 0 |
|  | Sebha | 252,831,000 | 116,494,650 | 50,000 |
| 2013 | East | 1,452,890,500 | 537,694,300 | 36,640,800 |
|  | Tripoli | 1,823,994,500 | 669,305,200 | 128,400,000 |
|  | Misrata | 637,079,300 | 367,286,000 | 0 |
|  | Zawiyah | 893,711,000 | 372,078,000 | 0 |
|  | Sebha | 314,360,000 | 179,614,500 | 0 |
| 2014 | East | 1,288,186,000 | 577,309,700 | 577,309,700 |
|  | Tripoli | 1,254,861,900 | 402,610,500 | 74,834,000 |
|  | Misrata | 771,646,000 | 437,767,000 | 101,000 |
|  | Zawiyah | 1,175,677,000 | 472,764,000 | 0 |
|  | Sebha | 169,244,200 | 113,300,000 | 0 |
| 2015 | East | 1,295,185,500 | 475,190,750 | 5,581,650 |
|  | Tripoli | 1,312,224,000 | 315,791,500 | 43,238,000 |
|  | Misrata | 554,943,000 | 280,387,000 | 0 |
|  | Zawiyah | 1,162,978,000 | 480,982,000 | 380,000 |
|  | Sebha | 252,050,000 | 90,833,000 | 0 |
| 2016 | East | 1,353,369,000 | 469,718,800 | 25,361,000 |
|  | Tripoli | 1,781,998,000 | 531,148,500 | 45,244,000 |
|  | Misrata | 660,936,000 | 335,235,000 | 0 |

| Year | Region | Gasoline | Diesel | Kerosene |
|---|---|---:|---:|---:|
| | Zawiyah | 1,045,820,000 | 512,660,000 | 0 |
| | Sebha | 356,202,000 | 134,956,000 | 0 |
| 2017 | East | 1,427,195,000 | 508,418,300 | 24,621,500 |
| | Tripoli | 1,867,226,000 | 360,732,500 | 42,172,000 |
| | Misrata | 812,916,000 | 510,133,000 | 68,000 |
| | Zawiyah | 830,990,000 | 190,300,000 | 0 |
| | Sebha | 171,868,000 | 33,330,000 | 0 |
| 2018 | East | 1,541,191,000 | 570,349,400 | 21,005,500 |
| | Tripoli | 2,01,989,800 | 237,999,000 | 6,306,000 |
| | Misrata | 911,110,000 | 475,107,000 | 120,000 |
| | Zawiyah | 739,450,000 | 179,645,000 | 0 |
| | Sebha | 25,043,000 | 2,251,000 | 0 |
| 2019 | East | 519,035,000 | 217,694,030 | 12,380,000 |
| (until April) | Tripoli | 445,165,000 | 76,528,000 | 6,700,000 |
| | Misrata | 330,380,000 | 163,860,000 | 84,000 |
| | Zawiyah | 223,690,000 | 68,790,000 | 0 |
| | Sebha | 41,908,000 | 7,838,000 | 0 |

[a] Brega Petroleum Marketing Company

## Annex 65:    Letter calling for abolishment of the monopoly of the distribution companies

Figure 65.1
**Letter of the Minister of Interior**

*Translated from Arabic*

**State of Libya**
**Government of National Accord**
**Ministry of the Interior**
**Office of the Minister**

Ref. No.: *shin.sin*/1154
Date: 18 August 2019

Sir,

I write in response to the letter of the Chair of the National Oil Corporation (ref. no. 3457/4-1-25) of 13 August 2019 regarding the low level of fuel withdrawals by the four petroleum distribution companies (Sharara Oil Services, Al-Rahila, OiLibya and Highway Service Company) and their failure to monitor petrol stations and their operations.

The low withdrawal rate has led to a crisis in the supply of fuel to petrol stations and the closure of some stations. There is no justification for any of this, given that the Ministry has provided all petrol stations in and around Tripoli with the required protection. Security officials in no way interfere with the operation of those petrol stations and it is believed that the companies may be deliberately holding back from taking delivery of their daily fuel allowances in order to justify requests to increase oil imports from abroad or to reopen petrol stations closed by court order as the Office of the Public Prosecutor conducts a criminal investigation into smuggling activities.

Given all of the above and the fact that the matter relates to a basic necessity that affects security and services, the Ministry deems it necessary to issue a decision on ending the monopoly exercised by the four fuel distribution companies on this activity, in order to ensure that petrol station owners and operators work directly with the Brega Petroleum Marketing Company and obtain their supplies from its depots, without any intermediaries to facilitate operations. This should fully resolve the current crisis.

(*Signed*) Fathi Ali **Bashagha**
Acting Minister of the Interior

Chair of the Presidential Council
Government of National Accord

cc:
Director of the National Oil Corporation
Classified matters department of the Office

## Annex 66:     Letters issued by the Municipal Council of Zawiyah

Figure 66.1
**Official translation**

*Translated from Arabic*

Municipal Council of Zawiyah
Date approved: 12/11/2018

Re: Response to media statements made by the board of the National Oil Corporation

(a) The oil refining complex in Zawiyah comprises:

1. The Azzawiya Oil Refining Company, with its refinery, oil terminal and oil blending and asphalt production facilities;

2. The Brega Petroleum Marketing Company (fuel and gas supply depots);

3. The Akakus Oil Operations and its oil terminal;

4. The Specific Training Centre for Oil Industries;

5. The Arabian Gulf Oil Company (oil terminals).

(b) We would like to state that:

1. The surface area of the oil complex totals 250 ha and falls within the city limits;

2. The Zawiyah oil refinery was established in 1973 and has not been further developed since;

3. The safety fences have been in a state of disrepair since 2008 and are not fit for purpose;

4. This vast area has no security cameras, alarms or electronic protection systems, and the guards are not authorized to bear arms;

5. The area is not equipped with internal or perimeter gates to control movement within or around the oil complex;

6. Perimeter watchtowers are dilapidated and out of use;

7. The Zawiyah oil complex has not suffered any systematic attacks or sabotage and has not been the scene of armed clashes;

8. Unlike in the central and eastern parts of the country, the oil complex has not been subject to closures; nor have exports been interrupted. On the contrary, any stoppages or strikes have been extremely limited in scope and have been resolved with minimal losses through the use public pressure;

9. All the installations in the oil complex are meeting production targets and the Akakus company is exporting approximately one third of Libyan output through the Zawiyah oil terminal;

10. During the battle of Tripoli International Airport in 2014 and the fire that subsequently engulfed the Tripoli depot, it was the firefighting squad from the Zawiyah oil complex that was first on the scene to contain the fire; the Zawiyah depot and oil tankers were the nearest at hand to tackle the fuel crisis in the capital and to resume work after the recent crisis there;

11. We have referred to the report of the fuel crisis committee on what lies behind the smuggling. Reports by the depot management confirm that the amount of fuel being siphoned off daily has continued to drop and, compared with the Tripoli and Misratah depots, is the lowest in the country;

**S/2019/914**

1902588E                                          2

12. The irregularities and breaches within the oil complex were all carried out by individuals who infiltrated it through the main gate or openings in the perimeter fence;

13. We believe that the timing of these allusions to a possible suspension of operations at the Zawiyah is not conducive to carrying out economic reform, given that production has picked up again and the price of crude has risen.

(c) The Municipal Council of Zawiyah has been taken aback by statements casting the City of Zawiyah, which is responsible for the security of the oil complex, in a bad light before public opinion, both at home and abroad. The daily acts of sabotage, closures and kidnappings of oil workers to which all oil facilities – fields, refineries and terminals – and even the offices of the National Oil Corporation itself are subjected elicit no such response. The City of Zawiyah, however, has been scrupulous about maintaining security at the oil complex. Some 7,000 employees, regular visitors and students enter and leave the complex every day. We must ask, what has the National Oil Corporation done since 2011 to support sustainable development or to remediate harm suffered by the population and the environment? We demand a commission of inquiry to examine these facts closely and verify them so that we might present a true picture of the City of Zawiyah.

Yours sincerely,

(*Signed*) Eng. Jamal Abdulnasser **Bahr**
Mayor of the Municipality of Zawiyah

19-18816

## Annex 67:     Routes employed by fuel smugglers from Zawiyah

Figure 67.1
**Routes used and main check points crossed by fuel smugglers**



A.   Located at 32°45'29.8"N 12°41'31.3"E, is the first check point after the oil complex, under the control of an armed group affiliated to the Awlad Sagir tribe.

B.   Located at 32°28'37.9"N 12°40'33.0"E, in the town of Bir Bin Shuaib, is the second check-point common to both routes, under the control of an armed group affiliated to Awlad Sagir tribe with some elements from the Al Hirarat tribe.

South Route:

C.   Located at 32°28'37.9"N 12°40'33.0"E, this check point is known as the "T-Check Point", under the control of Imad al Tarabulsi forces.

D.   Located at 32°01'15.5"N 11°56'45.1"E, in the town of Shakshuk, is under the control of armed groups from Jadu.

West Route:

E.   Located at 32°33'49.3"N 12°25'15.2"E, this check point is known as "roundabaout al-Jeweili" and is under the control of Zinati armed groups.

F.   Located at 32°34'12.9"N 12°20'16.8"E, this check point is known as "South Surman route" and is under the control of Zinati armed groups.

G.   Located at 32°45'33.8"N 12°28'22.5"E, in the city of Sabratah, this check point is under the control of listed individual  Mus'ab Mustafa Abu al Qassim Omar (LYi.024), a.k.a. Musa Abu Ghrayn.

H.   Located at 32°50'36.1"N 12°14'35.0"E, in the western exit of the city of Sabratah, near the entrance of the Mellitah Oil and Gas complex, this check point was under the control of listed individual, Ahmad Oumar Imhamad al-Fitouri (LYi0.23), a.k.a. Al Ammu Dabbashi, and now is controlled by the Sabratah Millitary Council.

S/2019/914

## Annex 68: Specifications of the diesel oil imported by Libya

Figure 68.1
**Specifications for diesel oil**

### Libyan specification for Diesel Oil no. (1) 126/2007

| No | TEST NAME | METHOD | UNIT | Limit |
|---|---|---|---|---|
| 1 | Specific Gravity @ 15.6 ° C | ASTM D-1298 | | report |
| 2 | Distillation Recovery @ 250 °C | ASTM-D-86 | Vol.% | < 65 |
| | Recovery @ 350 °C | ASTM-D-86 | Vol.% | 85 (min.) |
| | 95% vol. | ASTM-D-86 | °C | 360 (max) |
| 3 | Flash point | ASTM-D-93 | °C | 60 (min.) |
| 4 | Viscosity @ 40 °C | ASTM-D-445 | cSt | 2 - 5 |
| 5 | Pour Point | ASTM-D-97 | °C | Winter  -1 (max) Summer  +3 (max) |
| 6 | Total Sulfur | ASTM-D-4294 | Wt% | 0.1 ( max) |
| 7 | Heat of Combustion (Gross) | ASTM–D- 4868 | Kcal/kg | 10600 (min) |
| 8 | Cu Corrosion (3hours@ 50 °C) | ASTM-D-130 | | No. (1) |
| 9 | Acid No. (Total Acidity) | ASTM-D-974 | mg/KOH/g | 0.1 |
| 10 | Carbon Residue (CONR)10%RES | ASTM-D-189 | Wt% | 0.15 (max) |
| 11 | Ash Content | ASTM-D-482 | Wt.% | 0.01 (max) |
| 12 | Cetane Index by calculation Cetane index by measuring | ASTM-D-976 | | 46 (min) 51 (min) |
| 13 | Cloud Point | ASTM-D-2500 | °C | Winter + 3 Summer +6 |
| 14 | Polyaromatic | ASTM-D-6591 | °C | 11 (max) |

19-18816

**Annex 69:      Indication of the area where Ship-to-Ship transfers of Libyan fuel are taking place**

Figure 69.1
**Approximate location of the area where STS transfers. 34°8'25"N, 11°35'25" E**



S/2019/914

**Annex 70:      LIA strategy**

Figure 70.1
**LIA strategy to improve transparency, governance and accountability**



Libyan Investment Authority                                    المؤسسة الليبية للاستثمار

## THE LIA'S TRANSFORMATION STRATEGY

**Background**

The LIA is investing in a comprehensive 12-18 month strategy of transformation to improve transparency, governance and accountability in the management of the Authority and its assets.

The LIA Board of Directors are fully committed to rebuilding trust and confidence in the LIA - to demonstrate to the United Nations Sanctions Committee (and its Panel of Experts); third party countries; outside investors and others that it follows international best practice for sovereign wealth funds, in keeping with the Santiago Principles.

It is acutely aware that the effect of UN sanctions on its assets has often placed a heavy burden on the banks with which it works. By implementing the strategy, the LIA Board of Directors is seeking to forge new and productive relationships with banks and financial institutions.

The LIA's strategy has three key elements:

(1) improved internal governance of the LIA and its approach to the management of its assets;

(2) the protection, preservation and growth of the LIA's asset base; and

(3) the LIA's approach to potential disputes and litigation.

The objectives of this strategy are to:

(1) to ensure the best practice management and protection of the LIA's assets - frozen and unfrozen - within the existing sanctions regime and in accordance with the Santiago Principles for sovereign wealth funds in accordance with the LIA's purpose: for the benefit of Libya and its people;

(2) provide improved independent, verifiable financial information about the LIA's investments, including reporting on their performance; and

(3) ensure that the LIA's assets are controlled and managed by LIA employees rather than third parties who have no accountability to the LIA.

The LIA Board of Directors believes that the strategy with improve significantly the professionalism of the LIA and will bring its operations in line with global best practice for sovereign wealth funds; enabling it to manage its assets as effectively and as efficiently as possible.

**Long Term Strategy**

This strategy for transformation in intended to be completed within 12-18 months and is focussed on specific projects.

In parallel, the LIA is also continuing with its long term strategy to improve and restructure its overall investment portfolio with the ultimate goal of returning to a premium profit margin, with sustained value growth and improved investment decision making.

As part of this long term strategy, the LIA are continuing their work with International independent well known companies with setting out a long term investment policies.

1

Libyan Investment Authority  المؤسسة الليبية للاستثمار

### Governance and Management

The governance and management reforms element of the LIA's strategy involve an extensive programme to ensure that the LIA is able to observe international best practices for sovereign wealth funds and for the LIA's frozen funds to be managed as effectively and as efficiently as possible within the framework of the United Nations' existing sanctions regime.

Under these reforms, the LIA is committed to taking concrete and practical steps to create more efficient and coherent internal structures and procedures to provide greater transparency to its activities and, ultimately, to protect and grow its investments astutely.

For example, the LIA has commenced in implementing with a high qualified global training institutions for training and development of its staff and is embarking upon a programme in partnership with the international community parites to improve its accountability and internal management systems.

The LIA has also become a member in the International Forum of Sovereign Wealth Funds (IFSWF) to aim for a greater level of governance.

The LIA Board of Directors acknowledge and recognise the size of the task. Implementing the strategy is challenging and the reforms are reliant upon external professional consultants being hired to provide both expert and independent guidance and resource. For example, the LIA Board of Trustees has given permission to the LIA Board of Directors to propose external auditors and experts in forensic review. In addition, international consultants with relevant first class expertise will be appointed over the coming months to advise on internal management reforms, as well as investment reporting; forensic capability and project and process management.

These reforms will require the co-operation of the banks and financial institutions which manage and have custody of the LIA's assets – so that the LIA can properly evaluate its investments and make informed choices with respect to future dealings.

The LIA's strategy is fundamental to the LIA's contribution to economic reform in Libya and has been discussed and adopted by the LIA Board of Directors .

### Asset Protection

The asset protection reforms element of the LIA's strategy are designed – within the existing sanctions regimes - to protect the LIA's assets (frozen and unfrozen) becoming subject to unwanted attachment and/or other enforcement orders where parties to disputes have obtained judgments and orders against the State of Libya and/or other Libyan state entities - as has been attempted in certain jurisdictions.

Too often third parties with claims against the State of Libya have simply sought to attack LIA assets by way of court enforcement applications, as such assets are generally of high value and are perceived to be readily available in numerous jurisdictions. However, the LIA is not an emanation of the State of Libya and its assets are not to be used to cover judgments against Libya.

### Legal

The LIA recognises that its reputation has been impacted by its involvement as a counterparty in litigation and significant efforts are being made to ensure that the LIA alone (and not third parties with little, if any, accountability) manages and directs its disputes and ensures that, where formal proceedings become necessary, they are handled efficiently and effectively – to serve the LIA's best interests – both long and medium term and legally and commercially.

The intention is also to reduce senior management time in managing a portfolio of international litigation, which in turn distracts from the LIA's ability to deal with its core business.

A significant number of the LIA's disputes involve individuals purporting to act on behalf of, or giving instructions on behalf of, the LIA. This situation has arisen directly out of a dispute concerning the valid Chairman of the Authority, which the LIA Board of Directors (appointed by the Government of Accord's Council of Ministers) is actively seeking to bring to a close in the English Courts.

2

**Libyan Investment Authority**  المؤسسة الليبية للاستثمار

### Conclusion

The LIA's reform strategy and long term strategy are both fundamental to ensuring that the Authority remains profitable and that its assets are safeguarded for the future of Libya and its people.

This is imperative because the LIA has a critical contribution to make to economic reform in Libya and it hopes that banks and financial institutions that wish to work in partnership with the LIA share this vision.

The implementation of the reform strategy is being carried out in full co-operation and agreement with the other key economic and political institutions and international community parties has been discussed and adopted by the LIA Board of Directors.

We look forward to working together with world-class banks and financial institutions to further the objectives described above.

Dr. Ali Mahmoud Hassen Mohammed
Chairman&CEO
**Libyan Investment Authority**

3

**Annex 71:    Legal and other issues faced by designated entities**

**Legal disputes**

1.    Supreme Court of Libya - Details of the two appeals, which the Supreme Court of Libya decided on 10 April 2019 were provided in annex 58 to S/2018/812.

2.    It should be noted that the Administrative Chamber of the Supreme Court has set aside the two judgments of the Administrative Chamber of the Benghazi Court based on that Court's lack of jurisdiction. The Supreme Court made no findings on the main grounds, viz., the matter of legality of the formation and functioning of the Board of Trustees and, consequently, that of the Board of Directors.

**Other legal cases in Libya**

3.    The court case filed by Mr. Abdulmagid Breish is pending.

4.    The Panel has learned that a former Chairman of LIA, Mohsen Derrigia, had filed a case in the Tripoli Court, challenging his removal as he was not formally dismissed. The lower court had turned down his application on the ground that decisions of the Board of Trustees are not subject to legal review. The Supreme Court, in its decision of 20 March 2019, accepted his appeal and overturned the judgment of the lower court.

5.    United Kingdom – The case is before Mr. Justice Andrew Baker in the Queen's Bench Division, Commercial Court. The applicant here is Dr. Ali Mahmoud Hassan Mohamed. The respondents are the Receivers, the LIA, Mr. Abdulmagid Breish, former Chairman of the LIA and Dr. Hussein Mohamed Hussein Abdlmola, Chairman of LIA east.

6.    The applications before the Court seek: A declaration that Dr. Mahmoud has been since 15 July 2017 and remains validly appointed as Chairman of the LIA with authority, therefore, to exercise control over the property the subject of the receivership order in question; an order that the respective receivership order be discharged with whatever may be the appropriate consequential orders and directions, including for transfers of assets in the hands of the receivers.

7.    After detailed discussion, Justice Baker held on the preliminary issues:

   a.  *"The question of which body represents or has at any material time represented the executive authority and Government of Libya falls to be determined, if it arises before this court, under English law; and*

> b. *The executive authority and Government of Libya is represented today and has been represented since at least 19 April 2017 by the Government of National Accord and the Presidency Council, and that is so if and insofar as relevant to and for the purpose of Article 6 of Law No. 13 of 1378 DP (2010) made by the then General People's Congress of Libya or for any other purpose to which the question might matter if it arises before this court in relation the Applications."*

8.    By further order of 10 July 2019, the respondents, Breish and Hussein, were given permission to appeal in respect of the above Order of 14 February 2019.

9.    The issues to be tried were listed in Annex 1 of the order dated 10 July 2019. Permission was also given for expert evidence in the field of Libyan law. The issues to be considered by the experts are detailed in Annex 1 of the order dated 25 July 2019.

10.    Since there was a dispute over authority, the Court appointed receivers who would handle particular assets and pursue the litigation on behalf of LIA (paragraph 16 of Annex 58 to S/2018/812). The Panel does not have full details of these cases.

11.    Proper conduct of litigation is essential as some assets of LIA are subject to attachment, or attempts are being made to attach. The claims leading to such attachments are not against the LIA, but against the Libyan state for pre-2011 contracts. Lack of proper monitoring and defence of these cases risks loss of LIA assets.

**Long Term Portfolio (LTP)**

12.    The LIA authorities explained the difficulties they encounter in managing the assets of the Long Term Portfolio. The Panel has confirmed that the assets (approximately US$ 10 billion) have been held in the name of LFIC from well before the assets freeze became operative and are all frozen. These assets are generating profit.

13.    Representatives of the LTP and of the BoD of the LIA in Tripoli emphasised that the LTP was a separate company and pointed to its registration in 2018 in the Commercial Register of Tripoli to prove this point. The Panel, however, ascertained that decision 767 of 1991 created a committee to manage a portfolio to invest the gains from shares in FIAT, sold for substantial profit in the late 1980s. This decision did not create a legally independent entity. It has neither articles of association nor a certificate of incorporation. This portfolio was run by the LFIC. Currently, all the investments are in the name of the LFIC. Previous Chairmen had recommended the integration of this Portfolio into the LIA but this was not done. The LIA claims that the LTP is a separate legal entity and has appointed a Chairman and BoD for the LTP. Previous Chairmen of the LIA have stated that is not a separate legal entity.

14.   The Panel has not yet confirmed the validity or otherwise of the claims above, as these have arisen post 2011 and would not affect the assets freeze. These assets were, and are, still legally in the name of LFIC, which is acknowledged by the LIA. Regardless of whether the LIA chooses to nominate a new BoD, as was done in 2017, the assets cannot be legally transferred, more so as the legal existence of LTP as an independent company, is not free from doubt.

15.   The BoD of the LIA in Tripoli reconstituted the board of LTP by decision number 20/2017 issued in December 2017. Sami Mabrouk was removed as chairman of the LTP and Atef Al Bahri was appointed the new chairman per the decision. Sami Mabrouk is resident in Jordan as the head of the representative office of the LTP there. He left Tripoli in 2014 to establish this office, which was registered in Jordan on 6 August 2015. The Panel has seen the decision of the BoD of the LIA, signed by Hassan Bouhadi, then chairman, to establish the office to Jordan.[219] Sami Mabrouk´s refusal to hand over to Atef al Bahri has engendered a dispute between the two offices, with even the Jordanian authorities refusing to recognize the appointment of Atef al Bahri. Sami Mabrouk also challenged his removal in Tripoli courts.

16.   The assets in Jordan are apparently frozen, but the Panel awaits supplementary information to determine the proper implementation of the assets freeze. The Panel is further enquiring into the allegations of mismanagement and misappropriation of funds by various Libyan authorities.

17.   An audit of the funds, other financial assets and economic resources, belonging to the LTP and its representative office in Jordan may shed light on the effective implementation of the assets freeze. An audit should encompass all assets, which are declared to be not subject to the assets freeze, and all assets controlled directly or indirectly. It is known, for instance, that large sums were transferred in the past for the purported administrative running of the LIA Malta office. It is necessary to verify how these transfers were effected and how these sums were not subject to the assets freeze.

18.   This case also illustrates the confusion generated by two boards of LIA, one in Tripoli and one in the east and how this affects the management of LIA assets (see paragraph 23).

**Issues with financial institutions and member states**

19.   Both designated entities face problems with the KYC processes, particularly in HSBC UK and HSBC Luxembourg, and are consequently unable to access to or obtain information on their funds even though the banks are collecting its monthly management fees. The completion of the KYC process,

---

[219]  Reference to Hassan Bouhadi in paragraphs 217 and 218 of S/2017/466.

which includes updating of LIA's authorised signatory list, is linked to the pending litigation in the United Kingdom.

20.    The Panel specifically asked the designated entities if the national regulator had been approached. Their response was that it is time consuming and they cannot afford the delay. This does not appear convincing as the net result is that they still cannot have access to the funds. The Panel advised that they could submit exemption requests as per the provisions of the resolutions. The representatives of the designated entities responded by pointing out instances of considerable delay at the level of the financial institutions and the national authorities in processing the documents and sending onwards to the Committee. This issue could be addressed by simplified and quicker procedures for processing exemption requests.

**Implementation Assistance Notice 6**

21.    LIA is facing problems of financial flow pursuant to issue of IAN 6 as funds which were earlier freely available are now frozen. When access to funds is requested, some financial institutions delay and seek clarification as to whether the funds are free or frozen.

22.    LIA also raised the issue of funding of subsidiaries, one being Libyan African Investment Company (LAICO). Earlier, the interest from frozen accounts, which was considered free money, contributed to the debt payments of hotels managed by LAICO. This is no longer possible. LIA now requires approval for release of frozen funds for payment of the outstanding loans of the hotels. LIA is using LFIC funds in Libya to fund the LAICO hotels. This is in terms of a decision of the BoT of LIA. LAICO is not subject to the UN assets freeze. It is, however, subject to the assets freeze under EU regulations. Nevertheless, it appears that LIA had been utilising their funds, which ought to have been frozen, to help LAICO out of its financial difficulties. Now that these funds, being income accrued from frozen funds, have been correctly frozen, LIA is making known its difficulties. This issue is relevant in the context of governance and management issues of LIA and its subsidiaries.

**LIA East**

23.    The 'interim government' continues to appoint a parallel Board of Directors for the LIA. Dr. Hossein is the current Chairman and he is also a party to the court case relating to the removal of the receivers, pending in the United Kingdom. This Board has no control over the LIA assets. Nevertheless, this is one of the issues which make financial institutions wary in allowing access to funds.

**Annex 72:     Designated individuals**

1.     On 16 February 2019, the Panel interviewed Mohammed Kashlaf (LYi.025) and Abd Al-Rahman al-Milad (LYi.026) in Libya. The Panel explained the assets freeze and travel ban measures, including the delisting procedure to them.

2.     Mohammed Kashlaf (LYi.025) said that he works for the PFG, and he confirmed that he is still receiving his salary from the Ministry of Defence through the PFG. Since 2014 he has been tasked with securing the perimeter of the oil complex in Zawiyah. He requested sight of the evidence submitted for his designation as he cannot prepare a defence without it.

3.     Abd Al-Rahman al-Milad (LYi.026) explained that he had been in charge of the Coast Guard port facility at the Zawiyah oil complex since 2013. He also asked for the evidence leading to his designation. He claimed that he had saved many migrants and referred to his role in seizing several vessels. He refused to provide his pay slip or any other documentation.

**Annex 73:     Suggestions for passenger profiling system**

1.     Some countries have developed their own system to process passenger information and some others use the Global Travel Assessment System (GTAS), which is a license-free software application, developed by the US Customs and Border Protection and made available by the World Customs Organization (WCO) to member countries free of cost. GTAS is an Open Source web application for improving Global Security by using industry-standard Advance Passenger Information (API) to screen commercial air travellers. It was developed in response to resolution 2178 (2014) to help the world combat terrorism and improve travel security for everyone.

2.     For this purpose, the following are required:

   c.   Legislation mandating the airlines/master of the vessels etc. to electronically submit passenger information in a prescribed format at stipulated time to the competent authorities (Customs/Immigration/Border Force). Some countries may ask for only basic travel information of the passengers, collected before the departure of the aircraft (API- Advance Passenger Information) or it can be more detailed including information furnished by the passenger at the time of purchase of ticket (both API and PNR data).

   d.   The competent authority can screen the passenger information using an automated system, against certain dynamic risk parameters, to identify the targeted or risky passengers. Using this system, persons subject to travel ban can easily be identified, when they enter or leave a country.